FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

2015 DEC -4   AM 8: 33

| | |
|---|---|
| ANGELA DEBOSE,            ) | |
|                          ) | |
|        Plaintiff,        ) | |
|                          ) | |
| v.                       ) | CASE NO: 8:15 cv 2787 T 17 AEP |
|                          ) | |
| USF BOARD OF TRUSTEES, USF, and  ) | |
| ELLUCIAN, L.P.,          ) | |
|                          ) | |
|        Defendants.       ) | |
| _____/ | |

## COMPLAINT

COMES NOW the Plaintiff, Angela DeBose, and brings this action against the

Defendants, University of South Florida Board of Trustees (hereinafter referred to as "USF"),

and Ellucian Company or Ellucian, L.P. (hereinafter referred to as "Ellucian") and alleges as

follows:

1. This is a personal action for damages arising from deprivations of all of Plaintiff's

Civil Rights under 42 U.S.C. §1983, and rights secured by the Civil Rights Act of 1964, as

amended and 42 U.S.C. §1981 as amended and other laws of Rights under the Constitution of the

United States, and as more fully set forth below for violations of the Fourteenth Amendment and

for Rights in Contract that were violated by the Defendant under "color of Law". Angela

DeBose (hereinafter referred to as "DeBose" or "Plaintiff") seeks redress for Defendant's

discriminatory and retaliatory actions and damages for the personal injuries sustained by the

Plaintiff as a direct and proximate result of the wrongful conduct of the Defendants in connection

TPA - 33691
$400

1

with her employment, wrongful separation, wrongful termination, common law breach of express contract, civil conspiracy, and tortious interference with future employment.

## JURISDICTION AND VENUE

2. Plaintiff seeks damages which exceed seventy-five thousand dollars ($75,000.00), excluding fees and costs.

3. Jurisdiction is conferred upon this Court by 42 U.S.C. § 1981 and 28 U.S.C. § 1983 and Florida Statutes 768.28.

4. This Honorable Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) because the amount in controversy exceeds $75,000.00, and because there is complete diversity of citizenship between Plaintiff and Defendant Ellucian. The Court has personal jurisdiction over Ellucian because a substantial part of the events giving rise to Angela DeBose's claims occurred in this judicial district, and/or Ellucian knew or should have known that its acts and omissions as alleged herein would have a substantial effect on parties in this judicial district.

5. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over this and all other state law claims in this action because these claims arise out of the same nucleus of operative facts as do the federal law claims for which this Court has original jurisdiction. Within 180 days of the adverse and discriminatory actions taken against Plaintiff by Defendant, Plaintiff filed charges of discrimination with the United States Equal Employee Opportunity Commission (EEOC), which cross-filed charges with the Florida Commission on Human Rights (FCHR). These administrative proceedings did not reach resolution, with Plaintiff requesting a "Right to Sue" letter following her termination. The "Right to Sue" letter has not yet been issued.

6. Venue is proper in this United States Judicial District pursuant to 13 U.S.C. § 1391 because Angela DeBose resides in this district, USF's main campus is located in this district, and a substantial part of the events giving rise to claims against Ellucian occurred in this judicial district, and/or Ellucian's actions giving rise to this suit have had a substantial effect on parties in this judicial district.

## THE PARTIES AND THEIR RELATIONSHIP

7. At all relevant times herein, plaintiff, Angela DeBose, was and is a citizen of the United States of America and the State of Florida as well as a resident of the City of Tampa, Hillsborough County, Florida. At all relevant times herein, plaintiff was an employee of the Defendant USF as defined by federal and Florida law.

8. Defendant USF Board of Trustees, also known as the University of South Florida Board of Trustees, is the governing body of the University of South Florida System, and public body corporate created by Article IX, Section 7 of the Constitution of the State of Florida. Defendant is based at 4202 E. Fowler Avenue, Tampa, Florida. Defendant USF Board of Trustees is a body corporate authorized to sue and be sued under the laws of the State of Florida on behalf of USF.

9. The University of South Florida is an academic institution and public employer of the State of Florida based at 4202 E. Fowler Avenue, Tampa, Florida. USF is an "employer" in an "industry affecting commerce" as defined by federal and Florida law. USF is part of the State University System with its main campus in Hillsborough County, Florida. At all times material hereto, Defendant USF was and is a public university within the State University System of the State of Florida and a "state agency," pursuant to §216.011(1)(qq), Florida Statutes.

10.  Paul Dosal ("Dosal") is Vice Provost for Student Success and was employed at all relevant times by USF.

11.  Robert Sullins, a.k.a. "Bob" Sullins ("Sullins") is Dean of Undergraduate Studies and was employed at all relevant times by USF.

12.  Travis Thompson ("Thompson") is a Director of Undergraduate Studies Operations, and was employed at all relevant times by USF.

13.  Ralph Wilcox ("Wilcox" or "Provost") is Provost and Executive Vice President and was employed at all relevant times by USF.

14.  Carrie Garcia ("Garcia") is a Director in Information Technology and was employed at all relevant times by USF.

15.  All Defendants collectively referred to hereafter as "USF" or "defendants" conduct significant levels of educational and commercial activity within Hillsborough County, Florida and within the State of Florida in general.

16.  Ellucian Company or Ellucian Company, L.P. is a Delaware limited partnership with its principal place of business in Fairfax, Virginia.  Ellucian develops and sells computer software used to manage, support and deliver administrative and academic record keeping capabilities to colleges and universities; and computer software for use by colleges and universities, namely, software used by higher education administrators, instructors, students, prospective students, alumni, donors and vendors to access student, financial, financial aid, academic, human resources, educational and personnel records, and instructional tools, course materials and resource materials.  Ellucian also does business in Florida and has an office in Maitland, Florida.

4

17. Andrea Diamond ("Diamond") is a Functional Consultant and was employed at all relevant times by Ellucian and worked as a consultant at USF during a substantial part of the events that occurred and had a substantial effect on parties in this district, giving rise to this suit and claims against Ellucian and USF.

## PLAINTIFF'S ALLEGATIONS

18. DeBose was initially hired by Defendant USF in or about January 1988 as a computer programmer/analyst. In October 1996, after holding several progressively higher level positions, DeBose was hired to the position of University Registrar, pursuant to a written Employment Agreement, renewed annually.

19. DeBose has more than 20 years of Registrar-related experience and information systems experience, including many years as a peer consultant to other higher education institutions, and has served four different presidents and various provosts during her time at USF.

20. During all times relevant pursuant to this action, DeBose's performance was evaluated as better than satisfactory, with DeBose receiving exemplary performance ratings.

21. In 2010, Paul Dosal, a history professor at USF, was appointed by Ralph Wilcox, Provost, to serve initially as interim director over the Division of Enrollment Planning & Management and to lead the USF Student Success initiative.

22. DeBose helped Dosal onboard to his new role and assisted him with his role and responsibilities. Subsequently, Dosal was appointed approximately one year later by Wilcox to the position of Vice Provost for Student Success.

23. In 2010-2011, Dosal added two additional responsibilities to DeBose's range of duties as University System Registrar—to establish a new Transfer Articulation Area and to

implement Degree Works, a degree audit and advising system. For both responsibilities, DeBose met or exceeded expectations and received an exemplary performance rating.

24. In 2012, Dosal assigned DeBose the task of implementing Academic Tracking at USF. DeBose implemented a tracking system in one year and Dosal rated DeBose's performance as exemplary.

25. In 2013, DeBose noticed a marked change in the behavior exhibited by Dosal as her immediate supervisor, but also Bob Sullins, Travis Thompson, and Ralph Wilcox, towards DeBose. The defendants individually and collectively engaged in continuous and unwarranted criticism of DeBose from 2013 forward, including by way of example:

a. Making DeBose's race an issue by seeking to portray or stereotype her as an angry black woman;

b. Creating a work environment that was permeated by threatening behavior, isolation, bullying, and repeated degrading epithets;

c. Making false, harmful derogatory statements about DeBose to others within the USF Community, to raise questions about DeBose's leadership, competence, professionalism, and business acumen or ability; and

d. Giving conflicting directives and messages to frustrate DeBose's purpose in performing her role as University System Registrar.

26. On June 6, 2014, Bob Sullins sent an email to Dosal stating that "Angela's tirades have driven Caurie to resign!" Sullins continued, "We should do everything we can to head that off!" (**Exhibit** – "Email About Caurie Waddell") At the time that Sullins sent the email, Caurie Waddell ("Waddell") was no longer an employee in the unit managed by DeBose but rather working in another USF department.

6

27. On June 12, 2014, DEBOSE received word that a damaging email sent by Thompson to Dosal copying Bob Sullins had been circulated around campus, stating Waddell was leaving USF to "get away from the tyranny of Angela" and that Thompson was working with Dosal and Sullins to fire DeBose.

28. Waddell, aware of the email, stated to Dosal and a number of USF employees that "Travis [Thompson] sent the email to Dosal". Waddell stated that the contents of the email were "false" as to her reason for leaving USF.

29. On June 20, 2014, an email was sent from webmaster@acad.usf.edu, an email account exclusively controlled by limited staff within the Provost's Office, which referred to DeBose's alleged behavior as "hostile" and "self-serving". The email stated DeBose had "become a cancer" and called for her removal. (**Exhibit** – "Email from Provost's Webmaster Account")

30. Ralph Wilcox, Provost and Executive Vice President, and Thompson, a former web services administrator for the Provost's Office, both had permissions to send and receive emails using the webmaster@acad.usf.edu account, which was unpublished since 2005 and not available for general use. (**Exhibit** – "Reply from Gerard Solis About Webmaster Account")

31. On June 22, 2014, Wilcox forwarded the email from webmaster@acad.usf.edu to Dosal, stating they "need to discuss this". Dosal responded back that he [Dosal] and Sidney Fernandes, Chief Information Officer of Information Technologies, had agreed to "reorganization." Wilcox, asking no questions, thanked Dosal for "getting ahead of this." (**Exhibit** – "Provost Response to Reorganization Plan")

32. On June 23, 2014, Dosal asked DeBose to meet him to discuss a "troubling email" he received, which led him and the Provost to make the decision to move Degree Works to IT.

7

33. DeBose disclosed to Dosal that she had learned about an email that contained damaging, harmful, and derogatory statements and that Thompson claimed to be working with Dosal and Sullins to "get her fired."

