UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**ANGELA DEBOSE,**

     **Plaintiff,**

                                    **Case No. 8:15-cv-02787-EAK-AE**

**v.**

**UNIVERSITY OF SOUTH FLORIDA
BOARD OF TRUSTEES, and
ELLUCIAN COMPANY, L.P.**

     **Defendants.**

---

**THIRD AMENDED COMPLAINT FOR EQUITABLE AND INJUNCTIVE
RELIEF AND DAMAGES, AND DEMAND FOR JURY TRIAL**

Plaintiff ANGELA DEBOSE (hereinafter "Plaintiff" or "DeBose") hereby sues UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES ("USFBOT") and ELLUCIAN COMPANY, L.P. ("Ellucian"), together "Defendants," and in support thereof, Plaintiff states as follows:

**Jurisdiction, Parties and Venue**

1.     This is an action for unlawful employment practices including gender and race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, as amended ("Title VII") and the Florida Civil Rights Act of 1992, §760.01, Fla. Stat., *et seq.* ("FCRA"); intentional interference with a business relationship; civil conspiracy; and breach of contract under Florida law. Plaintiff seeks equitable relief and damages including: declaratory relief and injunctive relief; reinstatement to employment, or in the alternative, front pay; promotion, or in the

alternative, front pay; lost pay and benefits; liquidated damages; compensatory damages; attorneys' fees, costs and expenses; and all other relief this Court deems just and proper.

2.      This Court has jurisdiction over this action pursuant to the United States Constitution, Art. III, §2, Cl. 1; 28 U.S.C. §§1331, 1343, 2201 and 2202; 42 U.S.C. §2000e-5; 42 U.S.C. §12117; 29 U.S.C. §2617; and supplemental jurisdiction pursuant to 28 U.S.C. §1367.

3.      Plaintiff is a resident of Hillsborough County, Florida, and a citizen of the United States of America.

4.      Defendant USFBOT is the governing body of the University of South Florida (USF), and public body corporate created by Article IX, Section 7 of the Constitution of the State of Florida.  Defendant USFBOT is based at 4202 E. Fowler Avenue, Tampa, Florida.

5.      Defendant USFBOT is a body corporate authorized to sue and be sued under the laws of the State of Florida on behalf of USF.  USF is an "employer" in an "industry affecting commerce" as defined by federal and Florida law.  USF is part of the State University System with its main campus in Hillsborough County, Florida. At all times material hereto, USF was and is a public university within the State University System of the State of Florida and a "state agency," pursuant to §216.011(1)(qq), Florida Statutes.

6.      Ellucian Company, L.P. is a Delaware limited partnership with its principal place of business in Fairfax, Virginia.  Ellucian has  significant contacts with Florida, has an office in Maitland, Florida, and places employees throughout the state of Florida, including the main USF campus in Hillsborough County.

7.     Plaintiff was an employee of Defendant USFBOT and is an aggrieved person within the meaning of Title VII, and the FCRA.

8.     Defendant USFBOT is an employer within the meaning of Title VII, and the FCRA.

9.     Venue in the Tampa Division of the Middle District of Florida is proper as the unlawful employment-related practices described herein occurred in Hillsborough County, Florida; Plaintiff is a resident of Hillsborough County, Florida, and was employed by Defendant USFBOT in Hillsborough County, Florida.  28 U.S.C. §1391; Middle District Local Rule 1.02(c).

10.     Venue in the Tampa Division of the Middle District of Florida is proper as to Defendant Ellucian because a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district, and/or Defendant Ellucian knew or should have known that its acts and omissions as alleged herein would have a substantial effect on parties in this judicial district.

11.     Plaintiff has met all conditions precedent and exhausted all administrative remedies prior to filing suit, including:

a.     Filing a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") via dual-filing same through the Florida Commission on Human Relations ("FCHR");

b.     Receiving a Notice of Right to Sue from the EEOC within the appropriate amount of time for filing this action;

      c.     Filing this action more than 180 days from the time Plaintiff filed her Charge of Discrimination without the FCHR issuing a determination on the charge; and

      d.     Defendant USFBOT has been given notice of tort action taken against it pursuant to the requirements of section 768.28(6)(a), *Florida Statutes*.

### Facts

12.     Plaintiff's gender is female and her race is Black.

13.     DeBose was initially hired by USF in or about January 1988 as a computer programmer/analyst.

14.     In October 1996, after holding several progressively higher level positions, DeBose was hired to the position of University Registrar, pursuant to a written Employment Agreement, renewed annually.

15.     DeBose has more than twenty (20) years of Registrar-related experience and information systems experience, including many years as a peer consultant to other higher education institutions, and has served four different presidents and various provosts during her time working for USF.

16.     During all times relevant pursuant to this action, DeBose's performance was evaluated as better than satisfactory, with DeBose receiving exemplary performance ratings.

17.     In 2010, Paul Dosal, a history professor for Defendant USFBOT, was appointed by Ralph Wilcox, Provost, to serve initially as interim director over the Division of Enrollment Planning & Management and to lead the USF Student Success initiative.

18.     DeBose helped Dosal onboard to his new role and assisted him with his role and responsibilities. Subsequently, Dosal was appointed approximately one year later by Wilcox to the position of Vice Provost for Student Success.

19.     In 2010-2011, Dosal added two additional responsibilities to DeBose's range of duties as University System Registrar—to establish a new Transfer Articulation Area and to implement Degree Works, a degree audit and advising system.  For both responsibilities, DeBose met or exceeded expectations and received an exemplary performance rating.

20.     In 2012, Dosal assigned DeBose the task of implementing Academic Tracking at USF.  DeBose implemented a tracking system in one year and Dosal rated DeBose's performance as exemplary.

21.     In 2013, DeBose noticed a marked change in the behavior exhibited by Dosal as her immediate supervisor, but also Bob Sullins, Travis Thompson, and Ralph Wilcox, towards DeBose.   USF's employees individually and collectively engaged in continuous and unwarranted criticism of DeBose from 2013 forward, including by way of example:

    a.     Making DeBose's race an issue by seeking to portray or stereotype her as an angry Black woman and/or "Black bitch";

    b.     Creating a work environment that was permeated by threatening behavior, isolation, bullying, and repeated degrading epithets;

    c.     Making false, harmful derogatory statements about DeBose to others within the USF Community, to raise questions about DeBose's leadership, competence, professionalism, and business acumen or ability; and

       d.     Giving conflicting directives and messages to frustrate DeBose's purpose in performing her role as University System Registrar.

22.     On June 6, 2014, Bob Sullins sent an email to Dosal stating that "Angela's tirades have driven Caurie to resign!" Sullins continued, "We should do everything we can to head that off!" At the time Sullins sent this email, Caurie Waddell ("Waddell") was no longer an employee in the unit managed by DeBose but rather working in another USF department.

23.     On June 12, 2014, Debose received word that a damaging email sent by Thompson to Dosal copying Bob Sullins had been circulated around campus, stating Waddell was leaving USF to "get away from the tyranny of Angela" and that Thompson was working with Dosal and Sullins to fire DeBose.

24.     Waddell, aware of the email, stated to Dosal and a number of USF employees that "Travis [Thompson] sent the email to Dosal". Waddell stated that the contents of the email were "false" as to her reason for leaving USF.

25.     On June 20, 2014, an email was sent from webmaster@acad.usf.edu, an email account exclusively controlled by limited staff within the Provost's Office, which referred to DeBose's alleged behavior as "hostile" and "self-serving". The email stated DeBose had "become a cancer" and called for her removal.

26.     Ralph Wilcox, Provost and Executive Vice President, and Thompson, a former web services administrator for the Provost's Office, both had permissions to send and receive emails using the webmaster@acad.usf.edu account, which was unpublished since 2005 and not available for general use.

27.    On   June   22,   2014,   Wilcox   forwarded   the   email   from webmaster@acad.usf.edu to Dosal, stating they "need to discuss this".  Dosal responded back that he [Dosal] and Sidney Fernandes, Chief Information Officer of Information Technologies, had agreed to "reorganization."  Wilcox, asking no questions, thanked Dosal for "getting ahead of this."

28.    On June 23, 2014, Dosal asked DeBose to meet him to discuss a "troubling email" he received, which led him and the Provost to make the decision to move Degree Works to IT.

29.    DeBose disclosed to Dosal that she had learned about an email that contained damaging, harmful, and derogatory statements and that Thompson claimed to be working with Dosal and Sullins to "get her fired."

