ANGELA W. DEBOSE,

    Plaintiff,

v.                                        Case No: 8:15-cv-2787-T-17AEP

UNIVERSITY OF SOUTH FLORIDA
BOARD OF TRUSTEES and ELLUCIAN
COMPANY, L.P.,

    Defendants.

_____

## ORDER

This cause comes before the Court pursuant to the motions for summary judgment (Doc. Nos. 68 and 75) (the "**Summary Judgment Motions**") filed by the Defendants, University of South Florida Board of Trustees ("**USF**"), and Ellucian Company, L.P. ("**Ellucian**"), and the responses in opposition (Doc. Nos. 151 and 169) filed by *pro se* Plaintiff, Angela W. DeBose (the "**Plaintiff**" or "**DeBose**"). For the reasons set forth below, the Summary Judgment Motions are **GRANTED IN PART AND DENIED IN PART**.

## I.    Introduction

The Court must decide whether DeBose is entitled to a jury trial on her claims that USF terminated her employment after 27 years due to race/gender discrimination and/or in retaliation for her complaints of discrimination. Because DeBose has testified under penalty of perjury that high-ranking employees at USF have admitted to her that the person who fired her is, essentially, a virulent racist, DeBose is entitled to her day in Court on her claim that she was fired due to her race/gender. Similarly, DeBose strings together enough circumstantial evidence to proceed to a jury on her retaliation claims, in which

she contends that she was terminated and given a poor employment review for protesting USF's alleged acts of discrimination. The remainder of DeBose's claims, however, are far too speculative and unsupported to withstand summary judgment. As a result, the Summary Judgment Motions are granted in part and denied in part.

## II.    Background

### A.    Plaintiff's employment history at USF

The Plaintiff was hired by USF in 1988 and became the USF Registrar on October 1, 1996. (Doc. No. 76, at 1). DeBose remained Registrar until her employment was terminated on August 19, 2015. (Doc. No. 76, at 10).

### B.    Plaintiff's tenure under the supervision of Paul Dosal

On July 1, 2010, Paul Dosal became DeBose's direct supervisor. (Doc. No. 76, at 2). DeBose initially had a "good relationship" with Dosal. (A. DeBose Dep. Tr. 33:3-6). So much so that during 2011 or 2012, (A. DeBose Dep. Tr. 169:11-14), Dosal allegedly confided in her that USF's Provost, Ralph Wilcox, is "a nasty son of a bitch," and that "he's not going to think highly of you . . . because . . . you're black." (A. DeBose Dep. Tr. 167:19—168:14).

Things "changed" with Dosal, however, in late 2013 and early 2014. (A. DeBose Dep. Tr. 33:12-14). During that time period, DeBose claims that Dosal "started being more aggressive, edgy," "would clench his jaw," and "just stopped being pleasant at all." (A. DeBose Dep. Tr. 34:10-15). According to DeBose, Dosal's animosity towards her spread to others at USF, including another employee named Travis Thompson, who

allegedly told Dosal that DeBose was not collaborative and that things were not going well with Degree Works.[1] (A. DeBose Dep. Tr. 34:18-24—35:1-16).

Bothered by these issues, Dosal allegedly met with DeBose in the spring of 2014 and counseled her to work and behave more collaboratively. (Doc. No. 76, at 3). USF claims that DeBose's behavior did not improve and, in June of 2014, Dosal informed DeBose that responsibility for Degree Works and ATLAS were being transferred from the Registrar's Office to the information technology department. (A. DeBose Dep. Tr. 55:13-19). According to Dosal, the decision to transfer Degree Works and ATLAS away from the Registrar's Office came from USF Provost Ralph Wilcox. (A. DeBose Dep. Tr. 55:23-24). Around the same time, an email circulated within USF that accused DeBose of being responsible for the resignation of another USF employee, Caurie Waddell. (A. DeBose Dep. Tr. 63:17-25); (P. Dosal Dep. Tr. 36:15-19). According to DeBose, she feared that the Caurie Waddell situation was "going to be used as . . . grounds for [her] termination." (A. DeBose Dep. Tr. 63:17-25).

### C.    The AVP EPM position

During the summer of 2014, while the foregoing issues were percolating through the school, the position of Assistant Vice President for Enrollment Planning and Management ("**AVP EPM**") became vacant at USF. (Doc. No. 76, at 4). Dosal was responsible for filling the vacant AVP EPM position and, after consultation with Ralph Wilcox and USF President Judy Genshaft, USF employee Billie Jo Hamilton was appointed to the AVP EPM position. (Doc. No. 76, at 5). DeBose disagreed with USF's

---

[1] Previously, in the spring of 2011, Dosal transferred responsibility for USF's degree audit system, Degree Works, and its academic tracking system, ATLAS, to the Registrar's Office. (Doc. No. 76, at 3).

decision to directly appoint Hamilton to the AVP EPM position in lieu of conducting a national search. (A. DeBose Dep. Tr. 305:3-4). In fact, DeBose wanted the job for herself, and believed she was "a very strong candidate for the AVP position." (A. DeBose Dep. Tr. 310:2-4).

