```
 1                IN THE UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
 2                        TAMPA DIVISION

 3

 4   ANGELA W. DEBOSE,              )
                                    )
 5               Plaintiff,         )
                                    )
 6                                  ) Case No.
          vs.                       ) 5:15-CV-2787-EAK-AEP
 7                                  )
                                    )
 8   USF BOARD OF TRUSTEES, et al., )
                                    )
 9               Defendant.         )

10

11

12   _____

13                    JURY TRIAL - DAY 8
        BEFORE THE HONORABLE ELIZABETH A. KOVACHEVICH
14               UNITED STATES DISTRICT JUDGE

                    SEPTEMBER 20, 2018
15                      10:37 A.M.
                      TAMPA, FLORIDA
16   _____

17

18

19

20          Proceedings transcribed via courtroom digital
     audio recording by transcriptionist using computer-aided
21   transcription.
     _____

22

23              DAVID J. COLLIER, RMR, CRR
               FEDERAL OFFICIAL COURT REPORTER
              801 NORTH FLORIDA AVENUE, 7TH FLOOR
24                 TAMPA, FLORIDA  33602

25
```

1    **APPEARANCES:**

2

3    **FOR THE PLAINTIFF:**

4

5            *Angela DeBose (pro se)*

6            1107 Kirby Street

7            Tampa, Florida  33604

8            (813) 230-3023

9

10

11   **FOR THE DEFENDANT UNIVERSITY OF SOUTH FLORIDA:**

12

13           *Richard C. McCrea, Jr.*

14           *Cayla McCrea Page*

15           Greenberg Traurig, P.A.

16           101 E. Kennedy Boulevard

17           Suite 1900

18           Tampa, Florida  33602-5148

19           (813) 318-5700

20

21

22

23

24

25

```
1                         I N D E X

2

3    PLAINTIFF'S WITNESSES:

4

5    RALPH WILCOX                                        PAGE

6    Cross-examination by Mr. McCrae                       11
     Redirect examination by Ms. DeBose                    38
7    Recross-examination by Mr. McCrae                     61
     Further Redirect examination by Ms. DeBose            62
8

9    ALEXIS MOOTOO                                       PAGE

10   Direct examination by Ms. DeBose                      69
     Cross-examination by Mr. McCrae                       87
11   Redirect examination by Ms. DeBose                   106
     Recross-examination by Mr. McCrae                    109
12   Further Redirect examination by Ms. DeBose           109

13

14   DEFENSE WITNESSES:

15

16   SARAH THOMAS                                        PAGE

17   Direct examination by Mr. McCrae                     134
     Cross-examination by Ms. DeBose                      167
18   Redirect examination by Mr. McCrae                   177
     Recross-examination by Ms. DeBose                    181
19   Further Redirect examination by Mr. McCrae           182
     Further Recross-examination by Ms. DeBose            184
20

21   WILLIAM TRAVIS THOMPSON                             PAGE

22   Direct examination by Mr. McCrae                     190

23

24

25
```

```
 1                    P R O C E E D I N G S
 2                      - - - o0o - - -
 3            (The following bench conference was held.)
 4            THE COURT:  Okay.  The first thing, folks, is on
 5     the deposition designations.  If you agree, both sides, to
 6     the deposition designations and your cross-designations and
 7     then redacting the rest of the deposition, in other words,
 8     whatever you designate, whatever you cross-designate, and
 9     then redact means black out, they can come in as exhibits.
10     That's fine with the Court.  That's just not the first time
11     something like that has ever been done in my 45 years, okay?
12     That's not a problem.  All right.  That's one.  So we're
13     going to have to get the designations, I don't know, during
14     the lunch hour or something.
15            MR. MCCRAE:  We've exchanged them already.
16            THE COURT:  All right.  That's fine.  You can just
17     make it a joint exhibit if you want to, you can do that.
18            Number two, who you're going to put on after you
19     finish with Wilcox.  And on the time -- based upon the time
20     for presentation of the case, how much does she have left?
21            COURTROOM DEPUTY:  If we go through Tuesday,
22     plaintiff has 1 hour and 7 minutes.
23            THE COURT:  She has 1 hour and 7 minutes left?
24            COURTROOM DEPUTY:  Yes.
25            THE COURT:  Now, let me tell you the one place you
```

```
 1   can steal from, but you better be cognizant of it.  I've
 2   allowed two hours for each of you, that's been excluded from
 3   the courtroom time, that's next Wednesday or whenever we sum
 4   up.  You've got two hours, he's got two hours.  If you want
 5   to steal from that -- you're entitled to an opening and a
 6   rebuttal in the closing summation.  If you want to steal
 7   from that, that's going to constrain you in your summation,
 8   but you could do that, okay?
 9            MS. DEBOSE:  Um-hum.
10            THE COURT:  There's two hours there, but I'd be
11   very, very careful about that.
12            MS. DEBOSE:  Okay.
13            THE COURT:  Okay?  Now --
14            MR. MCCRAE:  A couple things, Judge, backing up.
15            On the depositions, I think a joint exhibit is
16   fine.  There's a portion of one of the depositions that
17   dealt with that consulting report that we dealt with earlier
18   in the case that was done after the termination decision by
19   a third-party, and there are questions about it that contain
20   information that are in the report.  So we've objected to
21   that and I would like to have that --
22            THE COURT:  Redacted.
23            MR. MCCRAE:  -- redacted.
24            THE COURT:  Did you show her what you want to have
25   redacted?
```

```
 1              MR. MCCRAE:  Well, we exchanged objections and
 2    that part we objected, and I can show her more specifically,
 3    but I think it's page 41 and 42, something like that, but
 4    I can give her the exact designation.
 5              THE COURT:  Give her the exact portion of it and
 6    let's see if we can redact that without a problem.
 7              What else?
 8              MR. MCCRAE:  The other issue, and this may be
 9    asking the Judge to call balls and strikes before we get
10    there, but we were asked this morning to have a third
11    witness here and we've produced her, but with an hour and
12    seven minutes left, I don't know what the Judge intends to
13    do if we don't --
14              THE COURT:  You mean Mootoo?
15              MR. MCCRAE:  Mootoo, yes.
16              THE COURT:  You intend to call her?
17              MS. DEBOSE:  I do.
18              THE COURT:  Okay.  So she's going to be here and
19    she's going to get called, and your Cross is separate and
20    apart from her Direct.
21              MR. MCCRAE:  I understand.
22              THE COURT:  So you're going to be --
23              MS. DEBOSE:  Yes, I understand.
24              THE COURT:  You understand what you're doing.
25              Now, is that all from you all?  Because I've got
```

1    one thing, or maybe two things.

2            MS. DEBOSE:  Just one other thing.  On Diamond,

3    there is an e-mail where she explains to her supervisor why

4    she wrote what she wrote in the Ellucian report.  Had she

5    appeared, I planned to present that into evidence and

6    question her about that.  Is that allowed to be entered?

7            Do you have an objection?

8            THE COURT:  You're offering -- you want to know if

9    you can offer the e-mail?

10           MS. DEBOSE:  Yes.

11           MR. MCCRAE:  We've objected to it on the basis of

12   hearsay.  It was not covered in her deposition.  She's not

13   here for me to cross-examine about it.

14           THE COURT:  His objection is sustained on that

15   basis.

16           What else?

17           MS. DEBOSE:  That's it.  I mean, I'm not going to

18   read from the depositions in court today, that wouldn't be a

19   good use of time, and so the designations and

20   counter-designations are fine.

21           THE COURT:  Jointly the depositions are going in

22   and they're in evidence and you can make reference to that

23   either using your time here or make reference to it in the

24   summations, both of you.  It's up to you.

25           MR. MCCRAE:  Right.  I think -- I think in the

```
 1   interest of time we'll confer at the end of the day or over
 2   the weekend and by Monday have a joint exhibit of the
 3   depositions.
 4            THE COURT:  That's fine with me.
 5            Now, one more thing.  Newspaper story.  Every time
 6   there's a front page story about something involving
 7   somebody in the case -- Wilcox is mentioned in that USF
 8   story on the front page of the Tampa Bay Times today.
 9   There's a big story about USF and the three campuses.
10   There's different people's names mentioned in.
11            MR. MCCRAE:  That's why he had to leave yesterday.
12            THE COURT:  Yeah.  Well, this morning -- there's
13   different people mentioned in that.  I haven't had time to
14   read it because I've been at the foot doctor.
15            And by the way, I apologize for this, but when
16   I broke my tooth I also broke a major toe and -- not break
17   it but dislocated it, and now I've got the happy news
18   that -- surgery, which I told them is out, not at my age,
19   but we're talking about rest.  I said, well, that's out too.
20   But I've got a problem.  It will be three months before they
21   can tell what's going to happen.  So anyway, I had to go see
22   him and find out where I was.  X-rays and all that kind of
23   stuff has been done and I've got a read on it.
24            I keep telling people that want me to keep going
25   forward, I say, gang, the click and clicks are working fine,
```

```
 1   but the body is giving out, see?  That happens to all of us.
 2   I'm 81 on my way to 82.  So we got to be realistic.
 3              Hear what I'm telling you, Rich?
 4              MR. MCCRAE:  I'm catching up to you, Judge.
 5              THE COURT:  But what I'm telling you is when
 6   things start to happen, just don't ignore them, take note.
 7              MR. MCCRAE:  I made it to 58 and I had two
 8   surgeries in that year, so I ruined my perfect record.
 9              THE COURT:  And you were athletic and did all the
10   right things.
11              MR. MCCRAE:  Yeah.
12              THE COURT:  Me too, but you get to the point where
13   the genes take over and heredity, and you ain't got no
14   control over that, gang, no control.
15              Okay.  Anyway, I'm going to ask the jury has
16   anybody read anything, know anything about, talk anything
17   about the parties, anything, because if I get a yes to that,
18   then I'm bringing that juror to sidebar and you're up here,
19   okay, if anybody read that story, because you couldn't
20   ignore it, it's on the front page, it's the headline.
21              MR. MCCRAE:  I pulled out of my driveway before it
22   landed on my driveway.
23              THE COURT:  Well, I've got to tell you, it's
24   there.  It's there, okay?
25              Let's get them in here.
```

1          All rise for the jury.

2     *(End of bench conference; proceedings resume in open court.)*

3          THE COURT:  Good morning, ladies and gentlemen of

4     the jury.  This morning my standard inquiry:  You have not

5     discussed this case among yourselves, with anyone else, nor

6     permitted it to be discussed in your presence; you have not

7     looked at, listened to any news media accounts of these

8     proceedings or anyone involved in these proceedings; and you

9     have not visited the site or scene of any of the alleged

10    occurrences in this case, correct?

11          JURORS:  Correct.

12          THE COURT:  Okay.  Now, that applies, ladies and

13    gentlemen of the jury, throughout the time you are in this

14    jury until you are discharged as jurors, okay?  So if

15    somebody is holding back whatever they're holding back for

16    you to look at in the future or tell you about in the

17    future, that's all got to wait until you're discharged.

18    Do you understand?

19          JURORS:  Yes.

20          THE COURT:  Everybody?

21          JURORS:  Yes.

22          THE COURT:  Okay.  You're under your oath for

23    that, subject to the perjury laws, okay?

24          Anybody read anything, seen anything, looked at

25    anything?  No?  Good.  All right.

RALPH WILCOX - SEPTEMBER 20, 2018          11
Cross-Examination by Mr. McCrae

```
 1              I apologize for the delay but that was because of
 2    the Court and a follow-up on my problem that I had a couple
 3    weeks ago.
 4              Anyway, the witness is back in the box.
 5              State your name again for the record.
 6              THE WITNESS:  Ralph Wilcox.
 7              THE COURT:  All right.  You may proceed.
 8              MR. MCCRAE:  May it please the Court.
 9              THE COURT:  Yes, sir.
10          CROSS-EXAMINATION OF RALPH WILCOX (continued)
11    BY MR. MCCRAE:
12    Q    Good morning, Dr. Wilcox.
13    A    Good morning.
14              MR. MCCRAE:  May I have Defendant's Exhibit Number
15    53.
16    BY MR. MCCRAE:
17    Q    If you would turn to Defendant's Exhibit Number 53 and
18    tell me whether you recognize that document.
19    A    I do.
20    Q    Is that an e-mail that you received that was forwarded
21    to you by Dr. Dosal on January 31, 2015?
22    A    Yes.
23              MR. MCCRAE:  All right.  I would move to admit
24    Defendant's Exhibit Number 53.
25              THE COURT:  54?
```

```
 1              COURTROOM DEPUTY:  53.

 2              THE COURT:  53.

 3              Yes.  Okay.  Mr. McCrea -- I thought that was

 4    happening.  Mr. McCrea, for all of your athletic years, get

 5    the volume up.

 6              MR. MCCRAE:  Okay, Judge.

 7              THE COURT:  They can't hear you and they haven't

 8    heard what you said since you got to the podium.

 9              MR. MCCRAE:  All right.  Well, that's bad.

10              THE COURT:  Got to rectify that, Mr. McCrea.

11              MR. MCCRAE:  Can you hear me now?

12              JURORS:  Thank you.

13              THE COURT:  They can hear me.  I know there's no

14    question about that.  Right?  Right.

15              MR. MCCRAE:  This is a recurring problem I have,

16    Judge.

17    BY MR. MCCRAE:

18    Q    Okay.  Taking a look at Defendant's Exhibit Number 53,

19    Dr. Wilcox, do you recognize that as an e-mail that

20    Dr. Dosal forwarded to you, FYI, and he forwarded to you

21    Alexis Mootoo's complaint or memorandum to him dated

22    January 29 of 2015?

23    A    Yes.

24    Q    All right.  And is that the first notification that you

25    had, on January 31 of 2015, of the incident in which
```

RALPH WILCOX - SEPTEMBER 20, 2018
Cross-Examination by Mr. McCrae

1    Ms. Mootoo was called little girl, was told to stay in her

2    lane, little girl, by Ms. DeBose?

3    A    I believe so, yes.

4    Q    All right.  And we looked yesterday at Plaintiff's

5    Exhibit Number 102, and you saw that Dr. Dosal had been

6    informed that Ms. DeBose had filed an EEOC charge on

7    February 4 of 2015, correct?

8    A    Correct.

9    Q    So you and Dr. Dosal were aware of this incident before

10   that charge was filed?

11   A    Yes.

12   Q    What was your reaction when you read that memorandum

13   from Ms. Mootoo?

14   A    Well, I was in part troubled in reference to hostility

15   and the alleged insults, which, frankly, have no place in a

16   university setting such as ours; but, I must confess, not

17   altogether surprised by the reference to lack of

18   collaboration.

19   Q    Okay.  If you would turn to tab 58.

20        Do you recognize this document as the written

21   reprimand, a draft of which was sent to you by Dr. Dosal on

22   February 2nd, 2015?

23   A    Yes.

24        MR. MCCRAE:  I would move to admit Defendant's

25   Exhibit Number 58.

RALPH WILCOX - SEPTEMBER 20, 2018          14
Cross-Examination by Mr. McCrae

1              THE COURT:  Any objections?

2              MS. DEBOSE:  No, Your Honor.

3              THE COURT:  Defendant's 58 in evidence.  You may

4    proceed.

5    BY MR. MCCRAE:

6    Q    All right.  And you indicated in your earlier testimony

7    that you were not required to and did not authorize the

8    written reprimand, but did you agree with it when you saw

9    the draft?

10   A    I did.

11   Q    And are you familiar with USF's grievance policy?

12   A    I am.

13   Q    Do you recall whether or not the policy requires that

14   before a written reprimand is issued an employee has to be

15   given prior notice and an opportunity to tell their side of

16   the story?

17   A    That's not my understanding, no.

18              MR. MCCRAE:  All right.  Could I have Plaintiff's

19   Exhibit 288.

20   BY MR. MCCRAE:

21   Q    Do you have this document in front of you?

22   A    The number again?

23   Q    I'm sorry.  This is Plaintiff's 288, which is already

24   in evidence.

25              MR. MCCRAE:  May I approach the witness,

```
 1    Your Honor?
 2              THE COURT:  Yes.
 3    BY MR. MCCRAE:
 4    Q    You were asked about that document earlier this week.
 5    Do you recognize that as USF's progressive discipline
 6    policy?
 7    A    I do.
 8    Q    All right.  And looking through that document, is there
 9    any language or anything in that policy that requires,
10    before a supervisor can give someone a written reprimand,
11    they have to give them prior notice and an opportunity to be
12    heard or tell their side of the story?
13    A    No.
14              MR. MCCRAE:  All right.  May I approach,
15    Your Honor?
16              THE COURT:  Yes.
17              MR. MCCRAE:   Thank you.
18    BY MR. MCCRAE:
19    Q    Now, taking a look at the last page of this policy, it
20    says, where it's highlighted:  For administrative employees
21    who are "at will" there is not the same requirement that
22    discipline be in the form of these same progressive steps.
23              Do you know whether or not Ms. DeBose was
24    considered to be an at-will administration employee?
25    A    Yes, I believe so.
```

1   Q     All right.  So this policy then would not apply to her?

2   A     Correct.

3   Q     And would you expect that Tonia Suber, who worked in

4   HR, would be knowledgeable about and follow USF's grievance

5   policies?

6   A     She was an Assistant Director in Human Resources at the

7   time, so absolutely I had confidence in her judgment.

8   Q     Would you expect her to be knowledgeable about and

9   follow USF's disciplinary policies?

10  A     Yes, relative -- certainly relative to non-faculty

11  employees.

12  Q     And why do you say that?  Why are you making a

13  distinction between faculty employees and non-faculty

14  employees?

15  A     Because primarily faculty employees follow a different

16  path through the Provost's Chief Academic Offices area of

17  responsibility.  Other staff employees,

18  including administrative staff, work through

19  Human Resources.

20  Q     And Ms. DeBose was a non-faculty administration

21  employee?

22  A     Yes.

23  Q     And that was the area for which Ms. Suber was

24  responsible?

25  A     Yes.

1    Q    All right.  Let me show you what was previously

2    admitted as Plaintiff's Exhibit Number 314.  This was the

3    memorandum by Denelta Adderley-Henry, Associate Director,

4    about the grievance.  Do you recall this document?

5    A    I do.

6    Q    All right.  And that document indicated that

7    Ms. DeBose's complaint was to be referred to DIEO for

8    investigation, or her grievance was to be referred?

9    A    Yes, rather than Human Resources.

10   Q    Okay.  And this was the grievance over the written

11   reprimand?

12   A    Yes.

13   Q    All right.  Did you direct that the grievance be

14   transferred from HR to DIEO?

15   A    No, I think Ms. Adderley-Henry was following University

16   policy and regulation.  I had no knowledge of it being

17   redirected.

18   Q    All right.  And do you know whether or not the fact

19   that it was transferred from HR as a grievance to DIEO as a

20   discrimination retaliation complaint had anything to do with

21   the fact that you were not involved in the process of

22   reviewing or making a decision about this issue?

23   A    No.

24   Q    You don't know one way or the other?

25   A    Could you ask the question one more time, please.

1    Q     Okay.  Let me try to be clearer.

2          There were questions that you were asked about you

3    being recused or you not being involved in the process of

4    reviewing Ms. DeBose's complaints about the written

5    reprimand, and do you know whether the fact that you were

6    not involved had anything to do with the fact that it wasn't

7    being treated as a grievance but it had been transferred to

8    DIEO for investigation?

9    A     I had no knowledge of that, no.

10   Q     Okay.  Fair enough.

11         Are you involved in the DIEO process?

12   A     No, that's −− that's an independent office that

13   conducts its own investigations and presents its findings to

14   University leadership.

15   Q     And I think you've said this, but is it the

16   responsibility of DIEO to deal with and investigate

17   complaints of discrimination and retaliation?

18   A     Yes.

19   Q     And there was some discussion or questions asked of you

20   about Dr. Dosal discussing Ms. DeBose's complaints with

21   other people at the University.  Do you know whether

22   Dr. Dosal discussed Ms. DeBose's EthicsPoint complaint or

23   her DIEO complaint or her EEOC complaint?

24   A     I have no knowledge of that.

25   Q     And do you have any knowledge of the purpose for which

 1   Dr. Dosal would have decided to share any, if any, one of

 2   those with other employees?

 3   A     No.

 4   Q     Let me ask you to look at tab 63.

 5         You are copied on this document?

 6   A     Yes.

 7         MS. DEBOSE:  May I see that, please?

 8         MR. MCCRAE:  I'm sorry?  Yeah.

 9         Your Honor, I would move the admission of

10   Defendant's Exhibits 63 and 64.

11         THE COURT:  63, 64, any objections?

12         MS. DEBOSE:  No, Your Honor, to the entry of it.

13         THE COURT:  Okay.  Defendant Exhibit 64 -- wait a

14   minute, 63 and 64?

15         MR. MCCRAE:  Yes, Your Honor.

16         THE COURT:  They're in evidence.  Go ahead.

17   BY MR. MCCRAE:

18   Q     Dr. Wilcox, could you move to tab 63.

19   A     Yes.

20   Q     And you're copied, I think it's on the next page, but

21   you're copied on this letter or memorandum?

22   A     Yes.

23   Q     All right.  And this was from Dr. José Hernandez?

24   A     Yes.

25   Q     And his position, again?

RALPH WILCOX - SEPTEMBER 20, 2018                    20
Cross-Examination by Mr. McCrae

```
 1   A     The Chief Diversity Officer of the University.
 2   Q     All right.  And was he conveying in this letter the
 3   conclusions after the investigation into Ms. DeBose's DIEO
 4   complaint of discrimination and retaliation?
 5   A     He was.
 6   Q     All right.  And DIEO determined that there was no cause
 7   to believe that there had been discrimination or
 8   retaliation?
 9   A     Yes.
10              MS. DEBOSE:  Your Honor, I have an objection.
11              THE COURT:  What's your objection?
12              MS. DEBOSE:  I think it --
13              THE COURT:  Do you need to come to sidebar?
14              MS. DEBOSE:  Yes.
15              THE COURT:  All right.  Come to sidebar.
16              Ladies and gentlemen of the jury, you may stand.
17   You may stand in the courtroom.
18              (The following bench conference was held.)
19              MS. DEBOSE:  I believe I filed a motion in limine
20   about the DIEO reports, that they shouldn't be entered
21   because they're prejudicial, or that they be -- the jury be
22   given clear explanation and instruction concerning that the
23   findings of that institution doesn't mean they investigated,
24   the findings of that institution doesn't mean that it's
25   in fact true, because we just saw yesterday, for example,
```

```
 1   that there was supposedly a DIEO investigation that didn't
 2   even occur until after the plaintiff was terminated.  So
 3   there's no evidence that they actually investigated it,
 4   because they didn't speak to any of the witnesses that
 5   plaintiff gave them.
 6           MR. MCCRAE:  Your Honor, there was no objection to
 7   this exhibit or the next one.  They're in evidence.
 8   I'm simply going through the document with this witness.
 9   It does have relevance in that this is in March of 2015,
10   which is just two months before the Ellucian report comes in
11   and the nonrenewal decision is made.  So it's important to
12   his mindset that as of the time he made the decision he had
13   been made aware by the Chief Diversity Officer that there
14   was no reason to believe that there was discrimination or
15   retaliation.
16           MS. DEBOSE:  First of all, I would rebut, there
17   were other DIEO reports on performance evaluations as well,
18   there was no finding, but we saw that there was no
19   investigation determined from Paul Dosal whether or not --
20   why Ms. DeBose's wasn't evaluated.  Paul Dosal provided --
21   Paul Dosal provided false information, to include
22   Laurie Meggesin to say she was a direct report and that
23   Alexis Mootoo was not evaluated.  Those are -- those were
24   not Ms. DeBose's peers and he influenced and lied to a DIEO
25   investigator.
```

RALPH WILCOX – SEPTEMBER 20, 2018          22
Cross-Examination by Mr. McCrae

 1              Second of all, on this, this determination was
 2    made and it did not have any investigation done, just like
 3    the Pamella Dupree investigation.  There were no witnesses
 4    talked to, it was simply a finding, you're done.  So to
 5    suggest it has probative evidentiary value, I think an
 6    instruction is necessary, because it isn't conclusive, it
 7    doesn't mean discrimination did not occur, just like the
 8    same kind of indication would have happened if the EEOC had
 9    come to a finding, that it's not probative and it's
10    prejudicial.
11              THE COURT:  What's your rebuttal?
12              MR. MCCRAE:  Your Honor, the plaintiff spent a
13    long time with this witness asking questions about the fact
14    that the written reprimand was a pretext, a setup, some way
15    of moving towards a termination.  I think it's important for
16    the jury to know that that complaint was investigated and he
17    was made aware that there was no basis, there was no
18    discrimination or retaliation with respect to the written
19    reprimand at the time he made the termination decision.
20              THE COURT:  I'm going to allow you to proceed
21    forward.  You can come back on Redirect and see where we
22    are.  Objection is overruled.
23    (End of bench conference; proceedings resume in open court.)
24              THE COURT:  All right.  Consistent with sidebar,
25    let's go forward.

RALPH WILCOX - SEPTEMBER 20, 2018
Cross-Examination by Mr. McCrae

```
 1              MR. MCCRAE:  Do you recall what my pending
 2  questions was?
 3              THE COURT:  Do you understand the question?
 4              THE WITNESS:  I do, Your Honor.
 5              THE COURT:  You may respond.
 6  A    Yes, the determination was no cause related to
 7  complaints of retaliation.
 8  BY MR. MCCRAE:
 9  Q    All right.  And this was sent to you five or six weeks
10  before Ms. Diamond arrived on campus in April?
11  A    Yes.
12  Q    Okay.  And it was two months before you received the
13  Ellucian report?
14  A    Yes.
15  Q    Exhibit 64 was the actual investigation that was
16  forwarded to you by Dr. José Hernandez, was it not?
17  A    Yes.
18  Q    This was the report that was done by DIEO as a result
19  of its investigation, correct?
20  A    Conducted by Camille Blake, yes.
21  Q    Okay.  And you sort of anticipated my question.  If you
22  can turn to the fourth page of that document.  You recognize
23  Camille Blake?
24  A    I do.
25  Q    All right.  And what was her position?
```

RALPH WILCOX - SEPTEMBER 20, 2018
Cross-Examination by Mr. McCrae

```
 1   A     Director of Equal Opportunity and Compliance.
 2   Q     All right.  Do you have any reason to believe that
 3   Tonia Suber, who was in HR, was involved in this
 4   investigation?
 5   A     Certainly not, no.  Not in the investigation or the
 6   report.
 7   Q     And if you take a look back at the first page -- and
 8   I'm looking at the paragraph that starts with "DeBose also
 9   filed the complaint with HR" and references Tonia Suber.
10         Do you see a discussion there that the complaints
11   were treated separately depending on the nature of the
12   complaints?
13   A     Yes.
14   Q     Or words to that effect?
15   A     Yes.
16   Q     And it's the obligation of DIEO to investigate
17   discrimination and retaliation?
18   A     Absolutely.  It's essential that, as an independent
19   office, the appropriate firewalls are set up --
20   Q     And Ms. Suber --
21   A     -- for that purpose.
22   Q     I'm sorry.  I don't mean to interrupt.
23   A     Yes.
24   Q     And Ms. Suber, as the HR person, handled HR decisions
25   that were not involved with discrimination or retaliation;
```

 1   is that correct?

 2   A    Decisions and grievances not filed -- not related to

 3   discrimination, yes.

 4   Q    Okay.  Let me move then to the Ellucian report.

 5        Did you play any part at all in planning the

 6   post-implementation assessment that was done by Ellucian?

 7   A    Absolutely not, no.

 8   Q    Did you ever make any suggestion that the Registrar's

 9   Office be included as one of the departments that was

10   interviewed by the consultant?

11   A    I made no suggestions about any -- any particular

12   office or individuals.  That was left to those who had

13   oversight of the product.  So I had no knowledge, no.

14   Q    When were you first made aware that Ms. DeBose had been

15   interviewed by the consultant?

16   A    When I received the report and saw her name on the list

17   of those invited.

18   Q    All right.  So you had no knowledge before you received

19   the report --

20   A    No.

21   Q    -- that she was even involved?

22   A    No.

23   Q    Let me show you what's already in evidence as

24   Plaintiff's Exhibit Number 224.

25        When you say "all of the people invited," the

1   first page of the report reflects that the consultant spoke

2   with 15 or 20 employees, I don't -- I'm not counting them,

3   but over the course of three days, correct?

4   A    Correct.  They were the participants, yes.

5   Q    And when did you first receive the Ellucian report?

6   A    When it was sent to me by Dr. Dosal following his

7   receipt of it.

8   Q    All right.  And before you received it, did you have

9   any awareness that it might contain criticism of the

10  Registrar's Office or Ms. DeBose individually?

11  A    No.

12  Q    At the time that you read it, did you have any

13  information or understanding whatsoever about Ms. Diamond's

14  qualifications or her methodology?

15  A    No.  She was represented as a consultant from the

16  company that served as a vendor for DegreeWorks to USF.

17  Q    When you read the report, did that give you any reason

18  to question or research Ms. Diamond's qualifications, her

19  education or her methodology?

20  A    I -- she was an independent consultant hired -- hired

21  by the University.  I had no reason to question her

22  qualifications.

23  Q    All right.  You've already testified here that after

24  you received and reviewed the Ellucian report you made the

25  decision to not reappoint Ms. DeBose, correct?

1   A     I did, yes.

2   Q     All right.  And did you make that decision because you

3   blamed her for the failure of DegreeWorks or for some other

4   reason?

5   A     Certainly no blame was ascribed to Ms. DeBose for the

6   underperformance of DegreeWorks, no.

7   Q     Okay.  So if it wasn't the failure of DegreeWorks, what

8   was it that came to you from the Ellucian report that lent

9   itself to your decision?

10  A     Well, again, as I think I testified before, there were

11  three risk factors identified in that report, and as chief

12  academic officer it was my responsibility to find solutions

13  to mitigate, mitigate those risks, which led me to consult

14  with the Director of Auditing Compliance at the University,

15  who was charged with overseeing and communicating directly

16  to the Board of Trustees areas of risk to the University.

17          I met with -- at the same time with the

18  Vice President for Information Technology, Mr. Fernandes,

19  because quite clearly the first two risk factors, the fact

20  that the consultant identified too many people, in her

21  estimation, had access to changing critical components to

22  best serve the needs of our students; and the second risk

23  factor, if you'll recall my testimony was that she had

24  identified a high risk area being that essentially the

25  responsibility for DegreeWorks was falling on the shoulders

 1  of one person and, of course, if that person left, if that

 2  person got sick, that represented a risk, a pretty

 3  significant risk to the University.  So Sidney Fernandes,

 4  the Vice President for Information Technology, gave me great

 5  confidence that he could fix those two -- first two risk

 6  factors in short order.

 7          The third risk factor was this continuing trend or

 8  theme that now I had heard, as I've testified, and witnessed

 9  firsthand for any number of years, that the lack of

10  collaboration and collegial partnership exhibited by the

11  Registrar's Office, custodian of student records,

12  represented a continuing risk as well and needed to be

13  addressed.

14  Q    I'm sorry.  I didn't --

15  A    Needed to be addressed.

16          So in essence, in my assessment, it really was a

17  culmination of years of disappointing leadership to

18  facilitate collaborative solutions to important -- important

19  problems, and that had to be fixed somehow.

20  Q    Did the other two areas of risk have anything to do

21  with lack of collaboration?

22  A    No, not at all.

23  Q    And the other two areas had to do, in my -- these are

24  my words, technical issues involving IT?

25  A    Technical structural issues, yes.

RALPH WILCOX - SEPTEMBER 20, 2018          29
Cross-Examination by Mr. McCrae

1   Q     And do you know -- and there's been testimony either by

2   you or while you were here that the responsibility for

3   DegreeWorks had been transferred from the Registrar's Office

4   to the IT Department in late June of 2014, about ten months

5   earlier?

6   A     Yes, hence my conversation with the Vice President for

7   Information Technology to seek conclusions.

8   Q     And at that time the responsibility for DegreeWorks,

9   after it was transferred, was in the hands of Carrie Garcia;

10  is that your understanding?

11  A     Yes.

12  Q     All right.  And do you know whether the other two areas

13  of risk already existed at the time that DegreeWorks was

14  transferred from the Registrar's Office to IT?