34. Dosal responded only, "you know about the email?" Dosal made no statements to deny or refute DeBose's statements.

35. DeBose asked for a copy of the email.

36. Dosal declined the request, stating he would not provide DeBose a copy.

37. DeBose stated to Dosal that the email was a public record.

38. Dosal became very defensive and cautioned DeBose against "getting legal" with him. Dosal stated that he investigated Thompson's email by personally meeting with Waddell. Dosal said Waddell told him the information he received was false, that she did not make the statements, and DeBose had nothing to do with her leaving USF.

39. Dosal stated he also asked HR to conduct an exit interview with Waddell to "see if she would give them a different account" and that the email was "proven false and didn't pan out."

40. DeBose asked Dosal why he had been treating her so poorly and why Dosal and the Provost [Wilcox] took action against her to decrease her scope or span of authority, predicated on a lie or false, malicious email. DeBose stated that punitive actions against her would give Thompson's false and damaging statements instant credibility and asked that action be taken to address Thompson's conduct. DeBose reminded Dosal of other similar conduct by Thompson.

41. Dosal admitted to the other incidents by Thompson, a planned 360 survey, and his own sudden mistreatment of DeBose, starting in 2013.

42. DeBose then asked Dosal why he was not more supportive.

43. Dosal stated he was "conflicted," "the Provost wants this," and "the Provost has been good to me."

44. On June 25, 2014, after admitting to plans to conduct a 360 feedback survey specifically targeting DeBose and the Registrar's Office, Dosal dispatched emails announcing the change to move Degree Works and attributed the success achieved thus far with the system to DeBose. (**Exhibit** – "Degree Works Moving Announcement")   Dosal never disclosed to DeBose that he contacted several USF staff and had already taken action to move Degree Works immediately after receiving the "troubling" email.

45. In late June, following the announcement to move Degree Works, DeBose received a number of reports that Dosal, Sullins, and Thompson were continuing their efforts to have her fired and of degrading intersectional race-gender discriminatory statements made about DeBose by Dosal, Thompson, et al. in emails.

46. On June 30, 2014, Dosal requested that DeBose meet with him again concerning the email that was reported to have been sent by Thompson.

47. DeBose, hearing that this meeting was to terminate her employment, contacted the USF Office of the General Counsel to discuss with Gerard Solis, USF Counsel, possible options, including a non-disparagement agreement. DeBose acknowledged that Solis "represented USF and did not represent her." DeBose disclosed the facts as she knew and understood them, including Dosal's unfair treatment, the email, and Dosal's statement not to get legal with him. DeBose asked Solis if he could tell her why she was "on USF's radar."

48. Solis responded, "You have a J.D., don't you. Understandably, you need to protect yourself." Solis said he thought "three-years pay was not out of range" but that it "cannot be in a lump sum" because of a recent regulatory change. Solis stated that he was not aware that

DeBose was on the radar and that "he had not received any calls or emails" about DeBose. After speaking with Solis, DeBose called the President's Office to inquire if the President was dissatisfied with DeBose's work or office. DeBose was given reassurances by the President's staff that President Genshaft had no criticisms and or desire to remove DeBose from her role as Registrar. Rather, the staff shared that the President tried but her efforts to persuade her Board to "remove Ralph" were unsuccessful.

49. At the meeting, Dosal started with, "Angela, you're not going to be fired today." Dosal commended DeBose for her work in successfully launching Degree Works and implementing 8-semester Academic Tracking plans in a year's time, "exactly as requested."

50. Dosal claimed for the first time that "Travis did not send the false email," contradicting his complete silence on the issue in the June 25, 2014 meeting with DeBose. Dosal said the statements came from someone else who gave Thompson "bad information."

51. Dosal did not disclose that Thompson claimed to have received the bad information from Cynthia Brown Hernandez. Dosal did not at any point disclose or discuss the webmaster@acad.usf.edu email sent on June 22, 2014 in the Provost's exclusive control.

52. DeBose replied to Dosal that she had heard from Waddell and others that Thompson sent the email. DeBose stated this was not a first occurrence by Thompson and his conduct would continue to decline, if not addressed or corrective action taken. DeBose left the meeting without giving Dosal the non-disparagement letter, which originated from the telephone call with Solis. DeBose telephone Solis again and left him a detailed message about the outcome of her meeting with Dosal.

53. In July 2014, Dosal's conduct worsened towards DeBose. Dosal created an even more hostile work environment permeated by bullying and racially-motivated behavior. Dosal

unfairly isolated DeBose from meetings, excluded her from discussions, and otherwise treated her as though she was not a director in the Student Success/Academic Affairs division.  On most occasions when Dosal encountered DeBose, he was on edge and hostile in words, body language, and expression.  In addition, Dosal, in conjunction with Sullins and Thompson, drew others into their attacks to oust DeBose, including Carrie Garcia and Sarah Thomas.

54. Dosal also began verbally attacking DeBose, exhibiting threatening behavior, making discriminatory remarks or references to marginalize DeBose and her race, to make her feel like an outsider, to frustrate DeBose, in hopes of accelerating her departure.  Dosal made it clear to DeBose on several occasions that she would not have any support and seemed determined to develop in DeBose a fear of Wilcox.  Dosal stated that:

a. He and the Provost [Wilcox] pushed out Jennifer Meningall, "another hostile black woman" from her position of Vice President of Student Affairs;

b. He and the Provost expressed a plan to maintain diversity by increasing international enrollment to offset anticipated declines in black enrollment from plans to reduce the number of Pell Grant recipients at USF by recruiting students of families with higher incomes by concentrating efforts on certain zip codes;

c. Though plans to put USF in the top 50 by Wilcox had failed, they were committed to significant reductions in black student enrollment and were prepared to explain away public concern by shifting the focus to total enrollment; they would express a commitment to diversity; however, their goal was the Fall Term student profile rather than social expectations for minority student access to college—(i.e. more smarts and less blacks).  (**Exhibit** – "Wilcox Response to Drop in Minority Enrollment").  DeBose's

11

white colleagues who heard these statements called her to see if she was okay or to warn her not to repeat what she heard to anyone;

d. He and the Provost [Wilcox] did not want USF to be viewed as an "HBCU" (that is historically black college or university) "on the same level as FAMU" and demanded changes in any areas that put USF in the bottom tier with FAMU (**Exhibit** – "Baccalaureate degrees awarded without excess hours, 2012-13");

e. Wilcox referred to black students in disparaging ways and used references to infer that blacks were animals and "thugs"; and

f. The Provost was not a person to back down, having taken on "the President, her Jewish contingent led by Momberg, and John Long" and won by "shaking her up" with a no confidence letter from the faculty concerning her "draconian" budgetary tactics and "having the ear of her Board and an influential trustee." (**Exhibit** – "Dosal Email About President's Draconian Approach to Budgets").

55.  On July 15, 2014, Paul Dosal sent a note asking again to meet with DeBose early morning at 8:45 a.m.

56.  Dosal started by expressing that there were "going to be changes in EPM."

57.  DeBose asked Dosal if he meant "Student Success."

58.  Dosal replied, "No, EPM." Dosal announced to DeBose that he would be "filling Bob Spatig's old position" of Assistant Vice President of Enrollment Management with Billie Jo Hamilton, without a search. Dosal said, he would be sure to "not create another Bob [Spatig]" by giving Billie Jo "a trial run to learn and serve in the position." Dosal stated, "If Billie Jo was not successful, she will go back to her role as Director of Financial Aid." Dosal said Billie Jo's compensation would be adjusted.

59. DeBose asked Dosal why he would "fail to conduct a search, the recommended and usual practice to fill vacant or new positions, to not deprive qualified applicants the opportunity to vie for positions." DeBose also asked why she was "overlooked."

60. Dosal responded that he and the Provost [Wilcox] want and approved this change and his action had "complete support" from the institution's leadership.

61. Dosal stated that the Provost [Wilcox] and his [Dosal's] contracts had been renewed and extended through 2019.

62. Dosal offered to DeBose to serve in her position as University System Registrar through 2019, if she "stopped pressing" him with questions and congratulated Hamilton.

63. DeBose accepted Dosal's offer to extend her employment through 2019 (**Exhibit** – "DeBose Email Referencing Extended Employment Agreement Thru 2019"). DeBose discontinued any further questions and stated that she would congratulate Hamilton, and later did so.

64. DeBose also asked Dosal to review her compensation and title. Dosal anticipated the request and did not take it seriously, having made a bet with Alexis Mootoo that DeBose would request equity or parity with Hamilton (**Exhibit** – "Dosal Email to Mootoo Concerning Bet").

65. On July 28, 2014, DeBose filed an EthicsPoint complaint against Thompson for misconduct, following his efforts to further isolate DeBose by excluding her from Executive Council for Academic Advisor (Exec-CAA) meetings, which her position or office had historically both attended and actively participated.

66. DeBose complained about Sullins and also Dosal for failing to appropriately supervise Thompson.

67. USF Audit & Compliance and Human Resources contacted DeBose concerning her EthicsPoint complaint against Thompson but took no further action to investigate.

68. On August 27, 2014, DeBose filed discrimination charges against Dosal with the USF Office of Diversity, Inclusion and Equal Opportunity (DIEO). As additional support for her claims, DeBose cited Dosal's actions to terminate DeBose's employment and his anticipatory breach of the verbal agreement to extend DeBose's employment through 2019.

69. The work environment became increasingly hostile following DeBose's DIEO complaint by way of the following examples:

     a. DeBose was excluded from meeting invitations;

     b. For standing scheduled meetings, DeBose was not notified of meeting cancellations or changes in meeting locations and thus was excluded from attending;

     c. DeBose was contacted several times about her performance appraisal and self-assessment but each scheduled evaluation meeting was canceled and documents already provided were repeatedly re-requested;

     d. DeBose was not evaluated in the 2014 year;

     e. DeBose was not privy to emails and other communications distributed or exchanged among Student Success/EPM directors and senior leadership; and

     f. DeBose and Registrar's staff were repeatedly subjected to use of the word "nigger" when Dosal's central staff visited the office, as though Dosal, who was aware of Alexis Mootoo's repeated usage of the word, had given her license or permission to use the word in the presence of DeBose and others on her staff, to make them extremely uncomfortable.

14

70. In late December 2014, DeBose filed a discrimination complaint with the U.S. Equal Employment Opportunity Commission (EEOC), alleging disparate treatment, disparate impact, and hostile retaliatory work environment claims.

71. On February 4, 2015, the situation had degraded; therefore, DeBose filed for a Temporary Restraining Order that was later converted to a Preliminary Injunction with the Middle District Court of Florida (MDF **Case Number 8:15-mc-18-T-EAK-MAP** ) against Dosal for berating, marginalizing, and making DeBose extremely uncomfortable and threatening DeBose's job in individual meetings with her.