30.    Dosal responded only, "you know about the email?"  Dosal made no statements to deny or refute DeBose's statements.

31.    DeBose asked for a copy of the email.

32.    Dosal declined the request, stating he would not provide DeBose a copy.

33.    DeBose stated to Dosal that the email was a public record.

34.    Dosal became very defensive and cautioned DeBose against "getting legal" with him.  Dosal stated that he investigated Thompson's email by personally meeting with Waddell.  Dosal said Waddell told him the information he received was false, that she did not make the statements, and DeBose had nothing to do with her leaving USF.

35.    Dosal stated he also asked HR to conduct an exit interview with Waddell to "see if she would give them a different account" and that the email was "proven false and didn't pan out."

36.     DeBose asked Dosal why he had been treating her so poorly and why Dosal and the Provost [Wilcox] took action against her to decrease her scope or span of authority, predicated on a lie or false, malicious email.  DeBose stated that punitive actions against her would give Thompson's false and damaging statements instant credibility and asked that action be taken to address Thompson's conduct.  DeBose reminded Dosal of other similar conduct by Thompson.

37.     Dosal admitted to the other incidents by Thompson, a planned 360 survey, and his own sudden mistreatment of DeBose, starting in 2013.

38.     DeBose then asked Dosal why he was not more supportive.

39.     Dosal stated he was "conflicted," "the Provost wants this," and "the Provost has been good to me."

40.     On June 25, 2014, after admitting to plans to conduct a 360 feedback survey specifically targeting DeBose and the Registrar's Office, Dosal dispatched emails announcing the change to move Degree Works and attributed the success achieved thus far with the system to DeBose.  Dosal never disclosed to DeBose that he contacted several USF staff and had already taken action to move Degree Works immediately after receiving the "troubling" email.

41.     In late June, following the announcement to move Degree Works, DeBose received a number of reports that Dosal, Sullins, and Thompson were continuing their efforts to have her fired and of degrading intersectional race-gender discriminatory statements made about DeBose by Dosal, Thompson, et al. in emails.

42.     On June 30, 2014, Dosal requested that DeBose meet with him again concerning the email that was reported to have been sent by Thompson.

43.     DeBose, hearing that this meeting was to terminate her employment, contacted the USF Office of the General Counsel to discuss with Gerard Solis, USF Counsel, possible options, including a non-disparagement agreement.     DeBose acknowledged that Solis "represented USF and did not represent her."  DeBose disclosed the facts as she knew and understood them, including Dosal's unfair treatment, the email, and Dosal's statement not to get legal with him.  DeBose asked Solis if he could tell her why she was "on USF's radar."

44.     Solis responded, "You have a J.D., don't you.  Understandably, you need to protect yourself."  Solis said he thought "three-years pay was not out of range" but that it "cannot be in a lump sum" because of a recent regulatory change.  Solis stated that he was not aware that DeBose was on the radar and that "he had not received any calls or emails" about DeBose.  After speaking with Solis, DeBose called the President's Office to inquire if the President was dissatisfied with DeBose's work or office.  DeBose was given reassurances by the President's staff that President Genshaft had no criticisms and or desire to remove DeBose from her role as Registrar.  Rather, the staff shared that the President tried but her efforts to persuade her Board to "remove Ralph" were unsuccessful.

45.     At the meeting, Dosal started with, "Angela, you're not going to be fired today."  Dosal commended DeBose for her work in successfully launching Degree Works and implementing 8-semester Academic Tracking plans in a year's time, "exactly as requested."

46.     Dosal claimed for the first time that "Travis did not send the false email," contradicting his complete silence on the issue in the June 25, 2014 meeting with DeBose. Dosal said the statements came from someone else who gave Thompson "bad information."

47.     Dosal did not disclose that Thompson claimed to have received the bad information from Cynthia Brown Hernandez.   Dosal did not at any point disclose or discuss the webmaster@acad.usf.edu email sent on June 22, 2014 in the Provost's exclusive control.

48.     DeBose replied to Dosal that she had heard from Waddell and others that Thompson sent the email.  DeBose stated this was not a first occurrence by Thompson and his conduct would continue to decline, if not addressed or corrective action taken.  DeBose left the meeting without giving Dosal the non-disparagement letter, which originated from the telephone call with Solis.  DeBose telephoned Solis again and left him a detailed message about the outcome of her meeting with Dosal.

49.     In July 2014, Dosal's conduct worsened towards DeBose.  Dosal created an even more hostile work environment permeated by bullying and racially-motivated behavior.  Dosal unfairly isolated DeBose from meetings, excluded her from discussions, and otherwise treated her as though she was not a director in the Student Success/Academic Affairs division.  On most occasions when Dosal encountered DeBose, he was on edge and hostile in words, body language, and expression.  In addition, Dosal, in conjunction with Sullins and Thompson, drew others into their attacks to oust DeBose, including Carrie Garcia and Sarah Thomas.

50.     Dosal also began verbally attacking DeBose, exhibiting threatening behavior, making discriminatory remarks or references to marginalize DeBose and her race, to make her feel like an outsider, to frustrate DeBose, in hopes of accelerating her departure.  Dosal made it clear to DeBose on several occasions that she would not have

any support and seemed determined to develop in DeBose a fear of Wilcox.  Dosal stated that:

a. He and the Provost [Wilcox] pushed out Jennifer Meningall, "another hostile Black woman" from her position of Vice President of Student Affairs;

b. He and the Provost expressed a plan to maintain diversity by increasing international enrollment to offset anticipated declines in Black enrollment from plans to reduce the number of Pell Grant recipients at USF by recruiting students of families with higher incomes by concentrating efforts on certain zip codes;

c. Though plans to put USF in the top 50 by Wilcox had failed, they were committed to significant reductions in Black student enrollment and were prepared to explain away public concern by shifting the focus to total enrollment; they would express a commitment to diversity; however, their goal was the Fall Term student profile rather than social expectations for minority student access to college—(i.e. more smarts and less Blacks DeBose's white colleagues who heard these statements called her to see if she was okay or to warn her not to repeat what she heard to anyone;

d. He and the Provost [Wilcox] did not want USF to be viewed as an "HBCU" (that is historically Black college or university) "on the same level as FAMU" and demanded changes in any areas that put USF in the bottom tier with FAMU;

e. Wilcox referred to Black students in disparaging ways and used references to infer that Blacks were animals and "thugs"; and

f. The Provost was not a person to back down, having taken on "the President, her Jewish contingent led by Momberg, and John Long" and won by "shaking her up" with a no confidence letter from the faculty concerning her "draconian" budgetary tactics and "having the ear of her Board and an influential trustee."

51.    On July 15, 2014, Paul Dosal sent a note asking again to meet with DeBose early morning at 8:45 a.m.

52.    Dosal started by expressing that there were "going to be changes in EPM."

53.    DeBose asked Dosal if he meant "Student Success."

54.    Dosal replied, "No, EPM."  Dosal announced to DeBose that he would be "filling Bob Spatig's old position" of Assistant Vice President of Enrollment Management with Billie Jo Hamilton, without a search. Dosal said, he would be sure to "not create another Bob [Spatig]" by giving Billie Jo "a trial run to learn and serve in the position." Dosal stated, "If Billie Jo was not successful, she will go back to her role as Director of Financial Aid."  Dosal said Billie Jo's compensation would be adjusted.

55.    DeBose asked Dosal why he would "fail to conduct a search, the recommended and usual practice to fill vacant or new positions, to not deprive qualified applicants the opportunity to vie for positions."  DeBose also asked why she was "overlooked."

56.    Dosal responded that he and the Provost [Wilcox] want and approved this change and his action had "complete support" from the institution's leadership.

57.    Dosal stated that the Provost [Wilcox] and his [Dosal's] contracts had been renewed and extended through 2019.

58.     Dosal offered to DeBose to serve in her position as University System Registrar through 2019, if she "stopped pressing" him with questions and congratulated Hamilton.

59.     DeBose accepted Dosal's offer to extend her employment through 2019. DeBose discontinued any further questions and stated that she would congratulate Hamilton, and later did so.

60.     DeBose also asked Dosal to review her compensation and title.  Dosal anticipated the request and did not take it seriously, having made a bet with Alexis Mootoo that DeBose would request equity or parity with Hamilton.

61.     On July 28, 2014, DeBose filed an EthicsPoint complaint against Thompson for misconduct, following his efforts to further isolate DeBose by excluding her from Executive Council for Academic Advisor (Exec-CAA) meetings, which her position or office had historically both attended and actively participated.