Dosal met with DeBose in July of 2014, ostensibly to try and patch things up. At that meeting, Dosal allegedly promised that he would "make it clear" to the USF community that he remained confident in DeBose, and told her he hoped she would remain a member of his team through the end of his tenure in 2019. (A. DeBose Dep. Tr. 66:8-15, 66:16-25—67:1-15). DeBose claims that during the meeting, Dosal responded to her request for an increase in compensation[2] by "allud[ing] to . . . N****r, you already make too much money." (A. DeBose Dep. Tr. 139:17-23). When DeBose responded that she believed she was not selected for the AVP EPM position because of her race, he allegedly "clenched his jaw" and denied that race was a factor, instead telling DeBose "the provost wants this." (A. DeBose Dep. Tr. 150:22—152:21). Following the meeting, on July 28, 2014, DeBose filed an internal complaint with USF, referencing discrimination with respect to the Degree Works/ATLAS transfer, Caurie Waddell email, and the AVP EPM appointment incidents.

### D.    DeBose's EEOC complaint and alleged acts of retaliation

After DeBose filed her internal complaint, she claims she "got a reprieve" from Dosal's allegedly hostile behavior. (A. DeBose Dep. Tr. 212:19-22). However, towards the end of the year, she filed a complaint with the EEOC, after which she alleges "things began to ramp up to an unacceptable level." (A. DeBose Dep. Tr. 230:6-13). For instance,

---

[2] Two days after being informed of Hamilton's appointment to the AVP EPM position, DeBose sent a memorandum to Dosal requesting a pay raise. (Doc. No. 76, at 6).

DeBose claims that after she filed the EEOC complaint she was "asked into meetings with no agenda . . . was not treated well or respectfully or civilly . . . was marginalized . . . berated . . . [and] treated poorly." (A. DeBose Dep. Tr. 230:6-20).

### E. The Alexis Mootoo incident and subsequent written reprimand

DeBose's acrimony with USF worsened on January 29, 2015, when DeBose attended a meeting with Dosal to discuss implementation of a new shared services model. (A. DeBose Dep. Tr. 77:1-10). Also present at the meeting was another African American employee, Alexis Mootoo, who allegedly had a history of "making [DeBose] and other people in [DeBose's] office uncomfortable with abusive language," including gratuitous use of the word "n****r." (A. DeBose Dep. Tr. 77:11-25—78:1-21). During the meeting, DeBose allegedly took umbrage with Mootoo's involvement in the implementation of the new shared services model, and referred to her as a "little girl" and told her to "stay in her lane." (A. DeBose Dep. Tr. 83:10-21).

While DeBose denies making those statements, Mootoo reported DeBose's alleged "little girl" comment to authorities at USF, who issued DeBose a written reprimand. (A. DeBose Dep. Tr. 83:22-24) (Doc. No. 77-2, at 2). According to DeBose, Mootoo fabricated the story in exchange for a deal with Dosal under which Mootoo would receive more favorable "pay and position." (A. Dep. Tr. 84:2—86:24). In support, DeBose claims that "Alexis Mootoo [would come] into the office supposedly for budget meetings and talking about n****r this and n****r that . . . [but that] Dosal knew about [her use of the word 'n****r]' and didn't have a problem with it." (A. DeBose Dep. Tr. 159:23—160:4).

### F. DeBose's allegations of a "backdrop" of racist conduct at USF

DeBose claims that by this time in her career at USF, "[t]here were constant references to [her as an] angry black woman, black bitch, n****r this, n****r that." (A.

DeBose Dep. Tr. 164:11-20). While DeBose reluctantly admits that Dosal did not call her an "angry black woman, black bitch, [or] n****r," (A. DeBose Dep. Tr. 164:21—165:9), she accuses Dosal of making veiled "racial statements" over the course of her time at USF, including a 2010/2011[3] comment in which he told her he was moving out of "the hood" and that she should do the same because they were the "only two people of color in EPM," (A. DeBose Dep. Tr. 166:5-16), a 2013[4] statement in which he asked her to attend Black Faculty Staff Association breakfasts, but that he did not want her to "be a token," (A. DeBose Dep. Tr. 169:24—170:13), and another incident in which he allegedly disparaged a "black Hispanic" person who had accused him of discrimination of having "forgotten . . . where he came from." (A. DeBose Dep. Tr. 172:24—173:21). DeBose further claims that Dosal told her that "others" at USF referred to her as "an angry black woman or black bitch or those kinds of things." (A. DeBose Dep. Tr. 171:19-23). DeBose claims that she asked Dosal who said those things, but that "he would not disclose" the source of his information. (A. DeBose Dep. Tr. 171:24—172:1).[5]

G.    The Ellucian audit and report

Approximately one month after DeBose filed her EEOC complaint, during February of 2015, USF engaged a consulting firm, Ellucian, to review and assess its implementation of Degree Works. (Doc. No. 76, at 8). As part of that review, Ellucian selected consultant Andrea Diamond to visit the USF campus and meet with several employees, including DeBose. (Doc. No. 76, at 8). When DeBose met with Diamond,

---

[3] (A. DeBose Dep. Tr. 166:17—167:16).
[4] (A. DeBose Dep. Tr. 171:8-12).
[5] The "angry black woman" and "black bitch" comments allegedly occurred during 2014, when DeBose told Dosal about an incident in which some unknown person vandalized her car with the derogatory phrase "wild bitch." (A. DeBose Dep. Tr. 124:23—125:3; 172:2-19).

she claims that Diamond's body language, face, and demeanor were "angry." (A. DeBose Dep. Tr. 97:16-23). After the meeting, Ellucian prepared a report (the "**Ellucian Report**") stating, among other things, that the Registrar's Office lacked an "atmosphere of working together for the good of the institution" and was "not willing to encompass change." (Doc. No. 76, at 8-9).