15  A     I believe so, yes.

16  Q     You're not sure?

17  A     I'm not sure.

18  Q     Okay.  Let me show you what was previously admitted as

19  Plaintiff's Exhibit Number 229.

20           THE COURT:  Two four nine?

21           MR. MCCRAE:  Two two nine, Your Honor.

22  I apologize.

23           THE COURT:  Two two nine.

24  BY MR. MCCRAE:

25  Q     Do you recognize that as the notice of

 1    non-reappointment?

 2    A      I do.

 3    Q      All right.  And as we heard earlier this week, it says

 4    in the second paragraph:  "This notice of non-reappointment

 5    does not constitute a dismissal for cause."

 6             In your experience as a university Provost, if

 7    someone is terminated for cause, would it make it easier or

 8    more difficult for that person to find a position with

 9    another university?

10    A      I think much more difficult.

11    Q      If you would turn to tab 100.

12             MR. MCCRAE:  Your Honor, I would move the

13    admission of Defendant's Exhibit Number 100.

14             THE COURT:  Any objection?

15             MS. DEBOSE:  No objection, Your Honor.

16             THE COURT:  Defendant's Exhibit 100 in evidence.

17    You may proceed.

18    BY MR. MCCRAE:

19    Q      All right.  Do you recognize this as USF's

20    non-reappointment policy?

21    A      I do.

22    Q      And it indicates that administration employment is

23    at-will.  Do you have an understanding of what that means?

24    A      Yes.

25    Q      What is your understanding?

RALPH WILCOX – SEPTEMBER 20, 2018                    31
Cross-Examination by Mr. McCrae

1    A    That there is no longterm commitment or expectation on

2    the part of the employee or the institution that he or she

3    has an employment agreement in perpetuity.

4    Q    Does the fact that administrative employment is at-will

5    mean that employees can be non-reappointed without being

6    given prior notice and an opportunity to respond?

7    A    In the case of staff in administration, yes.

8    Q    Okay.  Are you making a distinction between staff in

9    administration and faculty again?

10   A    Yes, I am.

11   Q    Are you making that distinction because the faculty

12   have a union?

13   A    They have a union and --

14   Q    Different rules?

15   A    -- there's something called tenure and rules.

16   Q    Okay.  But with respect to someone like Ms. DeBose, who

17   was in administration, the policy does not require prior

18   notice and an opportunity to respond before

19   non-reappointment occurs; is that correct?

20   A    Correct.

21   Q    And does at-will also mean that Ms. DeBose could have

22   been non-reappointed at any time?

23   A    Yes.

24   Q    And does it mean she could have been non-reappointed

25   without any reason?

RALPH WILCOX - SEPTEMBER 20, 2018                32
Cross-Examination by Mr. McCrae

```
 1   A    Yes.
 2   Q    Under the policy is there some requirement that a
 3   written reprimand be issued before an employee be
 4   non-reappointed?
 5   A    No.
 6   Q    Under the policy was there some obligation on the part
 7   of USF to look behind or investigate the consultant's
 8   Ellucian report before the non-reappointment?
 9   A    No.
10   Q    Was there some obligation under the policy to give
11   Ms. DeBose an opportunity to respond to the Ellucian report
12   before the non-reappointment took place?
13   A    No.
14   Q    Now, you told us that Ms. DeBose or someone who was
15   covered by the administrative at-will status can be
16   non-reappointed at any time, correct?
17   A    Correct.
18   Q    So Ms. DeBose could have been non-reappointed at any
19   time after she first made a complaint of discrimination in
20   July of 2014; is that correct?
21   A    Yes.
22   Q    And she was not -- you did not issue her this notice
23   until some ten months later, after you received the Ellucian
24   report?
25   A    Correct.
```

RALPH WILCOX - SEPTEMBER 20, 2018                    33
Cross-Examination by Mr. McCrae

```
 1   Q    And you did not issue her this notice until after DIEO

 2   had concluded that she had not been discriminated or

 3   retaliated against?

 4   A    Correct.

 5   Q    Have you ever non-reappointed any other employees

 6   during your tenure?

 7   A    I have.

 8   Q    Were any of those employees white?

 9   A    They were.

10   Q    And were they treated the same under this policy as

11   Ms. DeBose was treated?

12   A    Absolutely.  Consistent with University policy, yes.

13   Q    And did any of those employees make any complaint of

14   discrimination before you non-renewed their appointment?

15   A    Not that I recall.

16   Q    You were asked at some point about a Leellen Brigman.

17   A    Dr. Brigman, yes.

18   Q    Did you non-renew her appointment?

19   A    I did.

20   Q    And what is her race?

21   A    White.

22   Q    Did she ever make any complaint of discrimination?

23   A    No.

24   Q    And did you give her some notice and an opportunity to

25   respond before you gave her a notice of non-reappointment?
```

RALPH WILCOX – SEPTEMBER 20, 2018            34
Cross-Examination by Mr. McCrae

```
 1   A     No.
 2   Q     And is that what you have done consistently for the
 3   employees that you have non-renewed, regardless of their
 4   race?
 5   A     Yes.
 6   Q     Going back to the Ellucian report, under USF's policy,
 7   did it need to hire an outside consultant, pay that
 8   consultant, who spent three days talking to 18 employees, to
 9   have a reason to non-renew Ms. DeBose's appointment to the
10   University?
11   A     No.  No.  This was in -- this was commissioned with a
12   mind to ensure optimal performance of a significant
13   investment that the University had made to meet our --
14   better meet our students' needs.
15              MR. MCCRAE:  May I approach the witness,
16   Your Honor?
17              THE COURT:  Yes.
18   BY MR. MCCRAE:
19   Q     Dr. Wilcox, that document was previously admitted into
20   evidence as Plaintiff's Exhibit Number 295.  Do you
21   recognize that as the employment reference policy?
22   A     I do.
23   Q     All right.  And does the policy indicate the date that
24   it was put into effect?
25   A     Yes.  This was a relatively new policy implemented just
```

 1  last year, January 23rd of 2017.

 2  Q    All right.  Was that before or after you had your

 3  telephone call with Dr. Traynham?

 4  A    This was at least 18 months after I had that telephone

 5  call.

 6  Q    So this employment reference policy was implemented by

 7  USF a year and a half or more after you had a call with

 8  Dr. Traynham?

 9  A    Yes.

10  Q    You were asked about Plaintiff's Exhibit Number 277.

11  A    Yes.

12  Q    That reflects that you had a call with Dr. Traynham on

13  May 26 of 2015?

14  A    Yes.

15  Q    All right.  And that was exactly one week after the

16  notice of non-reappointment?

17  A    It was.

18  Q    Do you need to see it?

19  A    No, I recall that was -- that was -- the date was

20  changed to May 19th on that letter of non-reappointment.

21  Q    Based upon your experience in the State University

22  system, would you expect that Ms. DeBose would have

23  completed all of the necessary hiring steps at University of

24  North Florida in one week?

25  A    That would be a real challenge for anyone.

1  Q    And based upon your experience as University Provost,

2  is there any reason that you can conceive of why the Provost

3  of UNF would have called you about Ms. DeBose after she had

4  already been offered a job by University of North Florida?

5  A    That would make no sense whatsoever, if she had already

6  been offered the job.

7  Q    Based upon your experience, is there any reason why you

8  could conceive of Provost Traynham asking you if Ms. DeBose

9  was available if she had already been offered a job there?

10 A    If she'd been already offered a job it would make no

11 sense to seek clarification on her availability.

12 Q    In your role as Provost have you had occasion to reach

13 out to members of senior management at other State

14 Universities for employment references?

15 A    I have.

16 Q    And when you did that, did you expect or at least hope

17 for candor?

18 A    Honest and candid assessments of candidates that we may

19 be -- may have been considering for employment at the

20 University of South Florida, yes.

21 Q    And you were asked on your direct examination about

22 employment references you provided for Norine Noonan and

23 Julie Ashcroft.  Do you remember those names coming up?

24 A    I recall being asked about references for Dr. Noonan,

25 but not for Dr. Ashcroft.  Judy Ashcroft I think is --

RALPH WILCOX – SEPTEMBER 20, 2018                37
Cross-Examination by Mr. McCrae

1    Q     I'm sorry?

2    A     -- the name.  She was an employee that came from

3    outside the University of South Florida.  I don't recall

4    having received requests for reference subsequent to her

5    departure.

6    Q     Okay.  My apologies.  I misunderstood.

7            So talking about Norine Noonan, you did provide an

8    employment reference for her that you were asked about?

9    A     I did.

10   Q     And what is her race?

11   A     White.

12   Q     And did she ever make any complaint of discrimination

13   against University of South Florida?

14   A     Not that I'm aware of.

15   Q     Dr. Wilcox, was your decision to non-reappoint

16   Ms. DeBose based upon her race?

17   A     No.

18   Q     Did you decide to non-renew her appointment because she

19   had made a complaint of discrimination?

20   A     No.

21   Q     And did you say anything when you had your call with

22   Dr. Traynham about Ms. DeBose in retaliation because she had

23   filed a complaint of discrimination?

24   A     No.

25            MR. MCCRAE:  May I have a moment, Your Honor?

RALPH WILCOX – SEPTEMBER 20, 2018              38
Redirect Examination by Ms. DeBose

1                THE COURT:  Yes.

2    BY MR. MCCRAE:

3    Q    Going back to Exhibit Number 64, if you would turn to

4    that.

5                THE COURT:  Defendant's Exhibit 64.

6    Q    All right.  And take a look at the last page.

7    A    Yes.

8    Q    And because I have a mess of papers here, could you

9    just read the name of the person who signed that

10   investigative report.

11   A    That was Camille Blake, Director of Equal Opportunity

12   and Compliance.

13   Q    And she signed the investigative report that is

14   Exhibit 64?

15   A    She conducted and signed off on that investigative

16   report, yes.

17   Q    What is Ms. Blake's race?

18   A    She's African American.

19            MR. MCCRAE:  Nothing further, Your Honor.

20            THE COURT:  All right.  Redirect, if any.

21   Go ahead.

22            **REDIRECT EXAMINATION OF RALPH WILCOX**

23   **BY MS. DEBOSE:**

24   Q    Provost Wilcox, can at-will employees be discharged for

25   illegal, discriminatory reasons?

```
 1   A     No.
 2   Q     Provost Wilcox, have any of Ms. DeBose's prior
 3   supervisors ever -- did they ever seek to take disciplinary
 4   action against her, to your knowledge?
 5   A     Not that I'm aware of.
 6   Q     Did Harold Nixon, the former Vice President of Student
 7   Affairs, ever seek to take disciplinary action against
 8   Ms. DeBose?
 9   A     I have no knowledge of that.  It was prior to my time
10   at the University.
11   Q     Did Bruce Bursack, Executive Vice President of
12   Enrollment Planning & Management, seek to take disciplinary
13   action against Angela DeBose?
14   A     I don't recognize that name.
15   Q     Did Douglas Hartnagel, former Associate Vice President
16   of Enrollment Planning & Management, ever seek to discipline
17   Angela DeBose?
18   A     I have no knowledge of that.
19   Q     Did James Malek seek to -- former supervisor of
20   Angela DeBose and also at one point your supervisor, did he
21   seek to take disciplinary action against Angela DeBose?
22   A     I have no knowledge.
23   Q     Leellen Brigman, former Associate Vice President of
24   Enrollment Planning & Management, did she seek to take any
25   kind of disciplinary action against Angela DeBose?
```

```
 1   A    I have no knowledge of her taking disciplinary action,
 2   no.
 3   Q    Under former Provost Gerry Meisels, do you know of any
 4   action against Angela DeBose?
 5   A    Prior to my time at the University of South Florida.
 6   Q    Dr. Renu Khator, former Provost of the University of
 7   South Florida and your former manager, did she ever take any
 8   action against Ms. DeBose?
 9   A    Not that I'm aware of.
10   Q    You talked about the fact that you've tried to counsel
11   Ms. DeBose for years.  Do you have any concrete evidence
12   that you -- like counseling memoranda or any of that that
13   you've presented that supports your contention that you have
14   counseled Ms. DeBose?
15        MR. MCCRAE:  Your Honor, I would object to the use
16   of "concrete evidence."  Characterization.
17        THE COURT:  Well, do you understand the question?
18        THE WITNESS:  I do, Your Honor.
19        THE COURT:  You may respond.  Overruled.
20   A    Yes, I recall that evidence was entered to document the
21   fact that I had sought to mentor and counsel Ms. DeBose on a
22   number of occasions.
23   BY MS. DEBOSE:
24   Q    And what evidence would that be?  Would that be the
25   response to the precode contamination that you wrote
```

1   concerning Dr. Glen Besterfield?

2   A    No, not that I recall.  It was a memo that I had -- an

3   e-mail that I had sent to Ms. DeBose relatively early in

4   my -- in my tenure at the University of South Florida that

5   expressed my disappointment or my concern that the

6   demonstrated lack of collegiality was impacting Ms. DeBose's

7   leadership effectiveness.

8   Q    Is that an introduced exhibit in this case?

9   A    That's my recollection, yes.

10  Q    Okay.  I'd like to -- I will get back to that.

11          On the terms of the timeline, let's go over that.

12  Did you hear testimony from Paul Dosal that in June 2014

13  Angela DeBose came to him and expressed that she believed

14  she was being discriminated against?

15  A    I believe so, yes.

16  Q    In June 2014, was there any request concerning salary

17  or that kind of information from Paul Dosal?

18          MR. MCCRAE:  Your Honor, I think we're beyond the

19  scope of cross-examination.  I would object.

20          THE COURT:  I think we are too, but I'm allowing

21  the latitude.  Overruled.

22  A    Could you ask the question again?  I was a little

23  unclear on where the request was coming from.

24  BY MS. DEBOSE:

25  Q    In June 2014, was there an issue about Ms. DeBose's

1   compensation?

2   A    Ms. DeBose had expressed, if I recall correctly, some

3   concern that she wasn't being compensated at an appropriate

4   level.

5   Q    And what month was that?

6   A    I don't have a clear recollection.

7   Q    From the Defendant's Exhibits, was that month

8   August 2014?

9   A    I don't know.

10  Q    In July 2014, do you recall testimony that Ms. DeBose

11  filed an EthicsPoint complaint?

12  A    I recall testimony that she required -- that she filed

13  an EthicsPoint complaint, yes.

14  Q    Do you recall whether -- do you recall any testimony

15  that suggested that EthicsPoint complaint concerned

16  compensation?

17  A    I don't recall that.

18  Q    In August 2014 Angela DeBose filed -- did you hear

19  testimony that Angela DeBose filed a DIEO complaint?

20  A    I believe so, yes.

21  Q    And did you see the exhibit that counsel put up on the

22  screen concerning that -- that complaint?  Do you recall

23  seeing that?

24  A    Yes.

25  Q    Do you recall testifying that Tonia Suber had nothing

1   to do with that complaint, as far as your recollection?

2   A    Could I -- could I ask to see that, just to help bring

3   clarity to --

4   Q    Is this what you saw earlier?

5            THE COURT:  The exhibit number on that?

6   Q    The date, March 5th, 2015.

7   A    Could you just slide up, please.  A little more.

8            Yes.

9   Q    Okay.  So --

10           THE COURT:  That exhibit number is?

11           MS. DEBOSE:  That exhibit number is 258 for

12   Plaintiff's Exhibit.

13           THE COURT:  Okay.

14           MR. MCCRAE:  Your Honor, it's in evidence already

15   as Defendant's 63.

16   BY MR. MCCRAE:

17   Q    And before you testified that that is your listing

18   right there; is that true?

19   A    It is.

20   Q    And in terms of Ms. DeBose's DIEO complaint, did you

21   testify that Ms. DeBose made the complaint after not

22   receiving compensation in st. Petersburg?

23   A    Again, I don't recall the chronology.  One moment we're

24   going forward, one moment we're going back.  It's a little

25   difficult to follow, quite frankly.

RALPH WILCOX - SEPTEMBER 20, 2018          44
Redirect Examination by Ms. DeBose

1   Q    Okay.  Can we take a look at this.

2         The date that this was filed with DIEO, would you

3   agree it's November 2nd, 2014?

4   A    I do agree, yes.

5   Q    Would you agree that in the second paragraph it

6   references Tonia Suber?

7   A    Yes.

8   Q    Would you agree it also references Ms. Suber in other

9   parts than just the leading section, it deals with

10  Tonia Suber?

11  A    In that paragraph, yes.

12  Q    Would you agree when you look at the first paragraph

13  that it makes no reference to her complaint concerning

14  compensation?  Would you agree with that?

15  A    I would.  There's no specific reference there, no.

16  Q    Would you agree that you heard testimony from

17  Paul Dosal that he understood Ms. DeBose's complaint to

18  involve disparate treatment and -- well, would you agree

19  that Paul Dosal indicated Ms. DeBose's complaint involved

20  race discrimination and also -- in treatment and in terms of

21  impact?  Would you agree with that?

22         MR. MCCRAE:  Your Honor, misstates the record.

23         THE COURT:  Just -- ma'am, sustained.  Back up.

24  BY MR. MCCRAE:

25  Q    Do you recall Paul Dosal at all characterizing

RALPH WILCOX - SEPTEMBER 20, 2018          45
Redirect Examination by Ms. DeBose

1    Ms. DeBose's complaint?

2             THE COURT:  Yes or no.

3    A    Yes.

4    Q    How did he categorize it?

5    A    Concerns about differential treatment and Ms. DeBose's

6    concerns that that was impacting her level of compensation.

7    Q    Was Ms. DeBose's -- did you hear testimony that

8    Ms. DeBose's discrimination complaint was an issue about

9    money?

10   A    I believe that was part of it.

11   Q    All right.  So in terms of salary, just out of

12   curiosity, since Ms. DeBose's salary has been discussed, in

13   terms of compensation, could you share what Paul Dosal's

14   compensation is?

15   A    I don't have a specific number or recollection, but

16   I'm -- no.

17   Q    Perhaps your own?

18            MR. MCCRAE:  Your Honor, I would object on the

19   grounds of relevance and beyond the scope of Cross.

20            THE COURT:  Well, we have covered this topic since

21   we've been here.  I will allow the latitude.  Overruled.

22   Go forward.  She's on Redirect.  Overruled.  Take a seat.

23   Go forward.

24   A    The question again?

25   Q    Your compensation.

RALPH WILCOX - SEPTEMBER 20, 2018          46
Redirect Examination by Ms. DeBose

1  A     My compensation is in the range of $440,000.

2            THE COURT:  Is that a matter of public record?

3            THE WITNESS:  It is, Your Honor.

4            THE COURT:  Thank you.  Go forward.

5  BY MS. DEBOSE:

6  Q     In terms of timeline again -- so we've discussed June

7  and we've discussed August.  In August, the DIEO.  In July,

8  EthicsPoint.  In June, Ms. DeBose went to her supervisor.

9            In December -- do you recall testimony that in

10 December 2014 Angela DeBose filed an EEOC complaint?

11 A     Yes.

12 Q     Do you recall -- do you recall testimony that -- from

13 Paul Dosal that it was over the winter break, or do you not

14 recall that?

15 A     I don't recall the specific dates, no.

16 Q     In January of 2015, do you recall a discussion about a

17 meeting with Paul Dosal and Angela DeBose concerning

18 Shared Services and Alexis Mootoo attending?  Do you recall

19 that testimony?

20 A     I do.

21 Q     Do you recall what I'm going to put up here as

22 Exhibit 70, which was presented following that meeting, from

23 Angela DeBose to Paul Dosal?  Do you recall this exhibit?

24 A     I do.

25 Q     Do you recall this last paragraph?

 1    A     Yes.

 2    Q     And Paul Dosal reading it into evidence?

 3    A     Yes.

 4    Q     That a complaint of illegal discrimination has been

 5    filed?

 6    A     Yes.

 7    Q     Can you read the date of that e-mail communication.

 8    A     I believe it's Wednesday, January 28th, I think.

 9    Q     Of what year, sir?

10    A     Oh, I'm sorry.  2015.

11    Q     Thank you.

12                So in terms of the timeline, in January 2015

13    Paul Dosal -- would you agree and did you hear his testimony

14    that he had knowledge of Angela Debose's EEOC complaint?

15                MR. MCCRAE:  Objection.  Misstates the record.

16                THE COURT:  Objection, it states not on the

17    record?

18                MR. MCCRAE:  Misstates the record, Your Honor.

19                THE COURT:  Do you understand the question?

20                THE WITNESS:  I think so, Your Honor, yes.

21                THE COURT:  Overruled.  Take the response.

22    Let's go.

23                THE WITNESS:  Would you ask the question one more

24    time, please.

25

```
 1   BY MS. DEBOSE:

 2   Q    Do you recall in January -- do you recall testimony

 3   from Paul Dosal that he had received that communication from

 4   Angela DeBose?

 5            THE COURT:  Yes or no.

 6   A    I believe so, yes.

 7   Q    Do you recall that -- Paul Dosal testifying that he

 8   knew of Angela Debose's discrimination complaint?

 9   A    I believe so, yes.

10   Q    Do you recall Paul Dosal acknowledging he was aware

11   that Ms. DeBose filed an EEOC complaint?

12   A    I believe so.

13   Q    Okay.  In terms of timeline again, when you go from

14   January to February, do you recall testimony from Paul Dosal

15   and yourself acknowledging that Ms. DeBose was reprimanded

16   on February 4th, 2015?

17   A    Again, not specific date, but I acknowledge the

18   reprimand, yes.

19   Q    Do you recall testimony from Paul Dosal that on

20   February 4th, 2015 he asked Carrie Garcia to engage Ellucian

21   for an urgent PIA of DegreeWorks?

22   A    I do recall that, yes.

23   Q    Do you recall testimony from Paul Dosal that on

24   February 4th, when he wanted to give the written reprimand,

25   that Angela DeBose was not available to meet with him
```

RALPH WILCOX – SEPTEMBER 20, 2018          49
Redirect Examination by Ms. DeBose

1   early morning?

2   A    That was the Starbucks reference.

3   Q    Yes.

4   A    Yes, I do recall that.

5   Q    Do you recall that Angela -- do you recall testimony

6   that Angela DeBose filed a motion for a restraining order

7   and preliminary injunction with the Middle District on

8   February 4th, 2015?

9   A    Again, I don't recall the date, but I absolutely recall

10  the testimony related to the action, yes.

11  Q    So do you recall the date of the DIEO investigation

12  report presented to you by Mr. McCrea?

13  A    I do.

14  Q    Was it March 2015, March 5th, 2015?

15  A    March 5th, 2015, yes.

16  Q    Would you agree that March 5th, 2015 is after

17  February 4th, 2015?

18  A    Yes.

19  Q    Would you agree that the week of April 14th for the

20  Ellucian visit is after February 4th, 2015?

21  A    Yes.

22  Q    Would you agree that in February 2015 that visit was

23  scheduled for April 2015?  Did you hear testimony along

24  those lines?

25  A    I again don't recall the precise dates, no.

RALPH WILCOX - SEPTEMBER 20, 2018
Redirect Examination by Ms. DeBose

1    Q    Do you recall that -- Paul Dosal testifying that he

2    asked Ellucian for a writeup in May, May 8th specifically,

3    through the --

4    A    Again, no recollection of precise dates, but, yes, the

5    action was requested.

6    Q    Okay.  And in terms of Angela DeBose, you indicated

7    that you supervised her for a brief period; is that correct?

8    A    No.

9    Q    You didn't?  Okay.

10   A    I don't believe so.

11           THE COURT:  Let him finish his answer.

12           Have you finished your answer?

13           THE WITNESS:  I have, Your Honor.

14           THE COURT:  Okay.  Go ahead.

15   BY MS. DEBOSE:

16   Q    In terms of supervising her for a brief spell, do you

17   recall at all where Angela DeBose directly reported to you?

18   A    No.

19   Q    You indicated that at one point, in your testimony,

20   that the Registrar's Office reported to Student Affairs and

21   then was moved to Academic Affairs; is that correct?

22   A    Yes.

23   Q    In that period when the Registrar's Office moved to

24   Academic Affairs, did you at some point have supervisory

25   responsibility for the Office of the Registrar, the Office

RALPH WILCOX - SEPTEMBER 20, 2018              51
Redirect Examination by Ms. DeBose

1    of Financial Aid and the Office of Admissions?

2    A    I don't recall direct supervisory responsibility, no.

3    Q    Did you in your period -- I'll just move on.

4    I'm sorry.  Strike that.

5           You mentioned you non-reappointed Leellen Brigman.

6    A    Yes.

7    Q    Do you recall whether you non-reappointed

8    Leellen Brigman for matters having to do with test scores?

9    A    No.

10   Q    Do you recall if it had to do with recruiting students

11   from certain zip codes?

12   A    No.

13   Q    Do you recall if it had anything to do with reducing

14   the number of PEL-eligible students?

15   A    No.

16   Q    Do you recall if it had to do with your concerns about

17   the student profile and improving the quality of enrollment?

18   A    No.

19          THE WITNESS:  If I might add, Your Honor --

20   Q    Do you recall this exhibit --

21          THE COURT:  Wait.  Wait.  Do you need to explain

22   your answer?

23          THE WITNESS:  Well, I might add some clarity,

24   because if any of those had been the purpose, it wouldn't

25   have been a non-reappointment, rather it would have been a

RALPH WILCOX – SEPTEMBER 20, 2018
Redirect Examination by Ms. DeBose

1   termination for cause.  That's -- that's the only

2   clarification I would add, if that's helpful to the Court.

3             THE COURT:  Well, go ahead.  Next question.

4   BY MS. DEBOSE:

5   Q    Do you recall non-reappointing Leellen Brigman and

6   Tapas Das on the same day, within five minutes of each

7   other?

8   A    I recall non-reappointing both of them.  Again, the

9   date and times are not clear to me.

10  Q    And do you recall an issue from Leellen Brigman about

11  being concerned if certain changes were implemented it would

12  cause a substantial drop in black and Latino enrollment at

13  the University of South Florida?

14  A    No, I don't, and I believe the evidence speaks for

15  itself that the University of South Florida is clearly the

16  most diverse, the preeminent university in the State

17  University system to this day, and we continue to celebrate

18  remarkable successes in the achievements of our African

19  American students, our Latino students and our PEL-eligible

20  which are the limited income students.  So the answer is

21  absolutely not.

22  Q    Do you recall -- after Leellen Brigman's and Tapas Das'

23  termination, do you recall that enrollment for blacks

24  dropped 30 percent and Hispanics 55 percent from

25  implementing policies you recommended?

RALPH WILCOX – SEPTEMBER 20, 2018
Redirect Examination by Ms. DeBose

1    A    I -- that is not accurate data.

2    Q    Do you recall this exhibit, Provost Wilcox?

3    A    I do.

4    Q    And you discussed about a -- I believe a 17 point

5    swing.  Is there an attachment with this e-mail from

6    Angela DeBose to you?

7    A    Not on the e-mail that I see, no.

8    Q    Do you see reference to an attachment where it says

9    attachments?

10   A    I do now, yes.

11   Q    What does that say?

12   A    It says SCH by level, by college, by campus.

13   Q    SCH, is that an acronym for Student Credit Hours?

14   A    It is.

15   Q    Did Angela DeBose write on the underscore part,

16   "Perhaps the attached will clarify the matter"?

17   A    It does.

18   Q    Do you recall if Angela DeBose explained to you that

19   the dates for enrollment had changed?  Do you recall that,

20   that the window for registration started earlier in that

21   year than the prior year?

22   A    It's a long time ago.  I don't recall that, no.

23   Q    Do you recall her explaining that until you get to same

24   week comparisons beyond that change you don't have an

25   apples-to-apples comparison?

RALPH WILCOX - SEPTEMBER 20, 2018          54
Redirect Examination by Ms. DeBose

1   A    I don't remember that, no.

2   Q    Does it say something along those lines in the

3   paragraph?  Can we read that.  Could you read that aloud for

4   the jury.

5   A    With the appointment registration period now in the

6   rearview mirror, we are now beginning to get to comparable

7   numbers – without overstating the numbers in either

8   direction as a result of compressing the appointment window

9   this year.  (Next year's numbers during the appointment

10  period will be more closely aligned if we stay with a

11  timeframe that is comparable to the newly developed window.)

12  Positive news is that head count is up 3 percent and student

13  credit hours are up 5 percent.

14  Q    So extending out the numbers, did Ms. DeBose –– would

15  you agree, did she seek to give context to the recipients?

16  A    Attempted to, yes.

17  Q    Were you one of the recipients?

18  A    I'd have to see.  I didn't notice that.

19       Yes.

20  Q    Do you know whether anyone else had a similar question

21  that you expressed?

22  A    Our –– Michael Moore, Dr. Michael Moore, who was our

23  Director of Institutional Research, had those concerns, yes.

24  Q    In terms of Michael Moore, do you know what his

25  relationship was with Angela DeBose?

1   A    I don't.

2   Q    Did you know or do you recall that Angela DeBose

3   expressed to Paul Dosal that the Provost made a good call in

4   placing DegreeWorks with Angela DeBose in 2010?  Do you

5   recall that?  (sic)

6   A    I don't.

7   Q    Do you recall whether Michael Moore recommended

8   Angela DeBose for a Harvard scholarship for the summer

9   program?

10  A    I don't.

11  Q    In terms of this exhibit here, the webmaster exhibit,

12  did you testify that any number of people could have sent

13  from that -- sent that note about the "cancer" from that

14  list?

15  A    Yes.

16  Q    So in terms of the webmaster list, do you recall

17  testimony that the webmaster list was inactive?

18  A    I do hear -- I do recall something to that effect.

19  Q    Do you recall testimony that the last message sent from

20  the account was in November, on November 3rd, 2005?

21  A    I have -- I have no basis in which to confirm or not.

22          MS. DEBOSE:  I'd like to share Exhibit 131.

23            (Discussion had off the record between

24                Mr. McCrae and Ms. DeBose)

25          MS. DEBOSE:  In terms of 131, Counsel objects, so

```
 1    I will not --
 2                THE COURT:  Counsel objects to it?
 3                MS. DEBOSE:  Yes.
 4                THE COURT:  Let's come up to sidebar.
 5                MS. DEBOSE:  Well, I can just -- I'll just --
 6                THE COURT:  You're going to bypass it?
 7                MS. DEBOSE:  I'll just bypass it.
 8                THE COURT:  Okay.
 9    BY MS. DEBOSE:
10    Q    You spoke about the policies, and I'd like to just
11    share with you the progressive discipline policy, and just
12    to look at the bottom of the document there, do you see a
13    section that says Questions and a phone number?
14    A    I do.
15    Q    Do you see on the other side the title of the document
16    and a revision date, 4/2010?
17    A    I do.
18    Q    So the last time this policy was revised, is it safe to
19    say it was April 2010?
20    A     If this is a current document, yes, I would.
21    Q    So in terms of the other policy you testified to
22    concerning the reference policy, did you testify that it's a
23    new policy and no prior policy concerning employment
24    verifications or employee references existed?  Is that your
25    testimony?
```

1    A    I did, yes.

2    Q    And so in terms of USF policy on its website, are you

3    then testifying that this policy was developed, brand new,

4    no guidance existed prior to two thousand -- did you say

5    seventeen?

6    A    Yes, it was promulgated in January 2017.

7    Q    So in terms of guidance, if it didn't exist as a policy

8    before, what -- since you always consult policy, what

9    guidance did you seek and from whom?

10   A    With regard to references?

11   Q    Yes.

12   A    Use good professional judgment.

13   Q    So in terms of this document on USF policy, shouldn't

14   it have a title, a call number and the date it was created,

15   developed?

16   A    If you'll slide to the top, please.

17         That's -- that's not the formal policy document

18   that I am -- I am familiar with and I believe would be found

19   on the -- on the General Counsel's website today.