72. DeBose requested the preliminary injunction to maintain the status quo pending the resolution of her EEOC complaint to prevent further retaliation by Defendant, including termination.

73. On February 4, 2015, Dosal reprimanded by DeBose for allegedly calling Alexis Mootoo, a member of Dosal's central staff, "little girl." (**Exhibit** –"Dosal Reprimand") Dosal engaged Mootoo and Tonia Suber with USF Human Resources in his invidious plan to retaliate against DeBose for filing the EEOC complaint, though Suber was charged with investigating DeBose's EthicsPoint and DIEO complaints. Suber called upon Dosal to reward Mootoo with a promotion and salary increases for her cooperation, and Dosal readily complied (**Exhibit** – "Suber Request to Reward Mootoo"). Wilcox was aware of these events and Dosal consulted with him before issuing the reprimand.

74. On February 6, 2015, DeBose added a charge of retaliation to her EEOC (and DIEO) complaint. (**Exhibit** – "EEOC Complaint with Retaliation Box Checked")

75. On February 10, 2015, DeBose filed a grievance with USF Human Resources to object to the personnel action of the reprimand and lack of procedural "due process" safeguards,

as provided for under USF and SUS policy and DeBose's employment contract. DeBose provided her own sworn affidavit and affidavits/notarized statements from three witnesses that the alleged action did not occur.

76. On February 18, 2015, a USF St. Petersburg Human Resources staff assigned by USF Human Resources to investigate the complaint, canceled DeBose's grievance. (**Exhibit** – "Cancelled Grievance Related to Dosal's Reprimand")

77. For the remainder of February and in the month of March, Dosal working in conjunction with others, sought to create a for-cause justification to terminate DeBose, including efforts to allege that:

a. DeBose allowed the Registrar's budget to overspend last year's baseline budget into an alleged deficit—knowing that committed funds were expended under an approved "office renovation" budget and that the unit had large cash reserves in its carryforward and auxiliary accounts that were being withheld (**Exhibit** – "Email to Dosal About Releasing Registrar's Carryforward Budget for Renovations");

b. DeBose was inappropriately paying unit staff extra state compensation— knowing the secondary employment to support INTO-USF, Fully Online Vendor Programs, and Study Abroad Home of Record were approved pay-for-services activities authorized by Academic Affairs, Human Resources, and State of Florida/Florida Board of Governors (FLBOG) regulation; and

c. DeBose was uncollaborative by assisting other units and staffs through knowledge transfer and training rather than merely handing over unit work product.

78. On April 10, 2015, Carrie Garcia sent DeBose an email to meet with Ellucian on April 15, 2015 for a one-hour meeting concerning "pain points" with Degree Works—a system

16

DeBose had not managed since June 2014, when Dosal and the Provost moved it to IT (**Exhibit** - "Garcia Invitation for DeBose to Meet With Ellucian").

79. DeBose accepted Garcia's meeting invitation but was not informed the meeting was pursuant to a contract for consulting services with Ellucian. Garcia, Thompson, Sullins, Fernandes, and other USF staff on the Degree Works Steering Committee convened together immediately following DeBose's acceptance of the Ellucian meeting invitation in furtherance of their common scheme to conspire and plot against DeBose (**Exhibit** – "Steering Committee Ellucian Meeting"). Garcia also had several communications with staff employed by Ellucian.

80. At all times relevant, Garcia did not provide DeBose a meeting agenda or an advance copy of questions.

81. DeBose invited two employees to attend the meeting with her, Rolanda Lewis and Shruti Kumar. Rolanda Lewis ("Lewis") declined, having other meetings. Shruti Kumar ("Kumar") accepted and attended with DeBose.

82. Andrea Diamond, Functional Consultant with Ellucian, conducted the April 15, 2015 meeting.

83. Diamond did not ask DeBose or Kumar questions about Degree Works implementation or "pain points".

84. Diamond asked questions about the Banner Student Information System and Office of the Registrar business processes.

85. DeBose and Kumar answered the questions posed by Diamond for nearly one hour and wrote a detailed response to one of the questions asked.

86. Diamond did not make any recommendations and did not forward any additional questions to DeBose.

87.  On May 11, 2015, Dosal emailed DeBose a copy of the "Ellucian DegreeWorks Post-Implementation Assessment Report" and for the first time a meeting agenda was provided to DeBose (**Exhibit** – "Ellucian Report and Agenda").

88.  Dosal stated to DeBose that he was giving her the "opportunity to respond" before discussing the report with the Degree Works Steering Committee. Dosal did not state at any point to DeBose that notice of the Ellucian report and/or the opportunity to respond to the Ellucian Report was related to or concerned possible personnel action against DeBose.

89.  Dosal forwarded the Ellucian DegreeWorks Post-Implementation Assessment Report to Wilcox and also to the USF General Counsel's Office, specifically Solis. (**Exhibit** – "Dosal Email Involving USF General Counsel in Plan to Terminate DeBose")

90.  Diamond's report falsely stated that Lewis was kept from attending the meeting, though DeBose disclosed to Garcia that Lewis would not be attending due to a scheduling conflict.

91.  Diamond also alleged that the Registrar's Office was a "high risk" to Student Success, and "the registrar's office is not willing to encompass change," though Diamond did not recommend any changes to DeBose or Kumar.

92.  Based on Plaintiff's knowledge, information, and belief, Diamond did not conduct a risk assessment at, prior to, or following the April 15, 2015 meeting.

93.  DeBose emailed Kumar and Lewis a copy of the documents sent by Dosal—the Ellucian Report and Agenda.

94.  On May 11, 2015, Lewis responded to DeBose that she did not attend because she had other meetings.  (**Exhibit** –"Lewis Response to Ellucian Report")

95. On May 11, 2015, Kumar also responded in contradiction to the general accusations made in the report. Kumar also sent a second email contradicting Diamond's report (**Exhibit –** "Kumar Responses to Ellucian Report")

96. On May 11, 2015, DeBose replied to Dosal's inquiry and included the responses from Lewis and Kumar. DeBose also forwarded other relevant emails with her response.

97. DeBose wrote that the report from Diamond contained several functional errors and contained "criticisms all the way around." DeBose stated the report did not appear helpful to move USF forward. DeBose's expectation was that her entire response, including attachments from Lewis and Kumar would be included for the Steering Committee's review. (**Exhibit –** "DeBose's Cumulative Response to Ellucian Report")

98. DeBose received word that Dosal presented to the Steering Committee that DeBose "criticized the report." Dosal asked those in attendance, "Do you think there is anything wrong with the report?" The Steering Committee members responded "no" and Dosal stated, "It's now up to the Provost."

99. Dosal did not provide DeBose's collective written response and the documents forwarded from Lewis and Kumar.

100. On May 19, 2015, Kofi Glover ("Glover") requested to meet with DeBose, through his administrative assistant, about the "Ellucian Report" on behalf of the Provost [Wilcox].

101. DeBose sent Glover an email, inquiring how she might prepare and if others should attend (**Exhibit –** "DeBose Email to Glover Concerning Meeting Request to Discuss Ellucian Report").

102. Glover did not respond to the email.

19

103. As DeBose arrived at the meeting location, she received a phone call from Tony Embry and was told prior to entering the meeting with Glover that Dosal and Sullins requested to meet with Registrar's Office Managers "about Angela."

104. DeBose walked into the meeting room where Glover and Mike Beedy ("Beedy") were seated.  Glover immediately handed DeBose a termination letter from Wilcox. (**Exhibit** – "Wilcox Termination Letter")

105. Glover never brought up the matter of the Ellucian Report or discussed anything with DeBose aside from the termination letter itself.

106. The termination letter from USF Provost, Ralph Wilcox, stated that DeBose was being terminated from her employment not for cause or for disciplinary reasons but at his "prerogative."

107. USF terminated DeBose amid discrimination complaints with DIEO and the EEOC.

108.  USF terminated DeBose amidst a court action with the Middle District of Florida for preliminary injunction to maintain the status quo under Section 706(f)(2) of Title VII of the 1964 Civil Rights Act.

109. DeBose was under contract through June 30, 2015.

110. Dosal offered and DeBose accepted an extension of her employment contract through 2019.

111. DeBose was asked to leave the campus of USF immediately and was separated from her employment.

112. DeBose was forced by USF to take professional leave starting May 19, 2015, to exhaust all of her annual (vacation) leave.

113. DeBose was given a termination date of August 19, 2015, after which she would be paid out her sick leave, by USF.

114. When DeBose returned to her office to collect her belongings, Beedy followed DeBose and demanded in the presence of students and staff that DeBose leave all USF property.

115. Beedy followed DeBose as she left the building. Beedy stated that DeBose should contact him with all questions.

116. Several Registrar's staff members objected to Beedy treating DeBose "like a common criminal".

117. DeBose was not terminated in accordance with USF policy or in accordance with the terms and conditions of her employment.

118. DeBose was not permitted to grieve the separation or termination actions because Wilcox's termination letter stated the action was not for cause, while pointing publicly to the media, at large public, and the USF Community that it was due to the "Ellucian Report" and his claim that DeBose was "not collaborative." (**Exhibit** – "Oracle Student Newspaper")

119. DeBose was not afforded due process rights under the Administration Discipline procedure which states the following steps must be taken before dismissal can occur:

    a. A written request to dismiss the employee must be submitted to Human Resources, with approval from the dean/director/designee of the employee's college/division. The request must include any pertinent documentation to support the action.

    b. Human Resources will review the documentation to determine if there is just cause for dismissal. If so, the dean/director/designee is delegated authority to notify the

employee in writing of the proposed action.  The employee is given 10 calendar days

from the date of receipt of the notification to respond in writing to the proposed action.

     c. The employee is typically placed on administrative leave or annual leave during

the 10-day response period.

     d. If the employee provides no compelling reason for dismissal not to occur,

Human Resources will authorize the dean/director/designee to notify the employee in

writing that the dismissal action will be taken and its effective date.

120. Following DeBose's separation, DeBose was offered a job by the University of

North Florida (UNF) to implement predictive analytics.

121. UNF contacted USF as a courtesy to inform them of DeBose's hire and their desire

to have DeBose in the position before others learned of DeBose's availability.

122. On May 26, 2015, Ralph Wilcox, Provost, called the UNF Provost to interfere with

and discourage DeBose's hire. (**Exhibit** – "Wilcox Telephone Log")

123. Wilcox made several false and degrading statements about DeBose, including

stating that DeBose was "awful" and "uncollaborative," that he wanted to get rid of DeBose long

ago, and that UNF would "regret it" if they were to hire DeBose.