62.     DeBose complained about Sullins and also Dosal for failing to appropriately supervise Thompson.

63.     USF Audit & Compliance and Human Resources contacted DeBose concerning her EthicsPoint complaint against Thompson but took no further action to investigate.

64.     On August 27, 2014, DeBose filed discrimination charges against Dosal with the USF Office of Diversity, Inclusion and Equal Opportunity (DIEO).  As additional support for her claims, DeBose cited Dosal's actions to terminate DeBose's employment and his anticipatory breach of the verbal agreement to extend DeBose's employment through 2019.

65.     The work environment became increasingly hostile following DeBose's DIEO complaint by way of the following examples:

a. DeBose was excluded from meeting invitations;

b. For standing scheduled meetings, DeBose was not notified of meeting cancellations or changes in meeting locations and thus was excluded from attending;

c. DeBose was contacted several times about her performance appraisal and self-assessment but each scheduled evaluation meeting was canceled and documents already provided were repeatedly re-requested;

d. DeBose was not evaluated in the 2014 year;

e. DeBose was not privy to emails and other communications distributed or exchanged among Student Success/EPM directors and senior leadership; and

f. DeBose and Registrar's staff were repeatedly subjected to use of the word "nigger" when Dosal's central staff visited the office, as though Dosal, who was aware of Alexis Mootoo's repeated usage of the word, had given her license or permission to use the word in the presence of DeBose and others on her staff, to make them extremely uncomfortable.

66.     In late December 2014, DeBose filed a discrimination complaint with the U.S. Equal Employment Opportunity Commission (EEOC), alleging disparate treatment, disparate impact, and hostile retaliatory work environment claims.

67.     On February 4, 2015, the situation had degraded; therefore, DeBose filed for a Temporary Restraining Order that was later converted to a Preliminary Injunction with the Middle District Court of Florida (Case Number 8:15-mc-18-T-EAK-MAP) against

Dosal for berating, marginalizing, and making DeBose extremely uncomfortable and threatening DeBose's job in individual meetings with her.

68.　　DeBose requested the preliminary injunction to maintain the status quo pending the resolution of her EEOC complaint to prevent further retaliation by Defendant, including termination.

69.　　On February 4, 2015, Dosal reprimanded by DeBose for allegedly calling Alexis Mootoo, a member of Dosal's central staff, "little girl." Dosal engaged Mootoo and Tonia Suber with USF Human Resources in his invidious plan to retaliate against DeBose for filing the EEOC complaint, though Suber was charged with investigating DeBose's EthicsPoint and DIEO complaints. Suber called upon Dosal to reward Mootoo with a promotion and salary increases for her cooperation, and Dosal readily complied. Wilcox was aware of these events and Dosal consulted with him before issuing the reprimand.

70.　　On February 6, 2015, DeBose added a charge of retaliation to her EEOC (and DIEO) complaint.

71.　　On February 10, 2015, DeBose filed a grievance with USF Human Resources to object to the personnel action of the reprimand and lack of procedural "due process" safeguards, as provided for under USF and SUS policy and DeBose's employment contract. DeBose provided her own sworn affidavit and affidavits/notarized statements from three witnesses that the alleged action did not occur.

72.　　On February 18, 2015, a USF St. Petersburg Human Resources staff assigned by USF Human Resources to investigate the complaint, canceled DeBose's grievance.

73.     For the remainder of February and in the month of March, Dosal working in conjunction with others, sought to create a for-cause justification to terminate DeBose, including efforts to allege that:

a.      DeBose allowed the Registrar's budget to overspend last year's baseline budget into an alleged deficit—knowing that committed funds were expended under an approved "office renovation" budget and that the unit had large cash reserves in its carryforward and auxiliary accounts that were being withheld;

b.      DeBose was inappropriately paying unit staff extra state compensation—knowing the secondary employment to support INTO-USF, Fully Online Vendor Programs, and Study Abroad Home of Record were approved pay-for-services activities authorized by Academic Affairs, Human Resources, and State of Florida/Florida Board of Governors (FLBOG) regulation; and

c.      DeBose was uncollaborative by assisting other units and staffs through knowledge transfer and training rather than merely handing over unit work product.

74.     On April 10, 2015, Carrie Garcia sent DeBose an email to meet with Ellucian on April 15, 2015 for a one-hour meeting concerning "pain points" with Degree Works—a system DeBose had not managed since June 2014, when Dosal and the Provost moved it to IT.

75.     DeBose accepted Garcia's meeting invitation but was not informed the meeting was pursuant to a contract for consulting services with Ellucian.  Garcia, Thompson, Sullins, Fernandes, and other USF staff on the Degree Works Steering Committee convened together immediately following DeBose's acceptance of the Ellucian

meeting invitation in furtherance of their common scheme to conspire and plot against DeBose Garcia also had several communications with staff employed by Ellucian.

76.     At all times relevant, Garcia did not provide DeBose a meeting agenda or an advance copy of questions.

77.     DeBose invited two employees to attend the meeting with her, Rolanda Lewis and Shruti Kumar.   Rolanda Lewis ("Lewis") declined, having other meetings. Shruti Kumar ("Kumar") accepted and attended with DeBose.

78.     Andrea Diamond, Functional Consultant with Ellucian, conducted the April 15, 2015 meeting.

79.     Diamond did not ask DeBose or Kumar questions about Degree Works implementation or "pain points".

80.     Diamond asked questions about the Banner Student Information System and Office of the Registrar business processes.

81.     DeBose and Kumar answered the questions posed by Diamond for nearly one hour and wrote a detailed response to one of the questions asked.

82.     Diamond did not make any recommendations and did not forward any additional questions to DeBose.

83.     On May 11, 2015, Dosal emailed DeBose a copy of the "Ellucian DegreeWorks Post-Implementation Assessment Report" and for the first time a meeting agenda was provided to DeBose.

84.     Dosal stated to DeBose that he was giving her the "opportunity to respond" before discussing the report with the Degree Works Steering Committee. Dosal did not state at any point to DeBose that notice of the Ellucian report and/or the opportunity to

respond to the Ellucian Report was related to or concerned possible personnel action against DeBose.

85.     Dosal forwarded the Ellucian DegreeWorks Post-Implementation Assessment Report to Wilcox and also to the USF General Counsel's Office, specifically Solis.

86.     Diamond's report falsely stated that Lewis was kept from attending the meeting, though DeBose disclosed to Garcia that Lewis would not be attending due to a scheduling conflict.

87.     Diamond also alleged that the Registrar's Office was a "high risk" to Student Success, and "the registrar's office is not willing to encompass change," though Diamond did not recommend any changes to DeBose or Kumar.

88.     Based on Plaintiff's knowledge, information, and belief, Diamond did not conduct a risk assessment at, prior to, or following the April 15, 2015 meeting.

89.     DeBose emailed Kumar and Lewis a copy of the documents sent by Dosal—the Ellucian Report and Agenda.

90.     On May 11, 2015, Lewis responded to DeBose that she did not attend because she had other meetings.

91.     On May 11, 2015, Kumar also responded in contradiction to the general accusations made in the report.  Kumar also sent a second email contradicting Diamond's report.

92.     On May 11, 2015, DeBose replied to Dosal's inquiry and included the responses from Lewis and Kumar.  DeBose also forwarded other relevant emails with her response.

93.     DeBose wrote that the report from Diamond contained several functional errors and contained "criticisms all the way around."   DeBose stated the report did not appear helpful to move USF forward.  DeBose's expectation was that her entire response, including attachments from Lewis and Kumar would be included for the Steering Committee's review.

94.     DeBose received word that Dosal presented to the Steering Committee that DeBose "criticized the report."  Dosal asked those in attendance, "Do you think there is anything wrong with the report?"  The Steering Committee members responded "no" and Dosal stated, "It's now up to the Provost."

95.     Dosal did not provide DeBose's collective written response and the documents forwarded from Lewis and Kumar.

96.     On May 19, 2015, Kofi Glover ("Glover") requested to meet with DeBose, through his administrative assistant, about the "Ellucian Report" on behalf of the Provost [Wilcox].

97.     DeBose sent Glover an email, inquiring how she might prepare and if others should attend.

98.     Glover did not respond to the email.

99.     As DeBose arrived at the meeting location, she received a phone call from USF employee Tony Embry and was told prior to entering the meeting with Glover that Dosal and Sullins requested to meet with Registrar's Office Managers "about Angela."

100.     DeBose walked into the meeting room where Glover and Mike Beedy ("Beedy") were seated.  Glover immediately handed DeBose a termination letter from Wilcox.