DeBose vehemently disagrees with the conclusions and recommendations contained in the Ellucian Report, and claims that Diamond "went out of her way . . . to cast a negative light on the registrar's office" and that Diamond did not sincerely or honestly believed the opinions she expressed regarding the Registrar's Office. (A. DeBose Dep. Tr. 98:3—99:24). Rather, DeBose believes that Ellucian colluded with USF to give the school a non-discriminatory reason to fire her form her position. In support, DeBose cites to evidence that the Registrar's Office was included in the scope of Ellucian's review at the request or suggestion of USF. (A. DeBose Dep. Tr. 101:18-102:3). However, DeBose also admits that she lacks any firsthand knowledge that USF was responsible for the inclusion of negative information or opinions about her office in the Ellucian Report. (A. DeBose Dep. Tr. 101:4-10).

## H.    DeBose's non-reappointment as Registrar

The Ellucian Report was ultimately the final nail in the coffin for DeBose's 27 year career USF. After reviewing the Ellucian Report, Ralph Wilcox made the decision to non-renew DeBose's employment. (Doc. No. 76, at 9). On May 19, 2015, DeBose was issued a notice of non-reappointment, which effectively terminated her employment as of August 19, 2015. (Doc. No. 76, at 10).

### I.    USF's negative review of DeBose

Following her receipt of the notice of non-reappointment, DeBose communicated with her friend, Albert Colom, regarding possible employment at the University of North Florida ("**UNF**"). (A. DeBose Dep. Tr. 13:15-18).  On or around May 20, 2015, Colom sent a text message to DeBose stating that "depending on what you are interested in doing I can help here at UNF.  That is if you want to stay in Florida.  I have a few ideas." (Doc. No. 79-1, at 1).  DeBose responded "Love to talk about them as your time permits." (Doc. No. 79-1, at 1).

On May 26, 2015, Ralph Wilcox had a brief telephone call with UNF Provost Dr. Earle Traynham regarding his assessment of DeBose's professional capabilities for possible employment at UNF. (Doc. No. 78, at ¶¶ 8-9).   Wilcox claims he was complementary of DeBose's technical skills and abilities, but indicated that he believed she was not collaborative and was resistant to change. (Doc. No. 78, at ¶¶ 8-9).  DeBose tells a far different story, claiming that according to Colom, Wilcox told Traynham that DeBose was "toxic," "horrible," "uncollaborative," "awful," "if he hired [her], that he would regret it," and "he had been trying to get rid of [her] for years." (A. DeBose Dep. Tr. 15:23-25—16:1-2).  DeBose further claims "a guy named Lance," who "works at USF," told her that Wilcox bragged to Traynham "about undoing [her]"; that he "wanted [DeBose] to have nothing . . . not even a shirt . . . . bare, exposed with nothing." (A. DeBose Dep. Tr. 290:1-11).

### J.    DeBose is not selected for employment at UNF

Following the Traynham conversation, on May 27, 2015, DeBose received a text message from Colom stating "Hello spoke to my provost and we decided to pass on the

idea. I had good hope we could work together again. I am so sorry." (Doc. No. 79-1, at 2). Ultimately, DeBose did not obtain employment with UNF.

## III.   Standard of Review

"Federal Rule of Civil Procedure 56 requires that summary judgment be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *U.S. Commodity Futures Trading Com'n v. Am. Derivatives Corp.*, 2008 WL 2571691, at *2 (N.D. Ga. June 23, 2008) (internal quotations omitted). "The moving party bears the initial responsibility of informing the court of the bases for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (internal quotations omitted). "Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist." *Id.* "A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law." *Id.* "An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

Importantly, on a motion for summary judgment, the Court "may consider only that evidence which can be reduced to an admissible form." *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005). "To be admissible in support of or in opposition to a motion for summary judgment, a document must be authenticated by and attached to an affidavit that meets the requirements of Rule 56[c][4], and the affiant must be a person through whom the exhibits could be admitted into evidence." *Sauders v. Emory*

*Healthcare, Inc.*, 360 F. App'x 110, 113 (11th Cir. 2010). Here, DeBose has not authenticated any of the approximately 550 pages of documents attached to Doc. Nos. 165, 166, 187, and 188 and, as a result, none of those documents will be considered in response to or in support of the Summary Judgment Motions. Instead, the Court will restrict its analysis to those materials properly before the Court, including DeBose's deposition transcript and the affidavits submitted by representatives of the Defendants.