20   Q    So 616 is not on the website; is that your testimony?

21   A    I don't -- there are many, many policies with different

22   numbers, but certainly the policy relating to providing and

23   obtaining employment reference information clearly states --

24   in fact, I have it sitting right in front of me, yes,

25   clearly -- if you would put that back up.

```
 1              In the field that says Date of Origin, the date of
 2    origin here is January 23rd, 2017, the Date Last Amended,
 3    March 9th of '17, with Technical in parentheses, and the
 4    Date Last Reviewed, March 9th of 2017, and that is the
 5    policy that appears on the University's General Counsel's
 6    policy and regulations.
 7    Q    What is the number of that policy?
 8    A    It has 0-616, you're correct.
 9    Q    So it is the same policy.  Same policy, but as of the
10    date of this filing it did not have any of those dates.
11              I'm just going to wrap up here.
12              You talked about accountability measures, do you
13    recall that, yesterday?
14    A    I believe I made reference to performance
15    accountability measures, yes.
16    Q    In terms of accountability measures, did the
17    Registrar's Office under Ms. DeBose have responsibility for
18    the student information file?
19    A    Yes.
20    Q    The hours to degree file?
21    A    Yes.
22    Q    In those years, 2014 and 2015, is it true that the
23    University of South Florida received money from the State
24    because of reduction in excess hours and improved graduation
25    rates?
```

RALPH WILCOX - SEPTEMBER 20, 2018                    59
Redirect Examination by Ms. DeBose

1    A     Yes.

2    Q     Would you say that Ms. DeBose, Valeria Garcia,

3    Shruti Kumar and Rolanda Lewis and Terry Chisholm were at

4    least partly responsible for that success?

5    A     I think any performance improvement is less

6    attributable to administrative staff and primarily

7    attributable to the actions of our students, our professors

8    and our academic advisors, but Registrar's Office, as you

9    rightly point out, submits those reports, the hours to

10   degree file and others, to the State University system, yes.

11   Q     Do you recall the Registrar's Office, specifically

12   Angela DeBose, Shruti Kumar, Rolanda Lewis; the Office of

13   Decision Support, Valeria Garcia; and Office of the Provost,

14   Terry Chisholm, receiving accolades and appreciation for

15   that accomplishment?

16   A     No, not the whole group.

17   Q     Are you indicating that you don't recall it for

18   Ms. DeBose, or another party?

19   A     Certainly I recall Dr. Chisholm's -- commending

20   Dr. Chisholm for her leadership in driving the excess hours

21   initiative in collaboration with advisors in the colleges

22   and faculty.

23   Q     In terms of similarity in language, do you find it

24   interesting or can you comment on the use of

25   "uncollaborative" and "resistant to change" in your remarks,

                    RALPH WILCOX - SEPTEMBER 20, 2018          60
                    Redirect Examination by Ms. DeBose

 1   and Diamond's –– Andrea Diamond's report talking about a

 2   non-collaborative Registrar's Office and unwillingness to

 3   encompass change?  Is there any similarity in the language?

 4          THE COURT:  Don't respond.

 5          What's your objection?

 6          MR. MCCRAE:  Twofold, Judge.  It's beyond the

 7   scope of Cross, and counsel is testifying.

 8          THE COURT:  Sustained on both fronts.  Go forward.

 9   BY MS. DEBOSE:

10   Q    Is your statement "uncollaborative" similar to

11   Andrea Diamond's statement "non-collaborative"?

12   A    There seems to be similarities there, yes.

13   Q    Is your statement "resistant to change" similar to

14   Andrea Diamond's statement "unwillingness to encompass

15   change"?

16          MR. MCCRAE:  Your Honor, no foundation.  I'm not

17   sure what statement by him she's referring to.

18          THE COURT:  Sustained.

19          MS. DEBOSE:  Thank you, Your Honor.

20          THE COURT:  All right.  Thank you.

21          Recross.

22          MR. MCCRAE:  Thank you, Judge.  I'll be quick.

23          I can't get my hands on Plaintiff's 102.  Would

24   you mind if I borrow yours?

25          Okay.  I don't want to waste time, Judge.  I think

RALPH WILCOX - SEPTEMBER 20, 2018          61
Recross-Examination by Mr. McCrae

```
 1   I lost it last night, but I can show it to the witness on

 2   the computer.

 3              THE COURT:  All right.

 4              MR. MCCRAE:  Just on the timeline --

 5              THE COURT:  The Clerk has it for you.

 6              MR. MCCRAE:  Thank you.

 7              THE COURT:  That's Exhibit Number --
```

**RECROSS-EXAMINATION OF RALPH WILCOX**

**BY MR. MCCRAE:**

```
10   Q    102 is already in evidence, and do you recognize this

11   document?  There was testimony about it.  This reflects that

12   on February 4, 2015, that Lori Mohn, legal administrative

13   specialist, sent Dr. Dosal a notice of charge of

14   discrimination.

15              THE COURT:  You can't be heard, Mr. McCrea.  The

16   jury is waving their hands.

17              MR. MCCRAE:  I'm sorry.  I apologize.

18   BY MR. MCCRAE:

19   Q    Does this refresh your recollection that on February 4

20   of 2015 Dr. Dosal was sent a copy of a charge of

21   discrimination?

22   A    Yes, it does.

23   Q    All right.  And as we saw earlier, two days prior to

24   that he had already sent you a draft written reprimand?

25   A    That's correct.
```

RALPH WILCOX – SEPTEMBER 20, 2018          62
Further Redirect Examination by Ms. DeBose

1          MR. MCCRAE:  All right.  Nothing further, Judge.

2          THE COURT:  All right.  Any Re-redirect?  No?

3    Yes?

4          MS. DEBOSE:  Just one follow-up.

5          THE COURT:  All right.  Re-redirect.

6          **FURTHER REDIRECT EXAMINATION OF RALPH WILCOX**

7    **BY MS. DEBOSE:**

8    Q    In looking at that February 4th, 2015 forward, did you

9    hear anything from Paul Dosal's testimony to suggest that

10   was his first notice or first awareness of Ms. DeBose's

11   discrimination complaint?

12   A    I don't recall.

13          MS. DEBOSE:  Thank you.

14          THE COURT:  Okay.  Any Re-recross?

15          MR. MCCRAE:  No, Your Honor.

16          THE COURT:  All right.  Mr. Witness, you may step

17   down.  Take the microphone off.  Watch your step.  You may

18   resume the seat at counsel table.

19          Now, let me inquire, there is a witness out there

20   called by the plaintiff, yes?

21          MS. DEBOSE:  Yes, Your Honor.

22          THE COURT:  Okay.  Now, Counsel, without having to

23   come to sidebar, do you have an approximate estimation how

24   long that witness's testimony will take, considering --

25          MS. DEBOSE:  Yes, considering.

```
 1              THE COURT:  -- the timetable?

 2              MS. DEBOSE:  Yes.

 3              THE COURT:  How long for that witness?

 4              MS. DEBOSE:  I'm estimating 15 minutes.

 5              THE COURT:  15 minutes?

 6              MS. DEBOSE:  I'm sorry.  20 minutes.

 7              THE COURT:  20 minutes.

 8              And then there's cross-examination, right?

 9              MR. MCCRAE:  Yes, Your Honor.

10              THE COURT:  All right.  About how long?

11              MR. MCCRAE:  Half an hour, 20 minutes, depending

12      on Direct.

13              THE COURT:  Okay.  All right.  I'm going to break

14      now so everybody can go to lunch and not break that

15      examination up, okay?

16              So ladies and gentlemen of the jury, your standard

17      instruction, and I need you back in your jury room at

18      ten minutes after 1:00 by the courtroom clock.

19              All rise for the jury.

20                      (Jury exits proceedings.)

21              THE COURT:  Advise the witness that she can go to

22      lunch at this period of time and be back at ten minutes

23      after 1:00 by the courtroom clock.  Whoever called her,

24      advise her.

25              Question?
```

```
 1              MS. DEBOSE:  Yes.  Just housekeeping matters.
 2    I spoke with -- I'm sorry.
 3              THE COURT:  Go to the podium so the court reporter
 4    can hear you.
 5              MS. DEBOSE:  Housekeeping matters.  I want to make
 6    sure that Exhibits 121, 123, 124 --
 7              THE COURT:  Not so fast.  The Clerk is trying to
 8    get this down.
 9              MS. DEBOSE:  121, 123, 124 and 127, 45 and 46 are
10    in.  In terms of -- there are two documents that are
11    duplicated that have to be redacted to remove Rolanda Lewis,
12    her communication, in a forward from the plaintiff to
13    Paul Dosal about the Ellucian report, so the redaction is to
14    take out Rolanda Lewis, and that's on 121 and 124.  But
15    everything else is --
16              THE COURT:  Well, have you and Mr. McCrea
17    discussed that?
18              MR. MCCRAE:  Yes.
19              MS. DEBOSE:  Yes, Your Honor.
20              THE COURT:  Okay.  Well, then you three at an
21    appropriate time, consistent with the Clerk's schedule, need
22    to do that so that the exhibit in evidence to go to the
23    jury room is consistent with that.
24              Anything else, Mr. McCrea?
25              MR. MCCRAE:  I just wanted to approach the Clerk
```

RALPH WILCOX - SEPTEMBER 20, 2018
Further Redirect Examination by Ms. DeBose

```
 1    to give back this exhibit.

 2              THE COURT:  Okay.  That's fine.  Anything else?

 3              MS. DEBOSE:  And just on the depositions this

 4    morning, we've agreed that we could get those into evidence

 5    from Shruti Kumar, number 222; and 225-B, Andrea Diamond,

 6    225 dash B.

 7              THE COURT:  Okay.  Well, that's --

 8              MS. DEBOSE:  There are redactions to Diamond that

 9    we will jointly --

10              MR. MCCRAE:  Well, and redactions of any

11    non-designated portions.

12              THE COURT:  Right.  You already discussed with me

13    at sidebar there were going to be redactions and there were

14    certain lines that were going to be specifically included so

15    that those people would not have to testify but their

16    testimony under oath would go into the jury room as

17    exhibits.  That's the Court's understanding, okay?

18              MR. MCCRAE:  Right.

19              MS. DEBOSE:  Yes, Your Honor.

20              THE COURT:  Okay.  Now, let's let the Clerk get

21    organized on everything you've just thrown at her right now

22    and let her tell you when she's ready to talk to the two of

23    you -- if everybody is listening, Ms. DeBose.

24              MS. DEBOSE:  Yes.

25              THE COURT:  Okay?  Mr. McCrea?
```

RALPH WILCOX – SEPTEMBER 20, 2018          66
Further Redirect Examination by Ms. DeBose

1              All right.  Now, wait a minute, the Clerk has got

2     a question.

3              Yes.

4                         - - - - -

5       (Whereupon a discussion was had off the record between

6              the Court and the Courtroom Deputy)

7                         - - - - -

8              THE COURT:  Okay.  Certain of those exhibits,

9     Ms. DeBose, have not come in evidence yet, so we need to

10    make sure that Mr. McCrea has no objections.  Discuss it

11    over lunch and we'll talk about it at ten minutes after 1:00

12    by the courtroom clock, okay?

13             MS. DEBOSE:  Yes, Your Honor.

14             THE COURT:  All right.  We're in --

15             MS. DEBOSE:  Yes, Your Honor.  I was just going to

16    say, all the ones I gave you just now, those were agreed to

17    and not objected to, but that's fine.

18             MR. MCCRAE:  I think that's true.  I'll

19    doublecheck over the lunch hour.

20             THE COURT:  All right.  The Clerk needs to know,

21    okay?  Over lunch make sure you've given her the accurate

22    information.  Now, go to lunch and let's get back by

23    ten minutes after 1:00 by the courtroom clock.

24             We're in recess.

25                         - - - - -

 1                (Recess at 12:12 p.m. until 1:11 p.m.)

 2                          - - - - -

 3                (Jury re-enters proceedings.)

 4           THE COURT:  Madam Clerk, is the next witness

 5      outside?

 6           COURTROOM DEPUTY:  I didn't see Mr. Wilcox, so --

 7      I don't know who else is going to be --

 8           THE COURT:  Well, Mr. Wilcox is not the next --

 9      Mr. Wilcox, you concluded with him?

10           MR. MCCRAE:  Yes, and he had to get back for a

11      couple matters at the University.  He'll be back with us

12      later.

13           THE COURT:  All right.  That's fine.

14           The next witness for the plaintiff.

15           MS. DEBOSE:  Ms. Mootoo.  Ms. Alexis Mootoo.

16           THE COURT:  If you want to get her, please.

17      Have someone get her.  Mr. Bailiff.

18                (Alexis Mootoo enters proceedings.)

19           THE COURT:  If you'd come forward and stand right

20      here in front of this lady.

21           Ma'am, if you'll raise your right hand to be

22      sworn.

23           COURTROOM DEPUTY:  Do you solemnly swear or affirm

24      under penalty of perjury that the testimony you shall give

25      in this cause will be the truth, the whole truth and nothing

1    but the truth?  Do you?

2                    THE WITNESS:  I do.

3                    THE COURT:  Go over −− see where the Bailiff is?

4    Walk over there.  Watch your step.  Take a seat there,

5    ma'am, in the witness box, and when you're seated −−

6    sit comfortably, pull the chair towards the desk area.  The

7    Bailiff is going to put the microphone on your right lapel.

8    You've got a collar there.  Let's put it right on the

9    collar.  We're going to test to make sure the volume is

10   okay.

11                   Thank you, Mr. Bailiff.

12                   Please state your name for the record.

13                   THE WITNESS:  Alexis Mootoo.

14                   THE COURT:  That's too soft−spoken.  Speak up a

15   little bit.  Let's see if the microphone is okay.

16                   THE WITNESS:  Alexis Mootoo.

17                   THE COURT:  That's still too soft, Mr. Bailiff.

18                   Now, one more time.

19                   THE WITNESS:  Alexis Mootoo.

20                   THE COURT:  It's better, but, you know −− can you

21   hear me okay?

22                   THE WITNESS:  I can hear you.

23                   THE COURT:  Okay.  You better project to those

24   ladies and gentlemen in that jury box.  They've got to hear

25   you.  They're the audience, okay?

ALEXIS MOOTOO - SEPTEMBER 20, 2018          69
Direct Examination by Ms. DeBose

```
 1              THE WITNESS:  Okay.

 2              THE COURT:  One more time, the name?

 3              THE WITNESS:  Alexis Mootoo.

 4              THE COURT:  That's a lot better.  Keep the volume

 5    at that level.

 6              You may proceed, Ms. DeBose.

 7                 DIRECT EXAMINATION OF ALEXIS MOOTOO

 8    BY MS. DEBOSE:

 9    Q    Hello, Ms. Mootoo.

10              Could you tell the jury what your position is at

11    the University of South Florida.

12              THE COURT:  And spell your last name, please,

13    ma'am.

14              THE WITNESS:  M-O-O-T-O-O.

15              THE COURT:  Fine.  Go ahead.

16    A    I'm an Associate Director and also an Adjunct

17    Instructor.

18    Q    In 2014 what was your position?

19    A    Manager and Adjunct.

20    Q    Who did you report to?

21    A    Paul Dosal.

22    Q    And when you say Manager, was your responsibility

23    fiscal in nature, concerning budgets?

24    A    Yes.

25    Q    Did you have staff in 2014?
```

ALEXIS MOOTOO - SEPTEMBER 20, 2018          70
Direct Examination by Ms. DeBose

1    A    Yes.

2    Q    Who did you have reporting to you?

3    A    Taja Sumpter, Melanie Martin-Lewis and

4    Saviya Jean-Baptiste.

5    Q    And prior to the creation of an organization called

6    Shared Services, or unit, did you have staff reporting to

7    you when you joined Enrollment Planning & Management?

8    A    Yes.

9    Q    Who did you have?

10   A    Maggie Margaret Thomas, Saviya Jean-Baptiste,

11   Camille Calascibetta.

12   Q    So can you tell us what happened in February of 2015

13   that specifically involves your position.

14   A    I don't understand.

15   Q    Did your duties change in February 2015?

16   A    My duties became expanded.

17   Q    Okay.  Your duties were expanded.

18        Did that involve an increase or a raise of any

19   kind?

20   A    Yes.

21   Q    Did Paul Dosal give you that promotion?

22   A    Yes.

23   Q    Do you know the plaintiff in this action?

24   A    Actually, I'm not sure.

25   Q    Do you know Angela DeBose?

ALEXIS MOOTOO – SEPTEMBER 20, 2018          71
Direct Examination by Ms. DeBose

1   A     Oh, the plaintiff.  Yes.  Sorry.

2   Q     Okay.  In what capacity do you know Ms. DeBose?

3   A     Ms. DeBose was the Registrar of the University of

4   South Florida.

5   Q     And what was your working relationship with her like?

6   A     Collegial and good.

7   Q     Did you previously testify in this case that your

8   working relationship with Angela DeBose was wonderful?

9            MR. MCCRAE:  Your Honor, improper impeachment.

10           THE COURT:  It is improper impeachment, but

11   Madam Witness, at some point in time, even when your

12   deposition was taken, did you describe your relationship

13   with the plaintiff, DeBose, as "wonderful"?

14           THE WITNESS:  Yes.

15           THE COURT:  All right.  Go ahead, Ms. DeBose.

16           MS. DEBOSE:  Thank you, Your Honor.

17   BY MS. DEBOSE:

18   Q     So in your history at USF, have you ever had the

19   occasion to file a complaint of discrimination?

20   A     I have not.

21   Q     Are you aware that Ms. DeBose filed a complaint of

22   discrimination?

23   A     I had heard, but I wasn't -- I don't -- what do you

24   mean by "aware"?  Let me just make sure I understand.

25   Q     How did you learn about Ms. DeBose's complaint?

1    A     Frankly, from gossip.

2    Q     From gossip.

3    A     Around campus.

4    Q     Around campus.

5          So other than the gossip around campus, you had no

6    knowledge or information about Mrs. DeBose -- Ms. DeBose's

7    allegation of discrimination at University of South Florida?

8    A     No.

9    Q     Isn't it true in a prior -- in this proceeding, in

10   testimony -- is it true that you received information from

11   Paul Dosal?

12   A     What kind of information?

13   Q     Did Paul Dosal ever tell you in your time of reporting

14   to him that Angela DeBose filed a discrimination action

15   against him?

16   A     He sent me an e-mail saying that -- I don't recall the

17   words exactly, but vaguely alluding to allegations or

18   some -- some allegations happening, but there wasn't any

19   clarity or -- I had no knowledge of the actual case.

20   Q     So I'm going to just give this to you for your

21   reference.

22   A     Okay.

23            THE COURT:  You're handing her what?

24            MS. DEBOSE:  The deposition.

25            THE COURT:  Her deposition?

```
 1              MS. DEBOSE:  Yes.
 2              THE COURT:  Okay.  I just want you to know, the
 3    Clerk has given me a note, you're at the 30 minutes point.
 4              MS. DEBOSE:  30 minutes --
 5              THE COURT:  30 minutes left.
 6              MS. DEBOSE:  Okay.
 7    BY MS. DEBOSE:
 8    Q    Did you testify previously that you accused someone of
 9    discrimination?
10              MR. MCCRAE:  Your Honor, improper impeachment, and
11    may we approach?
12              THE COURT:  Yes.  Sustained.  It's improper.
13              This is on his clock.
14              (The following bench conference was held.)
15              MR. MCCRAE:  I would object to this line of
16    questioning about this witness making a complaint of
17    discrimination.  It was not against Dr. Dosal.  It was not
18    against Ralph Wilcox.
19              The Eleventh Circuit has already made it clear you
20    can't make a case of disparate treatment by pointing out
21    what other people claim and having a trial within a trial.
22              MS. DEBOSE:  Ms. Mootoo testified in her
23    deposition that she had two issues or complaints that she
24    filed at USF and that nothing was done about it, and that
25    her immediate supervisor, Paul Dosal, did nothing about it.
```

```
 1   I think that's relevant and --

 2              THE COURT:  Well, explore it with whatever

 3   questions you want to explore it with, and then if she

 4   doesn't answer consistent with her deposition, then you

 5   impeach her.

 6              MS. DEBOSE:  Sure.

 7              THE COURT:  But don't --

 8              MS. DEBOSE:  I understand.  I was trying to --

 9              THE COURT:  I know you're trying to move it, but

10   his objection is sustained to the last question.

11              Let's go back to work.

12   (End of bench conference; proceedings resume in open court.)

13              THE COURT:  Okay.  Consistent with sidebar, let's

14   go forward.

15   BY MS. DEBOSE:

16   Q    When did you learn about Angela Debose's discrimination

17   complaint?

18   A    Frankly, I don't know.  I don't know.

19   Q    Did Paul Dosal forward Angela Debose's discrimination

20   complaint to you?

21   A    No.

22   Q    Did Paul Dosal inform you of Angela Debose's

23   discrimination complaint?

24   A    He wrote me an e-mail stating that allegations had been

25   made.
```

ALEXIS MOOTOO - SEPTEMBER 20, 2018          75
Direct Examination by Ms. DeBose

 1  Q    Did you testify -- no.  Sorry.  Strike that.

 2          In your history at USF, have you ever filed a

 3  discrimination action against anyone yourself?

 4  A    I have not.

 5  Q    Did you ever state to Angela DeBose that you had been

 6  discriminated against?

 7          THE COURT:  What's your objection?

 8          MR. MCCRAE:  Consistent with sidebar, I object.

 9          THE COURT:  Well, she's just started to frame her

10  question.  It requires a yes or no answer.  Overruled.

11          State your question again.

12  BY MS. DEBOSE:

13  Q    Did you visit the office of Angela DeBose and state to

14  her that you felt you were -- you believed you were

15  discriminated against?

16          THE COURT:  Yes or no.

17  A    Yes.

18  Q    Did you tell Angela DeBose that you were discriminated

19  against by your graduate program coordinator?

20  A    Yes.

21  Q    Did you tell Angela DeBose that you had not filed a

22  formal charge of discrimination?

23  A    Yes.

24  Q    Did you tell her it was because you believed no one

25  would care?

                Direct Examination by Ms. DeBose

 1   A     Yes.

 2   Q     Did you tell her you believed that no one would do

 3   anything about it?

 4   A     Yes.

 5   Q     Did you also tell Ms. DeBose that to get anyone's

 6   attention on a discrimination complaint you have to have

 7   proof?

 8   A     Yes.

 9   Q     Did you tell Ms. DeBose what you thought the kind of

10   proof you needed was?  Do you recall?

11   A     I don't recall.

12   Q     Did you tell Ms. DeBose about an employee, a fellow

13   employee by the name of Bob Spatig?

14   A     Yes.

15   Q     Did you tell Ms. DeBose what your relationship had been

16   like with Bob Spatig?

17   A     Yes.

18   Q     Would you describe it for this jury.

19   A     Extremely difficult and contentious.

20   Q     Did you use the words abusive, emotionally --

21   A     Probably, yes.

22           MR. MCCRAE:  Your Honor.

23           THE COURT:  Yes.  I hear you.

24           You're going to get away from this, right?

25           MS. DEBOSE:  Yes.

                Direct Examination by Ms. DeBose

```
 1              THE COURT:  We're not going to --
 2              MS. DEBOSE:  Yes, Your Honor.
 3              THE COURT:  Okay.  Overruled.  Just take a seat.
 4  We're moving on, right?
 5  BY MS. DEBOSE:
 6  Q    Did you share with Ms. DeBose whether or not your
 7  immediate supervisor at the time, Paul Dosal, did anything
 8  about it?
 9  A    He did not do anything about it.
10  Q    Your earlier testimony, I would like you to go to
11  page 9 and lines 23 through 25 of your deposition.
12  A    Okay.
13              THE COURT:  It's right in front of you.  Go ahead.
14  A    I'm sorry, lines --
15  Q    Lines 23 through 25.
16  A    Yes.
17  Q    And if you go beyond that and turn over to page 10 and
18  all the way through line 5, have you read that?
19  A    Yes.
20  Q    Do you recall hearing that Ms. DeBose was claiming
21  discrimination?  Was it before or after Ms. DeBose left the
22  University of South Florida?
23  A    I need some clarification.  When you say "hear,"
24  what -- I heard, yes.  There was a lot of gossip around it.
25  Q    When did -- when did you learn that Ms. DeBose filed
```

ALEXIS MOOTOO - SEPTEMBER 20, 2018          78
Direct Examination by Ms. DeBose

1    discrimination?  Was it before or after she left employment

2    with University of South Florida?

3    A    When did I formally learn that?  After.

4    Q    You formally learned it after?

5    A    Formally learned after.

6    Q    Can you clarify what you mean by "formally."

7    A    I was informed of a discrimination claim by DIEO after.

8    Q    After Ms. DeBose left employ?

9    A    Right.

10   Q    Prior to that, do you have general awareness that

11   Paul Dosal -- did you help him with the discrimination

12   matters regarding Angela DeBose?

13   A    No.

14   Q    In terms of Paul Dosal, you say he forwarded you an

15   e-mail.  Did that e-mail ask your help with an employee

16   evaluation of Ms. DeBose?

17   A    No.

18   Q    Did it ask your help with putting together salary

19   information concerning Ms. DeBose?

20   A    No.  I recall Dr. Dosal asking me to compile USF

21   Registrar salary information to, I think, give you -- give

22   Ms. DeBose a raise.

23   Q    Did Dr. Dosal and you take Ms. DeBose's request

24   seriously?

25   A    Which request?

ALEXIS MOOTOO – SEPTEMBER 20, 2018          79
Direct Examination by Ms. DeBose

1   Q    You say Dr. Dosal forwarded you salary information

2   about Ms. DeBose.  Was that request taken seriously?

3   A    So I never had a discussion with Dr. Dosal about that.

4   He asked me in writing to provide comps for USF -- for

5   Registrars around the State and I provided that information.

6   I assume that he was taking that seriously, since he had

7   asked me to compile that information.

8            MS. DEBOSE:  I'd like to introduce Exhibit 43 --

9   42 and 43.

10            THE COURT:  Any objections?

11            MR. MCCRAE:  No objection, Your Honor.

12            THE COURT:  All right.  They're both in evidence.

13            MS. DEBOSE:  May I ask how I'm doing in terms of

14   time?

15            THE COURT:  Say again?

16            MS. DEBOSE:  May I ask how I'm doing in terms of

17   time?

18            THE COURT:  I still didn't hear that.

19            MS. DEBOSE:  I said:  May I ask how I'm doing in

20   terms of time?

21            Never mind.  I'll move on.

22            THE COURT:  How much time?  You've used twenty

23   additional.  You've got about ten left.

24   BY MS. DEBOSE:

25   Q    Could you take a look at this lower section.

ALEXIS MOOTOO - SEPTEMBER 20, 2018          80
Direct Examination by Ms. DeBose

1              Did you receive a forward of that e-mail from
2    Angela DeBose to Paul Dosal regarding the AVP position?
3    A     I don't recall.
4    Q     Is this your note in response to that?  Is this an
5    e-mail from Alexis Mootoo --
6    A     It is.
7    Q     -- to Paul Dosal?
8    A     Okay.
9    Q     Is it regarding the same subject line, Assistant
10   Vice President of Enrollment Planning & Management?
11   A     Honestly, I don't remember contextually what my
12   response was or why.
13   Q     Do you see the sentence that says:  Wow.  You predicted
14   this.  How would you like for me to proceed?
15   A     Yes.
16   Q     Is this in regards to Ms. DeBose's request for a
17   compensation review?
18   A     I don't think it would be about compensation.
19   Q     Did you work with Tonia Suber in putting together the
20   compensation information?
21   A     No.
22              MS. DEBOSE:  Your Honor, may I have a moment at
23   the bench?
24              THE COURT:  Yes, you can come to the bench, and
25   it's 1:30.  You have 13 left.

```
 1              (The following bench conference was held.)

 2              MS. DEBOSE:  I want to use time wisely, and

 3    Ms. Mootoo -- a lot of her testimony is not truthful.

 4    I can't impeach her with Paul Dosal's deposition, right?

 5              THE COURT:  That's correct.

 6              MS. DEBOSE:  She has no knowledge of his

 7    testimony, so --

 8              THE COURT:  No.

 9              MS. DEBOSE:  But she's not answering consistent

10    with him, so I'm going to ask her, if it's -- I'm sure it's

11    going to garner an objection, so that's why I want to just

12    clarify before I waste a moment on -- I'm going to ask her

13    if she's aware that Paul Dosal says he informed her of the

14    discrimination claim, that she helped him.

15              MR. MCCRAE:  She wasn't in the courtroom.

16              MS. DEBOSE:  I know that, but she can testify to

17    that.

18              THE COURT:  Whoa up.

19              Ask her a hypothetical question --

20              MS. DEBOSE:  I'll do that.

21              THE COURT:  -- if her supervisor -- who is her

22    supervisor?  That's Paul Dosal.  Then ask your question, did

23    your supervisor do this, this or the other, hypothetically.

24              MS. DEBOSE:  Yeah, because that's all I can do.

25    I mean --
```

```
 1              THE COURT:  Yes or no.  Yes or no.  You got
 2    13 minutes left.
 3              MS. DEBOSE:  I have exhibits that show that this
 4    is all not true.
 5              MR. MCCRAE:  Well, she can use the exhibits.
 6    I don't think she should refer to someone's testimony that
 7    she wasn't there for.
 8              THE COURT:  You can use the exhibits, but you're
 9    running out of time.
10              MS. DEBOSE:  That's what I'm saying.
11              THE COURT:  Do the best you can.
12    (End of bench conference; proceedings resume in open court.)
13              THE COURT:  Okay.  Consistent with sidebar.
14    BY MS. DEBOSE:
15    Q    Ms. Mootoo, who was your supervisor?
16    A    Paul Dosal.
17    Q    If you were to hear that Paul Dosal indicated that he
18    informed you of the discrimination complaint filed by
19    Ms. DeBose and received your help, what would be your
20    response, or what is your response to that?
21              MR. MCCRAE:  Same objection, Your Honor.
22              THE COURT:  Overruled.  Take the answer.
23    A    My response would be that I don't -- I would be
24    surprised.  I don't remember that.
25    Q    You don't remember any conversation with Paul Dosal
```

ALEXIS MOOTOO - SEPTEMBER 20, 2018          83
Direct Examination by Ms. DeBose

1   about Angela DeBose, is that correct, and her discrimination

2   complaint?

3   A     Not any -- no, I don't remember any conversations about

4   allegations of discrimination.

5   Q     In terms of your -- in terms of the complaint, is

6   Bob Spatig's classification a white male?

7   A     Yes.

8   Q     What is your classification?

9   A     African American.  Female.

10   Q     You reported that Angela DeBose called you a little

11   girl.

12   A     Yes.

13   Q     Did Paul Dosal ask you to make that statement?

14   A     No.

15   Q     Did Paul Dosal ask you to have Taja Sumpter corroborate

16   your statement?

17   A     No.

18   Q     Where did Ms. DeBose call you -- when and where did

19   Ms. DeBose call you a little girl?

20   A     In a meeting in January of 2015.

21   Q     In a meeting in January 2015?

22   A     I'm sorry, I don't remember the exact date.

23   Q     And do you remember the context of this alleged

24   statement?

25   A     I was attempting to present our new initiative of

1   Shared Services.  I had been asked about different processes

2   and how the Registrar's Office organization would be

3   affected by that.

4   Q     Who was in the room?

5   A     Ms. DeBose, Ms. Taja Sumpter, Ms. Melanie Martin-Lewis,

6   Ms. Saviya Jean-Baptiste, Ms. Kim Bushe, Mr. Tony Embry,

7   Ms. Suzanne Bishop.

8   Q     And did you have corroboration from your staff that

9   Ms. DeBose made this statement?

10  A     What do you mean by corroboration?

11  Q     Did your staff hear this comment?

12  A     They were present when the comment was made.

13  Q     Did Ms. DeBose's staff hear this comment?

14  A     Yes.

15  Q     Had Ms. DeBose ever used a term like "little girl" to

16  you before?

17  A     No.

18  Q     Had Ms. DeBose ever used the comment "stay in your

19  lane" before?

20  A     No.  Not until that day, no.

21  Q     What made it -- according to your recollection, what

22  made Ms. DeBose make such a statement?

23  A     I don't know --

24  Q     But it's your --

25  A     -- what would have precipitated for such a statement to

ALEXIS MOOTOO - SEPTEMBER 20, 2018          85
Direct Examination by Ms. DeBose

1    have been made.

2    Q    And you say your relationship was wonderful.

3    A    Yes.

4    Q    Was Ms. DeBose at all times professional with you?

5    A    Yes, until that day.

6    Q    Was Ms. DeBose unprofessional that day?

7    A    The comment was unprofessional, so up until that

8    comment she had been professional.

9    Q    Did you consider that comment discriminatory?

10   A    I considered that comment demeaning.

11   Q    And you contend Ms. DeBose made a demeaning comment to

12   you?

13   A    I don't know the reasoning or the -- or the -- I don't

14   know the reasoning why the statement was made, I can only

15   speak to how I received it.