124. On May 27, 2015, the offer of employment with UNF was rescinded.

125. In June 2015, following the SUS Florida Summit meeting, Dosal disclosed that

Wilcox "took great pleasure" in ruining DeBose's opportunity and desired to "see her [DeBose]

with nothing."

126. On June 15, 2015, DeBose contacted staff at UNF who confirmed Wilcox's

involvement in "poisoning the well" to prevent DeBose's hire.

127. Dosal, Sullins, Thompson, and Wilcox made degrading, offensive, and discriminatory statements about DeBose in public records and public meetings, in the course and scope of their employment with USF.

128. The Defendants, USF and Ellucian, are joint tortfeasors, jointly and severally liable to DeBose for her injuries.

### COUNT 1 – Racial Discrimination in the Making and Enforcement of Contracts 42 U.S.C. § 1981

Plaintiff re-alleges and incorporates herein the factual allegations contained in paragraphs 1 through 128.

129. By committing the actions alleged, USF denied DeBose the same right to make and enforce employment contracts—which includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship—as enjoyed by DeBose's white counterparts, because of DeBose's race.

130. In discriminating against DeBose because of her race, USF acted with malice or callous indifference to DeBose's federally protected rights.

131. DeBose has been injured by USF as a result of the violations as alleged, including pain and suffering, emotional distress, mental anguish, loss of capacity to enjoy life, loss of self-efficacy, and economic damages.

132. Except for reinstatement, DeBose demands all relief that is just and equitable, including compensatory damages, punitive damages, costs, and fees as provided by 42 U.S.C. § 1988.

### COUNT 2 – Retaliation 42 U.S.C. § 1981

Plaintiff re-alleges Paragraphs 1 through 132 and states additionally or alternatively:

133. On or about December 26, 2014 and March 16, 2015, DeBose opposed and complained to the EEOC and FCHR about unlawful racial discrimination and retaliation by USF against her.

134. DeBose's complaints comprised protected activity under 42 U.S.C. § 1981.

135. At or about the time DeBose engaged in the protected activity, USF was aware of DeBose's protected activity.

136. Dosal et al. attempted to intimidate and harass DeBose for objecting to unlawful discrimination, harassment, and discipline.

137. On May 19, 2015, USF separated DeBose from her employment, forcing her on professional leave and forcing her to exhaust all of her annual leave.

138. On August 19, 2015, USF fired DeBose.

139. USF took adverse employment actions against DeBose in retaliation for engaging in the protected activity and for maintaining the complaints.

140. A reasonable employee would have found USF's retaliatory actions materially adverse, as did DeBose; i.e. that USF's retaliatory actions against DeBose could well dissuade a reasonable employee from protected conduct.

141. By retaliating against DeBose, USF denied DeBose the same right to make and enforce employment contracts—which includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship—as enjoyed by white people.

142. By retaliating against DeBose, USF subjected DeBose to punishment, pains, penalties, and exactions of every kind less than those to which USF subjects similarly situated white people; and USF did so because of DeBose's protected activity.

24

143. By retaliating against DeBose, USF denied DeBose the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens; and USF did so because of DeBose's protected activity.

144. In retaliating against DeBose, USF acted with malice or callous indifference to DeBose's federally protected rights.

145. DeBose has been injured by USF as a result of the violations as alleged, including pain and suffering, emotional distress, mental anguish, loss of the capacity to enjoy life, loss of sense of self-efficacy, and economic damages.

146. Except for reinstatement, DeBose demands all relief that is just and equitable, including compensatory damages, costs, and fees as provided by 42 U.S.C. § 1988.

### COUNT 3 - Conspiracy to Interfere with Civil Rights
### Against USF and Ellucian 42 U.S.C. §§ 1985 and 1986

Plaintiff re-alleges Paragraphs 1 through 146 and states additionally or alternatively:

147. Under 42 U.S.C. § 1985(2), DeBose has the right to be free from intimidation by USF as a party and as a witness, and to be free of obstruction of justice and intimidation by USF in her federal action against USF to maintain the status quo.

148. Managers and agents of USF and Ellucian conspired to deter, by intimidation and threat, DeBose and many of DeBose's witnesses from testifying to matters pending therein, freely, fully, and truthfully, and to injure DeBose and many of her witnesses, in person and property, from providing testimony in deposition and/or otherwise that is favorable to DeBose and unfavorable to USF.

149. More specifically, Managers and agents of USF and Ellucian, including Garcia, Thompson, and Diamond, met with each other on many occasions in person and electronically, whereupon they agreed to intimidate DeBose by defaming her, firing her, and telling USF

employees (many of whom are witnesses favorable to DeBose and unfavorable to USF in this case) not to speak to DeBose and took overt acts in furtherance of the conspiracy, including trying to suggest DeBose was uncollaborative and engaged in wrongdoing, firing DeBose, and telling USF employees/witnesses not to communicate with DeBose.

150. USF acted with malice or callous indifference to DeBose's federally protected rights as alleged in this Count.

151. Under 42 U.S.C. § 1986 and under the circumstances of DeBose's employment (and termination thereof) with USF, USF and Ellucian had a duty to prevent Section 1985 conspiracies against DeBose.

152.  DeBose has been injured by USF and Ellucian as a result of the violations as alleged in this Count, including pain and suffering, emotional distress, mental anguish, loss of the capacity to enjoy life, loss of sense of self-efficacy, and economic damages.

153. Except for reinstatement, DeBose demands from both Defendants, jointly and severally, all relief that is just and equitable, including compensatory damages, punitive damages, costs, and fees as provided by 42 U.S.C. § 1988.

### COUNT 4 - Defamation of Character, Slander, and Libel
### by Travis Thompson By Defendant USF

Plaintiff re-alleges and incorporates herein the factual allegations contained in paragraphs 1 through 128.

154. Plaintiff and Defendant Thompson worked together at USF for the approximate period of time from July 2011 through August 2014.

155. While employed at USF in Undergraduate Studies, Thompson on multiple occasions spread a false and malicious rumor, telling Sullins, Dosal, the Directors of Advising, and others in the USF Community that Caurie Waddell was "leaving USF to escape the tyranny of Angela."

26

156.  Thompson met with Waddell for coffee prior to her departure and heard specifically from her that his suspicions about her leaving were untrue.

157.  However, Thompson, with complete and utter disregard for the truth, nonetheless told others that DeBose was an *angry black woman* who was driving Waddell, a white female away, because of DeBose's alleged "tirades".

158.  Thompson knew that his statements concerning Waddell and DeBose were false. Thompson knew that his statements had spread throughout the USF Community.

159.  Thompson escalated the rumor to Sullins, and in turn Dosal, with the intention of causing harm to DeBose's business reputation.  Thompson also used his security permissions as former webmaster for academic affairs to send an email to Wilcox, stating that DeBose was hostile, self-serving, and "a cancer"—calling for her termination as University System Registrar.

160. Defendant Thompson made the false statements to Sullins, Dosal, and others in the USF Community for his own gain and without reasonable care as to the truth or falsity of those statements.

161. As a proximate result of Defendant Thompson's false statements, Angela DeBose was professionally damaged.

162. Though knowing the statements made concerning Waddell and DeBose were false, Dosal and Wilcox removed Degree Works from the scope of DeBose's authority.

163.  Though knowing the statements were false, Dosal and Wilcox took overt action to treat DeBose differently, as the "angry black woman" stereotype perpetuated by Thompson and Sullins.

164. Knowing Thompson's statements were false, Dosal and Wilcox used Thompson's false accusations as justification to work in concert with Thompson and Sullins "to get [AD] fired."

165. Defendant Thompson's false and malicious accusation caused Plaintiff to suffer damages in the form of, inter alia, loss of reputation and estimation; the statements and email(s) prompted other torts and civil wrongs against Plaintiff, causing her to complain in response to the conduct and actions taken against Plaintiff to which she was subjected; it led to perceptions that implementation of Degree Works was a failure despite Plaintiff's success which was lauded by all constituents in the USF Community years prior; it led to Plaintiff's loss of opportunity for promotion and pay; it put Plaintiff's employment at issue and opened the door to Plaintiff's termination and loss of employment, salary and benefits.

### COUNT 5 – Defamation and Libel by Bob Sullins Against Defendant USF

Plaintiff re-alleges and incorporates herein the factual allegations contained in paragraphs 1-128.

166. Plaintiff and Defendant Sullins worked together at USF for the approximate period of time from October 1996 through May 19, 2015.

167. While Plaintiff was employed at USF in May 2014, Defendant Sullins wrote to Paul Dosal and falsely told Paul Dosal, inter alia, that Plaintiff's "tirades have driven Caurie [Waddell] to resign." Sullins wrote concerning DeBose, "We should do everything we can to head that off!"

168. Defendant Sullins made these false accusations without conducting any investigation to ascertain or determine the truth.

169. Defendant Sullins wrote the allegations and publicized the contents to Dosal and others in the USF Community, without reasonable care as to the truth or falsity of those statements.

170. As a proximate result of Defendant Sullins' false and libelous statements, Angela DeBose was professionally damaged.

171. Knowing the email Sullins sent concerning Waddell and DeBose was false, Dosal and Wilcox removed Degree Works from the scope of DeBose's authority, to give Sullins' false email instant credibility.

172. Knowing the email Sullins sent was false, Dosal and Wilcox took overt action to treat DeBose differently, as the tyrant Sullins perpetuated her to be.

173. Dosal and Wilcox conspired with Sullins, Thompson, and others to use Sullins' false and libelous email as an opportunity "to get [AD] fired."

174. As a proximate result of Defendant Sullins' false libelous statements, Plaintiff was portrayed in a false light and subjected to the USF rumor mill, public gossip, and speculation about her continued employment at USF.

175. Defendant Sullins' false and malicious accusation caused Plaintiff to suffer damages in the form of, inter alia, loss of reputation and estimation; it resulted in others accusing her of being uncollaborative, uncooperative, difficult to work with, and tyrannical.

176. Defendant Sullins wrote the fairy-tale-like email to amuse himself, making it an urgent imperative for Dosal to take action to protect *the fair white maiden* Waddell from the *angry black tyrant* DeBose by any means necessary.

177. The falsity and undertones of Sullins' email imperative caused Plaintiff to suffer damages in the form of, inter alia, loss of reputation and estimation; it caused Plaintiff to be

subjected to other torts and civil wrongs; it led to perceptions that implementation of Degree

Works was a failure despite Plaintiff's success which was lauded by all constituents in the USF

Community in years prior; it led to Plaintiff's loss of opportunity for promotion and pay; it put

Plaintiff's employment at issue by summoning USF leadership to "do everything necessary" to

Plaintiff, including Plaintiff's termination and loss of employment, salary and benefits.