101.    Glover never brought up the matter of the Ellucian Report or discussed anything with DeBose aside from the termination letter itself.

102.    The termination letter from USF Provost, Ralph Wilcox, stated that DeBose was being terminated from her employment not for cause or for disciplinary reasons but at his "prerogative," directly violating the term of Plaintiff's employment contract that would have renewed effective July 1, 2015.[1]

103.    USF terminated DeBose amid discrimination complaints with DIEO and the EEOC.

104.    USF terminated DeBose amidst a court action with the Middle District of Florida for preliminary injunction to maintain the status quo under Section 706(f)(2) of Title VII of the 1964 Civil Rights Act.

105.    DeBose was under contract through June 30, 2015.

106.    Dosal offered and DeBose accepted an extension of her employment contract through 2019.

107.    DeBose was asked to leave the campus of USF immediately and was separated from her employment.

108.    DeBose was forced by USF to take professional leave starting May 19, 2015, to exhaust all of her annual (vacation) leave.

---

[1] Plaintiff is engaged in an ongoing effort to obtain copies of her employment records and supporting documents from Defendant USFBOT such as the 2014-2015 employment contract, resulting in her currently seeking a Writ of Mandamus and Declaratory Judgment against USFBOT, Case No.: 15-CA-5663 in the Thirteenth Judicial Circuit Court in Hillsborough County, for violations of the Florida Public Records Act, Fla. Stat. §§ 119.01 et seq. Plaintiff intends to obtain additional supporting records throughout the course of this action and attaches examples of previous employment contracts she currently has in her possession for this Court's review. *See Composite Exhibit A.*

109.    DeBose was given a termination date of August 19, 2015, after which she would be paid out her sick leave, by USF.

110.    When DeBose returned to her office to collect her belongings, Beedy followed DeBose and demanded in the presence of students and staff that DeBose leave all USF property.

111.    Beedy followed DeBose as she left the building.  Beedy stated that DeBose should contact him with all questions.

112.    Several Registrar's staff members objected to Beedy treating DeBose "like a common criminal".

113.    DeBose was not terminated in accordance with USF policy or in accordance with the terms and conditions of her employment.

114.    DeBose was not permitted to grieve the separation or termination actions because Wilcox's termination letter stated the action was not for cause, while pointing publicly to the media, the at large public, and the USF community that it was due to the "Ellucian Report" and his claim that DeBose was "not collaborative."

115.    DeBose was not afforded due process rights under the Administration Discipline procedure which states the following steps must be taken before dismissal can occur:

a. A written request to dismiss the employee must be submitted to Human Resources, with approval from the dean/director/designee of the employee's college/division.  The request must include any pertinent documentation to support the action.

b. Human Resources will review the documentation to determine if there is just cause for dismissal.  If so, the dean/director/designee is delegated authority to notify the employee in writing of the proposed action.  The employee is given 10 calendar days from the date of receipt of the notification to respond in writing to the proposed action.

c. The employee is typically placed on administrative leave or annual leave during the 10-day response period.

d. If the employee provides no compelling reason for dismissal not to occur, Human Resources will authorize the dean/director/designee to notify the employee in writing that the dismissal action will be taken and its effective date.

116.   Following DeBose's separation, DeBose was offered a job by the University of North Florida (UNF) to implement predictive analytics.

117.   UNF contacted USF as a courtesy to inform them of DeBose's hire and their desire to have DeBose in the position before others learned of DeBose's availability.

118.   On May 26, 2015, Ralph Wilcox, Provost, called the UNF Provost to interfere with and discourage DeBose's hire.

119.   Wilcox made several false and degrading statements about DeBose, including stating that DeBose was "awful" and "uncollaborative," that he wanted to get rid of DeBose long ago, and that UNF would "regret it" if they were to hire DeBose.

120.   On May 27, 2015, the offer of employment with UNF was rescinded.

121.   In June 2015, following the SUS Florida Summit meeting, Dosal disclosed that Wilcox "took great pleasure" in ruining DeBose's opportunity and desired to "see her [DeBose] with nothing."

122.    On June 15, 2015, DeBose contacted staff at UNF who confirmed Wilcox's involvement in "poisoning the well" to prevent DeBose's hire.

123.    Dosal, Sullins, Thompson, and Wilcox made degrading, offensive, and discriminatory statements about DeBose in public records and public meetings, in the course and scope of their employment with USF.

124.    The Defendants, USFBOT and Ellucian, are joint tortfeasors, jointly and severally liable to DeBose for her injuries.   Plaintiff DeBose has complied with all administrative prerequisites and conditions precedent prior to the institution of this lawsuit.

125.     As a result of the foregoing, Plaintiff has suffered lost wages and benefits and will continue to suffer these damages in the future. In addition, Plaintiff had to retain the undersigned law firm to which she is obligated to pay reasonable attorneys' fees, costs and expenses.

### COUNT I - against Defendant USFBOT
### Gender Discrimination in Violation of Title VII and FCRA

126.    Plaintiff incorporates Paragraphs 1 – 11 and 12 – 125 above as if fully set forth herein.

127.    At all times relevant hereto, Plaintiff performed her duties in a satisfactory, professional and highly competent manner.

128.    Defendant USFBOT subjected Plaintiff to disparate treatment based on her gender (female) in violation of Title VII and FCRA, and because she is both Black and female.

129.    Defendant USFBOT's actions against Plaintiff, including but not limited to the failure to promote her and the termination of her employment, constitute adverse

employment actions based upon Plaintiff's gender, and because she is both Black and female.

130.     As a result of Defendant USFBOT's unlawful actions, Plaintiff has suffered and continues to suffer, past and future monetary losses, including damages in the form of lost wages and other benefits, damages to her career and to her professional and personal reputations, humiliation, emotional pain and suffering, mental anguish and stress, loss of enjoyment of life, and other non-pecuniary losses, and Plaintiff will likely continue to suffer these losses and impairments in the future.

131.     Additionally, Defendant USFBOT's unlawful actions caused Plaintiff to incur reasonable attorneys' fees, costs and expenses.

**WHEREFORE,** Plaintiff respectfully requests that this Court:

A.     Enter a judgment in favor of Plaintiff and against Defendant USFBOT declaring that Defendant USFBOT unlawfully discriminated against Plaintiff in violation of Title VII and/or the FCRA; and/or

B.     Issue a mandatory injunction:

1)     Requiring Defendant USFBOT to effectively plan, develop, undertake, implement and monitor a plan designed to ensure that Defendant USFBOT's employees are not subjected to discrimination; and/or

2)     Enjoining Defendant USFBOT from denying Plaintiff any of her rights, privileges or benefits of employment or otherwise treating her differently on account of her gender and/or race; and/or

C. Reinstate Plaintiff to employment with Defendant USFBOT, or, in the alternative, award Plaintiff front pay; and/or

D. Upon reinstatement to employment, promote Plaintiff to the position to which she would have been promoted absent the discrimination, or, in the alternative, award Plaintiff front pay resulting from the missed promotion; and/or

E. Award Plaintiff all lost pay and benefits; and/or

F. Award Plaintiff compensatory damages; and/or

G. Award Plaintiff her costs, expenses and attorneys' fees pursuant to Title VII and/or the FCRA; and/or

H. Retain continuing jurisdiction in order to ensure compliance with the terms of the mandatory injunction requested herein; and

I. Grant such additional relief as this Court deems just and proper.

### COUNT II – against Defendant USFBOT
### Unlawful Retaliation in Violation of Title VII and FCRA

132. Plaintiff incorporates Paragraphs 1 – 11 and 12 – 125 above as if fully set forth herein.

133. Title VII and the FCRA forbid retaliation against an employee because she has opposed an employment practice made unlawful by Title VII and/or the FCRA, or because she engaged in EEO activity, filed a charge or participated in any proceeding under Title VII and/or the FCRA.

134. Plaintiff engaged in protected activity on several occasions as described in the paragraphs above when she complained about gender discrimination, including but not

limited to: filing an EthicsPoint complaint, filing a complaint with Defendant USFBOT's DIEO, filing a Charge of Discrimination with the EEOC, filing a petition for a preliminary injunction in U.S. District Court Middle District of Florida.

135.    The actions of Defendant USFBOT, as fully set forth above, including but not limited to: failing to promote Plaintiff, terminating her employment on or about August 19, 2015, and giving a prospective employer (UNF) a poor reference were taken in retaliation for Plaintiff's opposition to the discriminatory treatment based on her gender, and violated Title VII and/or the FCRA.