## IV. Discussion

In her third amended complaint (Doc. No. 45) (the "**TAC**"), DeBose asserts the following claims: Count I – gender and/or race (primarily gender) discrimination under Title VII[6] and the FCRA[7] based on USF's failure to promote her to the AVP EPM position and her non-reappointment as Registrar; Count II – retaliation under Title VII and the FCRA based on her gender coupled with USF's failure to promote her to the AVP EPM position, her non-reappointment as Registrar, and Wilcox's poor reference to UNF; Count III gender and/or race discrimination (primarily race) under Title VII and the FCRA based on USF's failure to promote her to the AVP EPM position and based on her non-reappointment as Registrar; Count IV – retaliation under Title VII and the FCRA based on her race coupled with USF's failure to promote her to the AVP EPM position, her non-reappointment as Registrar, and Wilcox's poor reference to UNF; Count V – disparate impact based on her gender under Title VII and the FCRA related to the direct appointment of Hamilton to the AVP EPM position; Count VI – disparate impact based on her race under Title VII and the FCRA related to the direct appointment of Hamilton to the AVP EPM position; Count VII – breach of contract; Count VIII – tortious interference based

---

[6] All references to "Title VII" are to Title VII of the Civil Rights Act of 1964 ("**Title VII**").
[7] All references to the "FCRA" are to Chapter 760 of the Florida Statutes (the "**FCRA**").

on Ellucian's conduct in drafting the Ellucian Report; Count IX – tortious interference based on USF's conduct in giving her a negative review to UNF; and Count X – civil conspiracy between Ellucian and USF related to the Ellucian Report. Because both Defendants have moved for summary judgment on all of the Plaintiff's claims, the Court will address each category of claims, in turn, below.

## A.    Employment Discrimination Claims

In Counts I and III of the TAC, the Plaintiff asserts claims for gender and race discrimination, respectively, under Title VII and the FCRA. "Title VII prohibits an employer from discriminating 'against any individual with respect to [her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin.'" *Vickers v. Fed. Express. Corp.*, 132 F.Supp.2d 1371, 1377 (S.D. Fla. 2000) (quoting 42 U.S.C. § 2000e-2(a)). "Since the FCRA essentially mirrors Title VII, Florida courts look to federal case law construing Title VII" when ruling on FRCA claims. *McCabe v. Excel Hospitality, Inc.*, 294 F.Supp.2d 1311, 1313 n.1 (M.D. Fla. 2003).

Discriminatory intent, the hallmark of a claim for employment discrimination under Title VII and the FRCA, "can be established through either direct or circumstantial evidence." *Vickers*, 132 F.Supp.2d at 1377 (S.D. Fla. 2000). Here, while the Plaintiff's deposition testimony references a plethora of racially charged remarks during her tenure at USF, most of those statements were remote in time from the adverse employment actions at issue in this case and, in any event, do not specifically address USF's reasons for terminating DeBose's employment. *See* (A. DeBose Dep. Tr. 186:11-18) (referencing an alleged "backdrop" of statements about her "race, black woman, angry black woman, black bitch, those kinds of things," but not specifically linking any of the foregoing statements to the alleged adverse employment actions). Thus, given the lack of direct

evidence of discrimination, the Court must consider whether there is sufficient circumstantial evidence of USF's alleged discriminatory intent for the Plaintiff to survive summary judgment.

Where the "plaintiff seeks to prove intentional discrimination through circumstantial evidence of the employer's intent . . . [the] [p]lainitiff has the initial burden of establishing a prima facie case of discrimination." *Id.* at 1378-79. A plaintiff makes out a prima facie case of discrimination when she shows, by a preponderance of the evidence, that (1) she is a member of a protected class, (2) she was qualified for the position, (3) she experienced an adverse employment action, and (4) she was replaced by someone outside of her protected class or received less favorable treatment than a similarly situated person outside of her protected class." *Flowers v. Troup Cty., Ga., Sch. Dist.*, 2015 WL 6081186, at *6 (11th Cir. Oct. 16, 2015).

"[T]he establishment of a prima facie case creates a presumption that the employer discriminated against a plaintiff on the basis of race." *Id.* "[T]he burden then shifts to the employer to produce a legitimate nondiscriminatory reason for the action taken against the plaintiff." *Id.* "Once the employer advances its legitimate, nondiscriminatory reason the plaintiff's prima facie case is rebutted and all presumptions drop from the case." *Id.* The plaintiff then bears the "ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Id.* Accordingly, merely establishing a prima facie case of racial discrimination "is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion." *Id.* Rather, the "critical decision that must be made is whether the plaintiff has created a triable issue concerning the employer's discriminatory intent." *Id.*

Here, USF acknowledges that (1) DeBose is a member of a protected class, (2) Hamilton's promotion to AVP EPM and DeBose's non-renewal as Registrar constituted adverse employment actions, and (3) genuine issues of material fact exist regarding whether DeBose was qualified for her position as Registrar. However, USF disputes that DeBose has carried her initial burden of establishing that the written reprimand she received following the Alexis Mootoo episode constituted an adverse employment action, or that she received less favorable treatment than a similarly situated person outside of her protected class. Moreover, even if DeBose can make out a prima facie case on her promotion discrimination claim, USF contends that DeBose has failed to show that USF's decision to promote Hamilton was pretextual. The Court will address each issue in turn below.

## 1. Written Reprimand

For starters, Counts I and III of the TAC assert claims for employment discrimination based on the adverse employment actions of "failure to promote" and for "termination" of employment. (TAC, at ¶¶ 129, 142). Since the written reprimand that DeBose received in connection with the Alexis Mootoo incident has not been identified as an adverse employment action in either Count I or III of the TAC, DeBose has failed to plead, much less prove, that the written reprimand was issued with discriminatory intent. Moreover, even if the Court were to liberally construe the TAC to include such a claim, "to prove adverse employment action . . . an employee must show a *serious and material* change in the terms, conditions, or privileges of employment." *Anderson v. United Parcel Serv., Inc.*, 248 F. App'x 97, 100 (11th Cir. 2007) (emphasis in original). "[T]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a

13

reasonable person in the circumstances." *Id.* Here, DeBose has failed to demonstrate that the written reprimand resulted in a serious and material change in the terms, conditions, or privileges of her employment. To the contrary, the record is devoid of any evidence that the written reprimand had *any* adverse effect on DeBose's employment. For that reason alone, USF is entitled to summary judgment on any claim for employment discrimination based on the written reprimand.