16   Q    After that comment what was your relationship like with

17   Ms. DeBose?

18   A    I attempted to stay away from Ms. DeBose.

19   Q    You attempted to stay away from Ms. DeBose.

20        Did you support Ms. DeBose in terms of her budget?

21   A    Absolutely.

22        MS. DEBOSE:  I'm going to introduce Exhibit 45 and

23   46.

24        MR. MCCRAE:  No objection.

25        THE COURT:  Any objection?

ALEXIS MOOTOO - SEPTEMBER 20, 2018          86
Direct Examination by Ms. DeBose

```
 1            MR. MCCRAE:  No objections, Judge.
 2            THE COURT:  They come in, 45, 46.  Go forward.
 3  BY MS. DEBOSE:
 4  Q    Did you testify just moments ago that you worked on the
 5  compensation concerning Ms. DeBose and you -- you did not
 6  mention Ms. Suber.  Is this a note between you and
 7  Tonia Suber concerning salary increases for Ms. DeBose?
 8  A    Okay.
 9  Q    Do you still maintain you had no communication with
10  Tonia Suber concerning Ms. DeBose's salary?
11  A    So the question you asked me, if I gathered information
12  on compensation for Ms. DeBose, which I did, Tonia Suber did
13  not have anything to do with that.  I was asked about a
14  number of things relating to Ms. DeBose thereafter and
15  I answered.
16  Q    In March of 2015 did you work with Brian Allman --
17  A    Yes.
18  Q    -- on the situation involving INTO USF?
19  A    INTO -- I don't -- I don't think so.  I don't --
20  I don't know.
21            MS. DEBOSE:  I think I'm down to time.
22            THE COURT:  You're down to four minutes when I
23  just checked with the Clerk.
24            MS. DEBOSE:  So I'm going to --
25            THE COURT:  Stop.
```

ALEXIS MOOTOO – SEPTEMBER 20, 2018          87
Cross-Examination by Mr. McCrae

```
 1              MS. DEBOSE:  Stop here, yes.
 2              THE COURT:  All right.  Cross-examination,
 3    Mr. McCrea.
 4              MR. MCCRAE:  May it please the Court.
 5              THE COURT:  Yes.
 6              CROSS-EXAMINATION OF ALEXIS MOOTOO
 7    BY MR. MCCRAE:
 8    Q    Good afternoon, Ms. Mootoo.
 9    A    Good afternoon.
10    Q    Ms. Mootoo, what is your educational background?
11    A    I have a Doctorate degree.
12    Q    Okay.  And what is your Ph.D. in, if that's the right
13    way of saying it?
14    A    Oh.  Government.
15    Q    And what was your Ph.D. dissertation?
16    A    Structural racism.
17    Q    You said you're an adjunct professor?
18    A    Yes.
19    Q    What courses have you taught at USF?
20    A    Twentieth Century American Culture, Black Women in
21    America, Racism in American Society, The Black Experience,
22    The TransAtlantic, The Middle Passage, and Comparative
23    Politics.
24    Q    Okay.  That's a lot.
25    A    Yes.
```

ALEXIS MOOTOO - SEPTEMBER 20, 2018                    88
                   Cross-Examination by Mr. McCrae

1    Q     And who do you report to currently?

2    A     In my administrative job I report to Paul Dosal.  As an

3    adjunct I report to Andrew Berish and to Steve Tauber.

4    Q     And how long have you reported in your administrative

5    capacity to Paul Dosal?

6    A     Since March 28, 2011.

7    Q     So going on seven and a half years?

8    A     Yes.

9    Q     And how do you get along with Dr. Dosal?

10   A     We have a professional relationship.

11   Q     Has he ever made any positive decisions regarding your

12   employment with USF?

13   A     Yes.

14   Q     And what were those?

15   A     I was promoted in 2015, and I've been awarded raises

16   for performance.

17            MR. MCCRAE:  Could I have Exhibit 110.

18   Q     If you would turn to that notebook that has all the

19   tabs next to you.

20   A     Yes.

21   Q     And turn to tab 110.

22   A     Yes.

23   Q     Do you recognize this as an e-mail that you sent to

24   Dr. Dosal on January 28, 2015?

25   A     Yes.

```
 1              MR. MCCRAE:  All right.  Your Honor, I would move
 2     the admission of Defendant's Exhibit Number 110.
 3              THE COURT:  Any objection?
 4              MS. DEBOSE:  No, Your Honor.
 5              THE COURT:  Comes in.  Defendant's 110.
 6     BY MR. MCCRAE:
 7     Q    In this e-mail you were expressing some concerns you
 8     had about a meeting that you had with Dr. Dosal and
 9     Ms. DeBose the day before, January 27 of 2015?
10     A    Yes.
11     Q    Was that the same meeting or a different meeting than
12     the meeting in which you testified the "stay in your lane,
13     little girl" comment was made?
14     A    It was a different meeting.
15     Q    This was an earlier meeting?
16     A    Yes.
17     Q    And you -- one of your concerns was Ms. DeBose's tone
18     and demeanor as I was debriefing both of --
19     A    Yes.
20     Q    Both of you?
21     A    Yes.
22     Q    Why did you feel it necessary to express concern to
23     Dr. Dosal about that?
24     A    Because I needed to protect my own employment and
25     because I needed to push forward an initiative and I needed
```

Cross-Examination by Mr. McCrae

1   the assistance and the willingness of all the directors as

2   part of that initiative, and I did not feel that Ms. DeBose

3   was happy about the new initiative.

4   Q    All right.  And what is the new initiative that you

5   were trying to push forward?

6   A    I had been asked to bring all of the business and

7   fiscal duties within the unit into one Shared Services as we

8   were moving towards an RCM model at the University.

9   Q    All right.  And was that known as the Shared Services

10  Model?

11  A    Yes.

12  Q    And under that model certain things that were being

13  done in different offices would be consolidated?

14  A    Yes.

15  Q    Okay.  And what offices were being affected?

16  A    The Registrar's Office, the Office of Admissions and

17  the Office of Financial Aid, Community Engagement, and

18  Florida College Access Network.

19  Q    Okay.  Regarding number 2 under your concerns, could

20  you explain what that was about.

21  A    There were some deficits in the State funding of the

22  Registrar's Office and I needed to make sure that those were

23  cleared, and I needed the help of the Registrar to allow me

24  to assist in transferring funds from -- payroll charges that

25  were originally on State funds and transferring them to an

 1   auxiliary fund.

 2   Q     And when you say there was a deficit, was it a

 3   university fund, was it a fund at the Registrar's Office, or

 4   was it a fund somewhere else?

 5   A     It was a fund at the Registrar's Office.

 6   Q     And going down to where I highlighted, it says:

 7   "Angela is unwilling to allow me to assist her staff in

 8   ameliorating their financial situation that is currently a

 9   train wreck."  What did you mean by that?

10   A     That we were going to be in a deficit.

11   Q     All right.  What did you mean by she is unwilling to

12   allow me to assist her staff?

13   A     She had two staff members who were in charge of budget

14   at the time and she did not want me to be involved.

15   Q     All right.  In the next sentence you said:  "Now,

16   Angela is resorting to denying being made aware of

17   shortfalls although we met twice to discuss the Registrar's

18   E&G being in deficit at the end of fiscal year 2012-2013

19   (I met with her on 7/2013 and 11/2013)."  What does that

20   mean?

21   A     That I discussed these shortfalls with her, that I had

22   concerns about those, that I wanted to make sure that that

23   did not occur again, that they were -- that I could help in

24   making sure it didn't happen again.

25   Q     All right.  And going down then further, you say:

1    "I am not comfortable meeting with Angela and her staff

2    based on yesterday's meeting and the meeting I had with her

3    2 weeks ago."  What was the meeting two weeks earlier that

4    you were referring to?

5    A    Where she called me a little girl and to stay in my

6    lane.

7    Q    You're saying that happened two weeks before this

8    meeting?

9    A    I think so, yes.

10   Q    All right.  We'll get back to that.

11          And you say:  "Between her tone and seemingly

12   angry attitude toward me (which is completely unwarranted),

13   I am not sure how to proceed."

14          What did you mean by "her tone and seemingly angry

15   attitude toward me"?

16   A    She told me -- she called me a little girl, she told me

17   to stay in my lane, and she was obviously angry that I was

18   moving forward with an initiative that I had been mandated

19   to complete.

20   Q    Okay.  And then the last part says:  "I am concerned

21   that Angela will make claims that I am responsible" and

22   I think "for"?

23   A    Yes.

24   Q    "The current precarious financial situation of the

25   Registrar's Office."  Is that what you were alluding to

ALEXIS MOOTOO - SEPTEMBER 20, 2018          93
Cross-Examination by Mr. McCrae

1  earlier when you said that you sent this to protect your

2  employment?

3  A    Yes.

4  Q    Okay.  And what exactly were you concerned about?

5  A    I had been told at the beginning of my tenure in the

6  position by the budget director at Academic Affairs that my

7  responsibility was to make sure that Dr. Dosal's unit was

8  not in deficit, and if it was, even -- that I would be held

9  responsible for those deficits and I would lose my job.

10 Q    Who was that?

11 A    Kevin Toso.

12         MR. MCCRAE:  Could I have Exhibit 51.

13         This is already in evidence as Defendant's 51,

14 Your Honor.

15         THE COURT:  51.  Okay.

16 BY MR. MCCRAE:

17 Q    If you would turn to tab 51, Ms. Mootoo.

18         MS. DEBOSE:  May I see this?

19         MR. MCCRAE:  Yes.

20 BY MR. MCCRAE:

21 Q    Okay.  Are you familiar with this e-mail?

22 A    Yes.

23 Q    Do you recognize it as an e-mail that you sent to

24 Dr. Dosal on January 29 of 2015 as "a synopsis of today's

25 meeting"?

1    A    Yes.

2    Q    All right.  And does that e-mail refresh your

3    recollection that the meeting in which Ms. DeBose said,

4    "I want to make sure you stay in your lane, little girl, and

5    I will stay in my lane," took place on January 29 of 2015?

6    A    Yes.

7    Q    All right.  So does that help you recall that your

8    previous e-mail which was sent on January 28th, the day

9    before, and was talking about a meeting on January 27 was

10   referring to an earlier meeting?

11   A    Yes.

12   Q    Okay.  Now, with regard to this document, is this an

13   accurate description of what took place during the meeting

14   that you attended on January 29 of 2015?

15   A    Yes.

16   Q    What was the purpose of the meeting?

17   A    The purpose of the meeting was to introduce the new

18   initiative to the Registrar's staff and to get feedback from

19   their staff in order for us to establish processes that

20   would work best for the Registrar's Office.  It was

21   important that we get -- it was important that I get input

22   from our new -- newly defined customers.

23   Q    Okay.  And did you have similar meetings with the other

24   departments that you identified earlier?

25   A    All of them.

1    Q    And in so many words, this was to get their commitment

2    and buy-in for this model?

3    A    For the staff, yes.  The directors had already been

4    informed of this initiative and had been asked by Dr. Dosal

5    to -- to be helpful and cooperative, and so all -- everyone

6    was.

7    Q    And you write where it's highlighted:  "Angela began

8    instigating different scenarios where our new initiative

9    would fail."  Did that concern you?

10   A    Yes.

11   Q    Why?

12   A    Because I was under the impression that the meeting was

13   to get feedback from the staff about how to have a good

14   system.  I didn't think that this would -- I didn't think

15   that I would be in a circumstance where I would be defending

16   an initiative that had already been essentially sanctioned

17   by Dr. Dosal.

18   Q    All right.  And as highlighted below that, there

19   reached a point in the meeting where Ms. DeBose said,

20   "I want to make sure you stay in your lane, little girl, and

21   I will stay in my lane"?

22   A    Yes.

23   Q    And who did she direct that remark to?

24   A    Me.

25   Q    Did you see or do anything that would have prompted

1    that type of a response?

2    A    No.

3    Q    On the last page, again, you raised a point that you

4    raised in your earlier e-mail:  "It is clear that no matter

5    what I say or do to demonstrate that Tony and/or Kim are not

6    capable of handling very sensitive and important budget and

7    payroll matters, Angela is unwilling to allow me to assist

8    her staff in ameliorating their financial situation that is

9    currently a train wreck."  This is the same language that

10   you had put in your earlier e-mail to Dr. Dosal, correct?

11   A    Yes.

12   Q    Was that still your impression following the second

13   meeting on January 29?

14   A    Yes.

15   Q    And you say again -- actually, I may have mixed up

16   these two.  That was the earlier e-mail.  My apologies.

17   Sorry for confusing everyone.

18           When you had your meetings with the other

19   department heads and their staff, did you encounter the same

20   type of reaction?

21   A    No.

22   Q    How would you compare the reaction that you had in

23   these two meetings that we've looked at and the ones that

24   you had with the other departments with which you were

25   meeting about the Shared Services Model?

ALEXIS MOOTOO - SEPTEMBER 20, 2018          97
Cross-Examination by Mr. McCrae

```
 1   A    The other department directors were collaborative with

 2   me.

 3   Q    And during the meeting when Ms. DeBose said to you,

 4   "I want to make sure that you stay in your lane, little

 5   girl, and I will stay in my lane," how did that make you

 6   feel?

 7   A    I was very hurt.

 8   Q    All right.  Did you say anything to Ms. DeBose?

 9   A    No.

10   Q    Why not?

11   A    Because my staff were present and I needed for them to

12   continue to respect me as I needed them to.

13   Q    And at some point after the meeting you prepared the

14   e-mail that we looked at?

15   A    Yes.

16   Q    And why?

17   A    I sent the e-mail because I was attempting to carry out

18   an initiative that I had been tasked to complete and I felt

19   that I had experienced some resistance, resistance that I

20   had not anticipated at all.

21           MR. MCCRAE:  May I have a moment?

22           THE COURT:  Yes.

23           MR. MCCRAE:  I think I've scrambled my papers

24   here.

25           THE COURT:  Okay.
```

BY MR. MCCRAE:

Q    And why did you -- or how did you get involved in
discussing this meeting and this issue with Tonia Suber?

A    I'm sorry.  Could you repeat the question?

Q    Yeah.  At some point did you start interacting with
Tonia Suber in HR about the meeting and what took place at
the meeting?

A    The first e-mail that I wrote to Dr. Dosal I copied
Tonia Suber because she had been involved with other parts
on the University campus with us going into the Shared
Services Model.  I did write Tonia Suber an e-mail
officially on the matter I think two or three days later.
I know it was over the weekend.

        MR. MCCRAE:  Your Honor, I'm going to ask the
witness to take a look at Defendant's Exhibit 54, which I
believe is in evidence.

        THE COURT:  Okay.  Do you want to get the one that
the Clerk's got, or -- no, you can use your own up there,
that's all right.

        MR. MCCRAE:  I think I have it, Judge.

BY MR. MCCRAE:

Q    Have you taken a look at Exhibit 54, under tab 54?

A    This is the same e-mail, it's just forwarded to the
Provost?

Q    No, this is 54.  I can hand it to you.

```
 1   A    Yes, please, because this 54 here is different.
 2          MS. DEBOSE:  May I approach, Your Honor?
 3          THE COURT:  Yes.
 4   BY MR. MCCRAE:
 5   Q    That's not 54 in that book?
 6   A    No.
 7   Q    Okay.  My mistake.
 8          Okay.  Now I have to borrow it back.
 9          Now, this was an e-mail that's in evidence from
10   Tonia Suber to Dr. Dosal and you're copied on it.
11   A    Yes.
12   Q    Do you recall receiving this e-mail, which would have
13   been the day after that meeting on January 29th?
14   A    I do.
15   Q    Okay.  And in the e-mail Tonia Suber says:  I must add
16   that the situation with Angela is having an adverse impact
17   on Alexis emotionally.  She shared her feelings of working
18   in a hostile environment created by Angela, with being
19   continuously subjected to her abuse, and being, quote, beat
20   up on.
21          Is that accurate?  Did you share that with
22   Ms. Suber?
23   A    Yes.
24   Q    You were asked this, but did Dr. Dosal ask you to
25   report that meeting or --
```

```
 1   A     No.

 2   Q     How about the earlier meeting that you wrote --

 3   A     No.

 4   Q     Could you turn to Exhibit 68.

 5   A     Okay.

 6              MR. MCCRAE:  And, Your Honor, this is not in

 7   evidence.  I would move into evidence Defendant's Exhibit

 8   68.

 9              THE COURT:  68.  Show it to Ms. DeBose.

10              Any objection?

11              MS. DEBOSE:  No, Judge.

12              THE COURT:  All right.  68 in evidence.  Go ahead.

13   BY MR. MCCRAE:

14   Q     Are you with me, Ms. Mootoo?  Are you at tab 68?

15   A     Yes.

16   Q     Okay.  And I wanted to ask you -- you were asked some

17   questions about being aware that Ms. DeBose had made a

18   complaint.  If you could turn to page 7.

19   A     Okay.

20   Q     All right.  Do you recall being asked questions by DIEO

21   Investigator Camille Black?

22   A     Yes.

23   Q     And did you tell her that Dr. Dosal had never discussed

24   with you whether or not he planned to terminate Ms. DeBose

25   and you had never been part of a conversation with anyone
```

ALEXIS MOOTOO - SEPTEMBER 20, 2018          101
                Cross-Examination by Mr. McCrae

1    else about that?

2    A     That is correct.

3    Q     And is that accurate?

4    A     That is accurate.

5    Q     And did you tell the investigator that you had never

6    seen Dr. Dosal treat Ms. DeBose in an unprofessional manner

7    or in a way that took her -- took you aback?

8    A     That is correct.

9    Q     And is that accurate?

10   A     That is accurate.

11   Q     Did you tell the investigator that Dr. Dosal had

12   treated Ms. DeBose with respect and that you have never seen

13   Dr. Dosal not be respectful?

14   A     That's correct.

15   Q     And is that accurate?

16   A     Yes, that's accurate.

17   Q     Did you tell the investigator that you have done

18   nothing but try to be helpful to Ms. DeBose or anyone else

19   and that you have seen Dr. Dosal do nothing but be helpful

20   to Ms. DeBose or anyone else?

21   A     That's correct.

22   Q     Did you also tell the -- and is that accurate?  Was

23   that truthful?

24   A     Yes, that's truthful.

25   Q     Did you tell the investigator that Dr. Dosal had gone

1    to bat to get money for Ms. DeBose for projects on numerous

2    times?

3    A    That is correct.

4    Q    All right.  And you knew that because you had been

5    involved in helping Dr. Dosal get approval for that funding?

6    A    Yes.

7    Q    Were you involved in an effort by Dr. Dosal to get

8    money for renovating the Registrar's Office?

9    A    Yes.

10   Q    The time that you spoke with Ms. DeBose about feeling

11   like you were experiencing discrimination, was that

12   Dr. Dosal or someone else that you felt you were --

13   A    It was someone -- it was not Dr. Dosal.

14   Q    And was that on your administrative side or in your

15   side as a teacher?

16   A    Actually as a student, as a graduate student.

17   Q    Okay.  And the person you mentioned was the graduate

18   program director?

19   A    Yes.

20   Q    Who did that person report to?

21   A    Steve Tauber.

22   Q    Okay.  So he didn't report to Dr. Dosal?

23   A    No.

24   Q    And you were asked questions about Bob Spatig's

25   treatment of you.  Did you make a complaint to Dr. Dosal

ALEXIS MOOTOO - SEPTEMBER 20, 2018          103
Cross-Examination by Mr. McCrae

1    that Bob Spatig was discriminating against you?

2    A     No.

3              MR. MCCRAE:  If I may have a moment, Your Honor.

4              THE COURT:  Yes.

5              MR. MCCRAE:  That's all I have, Your Honor.

6              THE COURT:  All right.  Come to sidebar.  This is

7    the Court calling you to sidebar.  All of you.

8              You may stand in the jury box.  You may stand in

9    the courtroom.  You may stand, Madam Witness.

10             *(The following bench conference was held.)*

11             THE COURT:  Now, we've been here since Monday,

12   September the 10th, when we started picking the jury, and

13   the clock has been running on the plaintiff and on the

14   defendant since you all started your respective cases, okay?

15   You actually have, as of right now, six minutes left.

16   You think about how you want to use your six minutes, and

17   I told you before that if you start taking from your

18   summation time, that's at your own peril.

19             MS. DEBOSE:  I understand.

20             THE COURT:  Okay?

21             MS. DEBOSE:  Is my Redirect with this witness out

22   of those minutes?

23             THE COURT:  Pardon me?

24             MS. DEBOSE:  Can I Redirect with this witness, and

25   is it out of those minutes?

```
 1              THE COURT:  Absolutely.  And you can -- if you go
 2    beyond it, it's coming out of your summation time.
 3              MS. DEBOSE:  Yeah, but I -- I got to get her.
 4              THE COURT:  You understand that?
 5              MS. DEBOSE:  Yes, I do.
 6              THE COURT:  I got to be fair to Mr. McCrea,
 7    representing the University of South Florida.
 8              MS. DEBOSE:  I understand.
 9              THE COURT:  How many more witnesses have you got
10    today?
11              MR. MCCRAE:  I haven't started my case-in-chief,
12    Judge.  We're still on her case-in-chief.
13              THE COURT:  I know that, but did you call
14    witnesses?
15              MS. DEBOSE:  I saw a witness in the courtroom.
16              MR. MCCRAE:  Yes, I brought two in case the
17    plaintiff rests today.
18              THE COURT:  Fine.  Fine.
19              MR. MCCRAE:  So there's no gap.
20              THE COURT:  Okay.
21              MS. DEBOSE:  I don't know how long he was in here,
22    but Travis Thompson was in the courtroom listening to the
23    testimony.
24              THE COURT:  You got him out of here -- the Bailiff
25    got him out of here pretty fast, from the time he walked in
```

```
 1    and the first lady walked in.  Okay.  All right.
 2              We're going to do whatever you want to do
 3    time-wise, but please, everybody think about what you're
 4    doing, also bearing in mind the plaintiff has not taken the
 5    stand, and when you sum up, you cannot testify during
 6    summation because you're not under oath and that won't be
 7    allowed.  He'll get up and object and I'll sustain it and
 8    I'll ask the jury to disregard anything you may say.
 9              Likewise for him, he can't testify in summation,
10    and Mr. McCrea knows that.
11              Now, do you want to go forward with her
12    examination?
13              MS. DEBOSE:  Well, let me clarify here.  In terms
14    of when he calls -- when he's on his case-in-chief --
15              THE COURT:  Yeah, you get --
16              MS. DEBOSE:  -- I get to cross-examine?
17              THE COURT:  You get Cross, but you're running out
18    of time, so you're not going to be able to Cross.  You're
19    running out of time.
20              MR. MCCRAE:  Her cross-examination is coming out
21    of her summation after six minutes.
22              THE COURT:  That's right.
23              MR. MCCRAE:  After the next six minutes.
24              THE COURT:  She's got six minutes left.
25              MS. DEBOSE:  So you're saying every time -- every
```

```
 1   witness he brings, for cross-examination, that is out of my
 2   time?
 3              MR. MCCRAE:  It's out of your summation time.
 4              MS. DEBOSE:  Okay.
 5              MR. MCCRAE:  That's the only thing you've got
 6   left, which the Court reserved for each of you, two hours,
 7   two hours.  That's all that's left.
 8              MS. DEBOSE:  Um-hum.
 9              THE COURT:  Okay?
10              MS. DEBOSE:  I got it.
11              THE COURT:  I'm trying to be fair to each side
12   here, okay?  Because the record is replete with how you
13   spent your time the first week.
14              MS. DEBOSE:  Um-hum.
15              THE COURT:  Okay.  All right.  Let's go back to
16   work.
17              MS. DEBOSE:  All right.
18              THE COURT:  Thank you.
19   (End of bench conference; proceedings resume in open court.)
20              THE COURT:  Okay.  Redirect.
21              REDIRECT EXAMINATION OF ALEXIS MOOTOO
22   BY MS. DEBOSE:
23   Q   Ms. Mootoo, isn't it true that you testified moments
24   ago that you first learned of Ms. DeBose's discrimination
25   complaint after she had left?
```

```
 1   A    Formally, yes.

 2   Q    Wasn't that in fact false?

 3   A    No.

 4   Q    I just want to put up for you Exhibit 74 again.

 5              THE COURT:  Plaintiff's Exhibit?

 6              MS. DEBOSE:  Yes, Plaintiff's Exhibit 74.

 7              THE COURT:  Okay.

 8   BY MS. DEBOSE:

 9   Q    Is this a forward to you from Paul Dosal?

10   A    Yes.

11   Q    And in this forward to you -- do you see the whole

12   complete e-mail?  Did you happen to read this last

13   paragraph?

14   A    I guess I did.

15   Q    Isn't it true that -- what happened to Tonia Suber?

16   Did she leave the University of South Florida?

17   A    I believe so, yes.  Yes.

18   Q    Did she leave happy or disgruntled?

19   A    I have no idea.

20              MR. MCCRAE:  Your Honor, beyond the scope of

21   Cross.

22              THE COURT:  It's Redirect.  It's Redirect in her

23   case, because she called her.

24              MR. MCCRAE:  Right.

25              THE COURT:  Right.  If that's an objection, it's
```

1    overruled.  Let's go forward.

2    BY MS. DEBOSE:

3    Q    Did Ms. Suber leave happy or disgruntled?

4    A    I don't know.

5    Q    Was Ms. Suber, like you, promised a promotion and a pay

6    increase?

7    A    I don't know.

8    Q    Did Ms. Suber, to your knowledge, receive that pay

9    increase?

10   A    I don't know.

11   Q    Isn't it true that Paul Dosal asked you to get involved

12   and to help him with the discrimination complaint against

13   Angela DeBose?

14   A    No.

15   Q    If Paul Dosal testified the meeting at the

16   Shared Services was professional, would you be surprised?

17   A    The meeting he didn't attend or the meeting he

18   attended?

19   Q    The meeting he attended with you and Angela DeBose.

20   If he testified that was professional, would you be

21   surprised?

22   A    I don't know.

23   Q    Did you characterize the meeting as something less than

24   professional?

25   A    Frankly, I don't remember.

1              MS. DEBOSE:  I have nothing further, Your Honor.

2    Thank you.

3              THE COURT:  All right.  Recross.

4         **RECROSS-EXAMINATION OF ALEXIS MOOTOO**

5    **BY MR. MCCRAE:**

6    Q    Ms. Mootoo, would you, for the sake of a promotion or

7    pay raise, make up a fake story, a false story about

8    Ms. DeBose?

9    A    No.

10             MR. MCCRAE:  Nothing further, Judge.

11             THE COURT:  Any Re-redirect?

12        **FURTHER REDIRECT EXAMINATION OF ALEXIS MOOTOO**

13   **BY MS. DEBOSE:**

14   Q    Ms. Mootoo, you indicated that Angela DeBose called a

15   little girl; is that correct?

16   A    Yes.

17   Q    Were you in a meeting with Kim Bushe-Whiteman and

18   Angela DeBose in which you used the N word?

19             MR. MCCRAE:  Your Honor, this is past -- way past

20   Recross, Redirect.

21             THE COURT:  Well -- all right.  Did you understand

22   the question?

23             THE WITNESS:  Yes.

24             THE COURT:  You may respond.  Overruled.

25   A    What meeting?

1    BY MS. DEBOSE:

2    Q    Do you know what black privilege is?

3    A    Yes.

4    Q    Did you come into the Registrar's Office using the

5    N word?

6    A    When?  No.  I'm sorry.  When?

7    Q    Did you ever come into the Registrar's Office in the

8    presence of Kim Bushe-Whiteman or Tony Embry or Harold Smart

9    or other Registrar's Office staff using the N word?

10   A    No.

11              MS. DEBOSE:  I have nothing further, Your Honor.

12              THE COURT:  Any Re-recross?

13              MR. MCCRAE:  No, Your Honor.

14              THE COURT:  Any further need for the witness?

15   May she be excused and discharged?  Yes?  Yes.

16              MR. MCCRAE:  Yes, Your Honor.

17              THE COURT:  Both sides, yes?  May she be

18   discharged from any subpoena?

19              MS. DEBOSE:  I would like to reserve the right

20   to --

21              THE COURT:  You want to re-call her?

22              MS. DEBOSE:  Well, no, I'll let it go, Your Honor.

23              THE COURT:  Well, I'm just trying to --

24   Ms. DeBose, I'm not trying to prevent you from having her,

25   I'm trying to find out whether or not the witness has to

```
1   stay, if the witness is expected to come back or if I may
2   discharge her.  That's standard operating procedure by this
3   Court, to be courteous to all witnesses, okay?
4           MS. DEBOSE:  You may discharge her, Your Honor.
5   Thank you.
6           THE COURT:  Okay.  Do you need her, Mr. McCrea?
7           MR. MCCRAE:  No, Your Honor.
8           THE COURT:  All right.  Ma'am, thank you very much
9   for coming.  You are excused and discharged from any
10  subpoena you may have received.  You're excused from the
11  courtroom and the courthouse.  Thank you.
12          THE WITNESS:  Yes, Your Honor.
13          THE COURT:  Mr. Bailiff, escort the witness out.
14          COURT SECURITY OFFICER:  Yes, Your Honor.
15              (Alexis Mootoo exits proceedings.)
16          THE COURT:  Okay.  If any, call your next witness
17  in the plaintiff's case-in-chief.  And you're on the clock.
18          MS. DEBOSE:  Your Honor, I have the two
19  depositions to submit into evidence.
20          THE COURT:  Right.  And you want those -- you want
21  those submitted by -- and that's by agreement, Mr. McCrea?
22          MR. MCCRAE:  Yes, Your Honor, with the redactions
23  that were discussed.
24          THE COURT:  Okay.  These two items of evidence are
25  coming in and they will be marked as exhibits.  They are
```

```
1   redacted depositions, correct, of who?
2           MS. DEBOSE:  The redacted deposition only concerns
3   Andrea Diamond.
4           THE COURT:  Okay.
5           MS. DEBOSE:  The deposition -- there were no
6   redactions for Shruti Kumar that I'm aware of.
7           THE COURT:  Well, whatever condition they are in
8   on these two depositions, they're coming in.  The first
9   person is Andrea --
10          MS. DEBOSE:  Diamond.
11          THE COURT:  And the second person?
12          MS. DEBOSE:  Shruti Kumar, who attended the --
13          THE COURT:  Okay.  Just the names of the people,
14  all we need.  Those two items are coming in evidence.  One
15  is redacted, do you agree, Mr. McCrea?
16          MR. MCCRAE:  Yes, Your Honor.
17          THE COURT:  Okay.  Other than that, who if anyone
18  or any further witnesses for the Plaintiff DeBose?
19          MS. DEBOSE:  I would like to, if I can, see who
20  Mr. McCrea has available outside, because I was only under
21  the impression Ms. Mootoo was available today and we have
22  the same witnesses.  I'm sorry.
23          THE COURT:  Wait.  Wait.  Wait.  Wait.  Wait.
24  Wait.  Wait.
25          Ladies and gentlemen of the jury, I got to talk to
```

```
1    these people.  It's going to be easier in the courtroom.
2    I'm going to say 15 minutes by the courtroom clock, until
3    2:30.
4                 All rise for the jury.
5                      (Jury exits proceedings.)
6                 THE COURT:  You all may be seated.  Now, you're
7    going to take a break in a minute, but just let me talk to
8    you here now.
9                 Did you subpoena these other people or are you
10   talking about cross-examining Mr. McCrea's witnesses?
11                MS. DEBOSE:  Your Honor, I did subpoena them.
12                THE COURT:  But are you calling them in your
13   case-in-chief?
14                MS. DEBOSE:  I'd like to see who he has here so
15   I can know whether or not I wish to call them, but my
16   thought is no, I'm not, I'm going to strictly reserve for
17   Cross, but I did not know who -- I don't know who is outside
18   the door.
19                THE COURT:  Okay.  All right.  Now, listen to me.
20   I'm going to take this 15 minute break and then I'll come
21   back in here, but please discuss with me what you're doing,
22   okay, and the Clerk will tell me -- I think you've used your
23   six minutes, I'm not sure, but the Clerk will tell me how
24   much --
25                COURTROOM DEPUTY:  Three minutes left.
```

```
1              THE COURT:  You've got three minutes left on your
2   original time without going into your summation.   Three
3   minutes.  I'm not keeping it, the Clerk is.
4              Now, figure out what you're doing, who is calling
5   who as a witness, who may be here or who may not be here,
6   and bearing in mind you are now going into your summation
7   time, after the three minutes is gone you're into your
8   summation time, okay?  Just so we understand.
9              MS. DEBOSE:  Yes, Your Honor.
10             THE COURT:  Mr. McCrea, do you have something?
11             MR. MCCRAE:  Just for the record, Your Honor,
12  I was not asked to bring any other subpoenaed witnesses here
13  today.  These witnesses are here because I was concerned
14  that if the plaintiff rests we don't have any gap time.
15             THE COURT:  I got you.  I got you.  All right.
16  Okay.  I appreciate that.  That's professionally what you're
17  supposed to do, Ms. DeBose, when there's a trial, you have
18  an abundance of witnesses so there's no gap in time.
19             MS. DEBOSE:  Sure.
20             THE COURT:  Mr. McCrae is aware of that.  You were
21  not aware of it obviously.
22             MS. DEBOSE:  No, I'm aware, I just don't know the
23  names of who he has called.
24             THE COURT:  Okay.  We're taking the 15 minutes
25  now.  2:30 we'll be back in here.
```

```
 1                    (Recess at 2:15 p.m. until 2:31 p.m.)

 2                              - - - - -

 3              THE COURT:  All right.  Now, have you determined,

 4      Ms. DeBose, with the two witnesses' depositions, are you

 5      going to announce rest --

 6              MS. DEBOSE:  Yes, Your Honor.

 7              THE COURT:  -- of your case?  Yes?

 8              Now, with rest announced, may we reserve motions?

 9              MR. MCCRAE:  Your Honor, I would rather make a

10      quick motion, and I don't think it would be any more than

11      15 minutes.

12              THE COURT:  15 minutes?

13              MR. MCCRAE:  Yes, Your Honor.

14              THE COURT:  All right.  Defendant -- at the

15      conclusion of the plaintiff announcing rest, defendant

16      wishes to make motions.  Go ahead.

17              You may be seated, Ms. DeBose.

18              MR. MCCRAE:  Thank you, Your Honor.

19              The first issue is failure to satisfy conditions

20      precedent administrative exhaustion.  Title VII requires the

21      plaintiff to file a charge of discrimination and receive a

22      notice of right to sue from the EEOC as a condition of suit.

23      Forehand versus Florida State Hospital, 89 F.3d at 1562.

24              The Supreme Court has stated that Title VII's

25      procedural requirements are not relaxed for pro se
```

1    litigants, even those without any legal training.  In

2    *Baldwin County Welcome Center versus Brown*, 466 U.S. 147,

3    the U.S. Supreme Court stated:  Procedural requirements

4    established by Congress for gaining access to Federal Courts

5    are not to be disregarded by courts out of a vague sympathy

6    for particular litigants.