**COUNT 6 – Negligent Hire, Supervision, and Retention<br>of Travis Thompson by Defendant USF**

Plaintiff re-alleges and incorporates herein the factual allegations contained in paragraphs

1 through 128 and 154 through 177 above.

178. Prior to his hire to the Director of Academic Tracking position, Defendant

Thompson stated to DeBose that the process to Search for qualified candidates for the position

was a "ruse."

179. Thompson stated that though he did not have any advising experience or practical

hands-on knowledge of Degree Works or Academic Tracking systems, Dosal and Sullins had

guaranteed him that the Director of Academic Tracking position would be his.

180. When asked about the strength of the candidate pool of applicants, Thompson stated

it did not matter if others were better qualified; Dosal and Sullins had assured him that he would

be selected for the job.

181. When Plaintiff informed Dosal of Thompson's statements, Dosal became upset that

Thompson did not conceal these facts.

182. USF was required under its own policies and procedures and State University

System (SUS) and/or Florida Board of Governor (FLBOG) policy and procedure to make an

appropriate determination of the qualifications of each applicant.

183. USF was required under its own policies and procedures and State University System (SUS) and/or Florida Board of Governor (FLBOG) policy and procedure to make an appropriate investigation of Thompson to determine his suitability for the position and failed to do so.

184. An appropriate investigation would have revealed the unsuitability of Travis Thompson for the Director of Academic Tracking position; an appropriate investigation would have revealed Thompson's prior behavior and inability to maintain appropriate professional conduct.

185. It was unreasonable for USF to hire Thompson to the Director of Academic Tracking position in light of the information it knew or should have known or could have ascertained by reasonable due diligence. As a result of Defendant's negligent hire, DeBose was harmed.

186. Plaintiff complained to management, specifically Dosal and Sullins, about Thompson's professional misconduct, certain of which is described in this complaint, and Thompson's attempts to involve and/or implicate Plaintiff in his expressions of professional misconduct. Plaintiff also complained about Thompson's lack of job knowledge and performance.

187. When the conduct of Thompson continued to decline, Plaintiff filed an EthicsPoint complaint against Thompson, which was referred to USF Audit & Compliance and assigned to Human Resources for investigation.

188. Defendant USF, specifically Dosal, Sullins, and Tonia Suber in Human Resources, were required to properly investigate Plaintiff's complaints against Thompson.

189. Defendant USF failed to properly investigate Plaintiff's complaints against Thompson.

190. An appropriate investigation would have revealed Thompson's professional misconduct and unfitness to continue working in the position of Director of Academic Tracking. An appropriate investigation would have revealed Thompson's lack of job knowledge and strong need for training.

191. Neither Dosal nor Sullins took any remedial or corrective action against Thompson when both knew or had reason to know that Plaintiff's professional reputation had been damaged. Neither Dosal nor Sullins took any remedial or corrective action to intervene when Thompson's conduct continued to decline. Neither Dosal nor Sullins questioned the reliability of information received from Thompson about Degree Works or advising, though his lack of knowledge was well-known. Neither Dosal nor Sullins provided DeBose reasonable notice of Thompson's verbal or written statements nor gave DeBose opportunity to defend herself against Thompson's baseless accusations. Instead, Dosal and Sullins sought to conceal and defend Thompson's misconduct to continue his use as an instrument against DeBose.

192. It was unreasonable for Defendant USF to not investigate Thompson based on the information it knew or should have known from Plaintiff's complaints. It was unreasonable for Defendant USF to not have taken corrective or remedial action against Defendant Thompson.

193. It was unreasonable for Defendant USF to have allowed Thompson to continue to harm Plaintiff's business reputation. It was unreasonable that Thompson was not held accountable for his actions.

194. Subsequent to the decision to hire Thompson, Defendant USF became aware, or in the exercise of reasonable care should have become aware, that Thompson engaged in

inappropriate and unprofessional conduct concerning Plaintiff, Angela DeBose, which indicated Thompson's unfitness to work in the position of Director of Academic Tracking.

195. Defendant USF had a duty to take reasonable and appropriate action to ensure that its employee, Thompson, did not commit, allow or encourage inappropriate and unprofessional conduct against DeBose in her position as USF System Registrar.

196. Defendant USF knew or in the exercise of reasonable care should have known that, Thompson was committing, allowing or encouraging inappropriate and unprofessional conduct of lying, defaming, slandering, and libeling DeBose's business/professional reputation while in the course and scope of his duties for USF, as shown by the following:

    a. Thompson stated to the directors of advising that he was working with Paul Dosal to "get [Angela DeBose] fired," putting Plaintiff's employment at issue;

    b. Thompson, in conjunction with Dosal and Sullins, made statements to portray or stereotype Plaintiff as an "angry black woman," making her race an issue in terms of Plaintiff's work and worth;

    c. Thompson, with falsity and malice, stated that DeBose was the reason Waddell, a former employee, left USF—stating that DeBose had driven Waddell away;

    d. Thompson caused Waddell's departure to be escalated to Sullins, Dosal, and USF leadership such that Waddell's departure caused certain adverse actions to be taken against DeBose to reduce the scope and breadth of her professional authority at USF and not consider Plaintiff for promotion and pay opportunities;

e. Thompson sought to conceal his malice against DeBose by using his
permissions to webmaster@acad.usf.edu to send a destructive and particularly
damaging email to Wilcox, calling for DeBose's termination—which by exercise
of reasonable due diligence, USF, Wilcox specifically, could have discovered.

197. Defendant USF breached its duty when it failed to investigate, discharge and/or
reassign its employee, Defendant Thompson upon the aforementioned knowledge.

198. Defendant USF is liable for negligently retaining Defendant Thompson as an
employee.

199. Defendant USF negligently failed to have any policies or procedures governing,
monitoring, or disciplining Thompson for facilitation, participation or encouragement of harmful,
disruptive, and unprofessional conduct, while in the course and scope of his duties for USF;

a. Defendant USF did in fact have policies or procedures governing,
monitoring, or disciplining its employees for facilitation, participation or
encouragement of harmful, disruptive, unprofessional conduct, in the first or third
person, while in the course and scope of his duties for USF. However, the
Defendant negligently and carelessly failed to employ said procedures; or in the
alternative,

b. Defendant USF did have policies and procedures governing,
monitoring, or disciplining its employees for facilitation, participation or
encouragement of harmful, disruptive, unprofessional conduct, in the first or third
person, while in the course and scope of his duties for USF but implemented the
same in a careless and negligent manner.

34

200. As a direct and proximate consequence of Defendant USF's negligent retention of its employee, Thompson, the Plaintiff suffered harm to her reputation and estimation in the Community and caused Plaintiff to experience an adverse employment action.

201. But for USF retaining and assigning Defendant Thompson to the Director of Academic Tracking position without proper supervision and guidance, the unprofessional conduct would not have occurred, as Thompson would have been held to professional accountability standards for his actions and/or and omissions.

202. As a further direct and proximate result of the negligence of said Defendant USF, which caused the harm to Plaintiff, the Defendant is liable to the Plaintiff for all damages she has suffered.

**COUNT 7 – Negligence and Gross Negligence by Bob Sullins Against Defendant USF**

Plaintiff re-alleges and incorporates herein the factual allegations contained in paragraphs 1 through 128 and 166 through 177.

203. Defendant Sullins wrote and publicized the email about Angela DeBose "driving" Caurie Waddell away from USF, without any concern for the truth or falsity of his statements. (**Exhibit** – "Sullins Deposition")

204. Sullins did not have any knowledge of Waddell's qualification for the Tracking position she previously held under DeBose.

205. Sullins did not have any knowledge about the supervisor-employee relationship between DeBose and Waddell, once Waddell was hired.

206. Sullins did not have any knowledge about the training Waddell received as a result of her hire by DeBose.

207. Sullins had only anecdotal knowledge of Waddell's performance and was not aware of how efficiently or effectively Waddell carried out her assignments and had no specific knowledge of Waddell's performance ratings.

208. Sullins did not have any knowledge about Waddell's continued involvement with DegreeWorks/Tracking at DeBose's request, after Waddell's move to the Office of Decision Support at USF.

209. Sullins did not have any knowledge about Waddell's participation on the selection committee to help hire and train her successor at DeBose's request.

210. Sullins had no specific knowledge of problems with Degree Works or Tracking that would occur as a result of Waddell's departure; nor did Sullins have specific knowledge that continuity was at risk or that disruptions would occur as a result of Waddell leaving USF.

211. Nevertheless, Sullins wrote the allegations negligently, recklessly, and maliciously and publicized it to Dosal and others in the USF Community, without investigation and without reasonable care as to the truth or falsity of those statements.

212. As a proximate result of Sullins' false and libelous statements, Angela DeBose was professionally damaged.

213. Sullins, Dosal, Wilcox, and Thompson used Sullins' false and libelous email as an opportunity to work in concert "to get [AD] fired."

214. As a proximate result of Defendant Sullins' false and malicious accusation and his actions in concert with others, Plaintiff suffered damages in the form of, inter alia, loss of reputation and estimation; instigation of other torts and civil wrongs against Plaintiff; loss of opportunity for promotion and pay; it put Plaintiff's employment at issue and called for Plaintiff's termination and loss of employment, salary and benefits.

**COUNT 8 – Tortious Interference with a Business Relationship by Defendant Ellucian**

Plaintiff incorporates by reference the allegations of paragraphs 82 through 128 and 148-149 and 151-152, as if fully set forth in this paragraph.

215. On April 10, 2015, DeBose received an email from Carrie Garcia, inviting her to meet with Ellucian on April 15th for one-hour concerning "pain points" with Degree Works.

216. DeBose led the implementation of Degree Works in 2011and also led the implementation of Academic Tracking in 2012; however, responsibility for the system was moved to Information Technologies (IT) under Garcia mid-year in 2014 by Dosal and Wilcox.

217. DeBose accepted the meeting invitation, though she did not have any "pain points" or responsibility for Degree Works at that time.

218. On April 15, 2015, Tony Embry warned Plaintiff that he heard that the meeting was "a setup" and offered to attend the meeting.

219. DeBose informed Embry that Rolanda Lewis and Shruti Kumar had been invited and that Kumar would accompany her to the meeting but that Lewis declined due to a conflict.

220. Though DeBose gave prior notice that Lewis was not available, Garcia recommended delaying the meeting to see if Lewis could join.

221. After approximately 15 minutes of waiting and attempting to contact Lewis, the meeting proceeded with DeBose and Kumar answering all questions asked of them by Andrea Diamond, Ellucian Functional Consultant.