136.    The foregoing actions are the types that are reasonably likely to deter protected activity by Plaintiff and/or other employees, and therefore constitute retaliation in violation of Title VII and/or the FCRA.

137.    As a result of the foregoing, Plaintiff had to retain the undersigned law firm to which she is obligated to pay reasonable attorneys' fees, costs and expenses.  Plaintiff is entitled to recover her attorneys' fees, costs and other litigation expenses from Defendant USFBOT as a prevailing party pursuant to Title VII and/or the FCRA.

**WHEREFORE,** Plaintiff respectfully requests that this Court:

A.     Enter a judgment in favor of Plaintiff and against Defendant USFBOT declaring that Defendant USFBOT unlawfully retaliated against Plaintiff in violation of Title VII and/or the FCRA; and/or

B.     Issue a mandatory injunction:

1)     Requiring Defendant USFBOT to effectively plan, develop, undertake, implement and monitor a plan designed to ensure that USF employees are not subjected to unlawful retaliation; and/or

2)      Enjoining Defendant USFBOT from denying Plaintiff any of her rights, privileges or benefits of employment or otherwise treating her differently on account of her protected activity; and/or

C.      Reinstate Plaintiff to employment with Defendant USFBOT, or, in the alternative, award Plaintiff front pay; and/or

D.      Upon reinstatement to employment, promote Plaintiff to the position to which she would have been promoted absent the retaliation, or, in the alternative, award Plaintiff front pay resulting from the missed promotion; and/or

E.      Award Plaintiff all lost pay and benefits; and/or

F.      Award Plaintiff compensatory damages; and/or

G.      Award Plaintiff her costs, expenses and attorneys' fees pursuant to Title VII and/or the FCRA; and/or

H.      Retain continuing jurisdiction in order to ensure compliance with the terms of the mandatory injunction requested herein; and

I.      Grant such additional relief as this Court deems just and proper.

**COUNT III – against Defendant USFBOT**
**Race Discrimination in Violation of Title VII and FCRA**

138.    Plaintiff incorporates Paragraphs 1 – 11, 12-125, and 126-131 above as if fully set forth herein.

139.    Plaintiff is a member of a protected class in that her race is Black.

140.     Defendant USFBOT subjected Plaintiff to disparate treatment based upon her race in violation of Title VII, and/or the FCRA, and/or because she is an Black female, in violation of Title VII and/or the FCRA.

141.     Plaintiff's race was a motivating factor for the foregoing adverse actions, including but not limited to the failure to promote and termination, and negatively affected the terms, conditions and privileges of Plaintiff's employment.

142.     Defendant USFBOT acted intentionally, purposefully and/or with reckless indifference to Plaintiff's federally protected rights by failing to promote her, terminating her employment, and adversely affecting her employment benefits based on her race and/or based on her status as an Black female.

143.     Defendant USFBOT's actions caused Plaintiff to suffer lost wages and benefits, emotional distress, humiliation, shame, loss of self-esteem and dignity, mortification, disgrace, embarrassment, loss of enjoyment of life, and mental anguish, and Plaintiff will continue to suffer said damages in the future.

144.     Additionally, Defendant USFBOT's unlawful actions caused Plaintiff to incur reasonable attorneys' fees, costs and expenses.

**WHEREFORE,** Plaintiff respectfully requests that this Court:

A.     Enter a judgment in favor of Plaintiff and against Defendant USFBOT declaring that Defendant USFBOT unlawfully discriminated against Plaintiff in violation of Title VII and/or the FCRA; and/or

B.     Issue a mandatory injunction:

1) Requiring Defendant USFBOT to effectively plan, develop, undertake, implement and monitor a plan designed to ensure that USF employees are not subjected to discrimination; and/or

2) Enjoining Defendant USFBOT from denying Plaintiff any of her rights, privileges or benefits of employment or otherwise treating her differently on account of her race and/or gender; and/or

C. Reinstate Plaintiff to employment with Defendant USFBOT, or, in the alternative, award Plaintiff front pay; and/or

D. Upon reinstatement to employment, promote Plaintiff to the position to which she would have been promoted absent the discrimination, or, in the alternative, award Plaintiff front pay resulting from the missed promotion; and/or

E. Award Plaintiff all lost pay and benefits; and/or

F. Award Plaintiff compensatory damages; and/or

G. Award Plaintiff her costs, expenses and attorneys' fees pursuant to Title VII and/or the FCRA; and/or

H. Retain continuing jurisdiction in order to ensure compliance with the terms of the mandatory injunction requested herein; and

I. Grant such additional relief as this Court deems just and proper.

### COUNT IV – against Defendant USFBOT
### Unlawful Retaliation in Violation of Title VII and FCRA

145. Plaintiff incorporates Paragraphs 1 – 11, 12 – 125, 132-137, 138-144 above as if fully set forth herein.

146.     Title VII and the FCRA forbid retaliation against an employee because she has opposed an employment practice made unlawful by Title VII and/or the FCRA, or because she engaged in EEO activity, filed a charge or participated in any proceeding under Title VII and/or the FCRA.

147.     Plaintiff engaged in protected activity on several occasions as described in the paragraphs above when she complained about race discrimination, including but not limited to: filing an EthicsPoint complaint, filing a complaint with Defendant USFBOT's DIEO, filing a Charge of Discrimination with the EEOC, filing a petition for a preliminary injunction in the U.S. District Court Middle District of Florida.

148.     The actions of the Defendants, as fully set forth above, including but not limited to: failing to promote Plaintiff, terminating her employment on or about August 19, 2015, and giving a prospective employer (UNF) a poor reference were taken in retaliation for Plaintiff's opposition to the discriminatory treatment based on her race, and violated Title VII and/or the FCRA.

149.     The foregoing actions are the types that are reasonably likely to deter protected activity by Plaintiff and/or other employees, and therefore constitute retaliation in violation of Title VII and/or the FCRA.

150.     As a result of the foregoing, Plaintiff had to retain the undersigned law firm to which she is obligated to pay reasonable attorneys' fees, costs and expenses.  Plaintiff is entitled to recover her attorneys' fees, costs and other litigation expenses from the Defendants as a prevailing party pursuant to Title VII and/or the FCRA.

**WHEREFORE,** Plaintiff respectfully requests that this Court:

A.  Enter a judgment in favor of Plaintiff and against the Defendants declaring that the Defendants unlawfully retaliated against Plaintiff in violation of Title VII and/or the FCRA; and/or

B.  Issue a mandatory injunction:

1)  Requiring the Defendants to effectively plan, develop, undertake, implement and monitor a plan designed to ensure that Defendants' employees are not subjected to unlawful retaliation; and/or

2)  Enjoining the Defendants from denying Plaintiff any of her rights, privileges or benefits of employment or otherwise treating her differently on account of her protected activity; and/or

C.  Reinstate Plaintiff to employment with the Defendants, or, in the alternative, award Plaintiff front pay; and/or

D.  Upon reinstatement to employment, promote Plaintiff to the position to which she would have been promoted absent the retaliation, or, in the alternative, award Plaintiff front pay resulting from the missed promotion; and/or

E.  Award Plaintiff all lost pay and benefits; and/or

F.  Award Plaintiff compensatory damages; and/or

G.  Award Plaintiff her costs, expenses and attorneys' fees pursuant to Title VII and/or the FCRA; and/or

H.  Retain continuing jurisdiction in order to ensure compliance with the terms of the mandatory injunction requested herein; and

I.  Grant such additional relief as this Court deems just and proper.

**COUNT V – against Defendant USFBOT**
**Title VII/FCRA Disparate Impact Discrimination based on Gender**

151.    Plaintiff incorporates paragraphs 1 – 11, 12 – 125, 132-137, 138-144, and 145-150 above as if fully set forth herein.

152.    USF has a practice of directly appointing directors and administrators in Enrollment Planning and Management, Student Success, and Academic Affairs, without a candidate search or application process.  This facially neutral practice has a disparate impact on the Plaintiff's gender group, demonstrated by statistical evidence of employment discrimination by USF in all phases of employment that satisfies the statistical significance rule.

153.    USF's practice and Dosal's use of direct appointments has had a significant effect on limiting the employment opportunities of Plaintiff's protected class, female.  The selection rate of qualified female applicants is non-existent or significantly below the selection rate of qualified applicants of male gender for reclassification or direct appointment.  Statistical evidence demonstrates that USF, Academic Affairs, and Student Success have a systemic "pattern or practice" of discriminating.