> 2. *Less Favorable Treatment than a Similarly Situated Person Outside of DeBose's Protected Class*

As part of the Title VII plaintiff's prima facie case, the plaintiff must show that "[s]he was replaced by someone outside of [her] protected class or received less favorable treatment than a similarly situated person outside of [her] protected class." *Flowers*, 2015 WL 6081186, at *6. Importantly, "when a Title VII plaintiff alleges that an employer discriminates against black females, the fact that . . . white females are not subject to discrimination is irrelevant and must not form any part of the basis for a finding that the employer did not discriminate against the black female plaintiff." *Jefferies v. Harris Cty. Community Action Ass'n.*, 615 F.2d 1025, 1034 (5th Cir. 1980).

With respect to the Plaintiff's promotion discrimination claim, it is undisputed that Hamilton is a white female. Thus, while DeBose has failed to establish a prima facie case of gender discrimination with respect to the AVP EPM position, *see Jefferies*, 615 F.2d at 1030 (noting that "where both the person seeking to be promoted and the person achieving that promotion were women, 'because the person selected was a woman, we cannot accept sex discrimination as a plausible explanation for (the promotion) decision.'" (quoting *Adams v. Reed*, 567 F.2d 1283, 1287 (5th Cir. 1978))), the Plaintiff has made a prima facie case of intersectional race *and* gender discrimination with respect to

Hamilton's promotion. *See* (A. DeBose Dep. Tr. 127:21-24) (stating that DeBose believes "race/gender" was the reason for her failure to be promoted the AVP EPM position).

As to the Plaintiff's termination claim, the record contains an unverified statement in DeBose's statement of disputed facts that Carrie Garcia, a white female, "was appointed by Wilcox and Dosal as Acting University Registrar following DeBose's termination." (Doc. No. 170, at 33). Since USF does not appear to contest that DeBose's position was filled by someone outside of her protected class as a black female, and it is likely that DeBose would properly support this assertion of fact if "give[n] an opportunity to properly support or address the fact" under Rule 56(e)(1), the Court will presume for purposes of this order that the Acting University Registrar position was filled by a white female. Interestingly, however, at her deposition, DeBose testified that race, and race alone, was the reason for her termination. (A. DeBose Dep. Tr. 128:12-23). Since it is undisputed that the Registrar position was filed by a female, and DeBose appears to have abandoned her claim of intersectional discrimination with respect to her termination claim, USF is entitled to summary judgment on DeBose's termination claim based on gender discrimination. However, because the Registrar position was filled by a white female, DeBose has carried her burden of establishing a prima facie claim for race discrimination on her termination claim.

### 3.    Whether USF's Decisions to Promote Hamilton and Terminate DeBose were Pretextual

USF has proffered a legitimate, non-discriminatory reason for its decision to promote Hamilton, and not DeBose, to the position of AVP EPM, as well as for its decision to terminate DeBose's employment as Registrar. *See* (Doc. No. 77, at ¶ 17) (stating that DeBose was not selected for the AVP EPM position because she was not as qualified for

the position as Hamilton); (Doc. No. 78, at ¶ 6) (stating that DeBose was terminated for not acting in a collaborative manner and based on the opinions stated in the Ellucian Report). The question thus becomes whether DeBose has identified sufficient evidence of intentional discrimination to create a triable issue on her claims for employment discrimination. *See Wheatfall v. Bd. of Regents of Univ. System of Ga.*, 9 F.Supp.3d 1342, 1356 (N.D. Ga. 2014) ("[T]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.").

With respect to the AVP EPM position, DeBose supports her claim that she was subjected to race/gender discrimination on the fact that (1) Dosal gave Hamilton the opportunity to "go back to her position exclusively as director of financial aid" if she didn't do well as AVP EPM; (2) "the [AVP EPM] position was not posted or advertised and that . . . people [including DeBose] were given no knowledge or awareness of the position"; and (3) Dosal attempted to make "concessions" to DeBose regarding her salary and job title if she would "go along" with Hamilton's appointment. (A. DeBose Dep. Tr. 147:2—148:20). Frankly, DeBose's own testimony demonstrates that USF's decision to promote Hamilton over her had nothing to do with the fact that she is a black female. Perhaps Dosal exercised poor judgment by not conducting a nationwide search or hand-picking DeBose for the position. Perhaps he made the right choice. Regardless, whether promoting Hamilton was the right or wrong choice is unimportant because DeBose herself does not cite race or gender as a reason for Hamilton's promotion.