7          The Supreme Court quoted its earlier language in

8    *Mohasco versus Silver*, 447 U.S. 807.  "In the long run,

9    experience teaches that strict adherence to the procedural

10   requirements specified by the legislature is the best

11   guarantee of evenhanded administration of justice."

12         The *Baldwin* case, by the way, was a pro se

13   litigant, where the U.S. Supreme Court affirmed dismissal of

14   the claim because there was -- the pro se litigant didn't

15   prove that they had met the 90 day filing requirement under

16   Title VII.

17         In this case the parties stipulated in the joint

18   pretrial stip under the factual issue to be resolved whether

19   all conditions precedent to suit had been satisfied.  Here,

20   seven and a half or going on eight days into trial, the

21   plaintiff failed to introduce any evidence that she filed a

22   charge of discrimination with respect to either the

23   termination claim or the negative reference claim.

24         One other argument with respect to the negative

25   reference claim.  In the *National Railroad Passenger Corp.*

*versus Morgan*, the Supreme Court in 2002 announced that
discreet acts of discrimination that occur after the filing
of a charge need to be the subject of a new or an amended
charge.  Since 2002 the Courts have disagreed over whether
that applies only to discrimination claims or retaliation
claims, and frankly I think the majority of district courts
came down in favor of the older Fifth Circuit law in *Gupta*
saying that it's limited to discrimination claims.

        Our position is that that disagreement by the
District Courts was resolved by the *Duble -- Duble versus*
*FedEx Ground Package Systems*, 572 Fed.Appx. 889, which
involved a retaliation -- retaliatory termination claim that
arose after the filing of a lawsuit -- after the filing of
an EEOC charge, but before the filing of a lawsuit, and the
Southern District granted summary judgment for the employer
on that issue as not having been the subject of a timely
charge, and the Eleventh Circuit affirmed, saying in that
case there was an opportunity, so *Gupta* didn't apply.
It limited *Gupta* to where the act of discrimination or
retaliation occurs during the pendency of a lawsuit.

        In this case the evidence is that the negative
reference was done within a week of the termination.  This
lawsuit was filed in December of 2015, so there was
certainly time, seven months, between that allegedly
retaliatory reference and the filing of this lawsuit to

1    either amend or file a new charge on that issue.

2            With respect to the race discrimination and

3    retaliation claims, I'll try to keep this short, but summary

4    judgment on the race discrimination claim was denied on the

5    basis of evidence that the decision maker, Provost Wilcox,

6    supposedly made racial remarks.  There's no evidence in this

7    record to that effect.  There is no probative evidence in

8    the record of any discriminatory motive by Provost Wilcox.

9    There's been no showing that similarly situated comparators

10   who engaged in nearly identical conduct were treated

11   differently, and as the Eleventh Circuit has said, the

12   quantity and quality of the conduct has to be nearly

13   identical.

14           There's no showing that -- well, maybe I'll give

15   a little ground on this.  There has been an attempt to show

16   that somehow the Provost didn't follow USF policy; however,

17   the Eleventh Circuit has said that the failure to follow a

18   policy, even if I accept the fact that there's proof to that

19   effect, does not support an inference of discrimination

20   without evidence that the failure was done for

21   discriminatory reasons, and there is no evidence in the

22   record that anyone else was treated differently under any of

23   the policies that have been discussed.

24           I'll make essentially the same argument with

25   respect to the retaliation claim.  In order for there to be

a prima facie case, there needs to be a causal link. The Eleventh Circuit has said, as well as the U.S. Supreme Court, that the temporal proximity must be very close, otherwise that alone will not support an inference of retaliatory intent.

Here we have a record where the first time that discrimination is mentioned is in June of 2014; the next month, in July of 2014, Mr. Dosal, Dr. Dosal, is accused of discrimination; and we have -- we have a non-reappointment that occurs the following year, in May of 2015. Even if you go to the closest temporal period, you have four or five months between the filing of the EEOC charge and the filing of the first Federal action for restraining order and the non-reappointment. So I would suggest that the temporal proximity is not sufficiently close under the case law to support an inference of a causal link.

There is also no evidence of pretext. There's no evidence in the record of retaliatory statements being made by the decision maker, and again, there is no evidence that anyone similarly situated was treated any differently.

Last, the last point I'd like to make, Judge, is with respect to damages, which is the plaintiff's burden.

After seven and a half days, there is no evidence in the record to support an award of compensatory damages for pain and suffering. As the Supreme Court said in

1    *Carey versus Piphus*, 435 U.S. 247, it simply can't be

2    inferred from the violation.

3         The Eleventh Circuit in *Akouri versus State of*

4    *Florida Department of Transportation*, 408 F.3d 1338, agreed

5    and quoted the Fourth Circuit that, quote, testimony must

6    demonstrate that the plaintiff suffered demonstrable

7    emotional distress, which must be sufficiently articulated.

8    Neither conclusory statements that the plaintiff suffered

9    emotional distress nor the mere fact that a Constitutional

10   violation occurred supports an award for compensatory

11   damages.  There is no evidence in the record to support such

12   an award.

13        There is also no evidence in the record to support

14   an award of lost wages or benefits.  And I couldn't find any

15   binding case law on this issue, but *Szeinbach,*

16   S-Z-E-I-N-B-A-C-H, *versus Ohio State University,*

17   820 F.3d 814, the Sixth Circuit in 2016 said:  A Title VII

18   plaintiff is required to establish the amount of back pay

19   with reasonable certainty.  If the plaintiff fails to offer

20   such proof, then the award of back pay is not warranted.

21        There is no evidence in the record that allows

22   this jury with reasonable certainty to determine the amount

23   of lost wages or lost benefits.

24        The same argument applies to the retaliatory

25   reference claim.  There is no evidence in the record of

```
1    what, if anything, the plaintiff would have made or lost,
2    assuming that the jury found liability on that issue.
3              So on those grounds, Your Honor, we would move
4    under Rule 50 for judgment as a matter of law.
5              Thank you.
6              THE COURT:  All right, Mr. McCrea.
7              Response, Ms. DeBose.
8              MS. DEBOSE:  Your Honor, I don't have specific
9    case law to argue today that -- on this matter, but I would
10   like to be able to respond to Mr. McCrea's motion,
11   oral motion, in writing and then present the facts to this
12   Court.
13             In terms of the right to sue letter and all
14   conditions precedent, plaintiff satisfied those.  First of
15   all, the plaintiff did receive a right to sue letter and the
16   plaintiff's former counsel entered into a tolling agreement
17   with opposing counsel, and in that tolling agreement all
18   conditions were satisfied and met, including a condition to
19   have a 768.28 letter submitted showing that USF was on
20   notice that a civil action had been filed for damages.
21             Mr. McCrea makes the point about temporal
22   proximity.  If you look at the timeline of the case, the
23   temporal proximity to Ms. DeBose's EEOC complaint and the
24   actions that were taken against her -- under the Eleventh
25   Circuit Court, I believe they do define the time and the
```

1    duration as something within, you know, three or

2    four months, and that timeline was certainly hit.

3              In February of -- December 26th or 27th,

4    Ms. DeBose filed her EEOC complaint.  After the initial

5    filing, Ms. DeBose continued to update or revise her

6    complaint with the EEOC and subsequently checked the box to

7    add a retaliation charge following the February 2015

8    reprimand and other actions taken against her.

9              In terms of those updates with the EEOC, the

10   plaintiff has all of those, those updated documents, and

11   provided them to her former counsel.

12             And concerning the temporal proximity argument,

13   Ms. DeBose filed her charge and the University of South

14   Florida was notified in January.  In January you have the

15   defendant Paul Dosal starting to demand impromptu meetings

16   with no agenda for Ms. DeBose to attend.  You also have the

17   Shared Services meeting, which was the setup in terms of

18   having -- Ms. DeBose allegedly having called Alexis Mootoo a

19   little girl.  In the record you have heard evidence that

20   that was not something that Ms. DeBose did on any kind of a

21   basis and not -- had not engaged in any unprofessional

22   conduct.  You have following that the February 4th date

23   wherein Ellucian is engaged.  That is in close proximity to

24   Ms. DeBose's EEOC complaint.

25             So you have the meetings, the meetings with the

1   following of Ms. DeBose to the elevator, where Ms. DeBose

2   documented and felt threatened and felt uncomfortable in the

3   meeting and asked for civility at the workplace.  And then

4   you have on February 4th Ms. DeBose filing a motion for a

5   preliminary injunction and a temporary restraining order

6   against the University of South Florida.  That is all within

7   a short span of time, months, one month of the EEOC charge.

8           You have the temporal proximity of the Ellucian

9   report.  On February 4th the engagement was initiated.

10  Though the visit happened months later, in April, the

11  engagement was sought on February 4th, the same day as the

12  reprimand, the same day as the -- as Ms. DeBose filing for

13  the injunction.

14          So in terms of temporal proximity, while

15  Mr. McCrea has cited to legal argument -- which plaintiff is

16  all been certain that she can also posit legal argument in

17  her favor --

18          THE COURT:  What about the issue of damages?

19          MS. DEBOSE:  On the issue of damages, those have

20  been proven also.

21          Now, Mr. McCrea makes --

22          THE COURT:  Where in your case?

23          MS. DEBOSE:  In my case?  In terms of the fact

24  that Ms. DeBose had a 27.5 year history with the University

25  of South Florida, and the loss of -- the loss of consortium

1    is the only way I can put it, the loss of a family

2    relationship with the people that she worked with, to be cut

3    away from them and in the manner in which she was cut away

4    from them.

5            On a personal and on a professional level, the

6    defendants -- the defense would say, oh, Ms. DeBose got

7    employment within a relatively short span of time, but

8    Ms. DeBose -- we are already aware of the issue of the

9    exclusion of her contract claim at summary judgment, but

10   Ms. DeBose at all relevant times, all times, was under

11   contract and was terminated in 2015 while under contract.

12           THE COURT:  Okay.  Just the amount of money.

13   Money.

14           MS. DEBOSE:  Yes.

15           THE COURT:  Your salary at the University of

16   South Florida when you left was --

17           MS. DEBOSE:  My salary -- the salary of the

18   plaintiff at the time that she left the University of

19   South Florida was $135,000.

20           THE COURT:  You didn't say that in front of the

21   jury in evidence.  What is your current -- strike that.

22           What was your salary when you got a job after you

23   left the University of South Florida?

24           MS. DEBOSE:  The plaintiff had a job at the

25   University of South Florida earning 135, approximately, a

1    year.  The first job the plaintiff received was a job with

2    no benefits, so if she did not work, she did not have

3    insurance.

4              THE COURT:  How much --

5              MS. DEBOSE:  The first job was $100,000.

6              THE COURT:  Okay.  And that was with somewhere,

7    and then currently -- and that lasted how long?

8              MS. DEBOSE:  The job as a consultant -- as a

9    consultant was only -- I'll start the history.

10             Immediately after leaving the University of

11   South Florida the plaintiff worked as a consultant for -- it

12   was a two month -- two month job, two months.  Then the

13   plaintiff got an OPS job which was paying 100,000 a year

14   with no benefits.  That 100,000 a year job, that lasted a

15   year, so that's 15 -- that's $35,000 times that year.

16             THE COURT:  All right.  And that went on -- you

17   have to -- you haven't provided that testimony in front of

18   the jury, and you've already rested your case.  That's why

19   I kept asking you if you were going to testify, because at

20   the very bear minimum you should have testified about your

21   damages, but it's not for the Court to tell you because I've

22   got to be fair to both sides.

23             He's just made a critical motion on the issue of

24   damages, which you have not established, do you realize

25   that, factually in front of this jury.

```
 1              MS. DEBOSE:  Factually --

 2              THE COURT:  You're currently making a salary of

 3    what?

 4              MS. DEBOSE:  Factually that was discussed to the

 5    jury -- and I know it's not evidence, but that was discussed

 6    in the plaintiff's opening statement.

 7              THE COURT:  That's not evidence.

 8              MS. DEBOSE:  I did --

 9              THE COURT:  And you didn't provide it in your

10    case-in-chief.  I'm not arguing with you, Ms. DeBose, I'm

11    just pointing out to you that I kept asking you if you were

12    going to testify, because the one person who could testify

13    about damages was you.

14              MS. DEBOSE:  Yes, and I understood your question

15    to say was I resting my case in terms of calling those other

16    witnesses.

17              THE COURT:  No.  Resting your case.

18              MS. DEBOSE:  Yes.

19              THE COURT:  Period.  Case-in-chief.  And that's

20    what I indicated.  Resting your case-in-chief so he could go

21    forward.  That's why he's made this motion.

22              Now, Ms. DeBose, this is critically important.

23    I know you're going to do research and you're going to ask

24    me to give you time for the research, and I'm probably going

25    to grant it to you because I'm going to defer ruling, but
```

```
 1   what you haven't done is you haven't provided evidence, and
 2   you could have provided it from your own lips, sworn
 3   testimony, on your damages, and you didn't do it.
 4              MS. DEBOSE:  In terms of damages, Your Honor,
 5   I have testimony, yes, that the plaintiff can give about her
 6   damages in terms of economic damages and in terms of pain
 7   and suffering, and in this -- in this trial, which I will
 8   concede has been unusual, the Court understands that the
 9   plaintiff, pro se or not, asked for a continuance for
10   preparation for trial, which could not happen.
11              THE COURT:  Ms. DeBose.
12              MS. DEBOSE:  I have met every deadline of this
13   Court.  I have --
14              THE COURT:  Ms. DeBose, this has got nothing to do
15   with meeting all the deadlines of the Court.
16              Now, you don't want to hear what I'm telling you,
17   and you're going to have to listen to it.
18              You did not provide testimony in front of this
19   jury on the question of damages, and the Eleventh Circuit
20   requires that and all case law requires it.
21              Your current salary where you're working, I guess
22   at Florida Polytech, is what, 125?
23              MS. DEBOSE:  My present salary for the last --
24   since January of this year is now at $124,000.
25              THE COURT:  All right.  That would be your
```

```
1    attempts to mitigate your damages.
2             MS. DEBOSE:  Yes.
3             THE COURT:  Do you understand me?
4             MS. DEBOSE:  Yes.
5             THE COURT:  But you didn't give that to the jury,
6    and you rested your case.  You've completed your plaintiff's
7    case-in-chief, and he appropriately is getting up and making
8    this motion before he even is required to put on his
9    case-in-chief.  In other words, Mr. McCrea wants to go home.
10   He wants to stand on his motion, which is a pretty
11   significant motion.
12            You want to do research on the law, but what I'm
13   trying to tell you is you haven't provided critical facts on
14   damages.  I told you your opening statement is just argument
15   and you've got to provide evidence, and I can't represent
16   you and I can't represent the University of South Florida.
17   I'm the umpire.
18            MS. DEBOSE:  I understand.
19            THE COURT:  Calling balls and strikes.  I don't
20   swing and I don't pitch.
21            MS. DEBOSE:  I understand, Your Honor.
22            THE COURT:  You understand, but you haven't
23   complied, and you're going to walk out of here and walk out
24   of this trial feeling you're not being treated fairly.
25   You're being treated more than fairly, but you're not
```

```
 1   complying with what everybody else is required to comply
 2   with.  I'm not arguing with you, I'm just pointing out to
 3   you, you're expecting me to do things that I can't do.
 4           MS. DEBOSE:  No, Your Honor, I'm not expecting you
 5   to do anything that you can't do.  I am saying to you, in
 6   terms of your asking me -- when I asked for -- before the
 7   recess, I said in terms of "I'm not sure who he has out
 8   there," so --
 9           THE COURT:  Well, that's in his case-in-chief.
10           MS. DEBOSE:  I understand that, and so I was
11   responding about I don't intend to use those witnesses.
12           THE COURT:  But I asked you who are your next
13   witnesses, because you were down to -- I guess you're down
14   to six minutes on your timetable.
15           MS. DEBOSE:  Right, and I indicated --
16           THE COURT:  Wait a minute.  Without going into
17   your summation time.  And who were you going to call?
18           MS. DEBOSE:  I indicated to the Court the initial
19   plan was to get my depositions in, which we already have
20   conceded to work with those depositions --
21           THE COURT:  They're going to come into evidence
22   and then --
23           MS. DEBOSE:  Yes.
24           THE COURT:  -- you're resting.
25           MS. DEBOSE:  And I conceded that was the plan.
```

```
1    I was under the mistaken impression that I am on the witness

2    list, and I was under the mistaken impression --

3            THE COURT:  You mean his witness list?

4            MS. DEBOSE:  He's on the witness -- we're -- at

5    this point all my witnesses were stricken, as you know, and

6    so we have the same witnesses.

7            THE COURT:  But what about you?

8            MS. DEBOSE:  Yes, Your Honor, I am certainly

9    willing to put my testimony into evidence.  I thought you

10   meant as to other witnesses.

11           And so even with regard to this motion, when you

12   asked Mr. McCrea were there any motions today, I certainly

13   would have been prepared to respond to his motions.

14           THE COURT:  He doesn't have to tell you what his

15   motion is.

16           MS. DEBOSE:  I understand that, Your Honor.

17           THE COURT:  No, you don't.

18           MS. DEBOSE:  Well --

19           THE COURT:  I'm not arguing with you, ma'am.

20   We're in a bad place right now.  We're in a bad place.

21           He's got witnesses out there that want to come in

22   and testify in this case.  I'm going to defer ruling on the

23   motion, and I will give you time to do your research with

24   regard to his motion, but that's why I pointedly asked you

25   the question about your damages, because you have provided
```

```
 1   no evidence in your plaintiff's case-in-chief regarding
 2   that.  You do some research on the issue and tell me what
 3   the answer is with regard to that Monday morning.
 4            MS. DEBOSE:  I will, Your Honor, and I will --
 5            THE COURT:  All right.
 6            MS. DEBOSE:  I will say also, Your Honor, in terms
 7   of the case that I have against the University of
 8   South Florida, one of the types of damages -- or one of the
 9   requests, remedies, I will say, was also the fact that my
10   employment ended and that there is the same issue that was
11   filed with the injunction case, which was to maintain the
12   status quo and to keep my employment at the University of
13   South Florida at the level it would have been paid,
14   including reinstatement to my job.
15            THE COURT:  Okay.  Are you ready to call your
16   witnesses, Mr. McCrea?
17            MR. MCCRAE:  Yes, Your Honor.
18            THE COURT:  All right.  I'm deferring ruling.
19   Monday morning when we come in here I want all that research
20   that you're going to provide, and the jury instructions, you
21   have to file whatever you're going to file on those jury
22   instructions.  They are supposed to be filed tomorrow with
23   the Court on the jury instructions.
24            MR. MCCRAE:  We will.
25            THE COURT:  All right.  Let's call your witness in
```

```
1    here.
2              MR. MCCRAE:  We need Sarah Thomas.
3              THE COURT:  Okay.
4                (Sarah Thomas enters proceedings.)
5              THE COURT:  Would you come on forward, please,
6    ma'am.
7              All right, ma'am.  If you'd raise your right hand.
8              COURTROOM DEPUTY:  Jury.
9              THE COURT:  Oh, yes.  Let's get the jury in here.
10   I'm sorry.
11                (Jury re-enters proceedings.)
12             THE COURT:  Madam Witness, raise your right hand
13   to be sworn.
14             COURTROOM DEPUTY:  Do you solemnly swear or affirm
15   under the penalty of perjury that the testimony you shall
16   give in this cause will be the truth, the whole truth and
17   nothing but the truth?  Do you?
18             THE WITNESS:  I do.
19             THE COURT:  All right.  Ma'am, put your hand down.
20   Go over there to the witness box.
21             Ladies and gentlemen of the jury, we are now in
22   the defendant's case-in-chief.
23             All right.  Ma'am, take a seat.  Pull the chair
24   towards the desk area.  The microphone has got to be put
25   high up on the shoulder.  Right there.  Okay.  Fine.
```

```
 1              All right.  Please state your name for the record.
 2              THE WITNESS:  Sarah Thomas.
 3              THE COURT:  You're going to have to speak up a
 4    little bit, ma'am.
 5              THE WITNESS:  Sarah Thomas.
 6              THE COURT:  Well, you're going to have to move the
 7    microphone up higher, I think.  Can you get it?
 8              THE WITNESS:  Is that better?
 9              THE COURT:  Try.  Say your name again.
10              THE WITNESS:  Sarah Thomas.
11              THE COURT:  Can you increase your volume?
12              THE WITNESS:  Sarah Thomas.
13              THE COURT:  Well, you don't have to keep talking
14    to your shoulder.  We got to do something about it.
15              Okay.  Just a second.
16              THE WITNESS:  How is that?  Better?
17              THE COURT:  Say your name again.
18              THE WITNESS:  Sarah Thomas.
19              THE COURT:  Sarah Thomas.  Spell your last name.
20              THE WITNESS:  T-H-O-M-A-S.
21              THE COURT:  Okay.  If you can't hear her, let me
22    know.
23              You may proceed, Mr. McCrea, in defendant's
24    case-in-chief, first witness.
25              MR. MCCRAE:  Thank you.  May it please the Court.
```

1    **DIRECT EXAMINATION OF SARAH THOMAS**

2    **BY MR. MCCRAE:**

3    Q    Good afternoon, Ms. Thomas.

4    A    Good afternoon.

5    Q    Who do you work for?

6    A    University of South Florida.

7    Q    And how long have you worked there?

8    A    Five years.

9    Q    And what is your current position?

10   A    I'm a director within the Office of Decision Support.

11   Q    And who do you report to?

12   A    Valeria Garcia.

13   Q    And briefly could you tell us what your duties and

14   responsibilities are.

15   A    I manage a team of business analysts and I do project

16   management for Academic Affairs projects.

17   Q    All right.  And before coming to USF did you have any

18   background in project management?

19   A    Yes, I did.  I worked in IT as a project manager for

20   seven years previous to coming to USF.

21   Q    All right.  And are you familiar with Angela DeBose?

22   A    Yes.

23   Q    And how do you know her?

24   A    She was the Registrar at USF.

25   Q    And prior to 2014, how would you describe your working

SARAH THOMAS - SEPTEMBER 20, 2018              135
Direct Examination by Mr. McCrea

1    relationship with her?

2    A    It was good.

3    Q    And at some point did that change?

4    A    It did.

5    Q    And when did it change?

6    A    Around the time that the Tracking project started, the

7    DegreeWorks Tracking project --

8    Q    All right.

9    A    -- was in progress.

10   Q    And in terms of time, can you give us either a season

11   or a year or a month?

12   A    Yeah, it was like spring of 2014.

13   Q    All right.

14   A    April, you know, March, April, May, that timeframe.

15   Q    And how did your relationship, your working

16   relationship with Ms. DeBose, change in the spring of 2014?

17   A    It became more frictional.

18   Q    All right.  And you mentioned the Tracking project.

19   Could you briefly tell us what the Tracking project was.

20   A    Yes.  The Tracking project was a project that was going

21   to allow advisors to work with students to try to keep them

22   on track so that they could graduate on time.  So it allows

23   them to track their project -- their classes as they go

24   through their curriculum and progress towards a degree.

25   Q    And were you a member of the Tracking Steering

SARAH THOMAS - SEPTEMBER 20, 2018                136
Direct Examination by Mr. McCrea

1    Committee?

2    A     Yes.

3    Q     And was Ms. DeBose on that committee?

4    A     Yes, she was.

5    Q     And what was the purpose of that committee?

6    A     That committee was to strategize how we were going to

7    use Tracking, how we were going to implement it, if the

8    current implementation should be changed, basically to steer

9    how this project and how this tool should be used within

10   USF.

11   Q     And was the work of the Tracking Steering Committee

12   important to the University?

13   A     Yes, very much so.  The Provost actually asked that we

14   work with the advisors, and we brought them into this -- we

15   brought one of the advising directors into the Tracking

16   Steering Committee to try to get advisors to use the system.

17   To the best of my knowledge, that system was not being used

18   and the Provost wanted it used to try to help increase

19   student success.

20   Q     Did the Tracking Steering Committee have any sort of a

21   deadline or timeline?

22   A     Yes.  The Provost said we needed to get that done by

23   August of 2014.

24   Q     All right.  And what was your -- what was your role

25   with respect to the Tracking Steering Committee?

SARAH THOMAS - SEPTEMBER 20, 2018          137
Direct Examination by Mr. McCrea

1    A     I was the project manager.

2    Q     And what does it mean, what does that mean, that you

3    were the project manager of that --

4    A     So as project manager, I am in charge -- it is my

5    responsibility to make sure that project is successful, so

6    whatever needs to be done, I have to make sure it gets done,

7    whether it's meetings, direction, making sure everything is

8    done, and I had to track all the pieces of the project to

9    make sure that the whole thing was complete and done on

10   time.

11   Q     And how many people on the committee?

12   A     There was probably eight or ten, something like that.

13   Q     And how would you describe Ms. DeBose's attitude and

14   behavior as a member of the Tracking Steering Committee?

15   A     I think probably in the beginning it was okay, but as

16   we wanted to do -- we wanted to change how we use Tracking,

17   we wanted to use something called a three semester plan

18   option, she didn't like it.  She did not want us to use

19   that, that option.  She didn't think it was a good idea.

20   Q     All right.  And did her behavior or attitude manifest

21   itself in any way on the committee?

22   A     She was hostile at certain times in the committee.

23   Q     All right.  And was Travis Thompson a member of the

24   committee?

25   A     Yes, he was.

1   Q    Did you have an observation -- did you have the

2   opportunity to observe her interactions with Travis Thompson

3   on the committee or during committee meetings?

4   A    Yes, I did.

5   Q    And what were your observations?

6   A    I felt she was rude to him.  She would cut him off in

7   conversation.

8   Q    And did you have any observations about whether or not

9   Ms. DeBose was willing to consider the advisors'

10  suggestions?

11  A    She was not.  She did not want the users, who were the

12  advisors, she did not want them to have the ability to put

13  in what we call a USR or a project, and when you're the

14  end advisor -- you know, in every project I've ever managed,

15  you let the end user, you know, kind of determine how that

16  project is going to work, how the end user is going to use

17  it.  Part of the reason that they weren't using it is

18  because they didn't feel -- they felt it had problems and

19  that it wasn't usable in some ways and had some reliability

20  issues, so they didn't use it.

21  Q    As the project manager, did you have any concerns about

22  the success or failure of the project as a result of

23  Ms. DeBose's views and behavior?

24  A    Yes.  She did not -- she wanted the advisors to use the

25  Tracking system as is.  It was already -- there was a

1  tracking system that was in place.  It really wasn't being

2  used.  She felt that the advisors really just needed to

3  adapt their practices to use the tool and not modify the

4  tool or not modify the -- yeah, not modify the tool.

5  Q    Did you ever personally make any attempt to get

6  Ms. DeBose to cooperate with the direction that the steering

7  committee was moving in?

8  A    I actually talked to her one-on-one and I tried to

9  offer my services and, you know, tried to offer to work with

10 her, you know, to try to tell her that I could make this be

11 successful if she would kind of work with me on this.

12 I tried to do that right from the beginning because I didn't

13 want her to feel slighted or that we weren't on her side, so

14 I did try to make an effort, but I don't feel like it was

15 well-received.

16 Q    Why do you say that?

17 A    She just kind of dismissed me.  I don't -- I don't know

18 if it was because she -- you know, I was new, or -- I don't

19 know.  I just felt a bit dismissed.

20 Q    All right.  And during the course of your role as the

21 project manager on the steering committee, did you

22 periodically discuss these issues with Dr. Dosal?

23 A    Yes.

24 Q    All right.  And with what frequency?

25 A    Every time I had a problem that I couldn't resolve, my

1   job as the project manager is to bring it up to the primary,

2   you know, owner of the project, which was Dr. Dosal, and

3   I felt that things were getting stalled, the project was not

4   making progress, and as the project manager I would let him

5   know.

6   Q    Why were things getting stalled?

7   A    Things were getting stalled because I felt that Angela

8   was being obstructive.

9   Q    And did you report that to Dr. Dosal?

10  A    I did.

11  Q    You have a book in front of you.

12  A    Yes.

13  Q    And it has tabs.  If you could turn to tab 6, which is

14  already in evidence.

15  A    Okay.

16  Q    All right.  And do you recognize this as an e-mail that

17  you sent to Dr. Dosal on April 4 of 2014, spring of 2014?

18  A    Yes.

19  Q    All right.  And I highlighted a line there that you

20  wrote.  "I feel that this is premature to roll this out to

21  students at this time as there are still outstanding issues

22  that have not been brought to conclusion."  What does that

23  mean?

24  A    She was interested in rolling it out to students.

25  There were some issues that were concerned with the GPA,

 1    there were some discrepancies between what the advisors were

 2    seeing in Banner as the GPA and what we were seeing in the

 3    Tracking tool, and she had actually raised these to Ellucian

 4    but we didn't have a date yet on when Ellucian was going to

 5    resolve them, and so until we knew when they were going to

 6    be resolved and until we felt comfortable that the tool was

 7    going to be flexible enough for advisors to use, I didn't

 8    feel comfortable rolling this out to students.

 9    Q    And did Ms. DeBose agree with you that it was

10    premature?

11    A    No.

12    Q    And is that why you decided you needed to report this?

13    A    Yes, I did.  I just -- I was very nervous about putting

14    this out to the students.  I thought it had a high

15    probability of failure just putting this out to students

16    immediately without the advisors really embracing this tool.

17    Q    All right.  And you also in this e-mail put forth a

18    proposed agenda that you asked Dr. Dosal about.  Was

19    Dr. Dosal in attendance at the committee meetings?

20    A    Yes.

21    Q    And did he facilitate the meetings?

22    A    Actually, I was more of a facilitator.  He was

23    basically the primary stakeholder.