222. Diamond made no mention of "pain points." Diamond asked no questions about Degree Works other than how or if the Registrar's Office used the system.

223. DeBose received no feedback concerning the April 15, 2015 meeting until May 11, 2015 when Dosal emailed DeBose, providing her a copy of the "Ellucian DegreeWorks Post-

Implementation Assessment Report" and for the first time shared the April 14, 2015 meeting agenda.

224. Andrea Diamond, Ellucian Functional Consultant, falsely wrote that Lewis was kept from attending the meeting. Diamond also alleged that the Registrar's Office was a "high risk" to Student Success, and stated "the registrar's office is not willing to encompass change."

225. Diamond did not have knowledge or information to reasonably believe that Rolanda Lewis was kept from attending the meeting.

226. In the 45 minutes to one-hour meeting, Diamond did not have knowledge or information to reasonably conclude that the Registrar's Office was a high risk to student success.

227. Diamond did not have knowledge or information to reasonably state that the Registrar's Office was resistant to change.

228. Diamond did not ask, initiate, discuss, or recommend any changes reasonably related to the conclusions drawn in the Ellucian Report concerning the Registrar's Office.

229. Rather, Diamond was prepared, predisposed, or influenced to write those statements in the "Ellucian Report" in concert with Dosal, Sullins, Thompson, Garcia, and others as pretext or justification to terminate Plaintiff.

230. Diamond, an Ellucian Employee, knew of the business relationship Plaintiff had with USF in her position as University System Registrar.

231. Diamond wrote the Ellucian Report negligently, recklessly, and wantonly. Though Diamond either knew or had reason to know that DeBose had not been responsible for the Degree Works system for approximately one-year since June 2014, she wrote the report in such a way to assign blame and cause specific harm to DeBose and her employment at USF for the failures that occurred with subsequent efforts to redesign Academic Tracking and implement 3-

semester tracking plans by Garcia versus the 8-semester tracking plans DeBose had successfully deployed.

232. On May 19, 2015, Kofi Glover, Associate Provost, requested to meet with Angela DeBose to "discuss the Ellucian Report," on behalf of the Provost [Wilcox], who was allegedly away from the campus.

233. When Plaintiff arrived for the May 19, 2015 meeting, Plaintiff was handed a termination letter from Glover, signed by Wilcox.

234. On or about May 28, 2015, the Ellucian Report was stated in the USF Oracle and other media as being the specific reason for DeBose's termination.

235. Upon information and belief, the interference by Diamond, Ellucian Employee, whether acting alone or in concert with others, did induce USF to terminate Plaintiff's employment as University System Registrar.

236. Further upon information and belief, Defendant Ellucian improperly, intentionally, and unjustifiably through its employee, agent, or assign interfered by having an improper reason, as well as, utilizing improper methods.

237. Upon information and belief, Defendant Ellucian persisted in this course of action, despite the knowledge that their conduct would result in damage to Plaintiff, or at least was highly likely to result in damage to Plaintiff.

238. The termination of employment relationship by USF as a result has damaged Plaintiff.

## COUNT 9 – Negligent Supervision of Andrea Diamond by Defendants USF and Ellucian

Plaintiff incorporates by reference the allegations of paragraphs 82 through 128, 148-149, 150-151, and 215-238, inclusive, as if fully set forth in this paragraph.

239. On May 11, 2015, Plaintiff complained to Dosal about the false statements made in the Ellucian Report written by Andrea Diamond, Ellucian Functional Consultant, and also provided Dosal the responses from Lewis and Kumar to the Ellucian Report, which also contradicted Diamond's findings and conclusions.

240. Defendants USF and Ellucian were engaged in a contractual relationship.

241. Defendants USF and Ellucian were in privity of contract together.

242. Defendant USF had certain rights under the agreement to control the manner in which Andrea Diamond performed the work.

243. Defendant Ellucian had certain rights to control the manner in which Andrea Diamond, an Ellucian employee, performed her work.

244. Defendant USF owed DeBose a duty of reasonable care.

245. Defendant USF had a non-delegable duty to properly investigate DeBose's complaints concerning Diamond's findings and take into account the responses of Lewis and Kumar about the Ellucian Report.

246. Defendant USF breached that duty and failed to properly investigate Plaintiff's complaint, including the responses of Lewis and Kumar about the Ellucian Report.

247. An appropriate investigation would have revealed Diamond's false and negligent conclusions concerning the Registrar's Office, used to implicate DeBose.

248. It was unreasonable for Defendant USF to report or publish statements and take action on information Defendant USF knew or should have known to be false based on the responses from DeBose, Lewis, and Kumar as well as DeBose's employment history at USF.

249. Defendant USF is vicariously liable for the negligent supervision of Andrea Diamond.

40

250.  Defendant Ellucian had a duty to exercise certain control over its employee, Andrea Diamond, in the discrete work she performed for USF in a pre-determined period.

251.  Defendant Ellucian failed to properly supervise, train, or control Andrea Diamond, allowing her to become embedded or embroiled in the politics of USF; write a false, negligent, and unreasonably subjective report; and be used by USF as an instrument against DeBose.

252.  Defendant Ellucian is corporately liable for the harm that Plaintiff has sustained as a result of their negligent supervision.

253. The negligent supervision of Andrea Diamond in the contractual relationship between USF and Ellucian has damaged Plaintiff.

## COUNT 10 – Breach of Common Law Contract by Defendant USF

Plaintiff incorporates by reference the allegations of paragraphs 1 through 128, inclusive, as if fully set forth in this paragraph.

254. On July 15, 2014, Plaintiff was performing her job as University Registrar under an annual contract that was set to renew on July 1, 2015.

255.  On July 15, 2014, Defendant Dosal executed a verbal agreement to extend her employment contract to 2019.  A true and accurate copy of a writing to support or codify the existence of the verbal Employment Agreement is attached hereto as Proof of Plaintiff's Offer and Acceptance.

256. Dosal disclosed to Angela DeBose on July 15, 2014 at a meeting [Starbucks] that the employment contract of Ralph Wilcox, Provost and Executive Vice President, had been extended to 2019.

257.  In turn, Dosal disclosed that Ralph Wilcox extended Dosal's contract to 2019.

258.  Dosal said to DeBose, "I am offering to continue your contract through 2019."

259. Dosal stated to DeBose not to press him any further with her questions at the July 15th meeting at Starbucks about the unfairness of his action to directly appoint Billie Jo Hamilton. Dosal asked Plaintiff to "congratulate Billie Jo." Dosal stated to DeBose that he would also review her present compensation package, as DeBose requested.

260. DeBose then stated to Dosal that she would not press him further for answers at the meeting and would congratulate Hamilton; thereafter, DeBose immediately accepted Dosal's offer.

261. Later, following the meeting, DeBose congratulated Hamilton, who disclosed to DeBose, "I had been negotiating with Paul for a while."

262. As a follow-up to the July 15, 2014 meeting, DeBose sent an email to Dosal on July 17, 2014 that restated her disappointment about his use of direct appointments to advance her white counterparts. DeBose also affirmed Dosal's offer and her acceptance to extend DeBose's employment through 2019. DeBose reminded Dosal about his promise to review her compensation and title.

263. Dosal stated that he would more carefully review DeBose's reply and get back to her.

264. On August 1, 2014, Dosal replied to DeBose that he had consulted with Human Resources and "was advised" that DeBose's salary was appropriate. Therefore, Dosal stated that he planned no changes.

265. On August 3, 2014, DeBose asked Dosal to conduct a salary equity study with DIEO.

266. On August 22, 2014, Dosal said that he concluded his review with DIEO and planned no changes to DeBose's salary. In responding about DeBose's salary, Dosal did not on

August 1, 2014, August 22, 2014, or any other occasion deny that he offered to extend DeBose's employment at USF through 2019 or deny that DeBose accepted his offer.

267. This verbal agreement between Dosal and DeBose was binding and enforceable, with DeBose performing all of her obligations under the contract.

268. DeBose had a legal right to inquire about Hamilton's appointment at the meeting. DeBose had a legal right to withhold her congratulations to Hamilton. Her forbearance or restraint from exercising her legal rights was in consideration of Dosal's offer and her acceptance.

269. On March 5, 2015, prior to DeBose being terminated from her position as University Registrar at the University of South Florida, Jose Hernandez ("Hernandez"), Chief Diversity Officer, sent DeBose the findings of DIEO concerning DeBose's allegations of discrimination against Paul Dosal.

270. Hernandez alleged that Dosal's offer to continue DeBose's employment with him through 2019 showed that he had not discriminated against DeBose (**Exhibit**, "Hernandez Determination Letter Concerning Dosal's Offer to Extend DeBose's Employment Through 2019").

271. On March 10, 2015, DeBose responded to Hernandez et al. that she had accepted Dosal's offer but also stated Dosal's continued discrimination, creation of a hostile work environment, retaliation, and threatened termination put Dosal in breach of the Extended Employment Agreement and that Dosal failed to give her any assurances, following his actions of repudiation.

272. Hernandez unseasonably attempted to retract his statement and suggest that the verbal contract was not valid.

43

273. The writings referenced above provided clear notice to Dosal and Defendant USF of the obligation under the aforementioned verbal agreement to extend DeBose's employment through 2019.

274. Upon information and belief, on and before May 19, 2015, before the end of DeBose's annual employment contract on June 30, 2015, and before the end of the extended employment agreement on June 30, 2019, Defendant USF took action to terminate DeBose's employment.

275. On May 19, 2015, Plaintiff was separated from her employment and given notice of her termination, effective August 19, 2015. On May 19, 2015, Plaintiff was forced to go on professional leave and exhaust her annual (vacation) leave. On August 19, 2015, Plaintiff was terminated, losing her employment, salary, and benefits.

276. Therefore, Defendant USF materially breached both the annual employment agreement and the verbal agreement to extend Plaintiff's employment through 2019.

277. As a result of the foregoing breaches, Plaintiff has been damaged.

278. At all times material hereto, Plaintiff has performed her obligations under the annual employment agreement and the extended employment agreement.

279. The breaches of contract by Defendant resulted in injury to the Plaintiff. As a result, Plaintiff seeks all amounts owed by Defendant pursuant to the agreements. Further, the Plaintiff seeks all actual, consequential, and incidental damages that have resulted from the Defendant's breaches of the agreement, plus exemplary damages and costs, expenses, and pre- and post-judgment interest as allowed by law.

## COUNT 11 – Promissory Estoppel Against Defendant USF

Plaintiff incorporates all allegations in Paragraphs 1 through 128 and 254 through 279.