154.    USF's employment practices resulted in a gross statistical disparity, evident by a statistically significant low number of females and even more specifically, Black women, that have held the position of Assistant Vice President of Enrollment Planning); the inexorable zero of Blacks directly appointed to director positions and higher in Academic Affairs; and the statistically significant low number of females as well as specifically Black females directly appointed to director positions and higher within Student Success itself.

155.    USF's disparate impact discrimination is also evident when applying the four-fifths rule for selection procedures as well as the standard deviation rule in observed differences in racial, gender, or intersectional composition of the USF workforce.

**WHEREFORE,** Plaintiff respectfully requests that this Court:

A.    Enter a judgment in favor of Plaintiff and against the Defendant USFBOT declaring that Defendant USFBOT unlawfully discriminated against Plaintiff in violation of Title VII and/or the FCRA; and/or

B.    Issue a mandatory injunction:

    1)    Requiring Defendant USFBOT to effectively plan, develop, undertake, implement and monitor a plan designed to ensure that USF employees are not subjected to unlawful discrimination; and/or

    2)    Enjoining Defendant USFBOT from denying Plaintiff any of her rights, privileges or benefits of employment or otherwise treating her differently on account of her protected classification; and/or

C.    Reinstate Plaintiff to employment with Defendant USFBOT, or, in the alternative, award Plaintiff front pay; and/or

D.    Upon reinstatement to employment, promote Plaintiff to the position to which she would have been promoted absent the discrimination, or, in the alternative, award Plaintiff front pay resulting from the missed promotion; and/or

E.    Award Plaintiff all lost pay and benefits; and/or

F.    Award Plaintiff compensatory damages; and/or

G.    Award Plaintiff her costs, expenses and attorneys' fees pursuant to Title VII and/or the FCRA; and/or

H.    Retain continuing jurisdiction in order to ensure compliance with the terms of the mandatory injunction requested herein; and

I.    Grant such additional relief as this Court deems just and proper.

### COUNT VI – against Defendant USFBOT
### <u>Title VII/FCRA Disparate Impact Discrimination based on Race</u>

156.    Plaintiff incorporates paragraphs 1 – 11, 12 – 125, 132-137, 138-144, 145-150 amd 151-156  above as if fully set forth herein.

157.    USF has a practice of directly appointing directors and administrators in Enrollment Planning and Management, Student Success, and Academic Affairs, without a candidate search or application process.  This facially neutral practice has a disparate impact on the Plaintiff's racial group, demonstrated by statistical evidence of employment discrimination by USF in all phases of employment that satisfies the statistical significance rule.

158.    USF's practice and Dosal's use of direct appointments has had a significant effect on limiting the employment opportunities of Plaintiff's protected class, Black.  The selection rate of qualified Black applicants is non-existent or significantly below the selection rate of qualified applicants of other races for reclassification or direct appointment.  Statistical evidence demonstrates that USF, Academic Affairs, and Student Success have a systemic "pattern or practice" of discriminating, with not one of the 18 jobs filled during a five-year period went to a single qualified Black person.

159.    USF's employment practices resulted in a gross statistical disparity, evident by the "inexorable zero" or the total absence of African-Americans and Black females, that have held the position of Assistant Vice President of Enrollment Planning); the inexorable zero of Blacks directly appointed to director positions and higher in Academic Affairs; and the inexorable zero of Blacks directly appointed to director positions and higher within Student Success itself.

160.    USF's disparate impact discrimination is also evident when applying the four-fifths rule for selection procedures as well as the standard deviation rule in observed differences in racial, gender, or intersectional composition of the USF workforce.

**WHEREFORE,** Plaintiff respectfully requests that this Court:

A.      Enter a judgment in favor of Plaintiff and against Defendant USFBOT declaring that Defendant USFBOT unlawfully discriminated against Plaintiff in violation of Title VII and/or the FCRA; and/or

B.      Issue a mandatory injunction:

1)      Requiring Defendant USFBOT to effectively plan, develop, undertake, implement and monitor a plan designed to ensure that USF employees are not subjected to unlawful discrimination; and/or

2)      Enjoining Defendant USFBOT from denying Plaintiff any of her rights, privileges or benefits of employment or otherwise treating her differently on account of her protected classification; and/or

C.      Reinstate Plaintiff to employment with Defendant USFBOT, or, in the alternative, award Plaintiff front pay; and/or

D.    Upon reinstatement to employment, promote Plaintiff to the position to which she would have been promoted absent the discrimination, or, in the alternative, award Plaintiff front pay resulting from the missed promotion; and/or

E.    Award Plaintiff all lost pay and benefits; and/or

F.    Award Plaintiff compensatory damages; and/or

G.    Award Plaintiff her costs, expenses and attorneys' fees pursuant to Title VII and/or the FCRA; and/or

H.    Retain continuing jurisdiction in order to ensure compliance with the terms of the mandatory injunction requested herein; and

I.    Grant such additional relief as this Court deems just and proper.

## COUNT VII – against Defendant USFBOT
## Breach of Contract

161.    Plaintiff incorporates paragraphs 1 – 11, 12 – 125, 132-137, 138-144, 145-150, 151-156, and 157-160 above as if fully set forth herein.

162.    On July 15, 2014, Plaintiff was performing her job as University Registrar under an annual employment contract that was set to renew on July 1, 2015.

163.    On July 15, 2014, Defendant Dosal executed a verbal agreement to extend her employment contract to 2019.

164.    Dosal disclosed to Angela DeBose on July 15, 2014 at a meeting at Starbucks that the employment contract of Ralph Wilcox, Provost and Executive Vice President, had been extended to 2019.

165.    In turn, Dosal disclosed that Ralph Wilcox extended Dosal's contract to 2019.

166.    Dosal said to DeBose, "I am offering to continue your contract through 2019."

167.    Dosal stated to DeBose not to press him any further with her questions at the July 15th meeting at Starbucks about the unfairness of his action to directly appoint Billie Jo Hamilton.  Dosal asked Plaintiff to "congratulate Billie Jo."  Dosal stated to DeBose that he would also review her present compensation package, as DeBose requested.

168.    DeBose then stated to Dosal that she would not press him further for answers at the meeting and would congratulate Hamilton; thereafter, DeBose immediately accepted Dosal's offer.

169.    Later, following the meeting, DeBose congratulated Hamilton, who disclosed to DeBose, "I had been negotiating with Paul for a while."

170.    As a follow-up to the July 15, 2014 meeting, DeBose sent an email to Dosal on July 17, 2014 that restated her disappointment about his use of direct appointments to advance her white counterparts.  DeBose also affirmed Dosal's offer and her acceptance to extend DeBose's employment through 2019.  DeBose reminded Dosal about his promise to review her compensation and title.

171.    Dosal stated that he would more carefully review DeBose's reply and get back to her.

172.    On August 1, 2014, Dosal replied to DeBose that he had consulted with Human Resources and "was advised" that DeBose's salary was appropriate.   Therefore, Dosal stated that he planned no changes.

173.    On August 3, 2014, DeBose asked Dosal to conduct a salary equity study with DIEO.

174.    On August 22, 2014, Dosal said that he concluded his review with DIEO and planned no changes to DeBose's salary.   In responding about DeBose's salary, Dosal did not on August 1, 2014, August 22, 2014, or any other occasion deny that he offered to extend DeBose's employment at USF through 2019 or deny that DeBose accepted his offer.

175.    This verbal agreement between Dosal and DeBose was binding and enforceable, with DeBose performing all of her obligations under the contract.

176.    DeBose had a legal right to inquire about Hamilton's appointment at the meeting.   DeBose had a legal right to withhold her congratulations to Hamilton.   Her forbearance or restraint from exercising her legal rights was in consideration of Dosal's offer and her acceptance.

177.    On March 5, 2015, prior to DeBose being terminated from her position as University Registrar at the University of South Florida, Jose Hernandez ("Hernandez"), Chief Diversity Officer, sent DeBose the findings of DIEO concerning DeBose's allegations of discrimination against Paul Dosal.

178.    Hernandez alleged that Dosal's offer to continue DeBose's employment with him through 2019 showed that he had not discriminated against DeBose.

179.    On March 10, 2015, DeBose responded to Hernandez et al. that she had accepted Dosal's offer but also stated Dosal's continued discrimination, creation of a

retaliatory work environment, and threatened termination put Dosal in breach of the Extended Employment Agreement and that Dosal failed to give her any assurances, following his actions of repudiation.