To the contrary, DeBose obfuscates the true reasons for Hamilton's selection by making vague references to a handful of allegedly racial statements uttered by Dosal and

Wilcox during her tenure at USF. Most of these statements, including Dosal's statements about "leaving the hood" and not wanting DeBose to be a "token" were remote in time from Hamilton's promotion. Moreover, even if Wilcox is "a nasty son of a bitch" who was never "going to think highly of [DeBose] . . . because . . . [she is] black," it is undisputed that Dosal, not Wilcox, promoted Hamilton to the AVP EPM position. *See* (Doc. No. 76, at 5) (stating that Dosal appointed Hamilton); (Doc. No. 170, at 12) (failing to dispute that Dosal appointed Hamilton). Since the record is devoid of evidence that race and gender played a role in Dosal's decision to appoint Hamilton to the AVP EPM position, or that Wilcox's alleged racial animus towards DeBose influenced Dosal's hiring decision, DeBose has failed to show that USF's proffered non-discriminatory reason for not promoting DeBose was pretextual.

As for DeBose's claim of race-based termination discrimination, it is undisputed that Wilcox made the decision to terminate DeBose. *See* (Doc. No. 68, at ¶ 6) (stating that Dosal "was not involved in the decision to non-renew DeBose's employment). While Wilcox claims that he made the decision to non-renew DeBose's employment after reviewing the Ellucian Report, USF does not attempt to deal with the so-called evidentiary elephant in the room: DeBose's deposition testimony that Dosal told her that Wilcox was never "going to think highly of [DeBose] . . . because . . . [she is] black." At this stage of the proceedings, the Court is required to draw all reasonable inferences in favor of the non-moving party, DeBose, and given DeBose's testimony that Wilcox harbored racial animus towards her, she is entitled to a reasonable inference that her termination was discriminatory. This is true even though Dosal's alleged statement that Wilcox harbored racist views towards DeBose was remote in time from her termination. Stated simply,

DeBose's sworn testimony that Wilcox is a virulent racist cannot be discounted on summary judgment and, as a result, is enough to get her to a jury on her claim for race-based termination discrimination.

## B.    Retaliation Claims

"Title VII's retaliation provision makes it unlawful to discriminate against any individual because she has opposed any practice made an unlawful practice by the Act." *Demers v. Adams Homes of Nw. Fla., Inc.*, 321 F. App'x 847, 852 (11th Cir. 2009). "To establish a prima facie case of retaliation, the plaintiff must show: (1) that [s]he engaged in statutorily protect expression; (2) that [s]he suffered an adverse employment action; and (3) that there is some causal relationship between the two events." *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997). Once the plaintiff establishes her prima facie case, the employer must proffer a legitimate, non-discriminatory reason for the adverse employment action. *Id.* "If the employer offers legitimate reasons for the employment action, the plaintiff must then demonstrate that the employer's proffered explanation is a pretext for retaliation." *Id.*

In Counts II and IV of the TAC, the Plaintiff asserts claims for retaliation based on her gender and race, respectively.    Specifically, the Plaintiff alleges that she was retaliated against for filing internal complaints with USF, charges of discrimination with the EEOC, and an action seeking a preliminary injunction before this Court. *See* (Doc. No. 45, at ¶ 147). DeBose claims that because she engaged in the foregoing protected activities, she was denied a promotion to the AVP EPM position, terminated from her position as Registrar, and given a poor reference to the Provost of UNF. (Doc. No. 45,a t ¶ 148).

For starters, the Plaintiff's claims that she was denied the AVP EPM promotion due to unlawful retaliation are without merit. It is undisputed that DeBose did not engage in any statutorily protected activity until *after* she learned that Hamilton had been appointed to the AVP EPM position. *Compare* (Doc. No. 79-8) (demonstrating that DeBose's first ethics point complaint was submitted on July 28, 2014), *with* (Doc. No. 77, at ¶ 19) (stating that Dosal notified DeBose of Hamilton's appointment to the AVP EPM position on July 15, 2014). Thus, Counts II and IV, to the extent they are based on Hamilton's promotion to AVP EPM, fail as a matter of law due to a lack of causation. *See Univ. of Tex. Sw. Med. Center v. Nassar*, 133 S.Ct. 2517, 2534 (2013) (stating that to satisfy the causation element, the plaintiff "must establish that his or her protected activity was a but for cause of the alleged adverse action by the employer.").

The Plaintiff's claims that she was terminated and given a poor reference in retaliation for engaging in statutorily protected activities, however, require a more thorough analysis. USF does not dispute that the Plaintiff engaged in statutorily protected activity, or that she suffered an adverse employment action when she was terminated and given a negative reference to the Provost of UNF. To the contrary, USF attacks the Plaintiff's ability to establish the causation element of her prima facie case and, to the extent she can make out a prima facie case, USF contends that DeBose cannot show that her termination and any poor review were pretext for retaliation.

Prior to the Supreme Court's *Nassar* decision, a plaintiff could satisfy this requirement by showing, among other things, "close temporal proximity" between the protected activity and the adverse employment action. *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004). Following *Nassar*, however, a plaintiff must show more than

temporal proximity between the protected activity and their termination. *Cf. Smith v. City of New Smyrna Beach*, 588 F. App'x 965, 981-82 (11th Cir. 2014). Instead, to establish a claim for retaliation, the plaintiff must present evidence "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 133 S.Ct. at 2533.