24    Q    Okay.  And actually that word finds itself in the next

25    line.

1   A     Right.

2   Q     Next couple lines that I highlighted.

3         You say, "Finally, I would like to reiterate at

4   this meeting."  I take it that means the upcoming meeting?

5   A     Yes.

6   Q     "That the advisors are primary stakeholders on all

7   DegreeWorks and Tracking projects."  What did you mean by

8   that?

9   A     So a primary stakeholder in a project is someone who

10  has a vested interest in the success or failure of the

11  project, and it's usually someone who is using or has

12  control over the project.  So, for example, Angela DeBose

13  had owned the Tracking system, she was considered a primary

14  stakeholder, but the advisors were also considered a primary

15  stakeholder because they were using it, and I don't -- even

16  though she thinks that they were a primary stakeholder,

17  I don't feel like she involved them enough.

18  Q     And the next sentence says, "This means that they must

19  approve all Business Requirements Documents and provide

20  sign-off after User Acceptance Testing."

21  A     Right.

22  Q     What does that mean?

23  A     That means that right now the advisors weren't using

24  the tool.  If we got them to bring to the business

25  documents -- you know, the Business Requirements, and we got

SARAH THOMAS - SEPTEMBER 20, 2018          143
Direct Examination by Mr. McCrea

1   them to test it and say that they liked it, then we
2   basically have engaged them in and got buy-in from them to
3   use the tool, and that was my main objective, is to try to
4   get advisors to use the tool by involving them in the
5   process and allowing them to have a say in how the tool
6   works.
7   Q    Did you think it was important to the success of the
8   project that advisors feel like they had buy-in?
9   A    It was crucial.
10  Q    All right.  And again, did Ms. DeBose agree or disagree
11  with you on that point?
12  A    She agreed that the customers were primary
13  stakeholders, but she did not agree in allowing them to have
14  a say in submitting user requests and how the project was
15  going to be rolled out.
16  Q    And that's not the way --
17  A    That's not normal.
18  Q    That's not the way you saw things though?
19  A    No.
20  Q    Okay.  And before -- I think you may have mentioned
21  this, but you said "as there are still outstanding issues."
22  A    Right.
23  Q    You said something about inaccuracies or GPAs?
24  A    GPA was inconsistent.  The grade point average -- there
25  was a lot of grade point averages, but what the advisors

1    were seeing and what was showing up in Tracking had some

2    inconsistency.  And like I said, Angela did submit a ticket

3    to get that fixed, but we never heard back from Ellucian on

4    when that was going to be fixed.

5              There was also some flexibility issues, like the

6    advisors wanted to use the tool in a certain way.

7    For example, if you have Engineering, they have a very

8    prescriptive layout for all of their courses and you have to

9    take courses in a certain order, but that's not true of

10   Psychology, it's very -- you know, you have a whole broad

11   spectrum of courses to take, and they didn't have any way in

12   the current tracking system to represent like kind of a

13   placeholder that they could have with multiple courses in

14   there, so we wanted them to have some more flexibility and

15   we went out and tried to get them -- basically negotiated

16   with them to say, if we change this, will you use it, and

17   there was agreement.

18   Q    All right.  If you would then turn to tab 7.  This was

19   previously identified but not in evidence yet.

20             MR. MCCRAE:  I would move the admission of

21   Defendant's Exhibit Number 7.

22             THE COURT:  7, any objection?

23             MS. DEBOSE:  No objection.

24             THE COURT:  All right.  It's in.  Defendant's 7.

25

BY MR. MCCRAE:

Q    All right.  Ms. Thomas, do you recognize this string of

e-mails?

A    Yes.

Q    All right.  And these were e-mails that were

exchanged -- the first couple on the second page were

between you and Ms. DeBose?

A    Yes.

Q    And the last one was between you and Mr. Thompson and

Mr. Sullins?

A    Right.

Q    All right.  What was the subject matter of these

e-mails?

A    The subject matter was that I wanted the end users, the

advisors, to be able to submit requests for projects, to be

able to modify the system the way they wanted to in order to

better use it.

Q    Okay.  And when you sent your e-mail to Mr. Thompson

and Mr. Sullins --

A    Right.  I don't know that they were aware that she

was -- had reservations or was against letting the advisors

open USRs.

Q    Okay.  And when you say "I feel very strongly about

this issue," is this the one that we've just been talking

about?

1    A      Yes.

2    Q      Allowing the advisors to have access to USRs so that

3    they would buy into using the system?

4    A      Absolutely.

5    Q      And what did you mean by "she is conceding"?  Is "she"

6    Ms. DeBose?

7    A      Yes.

8    Q      "She is conceding that users are primary stakeholders;

9    however, she still wants to stop the primary stakeholder

10   from opening USRs."

11   A      Correct.

12   Q      What does that mean?

13   A      That means she's saying that they are primary

14   stakeholders but she doesn't want them to have a -- she

15   doesn't want them to be able to open a request for changing

16   the system.

17   Q      All right.  And the next sentence you say:  "I'm not

18   sure why she is resistant as she will be allowed to reject

19   any BRDs that are not feasible or that will inadvertently

20   impact the system."  What does that mean?

21   A      So Ms. DeBose was the owner of Tracking system, and

22   when we would get projects that were -- my vision was if we

23   got projects that were submitted by the advisors or advisor

24   committee, she would be able to review these and, you know,

25   let us know if this was feasible or not feasible or

1   sometimes just a bad idea, like, you know, you guys are

2   putting this forth and it's not -- you know, it's not going

3   to work well in the system --

4   Q     And --

5   A     -- technically, because she had a technical piece

6   that --

7   Q     I'm sorry.  I apologize.

8   A     So -- go ahead.

9   Q     I think you told us, but I want to make sure.  What

10  does USR mean?

11  A     It's a User Service Request.

12  Q     And can you -- can you tell us at least in the context

13  of the Tracking project what that means?  What would an

14  advisor do?

15  A     It would -- they would go into a system and open what's

16  called a USR, and it actually is just a request to change

17  something in a system, any system, and you could specify

18  I would like to change the tracking system to, you know,

19  display grades in a certain way or just change the way it

20  looked or whatever you wanted to do, you could request that.

21          Now, that would be vetted through, you know, other

22  people.  You can't just put in crazy -- I mean, you can put

23  in crazy requests, but those -- those are shelved.

24  Q     So in other words Ms. DeBose would retain the ability

25  to approve or disapprove a request?

1    A     Absolutely.

2    Q     And on the second page, the e-mail that you were

3    forwarding from Ms. DeBose says:  The advisors are primary

4    stakeholders as users of the system; they are not primary

5    process owners because they do not manage the associated

6    systems they use, and nor do they manage the processes that

7    maintain them.  What did you understand that to mean?

8    A     I mean, that's not incorrect.  They are primary process

9    holders -- primary stakeholders and they were not the

10   primary process owner; that's accurate.  However, I've never

11   worked on a project where the primary stakeholder was not

12   allowed to put in requests.  I mean, that's just not a

13   common practice and it was strange.

14   Q     The next line says:  "USRs affect the latter and not

15   the former."  Did you agree or disagree with that?

16   A     No, I disagree with that.

17   Q     Why?

18   A     Because USRs are going to affect how people use the

19   system.  A USR is going to change how it works, and the

20   advisors have to use the system.  It's going to affect both

21   the process owner and the stakeholder, both of them, so --

22   Q     Was this issue ever brought to the attention of

23   Dr. Dosal?

24   A     Yes.

25   Q     This disagreement?

1    A    Yes.

2    Q    And did you have -- did you reach any conclusion as to

3    why Ms. DeBose was resisting allowing the advisors to have

4    the ability to make requests?

5    A    I think in her mind she thought that this was going

6    to -- that this was not aligning with the strategic plan of

7    Academic Affairs and it would mess up reporting, and I think

8    she had some concerns it wouldn't be maintained, but we had

9    always -- you know, we had gotten buy-in from the advisors

10   that if we do a three semester plan, that they did assure

11   that they would maintain those, so --

12   Q    Okay.  Let me ask you to turn to tab 8.

13             MR. MCCRAE:  And this is already in evidence,

14   Your Honor.

15             THE COURT:  All right.

16   BY MR. MCCRAE:

17   Q    This is an e-mail or a series of e-mails between you

18   and Dr. Dosal in -- looks like that's again April of 2014.

19   A    Um-hum.

20   Q    And you had sent an e-mail to Ms. DeBose on April 10 --

21   A    Yeah.

22   Q    -- on the same issue.

23   A    Right.

24   Q    And you were expressing your position with respect to

25   the end users being allowed --

1   A    Right.  So I felt that she had concerns that the

2   advisors were going to -- the advisors have a lot of

3   different practices, and so I think she had concerns that

4   they were going to put in all kinds of maybe irrelevant

5   USRs, so I was trying to let her know that we were putting a

6   process in place so that she would have the ability to veto

7   or reject any USRs or requests that were not valid or maybe

8   inconsistent.

9   Q    All right.  And this e-mail you sent to Dr. Dosal --

10  I had asked you earlier whether you made him aware or

11  whether he was aware of this disagreement, but you say:

12  "This is too complex and an obviously sensitive subject."

13  Why did you say it was an obviously sensitive subject?

14  A    I feel like she was just very resistant to allowing

15  that practice, to allowing advisors to put in USRs.

16  Q    All right.  And you --

17  A    And she was not -- I wasn't going to back down, and

18  she's the Registrar, I didn't have any -- you know, I can't

19  overrule her.

20  Q    All right.  And you say:  "I ran this by Valeria before

21  I sent it and she asked to be included in the discussion

22  with you."  Who is Valeria?

23  A    She's my supervisor.  She's Associate Vice President at

24  USF.

25  Q    And this contemplated a meeting between you -- among

SARAH THOMAS - SEPTEMBER 20, 2018          151
Direct Examination by Mr. McCrea

```
 1   you and --
 2   A     Yes.
 3   Q     -- Valeria Garcia and Ms. -- and Dr. Dosal?
 4   A     Right.
 5   Q     All right.  And he asked to talk this through?
 6   A     Right.
 7   Q     And he had heard from Ms. DeBose about this issue?
 8   A     Correct.
 9   Q     And he indicated to you that he needed a whole lot of
10   information and guidance.
11   A     Right.
12   Q     And did that meeting take place?
13   A     Yes.
14   Q     And during that meeting did you describe to Dr. Dosal
15   what you've described to us here in terms of your views of
16   why the advisors should be allowed to have access as primary
17   stakeholders?
18   A     Yes.
19   Q     If you would look at tab 14.
20   A     Okay.
21   Q     All right.  Are you familiar with that document?
22   A     The e-mail?  Yes.
23   Q     All right.  And this is an e-mail dated May 27 of 2014?
24   A     Right.
25   Q     And this is an e-mail from you to Ms. DeBose?
```

```
 1  A     Yes.

 2          MR. MCCRAE:  I would move the admission of

 3  Defendant's Exhibit Number 14.

 4          THE COURT:  14.  Any objection?

 5          MS. DEBOSE:  No objection.

 6          THE COURT:  All right.  14 in evidence.  You may

 7  proceed.

 8  BY MR. MCCRAE:

 9  Q     This was an e-mail that you sent to a number of people.

10  A     Right.

11  Q     Ms. DeBose, Ms. Garcia.  Who is Carrie Garcia?

12  A     She was our IT leader.  She was -- she's a director in

13  IT that was managing the project from the --

14  Q     All right.

15  A     From outside.

16  Q     And there's a reference here -- and you sent this to

17  Ms. DeBose, Ms. Garcia and Mr. Thompson, and you refer to

18  "our most likely option, option C."

19  A     Correct.

20  Q     What was option C and why was it being discussed at

21  this time?

22  A     So option C was an option that the advisors had agreed

23  to, and we were encouraging this because we thought it was

24  the easiest and most straightforward way to get this done in

25  the time allotted, and what it was asking was that advisors
```

```
 1   fill out the next three semesters for a student, like fall,
 2   spring and the following fall, so at least they could track
 3   those next three semesters of courses, and they would have
 4   to fill that in quite a bit manually and it was a lot of
 5   work, but they did agree that they would do that, so we were
 6   trying to get them to do that in order to use the system.
 7   Q    Well, and you may have just answered my question, but
 8   what was the purpose of picking one of three options at this
 9   time?  Was it because of the deadline or some other reason?
10   A    It was the deadline partially, but also it was to get
11   them to use the system.  We had to really sit down and
12   negotiate with the Associate Dean of CAB that -- you know,
13   she was like an Advising director and she -- she basically
14   negotiated and said, if you guys do these certain things, we
15   are agreeing -- she was on the steering committee -- then I
16   will get the advisors to follow -- to use it.
17   Q    All right.
18   A    So she had agreed to it.
19   Q    On the second page there's an earlier e-mail to you and
20   Ms. Garcia and Sridevi Molleti on May 21 of 2014.
21   A    Um-hum.
22   Q    And it says:  "Sarah, I shared with you my perspective
23   on the tech team meeting agenda you proposed earlier.  My
24   response has not changed and believe you will need to move
25   your date out until I have sufficient time to address the
```

                SARAH THOMAS - SEPTEMBER 20, 2018
                   Direct Examination by Mr. McCrea

 1   below."  What was she referring to?  What was your

 2   understanding of what she was saying?

 3   A     She was talking about -- she didn't feel it was a

 4   feasible option and I think she wanted more time to look at

 5   this, so -- I had a deadline, I had put a deadline out to

 6   try to get an estimate back for option C, to try to

 7   determine how long it would take her department to do this,

 8   and I hadn't gotten a response back, so --

 9   Q     I wanted to ask you about -- the e-mail that she was

10   responding to talks about all options, so it says option A,

11   option B and option C.

12   A     Correct.

13   Q     So was Ms. DeBose responding to option C or was she

14   responding to selecting among three options?

15   A     She did not want to use any of the options.  She

16   thought advisors should change their practices to use the

17   Tracking system as it currently existed.

18   Q     In your mind, would that have worked?

19   A     No, I think it wouldn't have.

20   Q     Why?

21   A     Because they weren't engaging and they weren't using

22   the system, and we didn't know why.  We went out and talked

23   to them about it and found out, you know, what some of their

24   objections were.

25   Q     When you say "we went out and talked to them," who is

1    "we"?

2    A    It was me and Travis Thompson.

3    Q    All right.  And was there any representation of the

4    advisors' interest on the Tracking Steering Committee?

5    A    Yes.  Allison Cleveland-Roberts was there representing

6    the advisors.

7    Q    And was she -- did she share your view that the

8    advisors were not using and would not use the system?

9    A    Yeah.  She thought they would not use the system.

10   Q    Let me ask you to turn to tab 15, which is already in

11   evidence.

12            Are you with me?

13   A    Yes.

14   Q    Okay.  I'm sorry.

15   A    That's okay.

16   Q    All right.  This is an e-mail that you sent to

17   Dr. Dosal on May 27 of 2014, and you make some suggestions

18   about a meeting.  Is that a Tracking Steering Committee

19   meeting?

20   A    Yes.

21   Q    All right.  And you have in parentheses suggested roles

22   for different people for the meeting, and you say:  "Travis

23   (he will present a counterpoint to Angela's discussion

24   points and answer questions on option C)."  What did you

25   mean by that?

SARAH THOMAS - SEPTEMBER 20, 2018
Direct Examination by Mr. McCrea

1    A     So Angela wasn't really a big fan of option C.

2    She didn't think that they -- from what I remember, she

3    didn't think that they were going to be able to keep up the

4    three semester plan, so we had brought up counterpoints for

5    her argument, and Travis was presenting those, so that we

6    could move forward on that.

7            She had a tendency to talk quite a bit through the

8    meeting, what I would almost call a filibuster, and just

9    talk so much during the meeting that we weren't able to come

10   to a conclusion during the meeting, and that's -- I think

11   that happened at least once or twice, where we were not able

12   to come to conclusion on an option, and time is of essence

13   because we didn't have much time in order to get the project

14   done.

15   Q     All right.  And then next to Angela's name you put in

16   parentheses:  We need to keep her focused on the feasibility

17   of the option, not whether this is the best option.  What

18   does that mean?

19   A     I just wanted her to let us know if this option was

20   feasible, if it was doable from her perspective, from a

21   technical -- she was the process owner, and from that

22   perspective I wanted to know if it was feasible, and we

23   weren't getting that feedback.  What we were getting is her

24   disagreeing, that we shouldn't use any of the options, that

25   we would use the Tracking system as-is.

1   Q    Okay.  So you couldn't get her to engage --

2   A    No.

3   Q    -- as to whether any of the three options was feasible?

4   A    Correct.

5   Q    Could you turn to tab 17.  This is already admitted.

6            All right.  Are you familiar with this e-mail?

7   A    Yes, I am.

8   Q    All right.  And this actually forwards the last e-mail

9   that we looked at the next day at 6:03 p.m. to Dr. Dosal.

10           What prompted you to send this e-mail on May 28 of

11  2014 to Dr. Dosal?

12  A    I hadn't heard from Ms. DeBose on whether the option

13  was feasible and how much time.  I needed estimates from her

14  and I had not heard back, and I was clearly getting

15  frustrated with the lack of response.  And again, as project

16  manager, if something is slowing your project down, you need

17  to alert, you know, the primary owner of it, which was

18  Dr. Dosal.

19  Q    When you say "She is not responding to my e-mail about

20  the Tracking Option," what e-mail were you referring to?

21  A    The one where I'm explaining all of the options and

22  asking her for feasibility specifically on option C.

23  Q    All right.  And you say:  "At this point, I am going to

24  start tracking the time that we are wasting waiting for

25  information from the RO."  What does RO mean?

1   A     The Registrar's Office.

2   Q     All right.  And you say:  "If this keeps up, we will be

3   at risk for meeting our August timeline."

4   A     Absolutely.

5   Q     And that's a reference to having a -- implementing a

6   tracking program that --

7   A     Correct.

8   Q     -- the advisors are using?

9   A     Right.

10  Q     If you could turn to tab 18, which is already in

11  evidence.

12  A     I'm there.

13  Q     Okay.  And do you recognize this e-mail that you sent

14  to Dr. Dosal on Thursday, May 29, 2014?

15  A     I do.

16  Q     And what prompted you to send this e-mail to Dr. Dosal?

17  A     I needed him to give her a directive because I wasn't

18  getting response from her.  Now, as you can see, I sent this

19  at two o'clock in the morning, and I was extremely stressed

20  out and frustrated with the lack of response and what I felt

21  was kind of obstructive behavior, and I was reaching out to

22  Dr. Dosal to let him know that if I did not get a response,

23  that this -- that I needed him to talk to her and give her a

24  directive, basically.

25  Q     And, without prying, is it common for you to be --

SARAH THOMAS - SEPTEMBER 20, 2018          159
Direct Examination by Mr. McCrea

1   A    No.

2   Q    -- sending work e-mails --

3   A    No.

4   Q    -- at 2:15 in the morning?

5   A    No.  That was a very difficult e-mail to send.

6   Q    All right.  And you say here that "Angela has refused

7   to provide any feedback on feasibility or any estimates."

8   Was that a reference to the options or option C?

9   A    Yes.

10  Q    All right.  "It appears that she is deliberately

11  stalling this effort.  From the conversations I have had

12  with you, I think she is trying to confuse you with

13  inaccurate or irrelevant information."  What made you say

14  that?

15  A    I think Dr. Dosal often would get confused in the

16  steering committee.  He's not a super technical person,

17  he'll be the first person to admit, and when technical

18  issues came up I just didn't feel that they were being

19  explained clearly for him and he was getting more confused

20  and then really didn't understand the direction we should

21  take.

22  Q    All right.  You then go on to say:  "Travis, Carrie and

23  I have all seen a recent change in her willingness to

24  collaborate," and was that a reference to her not responding

25  to your e-mail or to her participation in the meeting or

1   what were you referring to?

2   A    Yes, lack of response basically is what that is.  And

3   we all kind of noted there was some hostility during the

4   Tracking Steering Committee meetings.

5   Q    All right.  Hostility between whom?

6   A    It was primarily directed at Travis Thompson.

7   Q    By whom?

8   A    By Angela DeBose.

9   Q    And you said:  "I will guarantee that if we do not make

10  any concessions for the advisors and continue with Angela's

11  approach to move forward with everything 'as is' that

12  Tracking will get as much use as it currently does, which is

13  none at all."  What was the basis for your belief that

14  Tracking was not getting any use at that time?

15  A    It was partially from feedback from Alison

16  Cleveland-Roberts, who was on the steering committee and

17  represented the advisors, and it was also from going out and

18  talking to advisors personally and seeing if they were using

19  it or they were using their own methodology, and most of

20  them were using their own methodology.

21  Q    All right.  And you told -- in the next line you said

22  to Dr. Dosal:  "And this project will be seen as a failure

23  and further erode the advisors' confidence in the tool."

24  A    Correct.

25  Q    What did you mean by that?

Direct Examination by Mr. McCrea

1    A     I didn't -- the Provost told us to get this done before

2    the fall semester so that advisors would have a tool to work

3    with the students.  This is why we had an August deadline.

4    I did not want this project to fail because then I would be

5    seen as a failure, but also because the advisors would

6    not -- if we can't fix all the issues that they saw with the

7    tool or all the struggles that they were having with the

8    tool, their confidence in using the tool was just going to

9    get worse.  They already had a lack of confidence, I felt,

10   with using the tool, and if we didn't make any changes to

11   that, it was never going to get better.

12   Q     All right.  You then say:  I know you want consensus on

13   these decisions and that you want to meet to discuss this,

14   but since I am up at 2:00 a.m. composing this message, you

15   can see that I have deep concerns about the timeline of this

16   project and the estimates that we may be facing.  Please

17   understand that my ultimate goal is to deliver a usable

18   Tracking system to this University, but I need Angela's

19   cooperation to do this and apparently I need you to give her

20   a directive to do this.

21         What made you think that you needed Dr. Dosal to

22   give Ms. DeBose a --

23   A     I was out of options.  I -- you know, as the University

24   Registrar, I certainly had no control over her as a project

25   manager, but I needed -- if -- basically I was telling him

SARAH THOMAS - SEPTEMBER 20, 2018            162
Direct Examination by Mr. McCrea

1    if he did not want this project to fail, then he needed to

2    give her a directive to give me estimates and to be

3    cooperative and be responsive.

4    Q     If you would turn to tab 21.  Okay.

5              MR. MCCRAE:  This has been identified but not

6    admitted.  I would move the admission of Defendant's Exhibit

7    Number 21.

8              THE COURT:  21.

9              MS. DEBOSE:  No objection, Your Honor.

10             THE COURT:  All right.  21 in evidence.

11   BY MR. MCCRAE:

12   Q     All right.  Ms. Thomas, are you familiar with Exhibit

13   Number 21?

14   A     Yes, I am.

15   Q     All right.  And is that a follow-up e-mail that you

16   sent the next month to --

17   A     Yes, it is.

18   Q     -- Dr. Dosal?

19             And you informed Dr. Dosal that the Tracking

20   Implementation project has a high probability of failure.

21   A     Correct.

22   Q     And you had reached that conclusion at that time?

23   A     Yes, I had.

24   Q     Is that -- did you consider that to be a pretty strong

25   statement?

SARAH THOMAS - SEPTEMBER 20, 2018          163
Direct Examination by Mr. McCrea

1   A    Yes, it's a strong statement, but I felt that it was

2   true.

3   Q    All right.  And you say:  "As there continues to be a

4   lack of collaboration from certain participants, indicated

5   by the unwillingness to meet and discuss, not bringing

6   issues to light in a timely manner and the outward hostility

7   towards other team members."

8   A    Um-hum.

9   Q    Who was that a reference to?

10  A    Angela DeBose.

11  Q    Is there some reason why you used a plural,

12  "participants"?

13  A    Yes.  I ran this by my boss and she wanted me to be

14  a little more vague in such a condemning e-mail because

15  I didn't know how Dr. Dosal was going to receive this.

16  I didn't know -- I had no idea, so she and I both made it

17  a little more generic, thinking that this would prompt

18  further conversations that we could have in person.

19  Q    And based upon your discussions with Dr. Dosal and your

20  previous e-mail, did you believe he knew who you were

21  referring to?

22  A    Yes.

23  Q    And you say down below "the potential of failure of

24  this project," and you give certain bullet points.  You said

25  the lack of collaboration means there's a high risk for

1    misinterpreted requirements, as was evident during the most

2    recent steering committee meeting.  What did you mean by

3    that?

4    A    In the steering committee meeting we were not -- we

5    were not really able to discuss requirements and just kind

6    of the feasibility of these options, especially option C,

7    and so it was -- it was frustrating because we couldn't --

8    we couldn't discuss this, the whole discussion became

9    derailed, whether -- you know, basically it was derailed by

10   Ms. DeBose saying that this was not going to work and that

11   none of the options were good, they should use the system

12   as is.

13   Q    And you sort of anticipated my next question when you

14   say, "We continue to see evidence of this when issues are

15   repeatedly derailed and obscured."

16   A    Yeah.

17   Q    Who were you referring to?

18   A    Angela DeBose.

19   Q    And you say:  I would like to mention that this

20   situation is causing much added stress and a lot of added

21   work, not only to me as the project manager, but to the

22   other core team members as well.

23   A    That's correct.

24   Q    How did you know that?

25   A    I asked them.  I went to Carrie and Travis and

1   I basically said, I'm feeling very stressed about this,

2   I feel there's a lack of cooperation, I am -- are you

3   feeling the same?  And, you know, they both felt stress from

4   the situation, from what I recall.

5   Q    All right.  And when you talk here about -- going back

6   up, when you say "the unwillingness to meet and discuss,"

7   what is that a reference to?

8   A    That is mostly just -- I think her -- it was more of an

9   unwillingness to share information freely, so I felt

10  that when we were asking direct questions sometimes,

11  especially -- I wasn't very familiar technically with the

12  Tracking tool, I didn't feel like I was really getting

13  straight responses on things along those lines.

14  Q    Was there ever an occasion when Ms. DeBose walked out

15  of a steering committee meeting?

16  A    Yes.

17  Q    And was the meeting over at that time?

18  A    No.

19  Q    And did you have occasion to observe her demeanor when

20  she left the meeting?

21  A    She seemed angry.

22  Q    This e-mail at the very end says:  "I have discussed

23  this with other core team members and they are in agreement

24  with my assessment.  If there are changes to be made that

25  can make this project function more efficiently, I would

1    recommend this be put in place as soon as possible."

2            What changes were you referring to?

3    A    Basically, because I felt that there was a lack of

4    cooperation and some of the other team members felt the

5    same, that I was going to advise that Tracking be taken out

6    of the Registrar's Office shop.  It was my opinion, I didn't

7    know how it was going to go over, but that's what I was

8    recommending in order to make this project successful.

9    Q    All right.  Did you actually make that recommendation

10   to Dr. Dosal?

11   A    Yes.

12   Q    All right.  And shortly after June 20 was DegreeWorks

13   transferred from the Registrar's Office?

14   A    Yes.

15   Q    When you recommended -- when you recommended to

16   Dr. Dosal that DegreeWorks be transferred away from the

17   Registrar's Office, how did he react?

18   A    He said, "You better be damn sure."

19   Q    All right.  And what did you understand him to mean?

20   A    This -- basically when you're saying something like

21   this about the Registrar of the University of South Florida,

22   you better not be mistaken in your assessment, so --

23   Q    After the ownership of DegreeWorks was transferred away

24   from Ms. DeBose and the Registrar's Office, did her

25   cooperation change?

 1   A    She -- she still seemed a bit hostile and angry about

 2   the situation.  Over time my relationship with her became

 3   less hostile because we were working on other projects

 4   together, but I don't think she was happy about that

 5   situation.

 6   Q    Do you know whether or not at this time she was aware

 7   that it was you and your e-mails that had --

 8   A    She was not.

 9             MR. MCCRAE:  May I have a moment, Your Honor?

10             THE COURT:  Yes.

11             MR. MCCRAE:  Nothing further, Your Honor.

12             THE COURT:  All right.  Now, Ms. DeBose, I think

13   the Clerk indicated already to you the time.  I think --

14   Madam Clerk, what is it?

15             COURTROOM DEPUTY:  Three minutes, Your Honor.

16             THE COURT:  Three minutes, Ms. DeBose.

17   Three minutes on the regular schedule and then you go into

18   the other time that we talked about.

19             MS. DEBOSE:  Yes, I understand, Your Honor.

20             THE COURT:  Okay?  It's 3:45.

21             **CROSS-EXAMINATION OF SARAH THOMAS**

22   **BY MS. DEBOSE:**

23   Q    Ms. Thomas, how would you classify Ellucian's

24   DegreeWorks?  What kind of software is it?

25   A    It's tracking software that tracks students' progress

1    to degree.  I mean, are you looking at the -- like the --

2    Q     Is it proprietary software?

3    A     Yes.  It's owned by Ellucian.

4    Q     And in terms of being proprietary software, what does

5    that mean?

6    A     That means that they own the code.

7    Q     And in terms of modification to the system, what does

8    that mean?

9    A     In terms of USF modifying it, it was modifying how we

10   were implementing the system, not the system itself.

11   Q     So in terms of Ellucian's Tracking, what you -- when

12   did you join the University of South Florida?

13   A     In 2013.

14   Q     In 2013, was there already a tracking system

15   implemented?

16   A     Yes.

17   Q     Did you testify to that earlier?

18   A     Yes, there was.

19   Q     So it was implemented in 2012.

20          Did Tracking -- was it under a one-and-done or was

21   there a phased approach to the rollout?  Do you -- do you

22   know or recall?

23   A     On the initial implementation of Tracking?

24   Q     Yes.

25   A     I don't know.

1    Q    So you were -- were you or were you not aware that

2    there was a three-pronged rollout for Tracking?

3    A    Not aware.

4    Q    Phase 1, advisor rollout, was that done when you were

5    at the University of South -- well, at the University of

6    South Florida working with Ms. DeBose?

7    A    This was -- I don't know when that was done.  If it was

8    done in 2012 then I was not there.  We did try to -- they

9    did roll it out earlier, I just don't think it was being

10   used to the extent we thought it would be.

11   Q    Okay.  And phase 2, did you hear about a student view

12   rollout of Tracking?

13   A    Yes, I did.

14   Q    And then phase 3, do you recall what that was?

15   A    I do not.

16   Q    Was it to bring on full-fledged analytics, perhaps, for

17   Tracking?

18   A    That could have been.

19   Q    So in terms of Ms. DeBose, you testified that

20   Ms. DeBose did not want advisors to issue USRs, and -- did

21   you testify to that?

22   A    Yes.

23   Q    Did you state that she didn't want advisors issuing

24   USRs?

25   A    Yes.

1   Q    And you said a USR is a User Service Request, correct?

2   A    Correct.

3   Q    To whom were USRs issued?

4   A    The USRs are issued to the process owners, typically.

5   Q    At the University of South Florida --

6   A    They go through IT but then they're directed to the

7   process owners.

8   Q    So USRs were submitted to IT.  So between an advisor

9   and IT submitting a USR, was there any middle process that

10  would stop advisors from issuing USRs to IT?

11  A    They could admit them, but that doesn't mean they would

12  be implemented.

13  Q    And did you testify earlier that there should be some

14  review process to make sure USRs make sense, don't

15  contaminate the system --

16  A    Correct.

17  Q    -- don't affect other processes?

18  A    Absolutely.

19  Q    So in terms of that, did you have a process in place to

20  keep advisors from submitting countless USRs, some of which

21  may have made sense and some of which may have not made

22  sense?

23  A    Not at the time, but we were putting one in place.

24  Q    And in terms of this action here, were you aware at any

25  point that Ms. DeBose had filed a discrimination charge

SARAH THOMAS – SEPTEMBER 20, 2018
Cross-Examination by Ms. DeBose

1   against Paul Dosal?

2   A      No.

3   Q      You were not informed by anyone that Ms. DeBose had

4   filed a discrimination charge?

5   A      No, I was not.

6   Q      If you were told that Paul Dosal stated that he

7   informed you of the discrimination charge, would you be

8   surprised?