280. For the purposes of this Count, Plaintiff Angela DeBose alleges in the alternative that there was no applicable contract or contractual provision or that the promises made were outside of and for actions by the parties that were not covered by any existing contract otherwise referred to herein.

281. Defendant Dosal made misrepresentations of material facts.

282. Defendant Dosal should reasonably have expected to induce action or forbearance on the part of DeBose.

283. Defendant Dosal's misrepresentations induced such action or forbearance by DeBose.

284. Plaintiff Angela DeBose suffered detriment caused by reliance on Dosal's misrepresentations.

285. As a result, DeBose suffered damages.

286. Plaintiff seeks all amounts owed by Defendant USF, including all actual, consequential, and incidental damages that have resulted from the Defendant's breaches of the agreement, plus exemplary damages and costs, expenses, and pre- and post- judgment interest as allowed by law.

### COUNT 12 – Equitable Estoppel Against Defendant USF

Plaintiff incorporates all allegations in Paragraphs 1 through 128 and 254 through 279, above.

287. For the purpose of this Count, Plaintiff Angela DeBose alleges in the alternative that there was no applicable contract or contractual provision or that the promises made were outside of and for actions by the parties that were not covered by any existing contract otherwise referred to herein.

288. The representations by Defendant USF, specifically employee and agent, Paul Dosal to Plaintiff Angela DeBose were as to material facts.

289. The representations made by USF were contrary to the condition of affairs later asserted by Dosal.

290. Plaintiff Angela DeBose relied on the representations.

291. Plaintiff Angela DeBose suffered detriment by a change in position as a result of the representations and reliance thereon.

292. Angela DeBose continued to perform her duties and functions at USF professionally at USF until USF unexpectedly and without provocation, separated her from her employment on May 19, 2015 and terminated her effective August 19, 2015.

293. As a result, DeBose suffered damages.

294. Plaintiff seeks all amounts owed by Defendant USF, including all actual, consequential, and incidental damages that have resulted from the Defendant's breaches of the agreement, plus exemplary damages and costs, expenses, and pre- and post- judgment interest as allowed by law.

## COUNT 13 – Negligent Misrepresentation, Concealment, Fraud, Fraud by Non-Disclosure, and Fraud in the Inducement by Defendant USF

Plaintiff incorporates by reference all allegations above, inclusive, as if fully set forth in this paragraph.

295. Defendant Carrie Garcia provided information in the course of USF business, or in a transaction in which USF has a pecuniary interest. Garcia supplied false information to lure DeBose to the Ellucian meeting on April 15, 2015.

296. Defendant Paul Dosal provided information in the course of USF business, or in a transaction in which USF has a pecuniary interest. Dosal supplied false information to DeBose

repeatedly, to lure her to meetings for purposes of berating, marginalizing, bullying, and reprimanding her at work at all relevant times stated herein.

297. Defendant Kofi Glover provided information in the course of USF business, or in a transaction in which USF has a pecuniary interest. Defendant Ralph Wilcox provided information in the course of USF business, or in a transaction in which USF has a pecuniary interest. Glover supplied false information on behalf of Wilcox to lure DeBose to the meeting to discuss the Ellucian report on May 19, 2015.

298. In each case, the information supplied by the above-named Defendants to Plaintiff was false.

299. The above named Defendants did not exercise reasonable care or competence in obtaining or communicating the information.

300. Each participated in setting up and walking Plaintiff into an "ambush."

301. Plaintiff justifiably relied on the information provided by the Defendants, and suffered damages proximately caused by its reliance on the false information.

302. On information and belief, the wrongful acts of the Defendants set forth in this Count were done maliciously, oppressively, and with the intent to mislead and defraud Plaintiff, and Plaintiff is entitled to punitive and exemplary damages to be ascertained according to proof, which is appropriate to punish and set an example of the Defendant.

303. Defendant USF, its employees, agents, and assigns, provided information in the course of its business, or in a transaction in which it has a pecuniary interest.

304. The information supplied by Defendant USF to Plaintiff was false.

305. Defendant USF did not exercise reasonable care or competence in obtaining or communicating the information.

306. Plaintiff justifiably relied on the information provided by Defendant USF, and suffered damages proximately caused by its reliance on the false information.

307. By reason of Plaintiff's reliance on the representations and fraudulent concealment of material facts by Defendant, Plaintiff has been damaged in an amount within the jurisdictional limits of this Honorable Court.

308. Defendant USF employed a scheme and common course of conduct to defraud the Plaintiff. The misrepresentations and concealment of facts by Defendant USF were material.

309. On information and belief, Defendant USF knew the misrepresentations and concealment of facts were false. Alternatively, Defendant USF acted with reckless disregard whether the representations to Plaintiff were true.

310. The Plaintiff relied upon the misrepresentations and concealment of facts by Defendant USF. The Plaintiff's reliance on these representations and concealment of facts by Defendant USF was reasonable and justifiable.

311. Plaintiff has suffered, and continues to suffer, economic and non-economic losses because of the wrongful conduct of the Defendant.

312. On information and belief, the wrongful acts of Defendant were done maliciously, oppressively, and with the intent to mislead and defraud the Plaintiff, and the Plaintiff is entitled to punitive and exemplary damages to be ascertained according to proof, which is appropriate to punish and set an example of the Defendants.

**COUNT 14 – Negligence and Gross Negligence by Defendants USF and Ellucian**

Plaintiff incorporates 82 through 128, 148-149, 150-151, 215-253, and 295-312, as though set forth in full in this cause of action.

313. Defendants USF and Ellucian, directly or indirectly, negligently, recklessly, wantonly, and/or pretextually, wrote, developed, published, supplied, and/or distributed the Ellucian Report.

314. Defendant USF owed a duty to employees of USF, including the Plaintiff, to use reasonable care in writing, developing, publishing, supplying, and/or distributing the Ellucian Report, including a duty to ensure that the Ellucian Report did not cause employees to suffer from unreasonable, unknown, or ill-founded consequences from its effects.

315. Defendant Ellucian had a duty to supervise and control its employee, to use reasonable care in writing and developing the Ellucian Report.

316. Defendant Ellucian failed to exercise reasonable care in writing and developing the Ellucian Report.

317. Defendant USF failed to exercise reasonable care in writing, developing, publishing, supplying, and/or distributing the Ellucian Report and breached its duties to the Plaintiff in that, and not by way of limitation, they did not investigate or warn of the known errors associated with the report, and did not exercise an acceptable standard of care, i.e., what a reasonably prudent consultant would have known and warned about. Moreover, the report failed to provide cautions, caveats, or safeguards to prevent the injuries sustained by Plaintiff.

318. Defendant USF failed to properly investigate Andrea Diamond's findings and/or conclusions in the Ellucian Report, and as a result subjected Plaintiff to an unreasonable risk of injury when its report was released and published.

319. Defendants knew, or should have known, that the Ellucian Report contained unreasonable, unsupported conjecture and conclusions subject to misinterpretation and potentially harmful to Plaintiff.

320. Defendants USF and Ellucian nevertheless wrote, developed, published, supplied, and/or distributed the Ellucian Report, knowing of its unreasonable risk of injury to Plaintiff.

321. Defendants knew or should have known that Plaintiff would suffer injury as a result of their failure to exercise reasonable care.

322. Upon information and belief, Defendants knew or should have known of the harmful nature of the Ellucian Report, as set forth herein, but continued to write, develop, publish, supply, and/or distribute the Ellucian Report at the expense of the Plaintiff, in conscious and/or negligent disregard of the foreseeable harm caused by the Ellucian Report.

323. Defendant USF failed to disclose to the Plaintiff and the general public facts known or available to them, as alleged herein, in order to ensure Plaintiff's termination. This failure to disclose deprived the Plaintiff of the benefit of information necessary for her retention or continued employment.

324. In addition, Plaintiff will show that the Defendant USF's acts and omissions, when viewed objectively from the named Defendants' viewpoint, involved an extreme degree of risk, considering the magnitude and potential harm to the Plaintiff.

325. Defendants had actual, subjective awareness of the risk, but still proceeded with their scheme with a conscious indifference to the rights or welfare of the Plaintiff.

326. As a proximate result of the Defendants' negligence and gross negligence, the Plaintiff has been damaged and it seeks to recover all actual, consequential, incidental, and exemplary damages.

327. By virtue of the Defendants' negligence, the Defendants have directly, foreseeably and proximately caused the Plaintiff to suffer harm, including separation from her employment,

termination, pain and suffering, loss of estimation in the community, and economic loss. As a result, the imposition of punitive damages against the Defendant is also warranted.

328. As a direct and proximate result of the Defendants' negligence, the Plaintiff suffered injury and harm as previously alleged herein, ascertainable economic loss and damages, arising from the harm done to Plaintiff as a result of the Ellucian report.

### COUNT 15 – Civil Conspiracy – All Defendants

Plaintiff incorporates by reference the allegations of all paragraphs, as if fully set forth in this paragraph.

329. Defendant USF, namely its employees, agents, assigns, including Dosal, Thompson, Sullins, Wilcox, Garcia, and Thomas and Defendant Ellucian and Diamond, namely its employees, agents, assigns, conspired together in a scheme to defame, discredit, and terminate Plaintiff.

330. All of the above-named Defendants acted in concert and at the behest of one another to terminate Plaintiff.

331. In pursuance of the conspiracy, each of the above-named Defendants promised either individually or through their respective agents, USF and Ellucian, to perform consulting services in order to induce Angela DeBose to the April 15, 2015 meeting as a "set-up" for the purpose of writing a false report as pretext for her termination.

332. All of the Defendants have received compensation under the Consulting Agreement or at a minimum, an indirect benefit (e.g. keeping their jobs, additional pay, title, etc.) from having their invidious scheme carried out, as a result of Plaintiff's termination.

333. All of the above-named Defendants knew the expected outcome of the Consulting Agreement, but conspired together and signed the agreement in order to induce Angela DeBose

to the April 15, 2015 meeting under false pretenses for the purpose of writing a false report as pretext for her termination.

334. As a direct and proximate result of the civil conspiracy committed by all of the above-named Defendants, Plaintiff has been damaged.

**COUNT 16 – Tortious Interference with a Business Relationship by Defendant USF**

Plaintiff incorporates by reference the allegations of paragraphs 1 through 128, as if fully set forth in this paragraph.

335. After receiving her May 19, 2015 separation/termination notice, DeBose was offered a job by the University of North Florida (UNF) to implement predictive analytics once news of Plaintiff's termination became public.