180.    Hernandez unseasonably attempted to retract his statement and suggest that the verbal contract was not valid.

181.    The writings referenced above provided clear notice to Dosal and USF of the obligation under the aforementioned verbal agreement to extend DeBose's employment through 2019:

A. DeBose fully performed the terms under the oral agreement by: (1) congratulating Billie Jo Hamilton for the AVP position and (2) forbearing from pressing Paul Dosal about the AVP position.

B. DeBose had a right to withhold a show of support for Hamilton and to continue to press Dosal for answers about his appointment of Hamilton for the AVP position.  However, DeBose conformed her behavior in consideration of and in accordance with the verbal agreement with Paul Dosal.

C. Paul Dosal also stated when he promised to extend DeBose through 2019 that he would also review DeBose's salary and title.  Dosal stated he sought guidance from Human Resources and Diversity, Inclusion and Equal Opportunity (DIEO), proving the existence of the oral agreement.

D. Though the parties assented and the promises exchanged under the oral agreement were performed within the space of one-year, USF-BOT breached the oral agreement by terminating DeBose in 2014, well in advance of 2019, as provided for under the oral agreement.  USF-BOT also kept DeBose from

having access to public records to prove the written existence of the oral agreement, which resulted in DeBose filing a Petition for Writ of Mandamus with the Thirteenth Judicial Circuit Court of Hillsborough County (Case Number 15-CA-5663).

182.     Upon information and belief, on and before May 19, 2015, before the end of DeBose's annual employment contract on June 30, 2015, and before the end of the extended employment agreement on June 30, 2019, USF took action to terminate DeBose's employment, violating the active employment contract.

183.     On May 19, 2015, Plaintiff was separated from her employment and given notice of her termination, effective August 19, 2015, in breach of the oral agreement for a contract extension through 2019.   On May 19, 2015, Plaintiff was forced to go on professional leave and exhaust her annual (vacation) leave.   Plaintiff sought to obtain copies of her employment records, including the contract extension, from her laptop, hard-drive, and other computerized and manual filing systems maintained by USF; USF demanded that Plaintiff immediately return her laptop and denied Plaintiff's request—unless Plaintiff could pay $9,000 to access the information and Paul Dosal ordered the personnel records maintained in DeBose's department destroyed.  (*See* Exhibit B – Email Reply from Mike Beedy, Human Resources Director at USF; and Exhibit C - Charge Document to Plaintiff's public records request). On August 19, 2015, Plaintiff was terminated, losing her employment, salary, and benefits.

184.     Therefore, USF materially breached both the annual employment agreement and the verbal agreement to extend Plaintiff's employment through 2019.

185.     As a result of the foregoing breaches, Plaintiff has been damaged.

186.    At all times material hereto, Plaintiff has performed her obligations under the annual employment agreement and the extended employment agreement.

187.    The breaches of contract by Defendant resulted in injury to the Plaintiff. As a result, Plaintiff seeks all amounts owed by Defendant pursuant to the agreements. Further, the Plaintiff seeks all actual, consequential, and incidental damages that have resulted from the Defendant's breaches of the agreement, plus costs, expenses, and pre- and post-judgment interest as allowed by law.

**WHEREFORE,** Plaintiff respectfully requests that this Court:

A.    Enter a judgment in favor of Plaintiff and against the Defendant USFBOT declaring that the Defendant USFBOT unlawfully breached the contract; and/or

B.    Specific performance of the contract; and/or

C.    Reinstate Plaintiff to employment with Defendant USFBOT, or, in the alternative, award Plaintiff front pay; and/or

D.    Upon reinstatement to employment, promote Plaintiff to the position to which she would have been promoted absent the breach, or, in the alternative, award Plaintiff front pay resulting from the missed promotion; and/or

E.    Award Plaintiff all lost pay and benefits pursuant to the contract; and/or

F.    Award Plaintiff compensatory damages; and/or

G.    Award Plaintiff all actual damages; and/or

H.    Award Plaintiff consequential and incidental damages; and/or

I.    Award Plaintiff her costs, expenses and attorneys' fees; and/or

J.     Retain continuing jurisdiction in order to ensure compliance with the terms

of the mandatory injunction requested herein; and

K.     Grant such additional relief as this Court deems just and proper.

### COUNT VIII – against Defendant Ellucian
### Tortious Interference with a Business Relationship

188.    Plaintiff incorporates paragraphs 1 – 11, 12 – 125, 132-137, 138-144, 145-

150, 151-156, 157-160, and 161-187 above as if fully set forth herein.

189.    On April 10, 2015, DeBose received an email from Carrie Garcia, inviting

her to meet with Ellucian on April 15th for one-hour concerning "pain points" with Degree

Works.

190.    DeBose led the implementation of Degree Works in 2011and also led the

implementation of Academic Tracking in 2012; however, responsibility for the system was

moved to Information Technologies (IT) under Garcia mid-year in 2014 by Dosal and

Wilcox.

191.    DeBose accepted the meeting invitation, though she did not have any "pain

points" or responsibility for Degree Works at that time.

192.    On April 15, 2015, Tony Embry warned Plaintiff that he heard that the

meeting was "a setup" and offered to attend the meeting.

193.    DeBose informed Embry that Rolanda Lewis and Shruti Kumar had been

invited and that Kumar would accompany her to the meeting but that Lewis declined due

to a conflict.

194.    Though DeBose gave prior notice that Lewis was not available, Garcia

recommended delaying the meeting to see if Lewis could join.

195.    After approximately fifteen (15) minutes of waiting and attempting to contact Lewis, the meeting proceeded with DeBose and Kumar answering all questions asked of them by Andrea Diamond, Ellucian Functional Consultant.

196.    Diamond made no mention of "pain points."   Diamond asked no questions about Degree Works other than how or if the Registrar's Office used the system.

197.    DeBose received no feedback concerning the April 15, 2015 meeting until May 11, 2015 when Dosal emailed DeBose, providing her a copy of the "Ellucian DegreeWorks Post-Implementation Assessment Report" and for the first time shared the April 14, 2015 meeting agenda.

198.    Andrea Diamond, Ellucian Functional Consultant, intentionally and falsely wrote that Lewis was kept from attending the meeting.  Diamond also alleged that the Registrar's Office was a "high risk" to Student Success, and stated "the registrar's office is not willing to encompass change."

199.    Diamond did not have knowledge or information to reasonably believe that Rolanda Lewis was kept from attending the meeting.

200.    In the forty-five (45) minutes to one-hour meeting, Diamond did not have knowledge or information to reasonably conclude that the Registrar's Office was a high risk to student success.

201.    Diamond did not have knowledge or information to reasonably state that the Registrar's Office was resistant to change.

202.    Diamond did not ask, initiate, discuss, or recommend any changes reasonably related to the conclusions drawn in the Ellucian Report concerning the Registrar's Office.

203.    Rather, Diamond was prepared, predisposed, or influenced to write those statements in the "Ellucian Report" in concert with Dosal, Sullins, Thompson, Garcia, and others as pretext or justification to terminate Plaintiff.

204.    Diamond, an Ellucian Employee, knew of the business relationship Plaintiff had with USF in her position as University System Registrar.

205.    Though Diamond either knew or had reason to know that DeBose had not been responsible for the Degree Works system for approximately one-year since June 2014, she wrote the Ellucian Report in such a way to assign blame and cause specific harm to DeBose and her employment at USF for the failures that occurred with subsequent efforts to redesign Academic Tracking and implement 3-semester tracking plans by Garcia versus the 8-semester tracking plans DeBose had successfully deployed.

206.    On May 19, 2015, Kofi Glover, Associate Provost, requested to meet with Angela DeBose to "discuss the Ellucian Report," on behalf of the Provost [Wilcox], who was allegedly away from the campus.

207.    When Plaintiff arrived for the May 19, 2015 meeting, Plaintiff was handed a termination letter from Glover, signed by Wilcox.

208.    On or about May 28, 2015, the Ellucian Report was stated in the USF Oracle and other media as being the specific reason for DeBose's termination.

209.    Upon information and belief, the interference by Diamond, Ellucian Employee, whether acting alone or in concert with others, did induce USF to terminate Plaintiff's employment as University System Registrar.

210.    Further upon information and belief, Defendant Ellucian improperly, intentionally, and unjustifiably through its employee, agent, or assign interfered by having an improper reason, as well as, utilizing improper methods.

211.    Upon information and belief, Defendant Ellucian persisted in this course of action, despite the knowledge that their conduct would result in damage to Plaintiff, or at least was highly likely to result in damage to Plaintiff.