Here, the record contains testimonial evidence that after DeBose filed her EEOC complaint on January 15, 2015, (Doc. No. 76, at 6), she was "asked into meetings with no agenda." (A. DeBose Dep. Tr. 230:6-20). Shortly thereafter, the Alexis Mootoo incident occurred, which DeBose claims was part of a deal in which Dosal promised Mootoo more favorable "pay and position." (A. Dep. Tr. 84:2—86:24). Approximately one month later, in February of 2015, USF engaged Ellucian to review and assess its implementation of Degree Works. (Doc. No. 76, at 8). This, as we now know, ultimately culminated in the Ellucian Report, which USF cited as its basis for its decision not to renew DeBose's employment. Shortly thereafter, Ralph Wilcox acknowledges that he told UNF Provost Earle Traynham that DeBose was "not collaborative and that she was resistant to change." (Doc. No. 78, at ¶ 9). DeBose's version of the negative reference is far more colorful, with DeBose claiming that people at USF and elsewhere told her Ralph Wilcox told Traynham he wanted DeBose "to have nothing . . . not even a shirt . . . . bare, exposed with nothing." (A. DeBose Dep. Tr. 290:1-11).

Clearly, things between DeBose and USF went sideways between 2014 and 2015, and during that period of time, DeBose filed multiple internal and external complaints alleging discrimination. DeBose's version of the facts, i.e. that she was the victim of a massive conspiracy because she filed complaints of discrimination, may not ultimately be

accepted by a jury, but there is certainly enough circumstantial evidence of retaliation to afford DeBose her day in Court. Specifically, given the close temporal proximity between DeBose's EEOC complaint and USF's decision to engage Ellucian, DeBose's testimony that the Registrar's Office was included in the scope of Ellucian's engagement at the request of USF, DeBose's testimony that she was treated differently following her complaints of discrimination, and the timing and circumstances surrounding the Traynham conversation, a reasonable jury could find that USF's actions were retaliatory. Thus, USF's motion for summary judgment is denied as to DeBose's claims that her termination and poor reference were retaliatory.

## C. Disparate Impact Claims

A disparate impact theory of discrimination "prohibits *neutral* employment practices which, while non-discriminatory on their face, visit an adverse, disproportionate impact on a statutorily-protected group." *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1274 (11th Cir. 2000) (emphasis in original). To prove a disparate impact claim, the plaintiff must show: (1) there is a significant statistical disparity between the proportion of minorities available in the labor pool and the proportion of minorities hired by the employer; (2) there is a specific, facially-neutral employment practice causing the disparity; and (3) that a causal nexus exists between the identified employment practice and the statistical disparity. *Id.* Importantly, to prevail on a claim for disparate impact, "the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Id.* At 1274-75.

Here, the only statistical evidence offered in support of the Plaintiff's disparate impact claims is an "Affidavit of Expert Opinion" offered by Saba Baptiste-Alkebu-Lan, a

purported subject matter expert on employment discrimination, (Doc. No. 177), and an unauthenticated spreadsheet attached to Doc. No. 188. *See* (Doc. No. 188, at 179). Since Ms. Baptiste-Alkebu-Lan's report is dated September 5, 2017, well after the deadline to disclose expert reports and the close of discovery, the affidavit is untimely and inadmissible in response to USF's motion for summary judgment. The same holds true for the spreadsheets submitted by the Plaintiff, which have not been authenticated and, as a result, are not admissible in response to summary judgment. Given, the Plaintiff's failure to support her disparate impact claims with admissible evidence in response to summary judgment, USF is entitled to summary judgment on Counts V and VI of the TAC.

### D.    Breach of Contract

To recover damages for breach of contract, the plaintiff must prove: (1) the plaintiff and defendant entered into a contract, (2) the plaintiff did what the contract required, (3) all conditions required by the contract for defendant's performance occurred, (4) the defendant failed to perform under the contract, and (5) the plaintiff was harmed by that failure. *Atlantica One, LLC v. Adragna*, 177 So. 3d 89, 91 (Fla. 5th DCA 2015). The Court previously dismissed DeBose's claims for breach of contract not based on an express contract. (Doc. No. 50, at 3-4). While DeBose previously represented that USF withheld a copy of her written employment agreement, (Doc. No. 49, at 6), discovery is now complete, and no written employment agreement has been shown to exist. For this reason alone, DeBose's breach of contract claim fails as a matter of law.

Moreover, it appears that in actuality DeBose was employed pursuant to USF Regulation 10.210, which states that "employment is at will and . . . employees may be non-reappointed upon written notice from the CAO." (Doc. No. 206-1, at 2). Under

Regulation 10.201, "the [required] period of notification prior to the effective date of non-reappointment is . . . [t]hree (3) months' . . . for employees with two (2) or more years of continuous employment." (Doc. No. 206-1, at 2). "Following receipt of the notice of non-reappointment, the CAO has the option to assign the employee other duties and responsibilities and/or to require the employee to use accrued annual leave." (Doc. No. 206-1, at 3). It is undisputed that this is exactly what happened here: DeBose was given three months' notice of her non-renewal, and was required to use accrued annual leave during the three month period following receipt of the notice of non-reappointment. As a result, DeBose has failed to prove that USF breached any of its non-reappointment procedures.