9   A      I don't recall him telling me that.

10  Q      Okay.  You stated that Ms. DeBose was hostile and rude,

11  hostile and rude and would filibuster meetings.  Could you

12  talk specifically about when that occurred and what --

13  A      That happened once or twice during the Tracking

14  Steering Committee, and I -- and what happened is we were

15  discussing options and I felt that Ms. DeBose was talking

16  about that none of the options were feasible and that the

17  advisors really should adapt their practices to use the

18  Tracking system as it was already laid out.

19  Q      And since you had a lot of conversations or discussions

20  with Paul Dosal, did Paul Dosal ever discuss with you that

21  he considered advisors resistant to change?

22  A      Yes.

23  Q      Was Tracking a new tool?

24  A      No.

25  Q      The Tracking was not a new tool?

SARAH THOMAS - SEPTEMBER 20, 2018          172
Cross-Examination by Ms. DeBose

1               When did Ellucian develop Tracking?

2    A    I don't know that.

3    Q    But you state it's not a new tool?

4    A    It was not a new tool when I was there, no.

5    Q    Was USF the first university to implement Tracking, do

6    you know?

7    A    I'm not aware.  I don't know.

8    Q    Do you -- did you ever -- we saw a lot of exhibits

9    online with you in communication with Paul Dosal; do you

10   agree?

11   A    Yes.

12   Q    A lot of communications with you and Travis Thompson

13   and Carrie Garcia; would you agree?

14   A    There are some, yes.

15   Q    Would you agree that on the majority of the

16   communications that were shared, Ms. DeBose was not copied?

17   A    When I felt that it was -- right.  They were not copied

18   when it was sensitive information or sensitive --

19   Q    In terms of change migration, you said you've done

20   project management for a lot of years.  Is it best practice

21   to have a whole host of people with lack of familiarity to

22   the technology or to systems or to other process willy-nilly

23   suggesting changes?

24   A    No, but I didn't feel the advisors were unfamiliar.

25   Q    Were the advisors savvy in technology -- in technology

1    to know all the touch points of what their change would

2    impact, would you say --

3    A    No.

4    Q    -- in your experience?

5    A    No.

6    Q    Did Ms. DeBose meet regularly with advisors, as far as

7    your knowledge?

8    A    As far as I know, yes.

9    Q    Was there a time when Ms. DeBose was employed in the

10   Registrar's Office that Office of Decision Support went

11   ahead with an advisor recommendation on changing Tracking

12   templates?

13   A    We did want to move forward with changing Tracking

14   templates to use the option C three semester plan, yes.

15   Q    Prior to the three semester plans, did you attempt

16   to -- did the Office of Decision Support attempt to change

17   the Tracking plans such to -- to test out this theory of

18   three semester plans, do you recall?

19   A    I don't know that they tested out the theory of three

20   semester plans, but we did talk it through with the advising

21   leadership and they were committing to us they would use

22   them if we rolled them out.

23   Q    Do you recall who Caurie Waddell is?

24   A    Yes.

25   Q    Do you recall Caurie Waddell, prior to leaving the

1   Registrar's Office and joining ODS, having to spend

2   countless hours with Angela DeBose, at least two days, to

3   correct a change where an advisor got -- an advisor had a

4   Tracking template changed to try to test out three semester

5   plans that pretty much caused the system to have unintended

6   consequences?

7   A    I don't recall that.

8   Q    Do you know what an -- as far as a project manager,

9   could you explain to the jury what an unintended consequence

10  is.

11  A    An unintended consequence is where you propose a change

12  in a system, it's not thoroughly vetted, and something makes

13  the system go awry.

14  Q    In terms of the Tracking system, in 2012 was the system

15  automated?

16  A    In 2012?  I wasn't at the University.

17  Q    In terms of the Tracking system when you were there,

18  was it automated to generate holds or put holds on students

19  or give them warnings?

20  A    That I don't know.  I don't know.  I'm not a technical

21  Tracking expert.

22  Q    Are you aware of the Ellucian visit?

23  A    I was aware that they came, but I was not involved or

24  interviewed by them.

25  Q    Do you recall the consultant's report stating that USF

1    for some reason is expecting that the Tracking system can be

2    used in three semester plans versus eight semester plans?

3    A     I was left out of that loop.  I don't know.

4    Q     Do you recall that the Ellucian report stated that the

5    system was intended to be set up as eight semester plans for

6    a four year graduation?

7    A     It was.

8    Q     And that it was not intended for a three semester plan

9    use?

10   A     That's correct.

11   Q     Do you -- did you have any conversations with

12   Bob Sullins concerning Caurie Waddell and her reasons for

13   leaving the University of South Florida?

14   A     With Bob -- no.

15   Q     Are you aware of an e-mail that alleges Angela DeBose

16   drove Caurie Waddell to leave the University of South

17   Florida?

18   A     No.

19   Q     Was Caurie Waddell working for you at the time that she

20   made her decision to leave the University of South Florida?

21   A     Yes.

22   Q     You said you were stressed about deadlines and working

23   until 2:00 a.m. in the morning.  Did Angela DeBose provide

24   the analysis, a detailed analysis of the options?

25   A     Yes, after --

SARAH THOMAS – SEPTEMBER 20, 2018          176
Cross-Examination by Ms. DeBose

1    Q    What was the deadline?  Was the deadline for the

2    analysis June 6, 2014?

3    A    The deadline was supposed to be in a few days, from

4    what I recall, but I believe this was conversation -- and

5    I don't recall the exact deadline, but I know we were all

6    trying to get the estimates back as quickly as possible.

7    Q    Would it -- would it surprise you if I were to share

8    with you in prior testimony that Paul Dosal, in responding

9    to an exhibit, acknowledged that the date deadline for the

10   information was June 6th, 2014?

11         MR. MCCRAE:  Your Honor, improper impeachment and

12   Counsel is testifying.

13         THE COURT:  Yes.  Sustained.  It's the form of

14   your question.

15         Assume that such and such is true.  What would be

16   your reaction?

17   BY MS. DEBOSE:

18   Q    If you were to hear that the deadline was in fact

19   June 6, 2014 and Angela DeBose provided you feedback on

20   June 4th, would you say that Angela DeBose met your deadline

21   in -- at least in advance of your deadline?

22   A    If that was the deadline.

23         MS. DEBOSE:  I have nothing further.

24         THE COURT:  Redirect.

25         MR. MCCRAE:  Briefly, Your Honor.

SARAH THOMAS – SEPTEMBER 20, 2018          177
Redirect Examination by Mr. McCrea

1          THE COURT:  All right.

2          MR. MCCRAE:  May it please the Court.

3          THE COURT:  Yes.

4          **REDIRECT EXAMINATION OF SARAH THOMAS**

5   **BY MR. MCCRAE:**

6   Q    Ms. Thomas, could you explain the reason for going from

7   an eight semester tracking plan to a three semester plan.

8   A    Yes.  The eight semester tracking plan that Ellucian

9   had put out was not working for many of our departments.

10  Like I said, Psychology was not using this because the first

11  semester or two or the first few years were pretty much the

12  same for everybody, but as you progress through a psychology

13  degree there are –– there are a lot of options you can take,

14  and so what we needed in the Ellucian Tracking plan was

15  something called like a trackable placeholder, where they

16  could say, hey, you can either take this course, this course

17  or this course, and once that's fulfilled, that requirement

18  is fulfilled and then it would fill in others.

19          They didn't have that, and it was very hard for

20  people that were in these non–structured majors to actually

21  use an eight semester tracking plan because students' plans

22  could change drastically as they progressed through their ––

23  through their degree.

24          If you have Engineering or Business, it's fairly

25  straightforward, you have to follow certain protocol and

1    it's very, very few options of classes to take, but things

2    like Psychology and Art and -- there's a whole host of

3    others that are -- are not prescriptive and they have a lot

4    of change, and the Ellucian product really was not working

5    well for that -- for those people, and so the Provost wanted

6    us to adapt that in order to have a system that would work

7    well for all the advisors.

8    Q    And was the change from eight semesters to three, as

9    opposed to four or one or two, was that something that came

10   from the advisors --

11   A    Yes.

12   Q    -- or was it something that was bounced off the

13   advisors?  What --

14   A    No.  We involved Alison Cleveland-Roberts, who

15   represented the Advising people, the advisors at the time,

16   and asked her if this would be usable for a lot of their

17   programs, Math, Psychology.  She was the Associate Dean for

18   the College of Arts and -- Arts and Science, and she said

19   that they could use that, they would be able to keep up with

20   that, and she would get buy-in from them so that they would

21   actually keep up with keeping those up-to-date.

22   Q    All right.  And you were asked about e-mails that you

23   sent to Dr. Dosal but you did not copy Ms. DeBose on.  Could

24   you turn to tab 10.

25   A    Yes.

SARAH THOMAS - SEPTEMBER 20, 2018          179
Redirect Examination by Mr. McCrea

 1  Q    Defendant's Exhibit Number 10, which is already in

 2  evidence.

 3  A    Yes.

 4  Q    All right.  In May of 2014, did you -- were you copied

 5  on this e-mail from Ms. DeBose to Dr. Dosal?

 6  A    No.

 7  Q    All right.  So you weren't aware that Ms. DeBose was

 8  telling Dr. Dosal that she thought you were confused about

 9  your role and that you were under the mistaken impression

10  that you set work priorities for her?

11  A    Correct.

12  Q    All right.  And was that in response to your request to

13  get the feedback that you asked everyone on the committee

14  for?

15  A    I was pressuring everyone to give me an estimate as

16  soon as possible.

17  Q    All right.

18  A    So -- and I --

19  Q    To your knowledge, did anyone else complain that you

20  had -- that you were confused about your role or that you

21  were --

22  A    No.

23  Q    You were under the mistaken impression that you set

24  work priorities for them?

25  A    No.

1    Q    Did the other people on the committee meet the

2    deadlines that you set?

3    A    Yes.

4    Q    And the deadlines that were just discussed a moment ago

5    seem to be on the second page of this e-mail, your e-mail.

6         There we go.

7    A    We will need an estimate on these three options by next

8    week, and that was May 21st.

9    Q    Okay.  And so this was your e-mail on May 21, and in

10   that e-mail you informed everyone on the committee that you

11   needed their estimates by the following week?

12   A    Correct.

13   Q    And did Ms. DeBose meet that?

14   A    No.

15        MR. MCCRAE:  Nothing further, Your Honor.

16        THE COURT:  Okay.  Have you completed your

17   examination, Mr. McCrae?

18        MR. MCCRAE:  Yes, Your Honor.

19        THE COURT:  All right.  Just wait one second

20   before you even start, Ms. DeBose.

21        Into the additional time we talked about from

22   which you're going to draw this, you've already used

23   seven minutes.

24        MS. DEBOSE:  I understand.  Thank you, Your Honor.

25        THE COURT:  Keep going.

1              **RECROSS-EXAMINATION OF SARAH THOMAS**

2    **BY MS. DEBOSE:**

3    Q    Ms. Thomas, did you testify moments ago that you didn't

4    know anything about Ms. DeBose being accused of being the

5    reason for Caurie Waddell leaving the University of South

6    Florida?  Is that correct?

7    A    I don't -- I don't remember anyone telling me that

8    Ms. DeBose was the reason that Caurie Waddell left.

9    Q    Isn't it true that you were copied on a majority of the

10   threads concerning Caurie Waddell and her retention?

11   A    I was copied possibly on some of them, but --

12   Q    I'd like to share with you Exhibit 19, from

13   Robert Sullins to -- Bob Sullins to Paul Dosal,

14   Travis Thompson, Sarah Thomas, and it says "Meeting on

15   Monday about retaining?"

16            Does this look familiar to you?

17   A    Yes.  Thank you.

18   Q    And does this e-mail that was part of the forward look

19   familiar to you?

20   A    Yes.

21            MS. DEBOSE:  I have nothing further.

22            THE COURT:  You've completed?  Okay.

23            Any Re-redirect?

24            MR. MCCRAE:  Short.

25            THE COURT:  All right.  Go on.  Go on.

**FURTHER REDIRECT EXAMINATION OF SARAH THOMAS**

**BY MR. MCCRAE:**

Q    You were asked about Plaintiff's Exhibit Number 19.

I don't think we saw a date, but there was an e-mail dated

June 7 of 2014 that preceded the one that you were asked

about.

A    Um-hum.  Yes.

Q    And do you recall whether this discussion about

Ms. Waddell's departure from USF took place before your

June 20 "high probability of failure" e-mail to

Dr. DeBose -- sorry, Dr. Dosal?

A    Dr. Dosal.  I don't recall being part of any

discussion, so I don't know when they discussed

Caurie Waddell's departure.

Q    Okay.

A    They -- or why she was leaving.

Q    Okay.

A    I was her supervisor, I asked her why she was leaving,

but I don't know about their personal discussions and I

wasn't part of them.

Q    Did she leave -- do you know whether she left before or

after your June 20 e-mail to Dr. Dosal about a high

probability for failure?

        THE COURT:  Keep your voice up, will you please,

Mr. McCrae.

SARAH THOMAS - SEPTEMBER 20, 2018
Further Redirect Examination by Mr. McCrea

```
 1            MR. MCCRAE:  I apologize, Judge.
 2   BY MR. MCCRAE:
 3   Q    Do you know, Ms. Thomas, whether Caurie Waddell left
 4   USF before or after your June 20, 2014 e-mail to Dr. Dosal
 5   warning him of a high probability of failure of the tracking
 6   project unless a change was made?
 7   A    I don't know the exact date that she left.  It looks
 8   according to this e-mail that it was before, but I -- it
 9   just -- I don't know.  I don't know the exact date.
10   I'm sorry.
11   Q    And prior to this e-mail you had sent your e-mail of
12   May 29, 2014 talking about your concerns with Ms. DeBose and
13   her participation on the tracking project, correct?
14   A    Correct.
15   Q    And by the way, it says on the second paragraph:  "I am
16   sure that she will, in effect, filibuster the next steering
17   committee meeting to stop any consensus on the direction of
18   this project."
19            Why were you sure that she would do that?
20   A    Because she had done it in the past.
21   Q    And what did you mean by that, "filibuster the next
22   steering committee meeting"?
23   A    She would talk quite a bit and not really allow
24   interruptions, but she would pretty much control the
25   Tracking Steering Committee meeting and discuss why the
```

SARAH THOMAS – SEPTEMBER 20, 2018                184
Further Recross-Examination by Ms. DeBose

1   options were not a feasible solution, why any of them

2   weren't, so in effect we were not able to progress with

3   making a decision on the options or moving forward.

4   Q    Would she allow other people to participate in a

5   discussion?

6   A    No.

7              MR. MCCRAE:  Nothing further, Your Honor.

8              THE COURT:  Okay.  Any Re-recross?

9              MS. DEBOSE:  Just briefly, Your Honor.

10        **FURTHER RECROSS-EXAMINATION OF SARAH THOMAS**

11   **BY MS. DEBOSE:**

12   Q    Ms. Thomas.

13   A    Yes.

14   Q    Who did --

15             THE COURT:  Keep the voice up.  The jury is having

16   trouble hearing you.

17   BY MS. DEBOSE:

18   Q    Who did Ms. DeBose report to?

19   A    Dr. Dosal.

20   Q    And so would you feel that it's necessary for you to be

21   privy to an employee and an employer in terms of

22   supervisor/employee relationship?

23   A    No.

24   Q    Okay.  So would you think that Angela DeBose would tend

25   to copy you on her communications to her supervisor?

1    A     No.

2    Q     I'd like to share with you Exhibit 15.

3            THE COURT:  Plaintiff's?

4            MS. DEBOSE:  Plaintiff's Exhibit 15.  It's already

5    in evidence, I believe.

6            COURTROOM DEPUTY:  It's already in.

7            THE COURT:  It's already in.  It's already in.

8    Plaintiff's 15.

9    BY MS. DEBOSE:

10   Q     So in terms of -- in terms of Tracking, would

11   Ms. DeBose have to filibuster meetings or did she have an

12   opportunity to engage with her supervisors and others at

13   higher positions to discuss any concerns?  I'm asking your

14   opinion.

15   A     My opinion?  Yeah, I think she would have opportunity

16   to discuss with other people.

17   Q     Is this an e-mail from Angela DeBose to Paul Dosal and

18   Sidney Fernandes regarding Tracking Options?

19   A     It is.

20   Q     Is the date May 26, 2014?

21   A     Yes.

22   Q     And are there attachments?

23   A     Yes.

24   Q     In terms of this, did Angela DeBose seem reluctant at

25   all to go into detail with the leadership to express her

SARAH THOMAS – SEPTEMBER 20, 2018          186
Further Recross-Examination by Ms. DeBose

1   concern about the Tracking project?

2   A    This is the first time seeing this, so can you please

3   repeat the question?

4   Q    Would you say from this analysis that has been given in

5   advance of it being shared with the steering committee that

6   Angela DeBose had any concerns about sharing her thoughts

7   about the options?

8   A    She had concerns, yes, she did.

9   Q    Does that underscore reflect the concern?

10  A    Yes, it does.

11  Q    That the system is going to a use that is not intended

12  by the vendor?

13  A    That's correct.

14  Q    Just one more question here.

15        You're testifying here today.  Are you aware of

16  the nature of this case?

17  A    Yes.

18  Q    Are you aware that this is not a case about DegreeWorks

19  or about Tracking?

20        MR. MCCRAE:  Objection, Your Honor.

21        THE COURT:  You have an objection?

22        MR. MCCRAE:  Yes, Your Honor.  The question was:

23  Are you aware that this case is not about DegreeWorks or

24  Tracking.  That's a characterization and argument.  There

25  has been plenty of evidence about it.

SARAH THOMAS - SEPTEMBER 20, 2018          187
Further Recross-Examination by Ms. DeBose

```
 1              MS. DEBOSE:  I was just asking her awareness,
 2    Your Honor, of the nature of the case.  She said --
 3              THE COURT:  Well, whoa up.  Whoa up.
 4              You can't testify from the podium, so just pose a
 5    question to her.  Assume such and such is true.  Go ahead.
 6    BY MS. DEBOSE:
 7    Q    Are you aware of what this case is about?
 8    A    Yes.
 9    Q    Are you aware that it is a case that involves a
10    complaint of discrimination?
11    A    Yes.
12    Q    Are you under the impression at all that this case is
13    about DegreeWorks?
14    A    No.
15    Q    Tracking?
16    A    No.
17    Q    Three semester plans?
18    A    No.
19    Q    Eight semester plans?
20    A    No.
21              MS. DEBOSE:  Thank you.
22              THE COURT:  All right.  Any re --
23              MR. MCCRAE:  No, Your Honor.
24              THE COURT:  Re-redirect?
25              MR. MCCRAE:  No re-re.
```

```
 1                THE COURT:  Any further use for this witness?  May
 2      she be excused and discharged?  Yes?
 3                MR. MCCRAE:  Yes.
 4                THE COURT:  Excused and discharged, yes?
 5                MS. DEBOSE:  Yes.
 6                THE COURT:  All right.  Ma'am, thank you very much
 7      for coming.  You're excused and discharged from any subpoena
 8      you may have received.
 9                THE WITNESS:  Thank you.
10                THE COURT:  Watch your step going down.  Watch
11      your step, ma'am.
12                THE WITNESS:  Thank you.
13                THE COURT:  Okay.  Escort the lady out of the
14      courtroom.
15                Thank you very much for being with us, ma'am.
16                THE WITNESS:  Thank you.
17                THE COURT:  You're discharged.  You may leave the
18      courtroom and the courthouse.  Thank you for being here.
19                THE WITNESS:  Thank you.
20                   (Sarah Thomas exits proceedings.)
21                THE COURT:  Present your next evidence.  Call your
22      next witness, Mr. McCrea.
23                MR. MCCRAE:  Yes.  The defendant will call
24      Travis Thompson.
25                THE COURT:  All right.
```

```
1                  (Travis Thompson enters proceedings.)
2              THE COURT:  Come forward, sir, please.  Come right
3    here in front of this lady, the Clerk.  Right here.
4              All right.  Sir, when you get up there, raise your
5    right hand to be sworn by the Clerk.
6              THE CLERK:  Do you solemnly swear or affirm under
7    penalty of perjury that the testimony you will give in this
8    cause will be the truth, the whole truth and nothing but the
9    truth?  Do you?
10             THE WITNESS:  I do.
11             THE COURT:  All right.  Sir, put your hand down.
12   Go over where the Bailiff is.  Watch your step.  Take a seat
13   there in the witness box, and when you're seated, pull the
14   chair towards the desk area.  The Bailiff is going to put a
15   microphone on your lapel, collar, whatever is going to work.
16             State your name for the record.
17             THE WITNESS:  My name is William Travis Thompson.
18             THE COURT:  Keep the volume up.  Say again.
19             THE WITNESS:  William Travis Thompson.
20             THE COURT:  Maybe the microphone has got to be
21   moved a little bit.  We've got to do something here.
22             Okay.  Say your name again.
23             THE WITNESS:  William Travis Thompson.
24             THE COURT:  Nothing is working.  Okay.  Try to put
25   it -- maybe lower.
```

```
1              All right.  Sir, say your name again.
2              THE WITNESS:  William Travis Thompson.
3              THE COURT:  That's better.
4              THE WITNESS:  Okay?
5              THE COURT:  Spell your last name.
6              THE WITNESS:  T-H-O-M-P-S-O-N.
7              THE COURT:  All right.  Now, Mr. Thompson, can you
8    hear me?
9              THE WITNESS:  I can.
10             THE COURT:  Good.  You've got to talk so that jury
11   can hear you.  Say your name one more time in a full voice.
12             THE WITNESS:  William Travis Thompson.
13             THE COURT:  Keep your voice up like that.
14             You may proceed, Mr. McCrea.
15             MR. MCCRAE:  Thank you, Your Honor.  May it please
16   the Court.
17             THE COURT:  Yes.  Microphone in hand.
18             MR. MCCRAE:  I will.
19         DIRECT EXAMINATION OF WILLIAM TRAVIS THOMPSON
20   BY MR. MCCRAE:
21   Q    Good afternoon, Dr. Thompson.  How are you?
22   A    Good, thank you.
23   Q    Who do you work for?
24   A    The University of South Florida.
25   Q    And how long have you worked for USF?
```

1   A    About 14 and a half years.

2   Q    And could you briefly describe your educational

3   background.

4   A    Certainly.  I graduated from St. Leo University with a

5   Bachelor's degree in Computer Information Systems, graduated

6   from the University of South Florida with a Master's degree

7   in Computer Science, and then a Doctoral degree in

8   Communication in the College of Arts and Sciences at the

9   University of South Florida also.

10  Q    And what is your current position with USF?

11  A    I am the senior product owner for the Archivum

12  platform, it's a business process management system at the

13  University of South Florida, so I oversee a team of about

14  25 folks.  I'm also a teacher in the Honors College, an

15  instructor, and I also have a research program at the

16  University as well.

17  Q    All right.  I think you might need to spell the name of

18  that program for our court reporter.

19  A    Okay.  A-R-C-H-I-V-U-M.  Sort of a play on a Latin

20  term.

21         THE COURT:  Thank you.

22  BY MR. MCCRAE:

23  Q    Latin term meaning what?

24  A    It's kind of a way of bringing archivum, or records,

25  archives, into the 21st Century.  It's a play on the Appian

WILLIAM TRAVIS THOMPSON SEPTEMBER 20, 2018    192
Direct Examination by Mr. McCrea

```
 1   name, the Appian Way, a way of bringing digital records into
 2   the 21st Century.  Kind of a nickname of sorts that was
 3   selected by stakeholders at the University for the system.
 4   Q    What knowledge do you have -- or let me say it this
 5   way.  Are you familiar with DegreeWorks?
 6   A    Yes.
 7   Q    And did you have occasion to work on DegreeWorks while
 8   you've been at USF?
 9   A    I did, in a number of different capacities.
10   Q    And when did you first begin working on DegreeWorks?
11   A    In 2011 I was asked to be the project manager for the
12   Degree Audit Implementation, overseeing that across the
13   University of South Florida.
14   Q    Was that before or after responsibility for DegreeWorks
15   had been moved to the Registrar's Office?
16   A    There were a series -- I was the third project manager
17   on the project, so I'm not aware of changes that might have
18   happened prior.  I became the project manager, and later
19   responsibility was transferred away from the Registrar's
20   Office.
21   Q    Okay.  And let me make sure I understand.  In 2011 --
22   did you say you began working on DegreeWorks in 2011?
23   A    I did.
24   Q    All right.  At this time was DegreeWorks managed by the
25   Registrar's Office, or --
```

1    A    Yes.

2    Q    Okay.  Are you familiar with the DegreeWorks Tracking

3    Steering Committee?

4    A    Yes.

5    Q    And did you serve as a member of that committee?

6    A    I did.

7    Q    And what was the purpose of the committee?

8    A    It was an executive leadership team, so I was one of

9    the support members, initially as project manager and then

10   later in my role in Undergraduate Studies as the Senior

11   Director for Academic Tracking and Advising.  The purpose of

12   that committee was to oversee the university-wide

13   implementation of the Tracking system.

14   Q    And was the work being done by that committee important

15   to the University?

16   A    Very.

17   Q    Why?

18   A    Students need to be able to plan their academic paths

19   forward in timely ways, and since about 2004 the University

20   was working on putting a system -- a computerized system

21   into place, really bringing recordkeeping from paper-based

22   into a more technologically-based approach, to allow

23   students to create their own academic plans ultimately.

24   Q    And did you have occasion to meet with Ms. DeBose or

25   interact with Ms. DeBose as part of the Tracking Steering

WILLIAM TRAVIS THOMPSON — SEPTEMBER 20, 2018     194
Direct Examination by Mr. McCrea

1  Committee?

2  A    I did, regularly for years.

3  Q    Okay.  And was that in committee meetings or outside

4  meetings or both?

5  A    Both.  Everything from weekly meetings -- Ms. DeBose

6  and I, we were partners, counterparts, as I understood it at

7  the time, in bringing the system to life, and so we met

8  weekly in her office and in other spaces around the

9  institution as well as in these committee meetings as well.

10 Q    You have a notebook in front of you with tabs.

11 A    Okay.

12 Q    Could you turn to tab 88.

13 A    Okay.

14 Q    Are you familiar with that document?

15 A    Yes.

16 Q    Can you tell me what it is.

17 A    It is an analysis of how we compared in terms of our

18 organization of the Tracking System Implementation with our

19 State University System peers across --

20 Q    Okay.

21 A    -- the board.

22          MR. MCCRAE:  Your Honor, I would move the

23 admission of Defendant's Exhibit 88.

24          THE COURT:  Any objection?

25          MS. DEBOSE:  I haven't seen it, Your Honor.

WILLIAM TRAVIS THOMPSON - SEPTEMBER 20, 2018    195
Direct Examination by Mr. McCrea

```
 1              Yes, I have an objection.

 2              THE COURT:  Is there an objection to it?

 3              MS. DEBOSE:  Yes.

 4              THE COURT:  You've got to come to sidebar then.

 5              Ladies and gentlemen of the jury, you may stand

 6    up.  You may stand up, Mr. Witness.  You may stand in the

 7    courtroom.

 8              (The following bench conference was held.)

 9              THE COURT:  Now, what's your objection?

10              MS. DEBOSE:  It reflects that it's a draft for

11    discussion.  It has no -- no one who it attributes to

12    authoring it.  It has no source.  It just looks like a

13    typewritten page.

14              MR. MCCRAE:  He will testify that he prepared this

15    and presented it to the Tracking Steering Committee.

16              THE COURT:  All right.  On that basis --

17              MS. DEBOSE:  Only on that basis.

18              THE COURT:  On that basis I will let it in.  Your

19    objection is overruled.  You have to lay the foundation with

20    him.

21              MR. MCCRAE:  I will.

22              THE COURT:  All right.

23    (End of bench conference; proceedings resume in open court.)

24              THE COURT:  All right.  Consistent with sidebar,

25    go forward.
```

WILLIAM TRAVIS THOMPSON, SEPTEMBER 20, 2018      196
Direct Examination by Mr. McCrea

```
 1   BY MR. MCCRAE:

 2   Q    You have before you Defendant's Exhibit Number 88.

 3   A    Yes.

 4   Q    Who prepared that?

 5   A    I did.

 6   Q    And for what purpose?

 7   A    At the request of the steering committee, to understand

 8   how we compare with other State University systems.

 9   Q    All right.  And did you present this to the steering

10   committee?

11   A    Yes.

12   Q    All right.  And because it says "Draft for

13   Discussion" --

14   A    Yes.

15   Q    -- did that mean discussion by the committee?

16   A    It did.

17   Q    And when it says "Draft," was it presented to the

18   committee in this form?

19   A    It was.

20            THE COURT:  Mr. DeBose -- excuse me.  Mr. McCrea.

21            Approximately when, Mr. Witness, did you prepare

22   that?

23            THE WITNESS:  This probably would have been around

24   20 -- middle 2014.

25            THE COURT:  And who were the members of the
```

WILLIAM TRAVIS THOMPSON - SEPTEMBER 20, 2018    197
Direct Examination by Mr. McCrea

1    steering committee for whom you prepared it?

2             THE WITNESS:  Yes.  Dr. Dosal, Paul Dosal;

3    Dean Sullins, Bob Sullins; Alison Cleveland-Roberts;

4    I believe the Chief Technology Officer was also a part of

5    the meeting as well.  I think those were the executive

6    members largely.

7             THE COURT:  Okay.  Were there other people

8    present?

9             THE WITNESS:  Yes, there would have been.

10            THE COURT:  All right.  But you don't remember who

11   they were?

12            THE WITNESS:  Not specifically, no.

13            THE COURT:  And you don't have a more definitive

14   idea of what the date was?

15            THE WITNESS:  I don't, not offhand.

16            THE COURT:  But it was in that year, in the

17   summertime?

18            THE WITNESS:  My recollection.  And it went via

19   e-mail to the committee, so it was -- this was part of the

20   committee's process.

21            THE COURT:  And that was your responsibility, to

22   prepare it?

23            THE WITNESS:  It was.

24            THE COURT:  Okay.  Objection is overruled.  Yes,

25   88 comes in.

WILLIAM TRAVIS THOMPSON - SEPTEMBER 20, 2018    198
Direct Examination by Mr. McCrea

1           MS. DEBOSE:  Your Honor, may I -- I think --

2     I appreciate your questions too, because that was my

3     concern, it's undated --

4           THE COURT:  You're going to get the opportunity to

5     cross-examine him.

6           MS. DEBOSE:  Okay.

7           THE COURT:  It's coming into evidence.  Go

8     forward.

9     BY MR. MCCRAE:

10    Q    And Dr. Thompson, why did you prepare this document in

11    2014 and seek an examination or comparison of how the other

12    State Universities were using their Tracking and Degree

13    Audit Systems?

14    A    Yes.  So there is a precedent in higher education, we

15    consult with other institutions, both in the State and out

16    of the State, as we try to understand and collaborate on how

17    to do things like implement technology systems.  I had done

18    work like this in the past at the request of others and also

19    at my own behest to try to understand how these kinds of

20    things are organized.  The steering committee asked me to

21    prepare this.  We were having significant challenges getting

22    this system off the ground.  We thought one of the

23    challenges might be how the work was organized and where

24    things were at in terms of responsibility, and we had heard

25    from colleagues that we were organized very differently, so

Direct Examination by Mr. McCrea

1    we wanted to understand more about those organizational

2    differences and the successes the other institutions had had

3    and our lack of success.

4    Q    Was Ms. DeBose a member of the steering committee at

5    the time that you prepared and circulated this document?

6    A    Yes.

7    Q    It says:  "USF is the only institution that has given

8    such an immense scope of responsibility and ownership to its

9    Registrar's Office for Tracking or the Degree Audit."

10   A    Yes.

11   Q    "USF is the only institution that assigned complete

12   technical ownership to the Registrar's Office for either the

13   Degree Audit or Tracking."

14   A    That's right.

15   Q    "USF is the only institution that assigned functional

16   ownership to the Registrar's Office for either the Degree

17   Audit or Tracking."

18   A    Yes.

19   Q    "USF is the only institution that assigned the business

20   analysis role to the Registrar's Office for the Degree Audit

21   or Tracking."

22   A    That's right.

23   Q    And that came from your discussions with whom?

24   A    Mid leadership, so Directors and others at the

25   University of Florida, Florida State, Florida International

1    and the University of Central Florida.

2    Q    What does the first point mean, that USF is

3    second-to-last?

4    A    One of the challenges in these kinds of implementations

5    is often that staff are asked to do an implementation on top

6    of their everyday work, and one of the questions that the

7    institution had was did we have enough resources, the right

8    people in place across all of these different areas.  At the

9    University of South Florida we operate very efficiently, and

10   so as it turned out, there was only one other institution,

11   I don't recall which, but that had lower resources on that

12   project than we did.

13   Q    Number 3:  "USF is the only institution that lacks

14   Academic Advising in the role of primary stakeholder for

15   both the Degree Audit and Tracking."  What does that mean?

16   A    So academic advisors are folks who help students build

17   their academic paths into careers.  It's a professional

18   role.  It emerged out of being faculty.  We have about 95,

19   or did at the time, academic advisors across the

20   Institution, and it was their responsibility to help

21   students complete their degrees in timely ways.

22           One of the keys here, and it ties together with

23   the other aspects, both the technical, functional and the

24   analytic role, as well as the primary stakeholder, all of

25   that was within the Registrar's Office, so we didn't have

WILLIAM TRAVIS THOMPSON - SEPTEMBER 20, 2018    201
Direct Examination by Mr. McCrea

1    the folks for whom the system was designed at the table in a

2    formal way to be able to say whether the system worked or

3    didn't.

4    Q    All right.  And could you then turn to tab 89.

5    A    Okay.

6    Q    And are you familiar with that document?

7    A    Yes.

8    Q    Did you have any role in preparing that document?

9    A    I did.

10   Q    And for what purpose?

11   A    This was a follow-on to the Tracking Steering

12   Committee's request of the calls across the State University

13   System that we were just looking at.  This is a follow-up

14   that they said, okay, after they had a sense of what it

15   looked like comparatively, now what are some possible steps

16   that we could take to become better organized and successful

17   in the way that we had seen other institutions.  This is

18   that set of recommendations.

19   Q    Did you share this document with anyone?

20   A    My recollection is this had gone to the steering

21   committee, the executive members as well.

22   Q    And would that include Ms. DeBose?

23   A    Should have.  She was part of the committee.

24   My recollection is this was presented to the committee when

25   she was part of it.

WILLIAM TRAVIS THOMPSON - SEPTEMBER 20, 2018
Direct Examination by Mr. McCrea

1    Q    In addition to being presented -- when you say

2    "presented," does that mean it was discussed at a meeting?

3    A    It does, yes.

4    Q    And what time period are we talking about?

5    A    Again, my recollection is this was around the middle of

6    2014.

7              MR. MCCRAE:  Your Honor, I move the admission of

8    Defendant's Exhibit Number 89.

9              THE COURT:  Any objection?

10             MS. DEBOSE:  No, Your Honor.

11             THE COURT:  All right.  89 in evidence.  Go ahead.

12             MS. DEBOSE:  I haven't seen it, but it's -- no

13   objection.

14             MR. MCCRAE:  I gave it to you.

15             THE COURT:  Have you seen it?

16             MS. DEBOSE:  The same issues from sidebar.

17             THE COURT:  Noted.

18             MS. DEBOSE:  Thank you.

19             THE COURT:  89 in evidence.

20   BY MR. MCCRAE:

21   Q    You made a number of recommendations in this document.

22   A    Yes.

23   Q    One of them was changing -- had to do with changing the

24   responsibilities and relationship of the Registrar's Office?

25   A    Yes.

1    Q    Was that something that you ever discussed with

2    Ms. DeBose?

3    A    Outside of this document, my recollection is no.

4    Q    All right.  And do you recall whether or not she

5    expressed any response on the Tracking Steering Committee to

6    your recommendations?

7    A    The move here was to engage academic advisors, the

8    people for whom this system was designed, to have a stake, a

9    formal stake in design and development and essentially

10   signing off on the system.  Undergraduate Studies is the

11   unit typically that that professional role comes in through

12   at the Institution, so the purpose here was to bring those

13   people into having a say on the system.

14              I'm sorry.  That was a lead-in to the question and

15   now I --

16   Q    Do you remember my question?

17   A    I don't.

18   Q    Okay.  Do you remember whether or not -- that's okay.

19   A    Oh, yes, I do.

20   Q    Whether Ms. DeBose expressed any reaction --

21   A    Yes.

22   Q    -- to the recommendations that you were making.

23   A    Yes.  This one in particular she did not agree with.

24   Q    All right.  And you made recommendations with respect

25   to people?

WILLIAM TRAVIS THOMPSON - SEPTEMBER 20, 2018    204
Direct Examination by Mr. McCrea

1    A    Yes.

2    Q    Moving technical resources for DegreeWorks into

3    enterprise IT organization, from RO to IT.

4    A    Yes.

5    Q    What does that mean?

6    A    That means from the Registrar's Office into the

7    Information Technology unit, and this was to bring us in

8    line with the same organization we had seen at these other

9    high performing State University systems.

10   Q    All right.  And you also made a recommendation

11   regarding moving technical ownership.  What does enterprise

12   IT organization mean?

13   A    One of the -- USF was reorganizing at the time.  IT had

14   separate units in different areas of the University.  It had

15   recently been consolidated into one unit through the

16   leadership of the then-CIO/CTO Mike Pearce.  In this case,

17   as the previous document said, the Registrar's Office was

18   both the primary stakeholder in terms of functional, they

19   were doing the analysis, and they were doing the primary

20   amount of coding, and this was also different from almost --

21   or every other enterprise system we had at USF, and we have

22   many others.  This one was really unique.  So the move here

23   is to bring -- why not have IT do the IT work, is the short

24   version of this bullet.

25   Q    All right.  And during the Tracking Committee -- or,

WILLIAM TRAVIS THOMPSON - SEPTEMBER 20, 2018      205
Direct Examination by Mr. McCrea

1    sorry, Tracking Steering Committee meetings, did Ms. DeBose

2    express agreement or disagreement with the recommendations

3    that you were making about making these changes?

4    A    My recollection is disagreement.

5    Q    All right.  Turn to tab 90.

6    A    Okay.

7    Q    All right.  Are you familiar with that document?

8    A    I am.

9    Q    And could you tell me what it is.

10   A    This is a follow-on to the previous two documents we've

11   looked at now, sort of in a sequence here.  The question is

12   how are we organized comparatively, recommendations for the

13   high level organization, and then the next question from the

14   executive leadership was make this real, what would this

15   look like if those changes that we just discussed were

16   implemented.

17   Q    And --

18   A    So they said get down into individual roles, and this

19   is an array of what those roles would be and the shifts

20   involved in those.

21   Q    What involvement, if any, did you have in preparing

22   this document?

23   A    I prepared it.

24   Q    And when did you prepare it?

25   A    At the same time as those previous two documents.  They

1   were a flow of all of the same work.

2   Q    And after you prepared it, did you share it with the

3   Tracking Steering Committee?

4   A    This also went for discussion as well.

5            MR. MCCRAE:  Your Honor, I would move the

6   admission of Defendant's Exhibit Number 90.

7            THE COURT:  Is it the same time period, in the

8   middle of 2014?

9            THE WITNESS:  Yes, Your Honor.

10           THE COURT:  All right.  Any objections?

11           MS. DEBOSE:  Same ones to those prior.

12           THE COURT:  Noted for the record.  Overruled.

13  90 comes in evidence.  Go ahead.  For the defendant.

14  BY MR. MCCRAE:

15  Q    Could you explain -- I highlighted at the top --

16  A    Yes.

17  Q    -- actually it's already shaded, but I highlighted.

18  What -- could you explain what that is about, what it means?

19  A    Yes.  The roles here, Scribe in this case, they were

20  folks who translate academic plans into system language, and

21  those folks, as I was just describing, the technical aspects

22  of all of that was coming in through the Registrar's Office.

23  As we saw at every one of those other State University

24  System institutions, that role was within IT, and so this

25  shows the transition or what a transition might look like in

WILLIAM TRAVIS THOMPSON - SEPTEMBER 20, 2018    207
Direct Examination by Mr. McCrea

1    the future were they to decide on that, where those roles

2    would best be housed based on this comparison and analysis

3    of the other institutions.

4    Q    Okay.  And this contemplated moving resources from the

5    Registrar's Office to IT?

6    A    Yes.

7    Q    Take a look at what's been marked for identification as

8    tab 91.

9              MS. DEBOSE:  May I see?

10             MR. MCCRAE:  I'm sorry.

11             THE COURT:  What number is this, 91?

12             MR. MCCRAE:  This is 91, Your Honor.

13             THE COURT:  Okay.  Lay your foundation.

14   BY MR. MCCRAE:

15   Q    All right.  Are you familiar with this document?

16   A    I am.

17   Q    What if any role did you have in preparing that?

18   A    I was one of the co-preparers that crafted this

19   document.

20   Q    All right.  And this has your name on the front page

21   with --

22   A    Yes.

23   Q    -- a couple of other people?

24   A    It does.

25   Q    Are those your co-preparers?

WILLIAM TRAVIS THOMPSON - SEPTEMBER 20, 2018    208
Direct Examination by Mr. McCrea

1    A    Yes.

2    Q    And who were they?

3    A    Sarah Thomas was at the time the project manager.

4    I had moved into a role in Undergraduate Studies at that

5    time.  She was hired into the role, a different version of

6    the role that I was in, and became project manager.

7    Of course myself.  Dr. Cleveland-Roberts was a key member

8    from the College of Arts and Sciences, almost half the

9    institution in terms of our undergraduate enrollment and a

10   representative member of the steering committee.  She

11   oversaw about 20 of the academic advisors and knew

12   intimately the challenges we had been dealing with going all

13   the way back to 2011 on the Degree Audit Implementation.

14   Q    Was this document -- actually it looks like a

15   PowerPoint.  Was this shared with the Tracking Steering

16   Committee?

17   A    It was.

18   Q    And when was that?

19   A    The same time, middle of 2014.

20   Q    And it's got a date on the front page of May 19 of

21   2014.  Do you know --

22   A    Perfect.  That sounds right on.

23        MR. MCCRAE:  All right.  Your Honor, I would move

24   the admission of Defendant's Exhibit Number 91.

25        THE COURT:  Any objection?

1          MS. DEBOSE:  Same objection, Your Honor.

2          THE COURT:  Same objection as before?  Overruled.

3     Defendant's Exhibit 91 in evidence.  You may proceed.

4     BY MR. MCCRAE:

5     Q    This document says "Options for Phase 2 Implementation

6     of Tracking."  What does Phase 2 mean?

7     A    Well, we had done a lot of work early on to get the

8     Tracking system up and running.  We were trying to work on

9     this eight semester plan implementation.  Basically, the

10    ideal, so to speak, undergraduate student spends about

11    four years in their undergraduate degree.  The idea is to

12    create an eight semester plan to help them move along and

13    progress.  We'd had challenges for, as the previous document

14    mentioned, upwards of a year, year and a half, in getting

15    that going.  The system wasn't working, we weren't getting

16    movement, so we were asked to double down our efforts.

17    Given that we hadn't had progress, we were asked to

18    double down efforts and develop an approach that could be

19    implemented right away.  So this phase 2 is that proposal.

20    Q    What does it mean when it says "In response to the

21    Tracking Steering Committee's request for Advising

22    leadership to develop an implementation plan for Tracking in

23    ATLAS"?

24    A    So this is related to the recommended shift to bring in

25    Academic Advising, one of the stakeholders and the people

WILLIAM TRAVIS THOMPSON - SEPTEMBER 20, 2018      210
Direct Examination by Mr. McCrea

1   who were literally to live their daily lives in this system,

2   probably five to six hours per day of an eight hour day.

3   The move, as the previous document suggested, was to bring

4   those folks into having a say into how the system should

5   work.  That proposal wasn't met by Ms. DeBose, received

6   well.  Senior and executive leadership came back and said,

7   well, we've tried that path of getting the system to work

8   and that has not worked, so they came to Academic Advising,

9   and I was leading that University-wide effort at the time,

10  and they said, what can we -- what can be done today with

11  all of the resources at hand to make this implementation

12  successful for our students.

13  Q    And it says -- has your name and Sarah Thomas' name?

14  A    Yes.

15  Q    It says "with support from IDSS Business Analysts."

16  A    Yes.

17  Q    Who is that?

18  A    Those are folks who analyze processes.  It's a

19  professional role.  IDSS stands for Information and Decision

20  Support Systems.  They were a unit that sort of, as it were,

21  was between IT and the users of systems.  Their role is to

22  translate user needs for the technology folks and

23  vice versa, for the technology folks to adapt user needs

24  into what we call requirements.

25  Q    Are they USF employees?

WILLIAM TRAVIS THOMPSON - SEPTEMBER 20, 2018    211
Direct Examination by Mr. McCrea

1    A    They are, professionals, and some of the background

2    work we did was to quite literally go and sit with academic

3    advisors and ask them how things were working, what wasn't,

4    and all of that fed into these recommendations.

5    Q    All right.  At the end of this PowerPoint, there are

6    different PowerPoints discussing option A, option B and

7    option C, and then there's a comparison of the options.

8    A    Yes.

9    Q    And then there's a before and after contrast.  And so

10   why -- and I think you may have told us but I just want to

11   be clear.  Why was it necessary on go to option A, B or C?

12   A    The Tracking implementation had failed, and at the time

13   that was actually the third failure of the implementation,

14   so again, senior leadership come back and said, work

15   together, find ways of making it work.  So we put all of the

16   options on the table, including what had failed previously,

17   other options, which was the eight semester plan version,

18   there was a lot of manual work involved, we didn't have

19   enough people to do the manual work that would have been

20   involved in that.  So option A, we put it on the table and

21   said to the steering committee, here are all of the options,

22   including what hasn't worked in the past, here are some

23   other options that we've come up with to make it work with

24   resources we have at hand today.

25   Q    So after these three options were presented to the

Direct Examination by Mr. McCrea

1   Tracking Steering Committee, what did the Tracking Steering

2   Committee do in terms of next steps?

3   A     The steering committee approved option C, which was to,

4   without new dollars, new investment, move forward with the

5   three semester plan approach.  We had already done kind of a

6   proof of concept or a prototype of that option C.  That was

7   Sarah Thomas and her business analysts, myself and

8   Dr. Cleveland-Roberts, we partnered with those folks, we

9   piloted it, and that was the option that the

10  recommendation -- the steering committee said move forward

11  with that.

12  Q     What was the reaction expressed by Ms. DeBose to either

13  the three options or to option C?

14  A     That a three semester plan couldn't work, something

15  about the system, it wasn't designed -- there were claims

16  for reasons why that just didn't hold with the prototype

17  that we had built.  We put this concept together and it was

18  a working proof of concept.

19  Q     All right.  Had you and anyone else reached out to

20  advisors as opposed to just talking to Dr. Cleveland Alison

21  Roberts -- Alison Cleveland-Roberts --

22  A     Yes.

23  Q     -- about advisors' use or nonuse of the tracking tool?

24  A     We did.

25  Q     And did you do that in any systematic way?

1   A    We did.

2   Q    And what did you do?

3   A    We talked with the Advising leadership.  There were

4   almost a dozen Directors of Academic Advising across the

5   University of South Florida at the time.  We focused in on

6   a couple of colleges who were ambitious and really wanted to

7   make change in their areas.  We met with their academic

8   advisors.  When I say "we," it was myself, Sarah Thomas and

9   her business analysts.  Again, the business analyst role,

10  this is a professional role, it's what they do, going into

11  the field to understand how systems work and how people work

12  and then make systems work for people.

13          There's frameworks we use that are international

14  frameworks, like the Lean process, they call it a go and

15  seek, there's a lot of work in the business world and many

16  others, we drew from those analytic frameworks and

17  brought -- analyzed that and then synthesized it to say, out

18  of all of what we've heard, here are the recommendations,

19  which led to option C, and that was probably with a

20  half dozen, maybe more, frontline academic advisors whose

21  professional lives had been doing this for a decade or more

22  in some cases.

23  Q    Do you know whether or not Ms. DeBose was made aware of

24  the concerns that had been raised by the advisors about the

25  Tracking tool?

1    A     For years.

2    Q     All right.  And how do you know that?

3    A     Going back to 2011, as projector manager, from the time

4    I was the project manager for the Degree Audit

5    Implementation -- again, I was already the third project

6    manager.  I was asked by senior leadership to continue on as

7    the project manager for the Tracking project, which was sort

8    of the next evolution of the Degree Audit.

9              Tracking Steering Committee, the Council on

10   Academic Advising Leadership, I chaired that committee for

11   two years connected with my role in Undergraduate Studies.

12   Literally years of phone calls, e-mails, committees,

13   steering committee review.  There was in my mind no question

14   that the eight semester plan proposal, the way the system

15   worked, it could not work, and that was the feedback

16   directly from Academic Advising, not in my own words, that's

17   from them.

18   Q     But that feedback was given to the Registrar's Office?

19   A     For years, yes.

20   Q     And during the time that you were working on the

21   Tracking Steering Committee, did you encounter any

22   difficulties in working with Ms. DeBose?

23   A     Yes.

24   Q     What difficulties did you encounter?

25   A     Indirection, I would call it, in the beginning.  So we

WILLIAM TRAVIS THOMPSON - SEPTEMBER 20, 2018    215
Direct Examination by Mr. McCrea

1    would ask questions, there would be a -- the system wouldn't

2    work for our academic advisors.  There was a lot of pressure

3    involved in this project.  It was quite clear we needed to

4    make movement.  The advisors couldn't use the system.  They

5    would ask questions about why doesn't it work and they would

6    get responses that the system log says the process

7    completed.

8            So one of the requirements, for example, was to

9    take data out of one system, put it into the Tracking system

10   in a way that the advisors could use it, and it wasn't there

11   in a way that they could use it, and this is across 100

12   almost different professionals, universally it was not

13   working.

14           The responses we would get were continually of the

15   order, well, the system log says that that data was moved

16   over, and spoke nothing about the actual issue resolution

17   that would make a difference in having the system work for

18   the professionals at hand.

19   Q    All right.  If you would turn to tab 14.

20   A    Okay.

21   Q    Actually, I'm sorry, it should be an e-mail dated

22   April 11 of 2014.  Is that tab 14 or is that tab 7?

23   A    It may be tab 7.

24   Q    Okay.  My apologies.

25   A    That's okay.  Tab 7, April 14 -- or, I'm sorry,

WILLIAM TRAVIS THOMPSON - SEPTEMBER 20, 2018    216
Direct Examination by Mr. McCrea

1    April 11.

2    Q    Okay.

3              THE COURT:  All right.  Is that in evidence

4    already?

5              MR. MCCRAE:  Yes, Your Honor.

6              THE COURT:  Okay.

7              MR. MCCRAE:  I believe Ms. Thomas testified about

8    this.

9              COURTROOM DEPUTY:  That's correct.

10             THE COURT:  Okay.  Go ahead.

11   BY MR. MCCRAE:

12   Q    Were you aware of a disagreement that arose in the

13   spring or late spring of 2014 about whether or not the

14   advisors should be, quote, unquote, primary stakeholders?

15   A    Yes.

16   Q    And was it your view that the advisors should be

17   primary stakeholders?

18   A    Without question, yes.

19   Q    Why?

20   A    These are the people who would be spending upwards of

21   75 percent of their professional lives in the system.

22   There's research around the world that says you involve the

23   people that the system is for in building it, and they were

24   not consulted or a formal part of the process in saying what

25   worked and what didn't.  So this builds on, again, even the

WILLIAM TRAVIS THOMPSON - SEPTEMBER 20, 2018    217
Direct Examination by Mr. McCrea

1   analysis that was just seen with the calls around the State

2   University System, they were primary stakeholders there but

3   not for the University of South Florida.

4   Q    All right.  And this e-mail from Ms. Thomas says:  "I'm

5   not sure why she is resistant as she will be allowed to

6   reject any BRDs that are not feasible or that will

7   inadvertently impact the system."

8         Is that consistent with your experience, that

9   Ms. DeBose was resistant to allowing the advisors to be

10  primary stakeholders?

11  A    Yes.

12  Q    Did you see any problems with allowing them to be

13  primary stakeholders?

14  A    No.

15        My microphone fell off.  I'm sorry.  Can you still

16  hear me?

17        THE COURT:  Have you got it fixed back?  Actually,

18  you've got it in a good place.

19        THE WITNESS:  Okay.  Yes, Your Honor.  Thank you.

20        THE COURT:  Thank you.  All right.  Let's go,

21  Mr. McCrea.

22        MR. MCCRAE:  Yes, Your Honor.  Thank you.

23  BY MR. MCCRAE:

24  Q    Okay.  Could you turn to tab 18.

25  A    Okay.

 1   Q    And this is already in evidence.

 2            This was an e-mail that Ms. Thomas sent to

 3   Dr. Dosal.

 4            Everyone knows the limits of my technical

 5   abilities.

 6            You were not copied on this?

 7   A    No.

 8   Q    And you can see that this is an e-mail about the

 9   Tracking project sent by Ms. Thomas to Dr. Dosal on May 29

10   of 2014?

11   A    Yes.

12   Q    And she says, "Angela has refused to provide any

13   feedback on feasibility or any estimates."  Do you know

14   whether or not that was accurate?

15   A    It is accurate.

16   Q    And where it says, "It appears that she is deliberately

17   stalling this effort," did you -- do you think that's

18   accurate?

19   A    I do.

20   Q    All right.  And she says:  "From the conversations

21   I have had with you, I think she is trying to confuse you

22   with inaccurate or irrelevant information."

23            Did you have any discussions with Dr. Dosal that

24   led you to reach that conclusion?

25   A    Dr. Dosal, going back to when I was project manager, he

1  asked to meet with me weekly.  He was the primary executive

2  sponsor, whose oversight was critical for this project, his

3  responsibility.  He and I had regular ongoing conversations

4  back to 2011 about the status of the Degree Audit as well as

5  the Tracking Implementation.

6  Q    All right.  And then the next paragraph says:  "Travis,

7  Carrie and I have all seen a recent change in her

8  willingness to collaborate."  Is that accurate?

9  A    Yes.

10  Q    And is that something that you had discussed with

11  Ms. Thomas before she sent Dr. Dosal this e-mail?

12  A    Our -- yes.  Our charge was to collaborate with all of

13  our partners across the institution, to include the

14  Registrar's Office.  At this point we had been working on

15  that for years, we hadn't had progress.  This is a follow-on

16  to the -- so the other documents were presented to the

17  steering committee around May 14th.  This is two weeks

18  later.  The Tracking Steering Committee said to move forward

19  with option C.  One of the next steps to move forward was to

20  get an estimate from the Registrar's Office on the work, and

21  now, two weeks on, we hadn't seen anything.  All of that

22  feeds into not just -- so the recent change, I would say it

23  was a lack of willingness and a decline, in other words.

24  Q    All right.  And did you observe any lack of

25  collaboration or decline in collaboration other than the

WILLIAM TRAVIS THOMPSON - SEPTEMBER 20, 2018    220
Direct Examination by Mr. McCrea

1    failure to provide the requested information?
2    A    Ms. DeBose and I had been meeting for weeks for a
3    couple years at that point.  Even in the hallway she would
4    no longer acknowledge me, look at me.  I would say hi.  So
5    just even everyday interaction had changed.
6              This wasn't the only thing.  There were other
7    projects going on at the time as well that we were not
8    getting response from the Registrar's Office or from
9    Ms. DeBose on those.  So this is consistent with other
10   activities and a lack of collaboration, not just this one
11   project.
12   Q    And had you noticed a change before May 29 of 2014?
13   A    I would say that the lack of collaboration was
14   consistent, frankly, for years.  After the steering
15   committee said to move forward with option C, it was the
16   option that Ms. DeBose disagreed with, she had claims that
17   they wouldn't work, when we had already heard from the
18   academic advisors themselves, the people who would do this
19   work, they told us universally this will work, and in fact
20   the recommendation that went to the steering committee was
21   their recommendation for option C.  So once this began,
22   after the steering committee said move forward, that was a
23   marked decline, I would say, that began after that and would
24   be represented or noticed here by Sarah as well.
25   Q    Will you turn to Defendant's Exhibit Number 21, which

WILLIAM TRAVIS THOMPSON - SEPTEMBER 20, 2018    221
Direct Examination by Mr. McCrea

1   is already in evidence.

2   A    Okay.

3   Q    And you are not copied on this e-mail, but this is an

4   e-mail about three weeks later.  The last one was May 29.

5   This was June 20.  In this e-mail Sarah Thomas informs

6   Dr. Dosal that the Tracking Implementation project has a

7   high probability of failure.

8   A    Yes.

9   Q    At that point did you share that feeling?

10  A    I did.

11  Q    And she says:  "There continues to be a lack of

12  collaboration from certain participants."  Was that an

13  accurate statement?

14  A    Yes.

15  Q    Who was not collaborating?

16  A    Primarily Ms. DeBose.

17  Q    Was there anyone else?

18  A    No.

19  Q    And it says "unwillingness to meet and discuss."

20  A    Yes.

21  Q    Was that also your observation?

22  A    Yes.

23  Q    And who do you believe that was referring to?

24  A    Ms. DeBose.

25  Q    All right.  And where it says "not bringing issues to

1   light in a timely manner and the outward hostility towards

2   other team members," do you know who that referred to, based

3   on your observations?

4   A    Yes.

5   Q    Who?

6   A    Ms. DeBose.

7   Q    And who was Ms. DeBose manifesting outward hostility

8   toward?

9   A    Everyone who was not in her office, the best I could

10  tell, as well as even some folks within her office.

11  Q    All right.  Now, when you say, "I have discussed this

12  with other core team members and they are in agreement with

13  my assessment.  If there are changes to be made that can

14  make this project function more efficiently, I would

15  recommend this be put in place as soon as possible," did you

16  have -- as you read this, do you have any understanding of

17  what change was being referenced?

18  A    These -- my understanding would have been the changes

19  that were recommended to the Tracking Steering Committee

20  based on our analysis compared with other State University

21  System institutions.

22  Q    Where it says, "I have discussed this with other core

23  team members and they are in agreement with my assessment,"

24  I think you've already told us, you shared the assessment

25  that there was going to be a high probability of failure

1   unless something changed?

2   A    Yes.

3           THE COURT:  You better stop.  Let's stop there.

4   We'll pick it up on Monday.

5           Mr. Witness, just stay where you are.

6           Ladies and gentlemen of the jury, five minutes to

7   5:00.  I need you back -- you know I'm in other matters

8   tomorrow.  I need you back in your jury room Monday morning,

9   ten o'clock.

10          Have a good weekend.  Take care of yourselves.

11  I need all six of you back.

12          All rise for the jury.

13              *(Jury exits proceedings.)*

14          COURT SECURITY OFFICER:  Jury is out of the

15  courtroom, Your Honor.

16          THE COURT:  Mr. Witness, you're on the stand.

17          THE WITNESS:  Yes, ma'am.

18          THE COURT:  You cannot discuss your testimony with

19  anybody.  You can talk about weather, sports, time --

20  weather, sports, timetable for the case, but nothing about

21  the case --

22          THE WITNESS:  Yes, Your Honor.

23          THE COURT:  -- at all --

24          THE WITNESS:  Understood.

25          THE COURT:  -- with anybody, and you cannot let

```
1    anybody discuss it in your presence.
2              THE WITNESS:  Yes, Your Honor.
3              THE COURT:  Do you understand?
4              THE WITNESS:  I do.
5              THE COURT:  Okay.  Watch your step going down.
6    I need you back ten o'clock Monday morning by the courtroom
7    clock.
8              THE WITNESS:  Yes, Your Honor.
9              THE COURT:  Watch your step going down.
10             Mr. Bailiff, escort him out.
11             COURT SECURITY OFFICER:  Yes, Your Honor.
12                 (Travis Thompson exits proceedings.)
13             COURT SECURITY OFFICER:  The witness is out of the
14   courtroom, Your Honor.
15             THE COURT:  All right.  Fine.
16             Mr. McCrea.
17             MR. MCCRAE:  Yes, ma'am.
18             THE COURT:  Do you plan a full day of witnesses
19   for the Court on Monday?
20             MR. MCCRAE:  I do.
21             THE COURT:  All right.  That's all I need to know.
22   Whatever arrangements you've got with Ms. DeBose with regard
23   to telling her who is coming in in the morning, et cetera,
24   is fine with me.  Obviously this gentleman is coming back on
25   Monday morning.
```

```
 1            MR. MCCRAE:  I will do that probably by end of day
 2   tomorrow once I --
 3            THE COURT:  Once you make up your mind who is
 4   available and all that kind -- okay.
 5            MR. MCCRAE:  Right.
 6            THE COURT:  Okay.  That's fine.
 7            Any other matters -- oh, the timetable.  Oh.
 8            Ms. DeBose, the Clerk tells me that you may have
 9   forgotten to admit -- this was discussed before lunch --
10   your Exhibits 121, 123, 124 and 127.  There was no objection
11   by the defendant, but you haven't gotten them to the clerk.
12            COURTROOM DEPUTY:  I have the exhibits, they just
13   had not been admitted on the record.
14            THE COURT:  They haven't been admitted.  Do you
15   have any objection?
16            MR. MCCRAE:  I have no objection.  Those are ones
17   that needed to be redacted.  I think we're just waiting on
18   that process.
19            THE COURT:  Okay.  Likewise those two depositions.
20            MS. DEBOSE:  Yes.
21            THE COURT:  Likewise.  Okay.
22            MR. MCCRAE:  Judge, there was one other issue.
23   I hate to take the Court's time, but early in the case
24   I think we admitted Defendant's 2 or 3, and I think
25   Your Honor didn't hear me.  I think I probably wasn't
```

1    speaking into the microphone.  So I think we have the wrong

2    number on that document and I think the Clerk is aware of

3    the issue.

4              THE COURT:  Okay.  Which document is that?

5              COURTROOM DEPUTY:  Exhibit Number 3 is the one

6    that's truly admitted, but I think it was indicated --

7              MR. MCCRAE:  It's Defendant's 3, which I think

8    Your Honor heard me say as Defendant's 2, so Defendant's 3

9    was what I asked to admit.

10             THE COURT:  I've got to check my notes.

11             Okay.  We'll do that.

12             Anything else?

13             MS. DEBOSE:  Yes, I do have a matter, and I know

14   you've ruled, but I do believe that those documents

15   should --

16             THE COURT:  Speak up.

17             MS. DEBOSE:  I do, and I wish to make a motion to

18   strike those unauthenticated documents submitted by -- and

19   prepared by that witness, Travis Thompson.  They have no

20   date.  They are drafts.  I can assure you that I never

21   received them.  There's no trail, e-mail or anything showing

22   the distribution, who those documents went to.  There's just

23   no evidence whatsoever, it's just like here, here is this

24   thing I prepared.

25             THE COURT:  The witness was on the stand and he

1   authenticated them.  He prepared them and he authenticated

2   them.

3            MS. DEBOSE:  The witness testified and put words

4   into Ms. DeBose's mouth, stating I think she received them

5   and she said this.  There's no trail, there's no trail of

6   evidence to show that that document ever got distributed to

7   any member of the steering committee, nothing.  There is

8   no --

9            THE COURT:  Only his testimony based on his

10  preparation of it.  The Court has admitted it.  It's been

11  properly authenticated.  You can deal with that, if you

12  wish, on cross-examination, bearing in mind you're into

13  your -- you're into your summation time.

14           MS. DEBOSE:  I understand, Your Honor.

15           THE COURT:  You can check with the Clerk on how

16  much you've gotten into that summation time.

17           MS. DEBOSE:  Sure.

18           THE COURT:  It's up to you on how much time you

19  use on the examination of the witness.  That's up to you.

20  You can challenge that when he comes in on your Cross if you

21  choose to do so, okay?

22           MS. DEBOSE:  Thank you.

23           THE COURT:  All right.  That's it for the day.

24  Let's pack up.

25           Now, I've got other matters coming in here

1    tomorrow, folks, so you'll have to pack up your belongings

2    and get them out of here tonight, because criminal is coming

3    in here tomorrow?  Okay.

4            MR. MCCRAE:  We're getting them out of here,

5    Judge.

6            THE COURT:  Okay.  Thank you.

7                      - - - - -

8            (Proceedings adjourned at 4:59 p.m.)

9                      - - - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript

4    of proceedings taken in a jury trial in the United States

5    District Court is a true and accurate transcript of the

6    proceedings taken by me in machine shorthand and transcribed

7    by computer under my supervision, this the 15th day of

8    October, 2018.

9

10

11                                    /S/ DAVID J. COLLIER

12

13                              DAVID J. COLLIER

14                              OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25