336. UNF contacted USF as a courtesy to inform them of the hire and their hopes "to get Angela DeBose in the position before others became aware of her availability."

337. On May 26, 2015, Ralph Wilcox, USF Provost, called Earle C. Traynham, UNF Provost, to "poison the well" and discourage UNF from going through with hiring DeBose.

338. Wilcox stated DeBose was "awful," "toxic," and that he "wanted to get rid of her for years." Wilcox also stated that UNF "would regret" its decision if it proceeded to hire DeBose.

339. On May 27, 2015, following Wilcox's phone call, the offer from UNF was rescinded.

340. Subsequently, in June 2015, at the SUS Florida Summit meeting, Wilcox's role in undoing the UNF offer of employment was discussed following Dosal's disclosure to certain USF employees that Wilcox wanted the Plaintiff to be left with "nothing"—not "even a shirt" on her back. Wilcox stated he wanted DeBose "bare," "exposed," and "thrashed."

52

341. UNF's employment relationship with Plaintiff was the subject of a valid, oral contract as well as a continuing business expectancy.

342. Defendant Wilcox had knowledge of the employment offer between UNF and Plaintiff.

343. Upon information and belief, the interference by Defendant Wilcox did induce Earle C. Traynham, UNF Provost, to rescind the UNF employment offer with Plaintiff. This was not the first time Wilcox has tortiously interfered with future employment following a termination. Plaintiff has verifiable proof of other such interference by Wilcox against others.

344. Further upon information and belief, Defendant Wilcox improperly, intentionally, and unjustifiably interfered by having an improper reason, as well as, utilizing improper methods.

345. To wit, upon information and belief, Defendant Wilcox contacted and induced Earle C. Traynham, UNF Provost, to terminate the offer with Plaintiff, solely to see her with no immediate prospect for a professional job in higher education in hopes of humiliating and degrading DeBose, *leaving her with not even a shirt, her back bare and exposed, so that the thrashing she received* at his hands was plainly visible.

346. The termination of the employment offer with UNF by Defendant Wilcox has damaged Plaintiff.

347. Upon information and belief, Defendant Wilcox persisted in his course of action, despite the knowledge that his conduct would result in damage to Plaintiff, or at least was highly likely to result in damage to Plaintiff.

## COUNT 17 – Defamation of Character by Ralph Wilcox

Plaintiff re-alleges and incorporates herein the factual allegations contained in paragraphs 1 through 128 and 335 through 347.

348. Plaintiff and Defendant Wilcox have worked at USF together for the approximate period of time from July 2001 through May 19, 2015.

349. Defendant Wilcox made false, derogatory, and degrading statements to Earle C. Traynham, UNF Provost, regarding Plaintiff to harm her business reputation and business opportunity, without reasonable care as to the truth or falsity of those statements.

350. Defendant Wilcox also made false, derogatory, and degrading statements in meetings with members of the USF Community attended by Registrar's Office personnel when his action to terminate Plaintiff was questioned.

351. Defendant Wilcox falsely claimed that he "could not get any work out of DeBose." Defendant Wilcox falsely stated that DeBose was "resistant to change." Defendant Wilcox further accused DeBose of being "difficult," "uncollaborative," and "toxic." Defendant Wilcox stated that he had wanted to "get rid of her [DeBose] for years." Defendant Wilcox made public statements in public meetings and in public records where he "trashed" DeBose's reputation.

352. As a proximate result of Defendant Wilcox's false, derogatory, and degrading statements, Plaintiff has suffered damages in the form of, inter alia, loss of prospective employment, salary and benefits.

## COUNT 18 - Intentional Infliction of Emotional Distress by Defendant USF

Plaintiff re-alleges and incorporates herein the factual allegations contained in paragraphs 1 through 128.

353. From 2014 to 2015, Defendant USF subjected Plaintiff to an invidious scheme to terminate her following over 27 years of employment and exemplary performance.

354. USF knew or had reason to know that DeBose would be eligible to receive full retirement benefits at 30 years or age 55, estimated at $1.2 million.

355. USF took action to end DeBose's employment only months after celebrating and recognizing DeBose for 25 years at a Years of Service Awards ceremony.

356. Plaintiff was neither offered nor asked to resign or retire. Plaintiff was not offered a severance package. Rather, Plaintiff was subjected to false and disparaging statements, abused and maligned, overlooked for promotion and pay, threatened, separated, and terminated.

357. Plaintiff's access to USF employee services were cut-off. Plaintiff was publicly humiliated and told to return all USF property and leave the campus by Beedy in the presence of staff and students, as though she were a common criminal.

358. The total sum of Defendant's actions to publicly terminate Plaintiff was intentional and willful and calculated to humiliate and degrade DeBose.

359. The actions of Defendant resulted in direct and significant injury to Plaintiff.

360. As a direct result and proximate result of the intentional and willful acts of Defendant USF, the Plaintiff was injured and suffered damages to include, but not limited to, pain and suffering, mental anguish, and loss of enjoyment of life.

**COUNT 19 - Vicarious Liability of Defendant USF for the Intentional Acts of Defendants Dosal, Sullins, Thompson, Wilcox, Garcia, and Diamond and of Ellucian for the Intentional Acts of Defendant Diamond**

Plaintiff re-alleges and incorporates herein any and all factual allegations contained in this complaint.

361. The conduct of defendants Dosal, Sullins, Thompson, Wilcox, Thomas, Garcia, and Diamond were done in furtherance of the agency relationship that existed between the defendants and USF; therefore, USF is liable for the intentional acts of the defendants by virtue of their Agency relationship.

362. Additionally, the defendants' conduct was in furtherance of USF's invidious plan to terminate Plaintiff. Accordingly, USF is vicariously liable for the defendants' intentional acts due to their employee relationship.

363. As a direct and proximate result of the defendants' intentional acts, Plaintiff suffered injury, pain and suffering, mental anguish, loss of estimation, and loss of capacity for the enjoyment of life. These losses are either permanent or continuing and Plaintiff will suffer the losses in the future.

### COUNT 20 - Intentional Spoliation Against Defendant USF

Plaintiff realleges and incorporates all sections of paragraphs 1 through 128 above and further alleges that:

364. Defendant USF had the non-delegable duty to exercise reasonable care to maintain, preserve and make available to the Plaintiff true and correct copies of all public records pertaining to her and her employment at USF. In July 2015, DeBose filed a petition for Writ of Mandamus against USF with the Thirteenth Judicial Circuit Court (13CIR **Case Number 15-CA-005663**) to obtain and preserve public records previously denied her.

365. Notwithstanding this duty, Defendant, USF, breached this duty by:

a. Negligently and carelessly failing to maintain proper custody of public records pertaining to Angela DeBose's employment. Solis deleted and/or failed to preserve all re-

lated evidence, though he was specifically informed by Dosal in an August 2014 email

that DeBose accused him of discrimination—in advance of DeBose filing DIEO and

EEOC complaints.  (**Exhibit** – "Dosal Email to Solis About Discrimination")

      b. Negligently and carelessly failing to maintain proper custody of electronic and

hardcopy records pertaining to Angela DeBose's employment.  Solis was specifically

copied on an email from Ralph Wilcox, indicating that an adverse employment action

against DeBose was imminent yet Solis did not take action with Human Resources, In-

formation Technology, or Student Success et al. to preserve public records.  (**Exhibit** –

"Solis Email About Waddell's Personnel Records")

      c. Negligently discarding, deleting, or otherwise destroying non-transitory records

that should have been kept as "personnel-related" or as "records estimated for potential

lawsuit," given that USF was on notice since 2014 of its own invidious plan as well as

DeBose's expressed concern to Dosal, et al.  (**Exhibit** – "Solis Email About Destruction

of Telephone Records")

      d. Negligently and carelessly failing to maintain records concerning all

communications, documents, etc. about or concerning Angela DeBose from 2014

through 2015.  Though Paul Dosal was asked to produce his emails, he intention-

ally withheld email damaging to USF including the email concerning Caurie

Waddell; the webmaster@acad.usf.edu email; and emails in his possession about

or concerning Angela DeBose in his possession that were sent in the months of

April and May 2015, etc.

366. As a direct and proximate cause of Defendant USF's failure to maintain and make

available these records, Plaintiff is damaged in her ability to prove up a prima facie case of race-

gender discrimination on the part of Paul Dosal, Ralph Wilcox, et al. for their intentional

discrimination in both treatment and impact in hire, promotion, compensation, and severance of

Plaintiff compared to her similarly situated white counterparts at USF, through DeBose's

separation on May 19, 2015 and resultant termination on August 19, 2015.

367. Therefore, the Plaintiff is entitled to judgment against USF for its negligent failure

to maintain and make available the foregoing records and to damages more specifically set forth

hereinafter.

## DAMAGES

368. As a direct result of the Defendants acts and omissions, Plaintiff suffered damages

for which the Defendants are jointly and severally liable. The damages sought are within the

jurisdictional limits of this court.

369. Plaintiff prays that she recover from the Defendants actual damages, statutory

damages, general damages, special damages, nominal damages, punitive damages, expenses,

costs of court and all other relief, either general or special, at law or in equity, to which she is

entitled.

370. In addition, Plaintiff seeks fees, expert witness fees, pre-judgment and post

judgment interest, and costs of court as allowed by law.

## JURY DEMAND

371. Plaintiff hereby demands a jury trial on all issues that can be submitted to a jury.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests judgment against the Defendants for the

following: (1) actual damages; (2) fees; (3) exemplary damages; (4) punitive damages, as

applicable; (5) pre-judgment and post-judgment interest; (6) court costs; and (7) such other and further relief in law and in equity as this Court may deem just and proper.

Respectfully submitted this __4th__ day of December, 2015.

Angela W. DeBose
1107 W. Kirby Street
Tampa, FL 33604
(813) 932-6959

**VERIFICATION**

Personally appeared before the undersigned, ANGELA DEBOSE, who first being duly sworn, deposes and says that the allegations of this Verified Complaint for damages and Demand for Jury Trial, consisting of paragraphs 1 through 371, inclusive, are true and correct to the best *of her knowledge, information, and belief.*

ANGELA DEBOSE

STATE OF FLORIDA            )
COUNTY OF HILLSBOROUGH )

The foregoing instrument was acknowledged before me this 4th day of December, 2015 by ANGELA DEBOSE, who is either personally known to me or who produced _____ as identification, and who did take an oath.

Wilmarie Filomeno Velazquez
NOTARY PUBLIC
STATE OF FLORIDA
Comm# FF011691
Expires 4/24/2017

Notary Public, State of Florida

My Commission Expires: ___4-24-17___

60