212.    The termination of employment relationship by USF as a result has damaged Plaintiff.

**WHEREFORE,** Plaintiff respectfully requests that this Court:

A.      Enter a judgment in favor of Plaintiff and against Defendant Ellucian declaring that Defendant Ellucian unlawfully interfered with Plaintiff's business relationship with USF; and/or

B.      Issue a mandatory injunction:

1)      Requiring Defendant Ellucian to effectively plan, develop, undertake, implement and monitor a plan designed to ensure that individuals such as Plaintiff are not subjected to unlawful interference; and/or

2)      Enjoining Defendant Ellucian from denying Plaintiff any of her rights, privileges or benefits of employment or otherwise treating her differently on account of her protected activity; and/or

3)      Enjoining Defendant Ellucian from benefiting from any contractual relationship that may have arisen out of the interference; and/or

C.      Award Plaintiff all economic losses resulting from the unlawful interference; and/or

D.      Award Plaintiff damages for mental distress; and/or

E.      Award Plaintiff punitive damages; and/or

F.      Award Plaintiff pre-judgment and post-judgment interest; and/or

G.      Award Plaintiff her costs, expenses and attorneys' fees; and/or

H.      Retain continuing jurisdiction in order to ensure compliance with the terms of the mandatory injunction requested herein; and

I.      Grant such additional relief as this Court deems just and proper.

**COUNT IX – against Defendant USFBOT**
**Tortious Interference with a Business Relationship**

213.    Plaintiff incorporates paragraphs 1 – 11, 12 – 125, 132-137, 138-144, 145-150, 151-156, 157-160, 161-187, and 188-212 above as if fully set forth herein.

214.    After receiving her May 19, 2015 separation/termination notice, DeBose was offered a job by the University of North Florida (UNF) to implement predictive analytics once news of Plaintiff's termination became public. (*See* Exhibit D - Text Message  from Albert Colom, Associate Vice President of Enrollment at UNF, Initiating Offer).

215.    DeBose accepted the offer of employment made to her by Albert Colom, Associate Vice President of Enrollment at the University of North Florida (UNF). UNF then contacted USF as a courtesy to inform them of the hire and their hopes to "get Angela DeBose in the position before others became aware of her availability."

216.    On May 26, 2015, Ralph Wilcox, USF Provost, called Earle C. Traynham, UNF Provost, to poison the well and discourage UNF from going through with hiring DeBose. (*See* Exhibit E – Ralph Wilcox Phone Log).

217.    Wilcox stated DeBose was "awful," "toxic," and that he "wanted to get rid of her for years."  Wilcox also stated that UNF "would regret" its decision if it proceeded to hire DeBose.

218.    On May 27, 2015, following Wilcox's phone call, the offer from UNF was rescinded. (*See* Composite Exhibit F - Text Message from Albert Colom, Associate Vice President of Enrollment at UNF, Rescinding Offer and associated phone records).

219.    Subsequently, in June 2015, at the SUS Florida Summit meeting, Wilcox's role in undoing the UNF offer of employment was discussed following Dosal's disclosure to certain USF employees that Wilcox wanted the Plaintiff to be left with "nothing"—not "even a shirt" on her back.  Wilcox stated he wanted DeBose "bare," "exposed," and "thrashed."

220.    UNF's employment relationship with Plaintiff was the subject of a valid, oral contract as well as a continuing business expectancy.

221.    Defendant Wilcox had knowledge of the employment offer between UNF and Plaintiff.

222.    Upon information and belief, the interference by Defendant Wilcox did induce Earle C. Traynham, UNF Provost, to rescind the UNF employment offer with Plaintiff.  This was not the first time Wilcox has tortiously interfered with future employment following a termination.  Plaintiff has verifiable proof of other such interference by Wilcox against others.

223.    Further upon information and belief, Defendant Wilcox improperly, intentionally, and unjustifiably interfered by having an improper reason, as well as, utilizing improper methods.

224.    Upon information and belief, Defendant Wilcox contacted and induced Earle C. Traynham, UNF Provost, to terminate the offer with Plaintiff, solely to see her with no immediate prospect for a professional job in higher education in hopes of humiliating and degrading DeBose, *leaving her with not even a shirt, her back bare and exposed*, *so that the thrashing she received* at his hands was plainly visible.

225. The termination of the employment offer with UNF by Defendant Wilcox has damaged Plaintiff.

226. Upon information and belief, Defendant Wilcox persisted in his course of action, despite the knowledge that his conduct would result in damage to Plaintiff, or at least was highly likely to result in damage to Plaintiff.

**WHEREFORE,** Plaintiff respectfully requests that this Court:

A.      Enter a judgment in favor of Plaintiff and against Defendant USFBOT declaring that Defendant USFBOT unlawfully interfered with Plaintiff's business relationship with UNF; and/or

B.      Issue a mandatory injunction:

1)      Requiring Defendant USFBOT to effectively plan, develop, undertake, implement and monitor a plan designed to ensure that individuals such as Plaintiff are not subjected to unlawful interference; and/or

2)  Enjoining Defendant USFBOT from denying Plaintiff any of her rights, privileges or benefits of employment or otherwise treating her differently on account of her protected activity; and/or

3)  Enjoining Defendant USFBOT from benefiting from any contractual relationship that may have arisen out of the interference; and/or

C.  Award Plaintiff all economic losses resulting from the unlawful interference; and/or

D.  Award Plaintiff damages for mental distress; and/or

E.  Award Plaintiff her costs, expenses and attorneys' fees; and/or

F.  Retain continuing jurisdiction in order to ensure compliance with the terms of the mandatory injunction requested herein; and

G.  Grant such additional relief as this Court deems just and proper.

**COUNT X – against Defendant USFBOT and Defendant Ellucian**
**Civil Conspiracy**

227.  Plaintiff incorporates paragraphs 1 – 11, 12 – 125, 132-137, 138-144, 145-150, 151-156, 157-160, 161-187, 88-212, and 213-226 above as if fully set forth herein.

228.  During the relevant time period, Defendant Ellucian and Defendant USFBOT had agreement in place to engage in shared business practices from time to time including but not limited to the creation of the Ellucian Report.

229.  During the time of Plaintiff's employment with Defendant USFBOT, the agents, officers and/or employees of Defendants conspired in an unlawful act of discrimination, retaliation, intentional interference, and breach of contract against Plaintiff.

230.   By way of example only, Defendants agreed and worked together in furtherance of a plan to terminate Plaintiff's employment for pretextual reasons by knowingly including inaccurate and improper information in the Ellucian Report with the intent of damaging Plaintiff.

231.   As a result of Defendants agreed upon and shared acts, Plaintiff was terminated from her employment and also otherwise damaged.

**WHEREFORE,** Plaintiff respectfully requests that this Court:

A.   Enter a judgment in favor of Plaintiff and against Defendants declaring that Defendants unlawfully conspired against Plaintiff and resulting in damage to Plaintiff; and/or

B.   Issue a mandatory injunction:

1)   Requiring Defendants to effectively plan, develop, undertake, implement and monitor a plan designed to ensure that individuals such as Plaintiff are not subjected to such unlawful acts of conspiracy; and/or

2)   Enjoining Defendants from denying Plaintiff any of her rights, privileges or benefits of employment or otherwise treating her differently on account of her protected status and/or activity; and/or

3)   Enjoining Defendants from benefiting from any contractual relationship that may have arisen out of the unlawful acts; and/or

C.   Award Plaintiff all economic losses resulting from the unlawful acts; and/or

D.   Award Plaintiff damages for mental distress; and/or

E.   Award Plaintiff punitive damages against Defendant Ellucian; and/or

F.      Award Plaintiff pre-judgment and post-judgment against Defendant

Ellucian; and/or

G.      Award Plaintiff her costs, expenses and attorneys' fees; and/or

H.      Retain continuing jurisdiction in order to ensure compliance with the terms

of the mandatory injunction requested herein; and

I.      Grant such additional relief as this Court deems just and proper.


## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully Submitted,


/s/ Charlotte Fernée Kelly
Charlotte Fernée Kelly (FBN: 0090105)
Fernee Kelly Law
620 East Twiggs Street
Suite 205
Tampa, Florida 33602
charlotte@ferneekellylaw.com

ATTORNEY FOR PLAINTIFF


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished by

CM/ECF service to all counsel of record this 2nd day of May 2016.

/s/ Charlotte Fernée Kelly
Charlotte Fernée Kelly