###      E.      Tortious Interference

Under Florida law, the elements of a claim for tortious interference are: "(1) the existence of a business relationship that affords the plaintiff existing or prospective rights; (2) the defendant's knowledge of the business relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff." *Int'l Sales & Serv., Inc. v. Austral Insulated Products, Inc.*, 262 F.3d 1152, 1154 (11th Cir. 2001). In the TAC, the Plaintiff asserts claims for tortious interference against USF and Ellucian, claiming that Ralph Wilcox's negative review of her performance cost her a prospective employment opportunity at UNF, and that Ellucian's statements criticizing the Registrar's Office in its report caused her termination from USF. Neither claim holds water for one very simple reason: despite DeBose's plethora of allegations concerning USF and Ellucian's improper behavior, the record is devoid of evidence that either entity *intentionally* interfered with her existing or prospective rights of employment.

With respect to USF, the only person who could have intentionally interfered with DeBose's prospective rights of employment at UNF is Wilcox. While DeBose claims Wilcox told Traynham he wanted DeBose "to have nothing . . . not even a shirt . . . . bare, exposed with nothing," (A. DeBose Dep. Tr. 290:1-11), during her deposition DeBose was unable to clearly articulate who informed her of Wilcox's alleged "not even a shirt" statement. (A. DeBose Dep. Tr. 290:12-20). The best DeBose could do was to identify "a guy named Lance . . . who works at USF." (A. DeBose Dep. Tr. 290:18-20). Given the lack of information regarding the proponent of the "not even a shirt" comment, DeBose has failed to demonstrate that the testimony can be reduced to an admissible form. The same holds true for any statements regarding Wilcox's conversation with Traynham that were relayed to her by her friend Albert Colom. Mr. Colom is not a USF employee and, as a result, anything he told DeBose in May of 2015 is hearsay, and does not qualify as an admission of a party opponent or under any other exception to the rule against hearsay. Thus, DeBose's recitation of Colom's alleged version of the Traynham conversation is inadmissible in opposition to USF's summary judgment motion. Since DeBose lacks any firsthand knowledge regarding Wilcox's intentions pertaining to the Traynham conversation, and Wilcox unequivocally denies interfering with DeBose's prospective rights of employment, USF is entitled to summary judgment on Count V of the TAC.

As for Ellucian, DeBose similarly lacks any firsthand knowledge regarding why Ellucian was critical of the Registrar's Office in its report. DeBose claims that Diamond's body language, face, and demeanor was "angry," (A. DeBose Dep. Tr. 97:16-23), that she "went out of her way . . . to cast a negative light on the registrar's office," and she that

did not sincerely or honestly believe the opinions she expressed regarding the Registrar's Office. (A. DeBose Dep. Tr. 98:3—99:24). However, having an "angry" demeanor does not equate to tortious interference, and DeBose's beliefs regarding Diamond's alleged targeting of her office and lack of sincerity are pure conjecture. As a result, Ellucian is entitled to summary judgment on Count VI of the TAC.

### F. Civil Conspiracy

To prove a claim for civil conspiracy, the plaintiff must show: (1) the existence of an agreement between two or more parties, (2) to do an unlawful act, (3) the doing of some overt act in furtherance of the conspiracy, and (4) damages. *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009). In the TAC, DeBose accuses USF and Ellucian of conspiring "to terminate Plaintiff's employment for pretextual reasons by knowingly including inaccurate and improper information in the Ellucian Report with the intent of damaging Plaintiff." (Doc. No. 45, at ¶ 230). The problem for DeBose, however, is that there is absolutely no record evidence of any agreement between USF and Ellucian to include information critical of the Registrar's Office in the Ellucian Report. There are no emails, letters, or alleged oral statements that show any anti-DeBose collusion between USF and Ellucian. Any belief by DeBose that such collusion occurred is pure conjecture and has not been properly supported for purposes of opposing the Defendants' summary judgment motions. As a result, DeBose's civil conspiracy claims fail as a matter of law.

### V. Conclusion

Accordingly, it is

**ORDERED** that the Summary Judgment Motions are **GRANTED IN PART AND DENIED IN PART AS FOLLOWS**:

(1) USF's motion for summary judgment is **GRANTED** with respect to DeBose's claims of gender discrimination (Count I);

(2) USF's motion for summary judgment is **GRANTED** with respect to DeBose's claims of race *and* gender discrimination based on Hamilton's promotion to AVP EPM (Count I and III);

(3) USF's motion for summary judgment is **DENIED** with respect to DeBose's claims of race discrimination based on DeBose's non-reappointment as Registrar (Counts I and III);

(4) USF's motion for summary judgment is **GRANTED** with respect to DeBose's claims of retaliation based on Hamilton's promotion to AVP EPM (Counts II and IV);

(5) USF's motion for summary judgment is **DENIED** as to DeBose's claims of retaliation based on her non-reappointment as Registrar and Wilcox's poor reference to UNF (Counts II and IV);

(6) USF's motion for summary judgment is **GRANTED** as to DeBose's claims for disparate impact, breach of contract, tortious interference, and civil conspiracy (Counts V, VI, VII, IX, X);

(7) Ellucian's motion for summary judgment is **GRANTED** as to DeBose's claims for tortious interference and civil conspiracy (Counts VIII and X).

It is further **ORDERED** that DeBose and USF are directed to confer and file a status report within 30 days that contains the following information:

(1) The status or result of any previously or currently scheduled mediation and, if already concluded, the result of such mediation;

(2) Proposed dates for the mediation (if not already conducted) and trial of the remaining claims in this matter; and

(3) Any remaining issues to be addressed by the Court.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida this 29th day of September, 2017.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties